TUCKER ELLIS LLP
David J. Steele - SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll - SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen - SBN 246364
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:	213.430.3400
Facsimile:	213.430.3409

Attorneys for Plaintiff,
FACEBOOK, INC. and INSTAGRAM, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC<br><br>Plaintiff,<br><br>v.<br><br>ONLINENIC INC., DOMAIN ID SHIELD SERVICE CO., LIMITED, and DOES 1-20<br><br>Defendants. | Case No. 5:19-CV-07071-SVK<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATUS REPORT AND SUPPORTING DECLARATION OF PERRY J. NARANCIC (Dkt. No. 55)**<br><br>No Hearing Set<br><br>Hon. Susan van Keulen<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

## I. INTRODUCTION

On November 11, 2020 this Court ordered Defendants OnlineNIC Inc. and Domain ID Shield Service Co., Limited ("Defendants") to: (i) search their production for any public documents and de-designate them as confidential; (ii) make a "robust, good faith effort to de-duplicate its production"; and (iii) file a status report supported by a declaration describing what Defendants did to comply with this order. Dkt. No. 54 ("Order"). Defendants were to complete all of the above tasks by December 15, 2020. Notwithstanding the representations in their Status Report (Dkt. No. 55), Defendants have not fully complied with either the letter or spirt of the Court's Order. In addition, Defendants have used this Court's Order to redact and filter relevant and responsive information from the electronic documents and data produced in response to the Order.

Plaintiffs have spent many hours meeting and conferring with Defendants regarding records produced partially, with defective metadata, and incomplete information. It has been a substantial undertaking which, rather than be productive, has only served as further evidence of Defendants' obfuscation and game of eliding its discovery obligations under the Federal Rules to frustrate Plaintiffs' prosecution of its case. Accordingly, Plaintiffs request that the Court appoint a Special Discovery Master, at Defendants' expense, to ensure the Defendants' full and complete compliance with the Order and their discovery obligations.

## II. DEFENDANTS' HAVE USED THE COURT'S DEDUPLICATION ORDER TO CULL RELEVANT AND RESPONSIVE SUPPORT TICKETS FROM ITS MOST RECENT ELECTRONIC PRODUCTION

### A. Defendants Have Systematically Delayed Plaintiffs' Efforts to Obtain Documents Establishing Their Unlawful Conduct

The present dispute dates back to Plaintiffs' First Request for Production of Documents that was served on March 20, 2020. Declaration of David J. Steele ("Steele Decl.") ¶ 2 & Exs. 1-2. As is typical in cases involving a large number of documents, Defendants requested, and Plaintiffs granted, several extensions of time in which to serve their written responses and produce their responsive documents. Ultimately, the deadline for Defendants' responses was set at May 11, 2020. *Id.* ¶ 3 & Ex. 3. Seemingly undeterred by this deadline, or the resulting waiver that accompanied their failure to respond in a timely

manner, May 11th came and went without Defendants serving their written responses or requesting a further extension. Defendants eventually served their written responses and completed their initial production of documents on June 9, 2020. *Id.* ¶ 4.

Unsatisfied with both Defendants' responses and the documents that they produced, Plaintiffs sent Defendants a comprehensive letter listing the deficiencies and requesting a meet and confer telephone conference. *Id.* ¶ 5 & Ex. 4. The meet and confer conference took place over a five days and ultimately concluded on July 15, 2020. *Id.* ¶ 6. To address Plaintiffs' concerns, Defendants agreed to provide supplemental written responses and to make a supplemental production of documents on or before July 21, 2020. *Id.* ¶ 6 & Ex. 5. Defendants, however, did not meet this deadline and instead provided the supplemental production on July 25, 2020 and provided written responses to Plaintiffs on August 19, 2020. *Id.* ¶ 7.

By agreement of the parties, Defendants' supplemental production was to have two separate electronic components. In response to sixteen of Plaintiffs' requests[1], Defendants agreed to produce native database files exported from a database containing information regarding their customers and their domain names (the "Registration Database"). *Id* ¶ 8. The balance of Defendants' responsive documents, including but not limited to emails, support tickets, financial records, corporate formation documents, contracts, agreements and pleadings from prior litigation and enforcement proceedings, were to be produced as TIFF files along with an image load file that was compatible with Plaintiff's Relativity e-Discovery platform ("Relativity Documents"). *Id.* ¶ 8. Defendants, however, did not produce the Relativity Documents as promised. Rather, Defendants produced all of these materials, including over 160,000 pages of support tickets as **PDFs** and without the metadata and load files as required by the Court's ESI Order, making review, tagging, searching, and making sense of the documents extremely onerous. *Id.*

---

[1] In response to Request for Production Nos. 1-13, 15-16 and 127, OnlineNIC stated that native database files containing responsive information for its Registration Database were produced.

When questioned about the discrepancy, Defendants' counsel explained that his client's e-Discovery vendor was a "high-end outfit" and the vendor told him:

> For productions produced in PDF format, load files are not necessary and not provided, as they serve to link opt text and certain metadata, which are not provided with PDFs. The cross-reference should provide everything they need.

*Id.* ¶ 9 & Ex. 6.

After several days of discussions about the requirements of the ESI Order, Defendants' counsel agreed to re-produce the Relativity Documents as TIFFs and with the load file as required by the Court's ESI Order. *Id.* ¶ 10. On August 5, 2020 Defendants supplied Plaintiffs with the re-produced Relativity Documents and on August 20, 2020 Defendants supplemented their initial production for the fourth time. *Id.* ¶ 11 & Ex. 8. What Plaintiffs did not appreciate at that time, was that Defendants had combined *hundreds* of separate support tickets and emails into single PDFs. *Id.* ¶ 12. In doing so, Defendants had created and produced over 1,000 PDFs that *each* had unreasonably large file sizes. *Id.* For example, ONLINENIC018278 is 1.3GB in size. *Id.* This was a significant violation of the ESI Order because the document viewers included with most e-Discovery tools, including the Relativity platform that Plaintiffs are using, cannot accommodate files of that size. So while large documents can be readily managed by these tools when produced as TIFFs (because each page is a separate file), documents produced as large PDFs must be individually downloaded and opened with a separate application, a process that takes extensive time when files are gigabytes in size. That process is cumbersome and time consuming, especially when trying to review 30,000 documents efficiently. Additionally, Defendants' final supplemental production also contained countless duplicate records. *Id.* ¶¶ 13-14.

All of the above, including the duplicate records, coupled with the mass and indiscriminate confidentiality designations and production of thousands of duplicate emails and support tickets is what led to the hearing on November 10th at which Defendants were ordered to de-duplicate their production. Many of the duplicate documents were contained in the 160,671 pages of support tickets that Defendants

produced in 103 PDFs.[2] Instead of reproducing the de-duplicated support tickets in the format required by the ESI Order, Defendants elected to produce native files from the database in which Defendants' support tickets are maintained ("Support Ticket Database"). *Id.* ¶ 15. Unlike the Relativity Documents, the native files comprising the Support Ticket Database were processed directly by Defendants in China and not their discovery vendor BlackStone Discovery. *Id.*

However, rather than produce the database files that contained the relevant support tickets, Defendants have used this Court's order to selectively remove and filter relevant and responsive information from its production.

### B. Defendants' Have Engaged In Intentional and Selective Production of Their Electronic Database Files

Defendants' initial production of the Support Ticket Database contained 37,840 records that were associated with 20,615 distinct support tickets. There was only one table in the entire database, and each record contained only seven data fields.[3]

```
OnlineNIC - Tickets working - 2020-11-30.kayako_searchterms
  id : int(11)
  ticketid : varchar(255)
  from_email : varchar(255)
  to_email : varchar(255)
  subject : varchar(255)
  content : longtext
  dateline : varchar(255)
```

*Id.* ¶ 16.

After spending several days reviewing the contents of Defendants' initial production, it was clear that Defendants had redacted many of the database fields and tables from the source files. *Id.* ¶ 17. In

---

[2] Some of these support ticket files contained thousands of support tickets, many of which were duplicates. In addition, Defendants produced these PDF files without the metadata required by the ESI Order and organized the documents in each file without page breaks such that one document ends on the same page that the following document begins. See Paragraph 12 of the Declaration of David Steele previously filed with this Court (Dkt. No. 52-1).

[3] The table was labeled *kayako_searchterms*. Kayako is a customer service software company based in London, United Kingdom. Kayako builds customer service and helpdesk software.

addition, after comparing the support tickets in the Relativity Documents with the support tickets in the Support Ticket Database, it was also clear that Defendants had filtered relevant and responsive support tickets from their production. *Id.* For example, in the Relativity Documents, Support Ticket No. SNO-1516186 was twelve pages in length and contained fourteen separate posts and approximately 2,495 words. *Id.* In contrast, that same support ticket in Defendants' initial production of the Support Ticket Database contained only two posts and 136 words. *Id.* Moreover, no index tables were produced, and the single table lacked the OnlineNIC customer ID field. Plaintiffs immediately raised this issue with Defendants' counsel, and after conferring with his client, Defendants agreed to make a supplemental production that would include all of the tables and files associated with the Support Ticket Database. *Id.* ¶ 18 & Exs. 9-10.

Defendants re-produced Support Ticket Database on December 15, 2020 (its third attempt at production), and that database was significantly larger and more complex than Defendants' prior production. *Id.* ¶ 19. There were 77,168 support ticket posts in the Supplemental Production, which was over twice as many as in the Initial Database. *Id.* In addition, each support ticket is stored across separate database tables with a combined sixty-nine fields of data, as compared to the seven fields in one table in Defendants' initial production. *Id.* Finally, the supplemental production contained 134 more database tables than did the initial production. *Id.* However, as has become all too common a theme in this case, during their review of Defendants' production over the past two weeks, Plaintiffs have discovered that Defendants' representations regarding the completeness of their production were false. *Id.* ¶ 20.

In response to several document requests for information related to the domain names listed in Plaintiffs' complaint, the individuals or entities associated with those domain names, and any other domain name associated with those individuals or entities, Defendants stated that they had searched their Support Ticket Database and produced all responsive documents. And one such individual covered by Defendants' response is one of OnlineNIC's more prolific customers, REDACTED *Id.* ¶ 21. Defendants' latest production did contain twenty-three support ticket posts related to REDACTED. However, Plaintiffs have discovered that there are ***171 more support tickets*** related to REDACTED that Defendants did not produce. *Id.* ¶ 22. By cross-referencing two of the previously unproduced index tables in the Support Ticket Database, *swticketword* and *swticketpostindex*, Plaintiffs

have been able to identify that these 171 support ticket posts are related to [REDACTED] and were removed or not selected from the Support Ticket Database before Defendants produced it.[4] *Id.*

It is also apparent from the review of original PDFs and the additional database tables produced that many of the support tickets are comprised of attached files. For example, the Support Ticket Database contains a tabled named ***hasattachments*** (the stored values are 0 and 1; and 4,388 rows (tickets) have a value of 1). *Id.* ¶ 23. Additionally, the database contains a table named ***swattachments*** that appears to store both the file type and location of the attached file on the database server's file system. *Id.* However, no attachments files were produced in any of Defendants' productions. *Id.*

And no matter what Defendants' excuse of the day will be, the unfortunate reality is these issues are not isolated incidents or occurrences. For the past eight months, Defendants have been selectively producing relevant and responsive documents and hiding relevant information in virtual boxes of irrelevant or duplicative documents in an effort to thwart Plaintiffs' legitimate discovery efforts. And it would be naïve to believe that having been caught with their hand in the cookie jar, Defendants will now honor their discovery obligations going forward.[5] *Id.* ¶ 24. This is especially true for defendant OnlineNIC as it has been previously sanctioned for this same behavior. *See Verizon California Inc. et al. v. OnlineNIC, Inc.* United State District Court for the Northern District of California, Case No. C 08-2832 JF(RS), *Order Granting In Part And Denying In Part Motions For Contempt Sanctions And For Relief From Judgment* (Dkt. No. 136) (holding OnlineNIC in civil contempt finding by clear and convincing evidence that, after being ordered to produce certain documents, OnlineNIC produced "a selective subset of data."). *Id.* ¶ 25.

**C.    Appointment of a Special Master is Authorized and Warranted**

Under FED. R. CIV. P. 53(a)(l)(C) ("Rule 53"), a district court may appoint a special master to

---

[4] Given that all of these ticket posts contain direct links to either this Customer, his/her OnlineNIC User ID "[REDACTED]" or his pseudonym, "[REDACTED]" there should be little doubt that Defendants failure to produce these index tables in their initial database production was in furtherance of their plan and scheme to withhold production of response and relevant discovery materials.

[5] Plaintiffs' counsel do not believe that Defendants' counsel has directly participated in Defendants' improper conduct. Plaintiffs recognize that Mr. Narancic's abilities to control his clients are somewhat limited, and that the discovery at issue requires significant technical knowhow to extract from Defendants' systems and produce.

7
PLAINTIFFS' RESPONSE TO DEFENDANTS' STATUS REPORT
Case No. 19-cv-07071-SVK

"address pre-trial and post-trial matters that cannot be addressed effectively or timely by an available district judge or a magistrate judge of the district." At the discretion of the Court, a special master can be appointed "to aid [the] judge in the performance of specific judicial duties, as they may arise in the progress of a cause." *Civil Aeronautics Bd. v. Carefree Travel, Inc.*, 513 F.2d 375, 382 (2d Cir. 1975) (quoting *Ex Parte Peterson,* 253 U.S. 300, 312 (1920) and citing *LaBuy v. Howes Leather Co.*, 352 U.S. at 256)); *see also Barnard-Curtiss Co. v. Maehl*, 117 F.2d 7, 11 (9th Cir. 1941) ("Whether a reference in such an action shall be made is largely within the discretion of the trial court"). In addition to their express authority under Rule 53, district courts also have inherent power to appoint special masters. *See Peterson*, 253 U.S. at 312; *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1566 (Fed. Cir. 1988); *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982) ("Federal courts have the inherent power to appoint persons unconnected with the court to aid judges in the performance of specific duties.").

Defendants' repeated selective and deliberately limited disclosure of their database files in this case, along with their being sanctioned for similar discovery misconduct in the past justifies the appointment of a special master to ensure full and complete production of its databases at Defendants' expense. In *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 560-64 (N.D. Cal. 1987), the Court appointed a special master at the expense of the party that was abusing the discovery process. Specifically, the party sanctioned failed to comply with their discovery obligations which included failing to "divulge information and produce documents." The Court explained that the use of special masters in certain pretrial and discovery proceedings has been upheld. *In re Armco, Inc.*, 770 F.2d 103 (8th Cir.1985). In *Armco* the special master was given "broad authority to supervise and conduct pretrial matters, including discovery activity, the production and arrangement of exhibits and stipulations of fact, the power to hear motions for summary judgment or dismissal and to make recommendations with respect thereto." *Id.* at 105. Numerous other cases have approved the appointment of special masters where parties have failed to comply with court orders, displayed intransigence in the litigation, or required close supervision. *See Ruiz v. Estelle*, 679 F.2d 1115, 1159-63 (5th Cir.), *modified on other grounds*, 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042 (1983); *Gary W. v. Louisiana*, 601 F.2d 240, 244-45 (5th Cir. 1979). The Court explained that discovery is an area where special masters are frequently appointed either because the problems are complicated or the parties are recalcitrant. *See United States v. American Tel. &*

*Tel. Co.*, 461 F. Supp. 1314, 1348-49 (D.D.C. 1978); *Fisher v. Harris, Upham & Co.*, 61 F.R.D. 447, 449 (S.D.N.Y. 1973), *appeal dismissed mem.*, 516 F.2d 896 (2d Cir. 1975).

### III.   CONCLUSION

In the spirit of what they thought was mutual cooperation and collegiality and in an attempt to avoid bringing premature issues to the Court, Plaintiffs have spent the past eight months accepting and attempting to conference with Defendants' about their slow and incomplete response to Plaintiffs' initial requests for production of documents only to find out that Defendants were involved in a carefully orchestrated ruse to delay, obfuscate and conceal. Having now been found out, Defendants must account for their duplicity.  Plaintiffs therefore request that this Court appoint a special master, at Defendants' sole expense, to oversee their compliance with all of their discovery and pre-trial obligations.

DATED: January 5, 2021                                       TUCKER ELLIS LLP


By: /s/David J. Steele
    David J. Steele
    Howard A. Kroll
    Steven E. Lauridsen

    Attorneys for Plaintiffs,
    FACEBOOK, INC. and INSTAGRAM, LLC

    Platform Enforcement and Litigation
    Facebook, Inc.
      Jessica Romero
      Stacy Chen
      Olivia Gonzalez