TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:     213.430.3400
Facsimile:     213.430.3409

DAVIS POLK & WARDWELL LLP
Ashok Ramani SBN 200020
ashok.ramani@davispolk.com
Micah G. Block SBN 270712
micah.block@davispolk.com
Cristina M. Rincon (*Pro Hac Vice*)
Cristina.rincon@davispolk.com
1600 El Camino Real
Menlo Park, CA 94025
Telephone:   650.752.2000
Facsimile:   650.752.2111

Attorneys for Plaintiffs,
FACEBOOK, INC. and INSTAGRAM, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ONLINENIC INC.; DOMAIN ID SHIELD SERVICE CO., LIMITED; and XIAMEN 35.COM INTERNET TECHNOLOGY CO., LTD.,<br><br>Defendants. | Case No. 5:19-cv-07071-SVK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO STRIKE DEFENDANTS' ANSWER AND FOR DEFAULT JUDGMENT AGAINST DEFENDANTS ONLINENIC AND DOMAIN ID SHIELD PURSUANT TO FED. R. CIV. P. 37 AND THE INHERENT POWER OF THE COURT;**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br><br>DATE: August 17, 2021<br>TIME: 10:00 a.m.<br>CTRM: 6 – 4th Floor<br><br>Hon. Susan van Keulen |

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on August 17, 2021 at 10:00 a.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Susan van Keulen of the United States District Court for the Northern District of California, located at 280 South 1st Street, Courtroom 6 – 4th Floor, San Jose, California 95113, Plaintiffs Facebook, Inc. and Instagram LLC ("Plaintiffs") will and hereby do move for an order to strike Defendants' Answer and for default judgment against Defendants OnlineNIC Inc. and Domain ID Shield Service Co., Ltd. (collectively, "Defendants") in the amount of $3,500,000, and for attorneys' fees in the amount of $2,057,782.17, the costs of the action, the costs of the Special Master in the amount of $88,937, and for a permanent injunction.

This motion is made pursuant to Rule 37 of the Federal Rules of Civil Procedure and the inherent power of the Court due to Defendants' intentional spoliation of electronically stored evidence and intentional violation of the Court's order appointing the Special Master. This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in Support of the Motion, the report by the Special Master (ECF No. 115), the Declaration of David J. Steele, the [Proposed] Order, the [Proposed] Default Judgment, any oral argument heard by the Court, such additional evidence as may be submitted to the Court, matters as to which the Court may take judicial notice, and such other matters as the Court deems proper.

1

DATED: July 13, 2021                        Tucker Ellis LLP

2

3

4                                          By:  /s/David J. Steele
                                                David J. Steele
5                                               Howard A. Kroll
                                                Steven E. Lauridsen
6

7                                          Davis Polk & Wardwell, LLP
                                                Ashok Ramani
8                                               Micah G. Block
                                                Cristina M. Rincon
9

10                                              Attorneys for Plaintiffs,
                                                FACEBOOK, INC. and INSTAGRAM, LLC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO STRIKE AND FOR DEFAULT JUDGMENT
Case No. 5:19-cv-07071-SVK

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1

TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS .......................................................................... 2

    **A.**   Background ...................................................................................... 2

        1.   The parties ................................................................................ 2

        2.   The nature of the claims ......................................................... 3

        3.   The appointment of the Special Master ................................. 4

    **B.**   The Special Master's findings in the Report ................................. 5

    **C.**   OnlineNIC's conduct in this action mirrors its conduct in a prior action
that resulted in a finding of contempt for discovery abuses. ......................... 6

III.  DEFENDANTS' MISCONDUCT REQUIRES TERMINATING SANCTIONS ............ 6

    **A.**   Terminating sanctions are proper under Rule 37(e)(2)(C) ............................. 7

        1.   Defendants intentionally deleted information important to
Plaintiffs' case ................................................................................... 9

        2.   Lesser sanctions cannot remedy the irreparable harm to Plaintiffs ... 10

    **B.**   Terminating sanctions are proper under Rule 37(b)(2)(A)(vi) .................... 11

        1.   Plaintiffs have been irreparably prejudiced by Defendants' data
destruction ................................................................................... 13

        2.   Defendants were willful, at fault, and acted in bad faith in
violating the Court's Order regarding the Special Master. ................. 13

        3.   The remaining *Anheuser-Busch* factors ............................................ 14

        4.   Terminating sanctions would not violate due process ...................... 16

    **C.**   Terminating sanctions are proper under Rule 37(c)(1)(C) ........................ 16

IV.   ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANTS IS
WARRANTED ........................................................................................ 17

V.    PLAINTIFFS SHOULD RECEIVE STATUTORY DAMAGES OF $100,000 PER
DOMAIN NAME FOR DEFENDANTS' VIOLATIONS OF THE ACPA ................. 18

    **A.**   Determining statutory damages ................................................... 18

T̲U̲C̲K̲E̲R̲ E̲L̲L̲I̲S̲ LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

**B.** Egregiousness of Defendants' conduct ............................................................ 18

**C.** Defendants use false identities and proxy services to hide cybersquatting activities ............................................................................................................ 19

**D.** Defendants' pattern of unlawful cybersquatting against famous marks ........ 20

**E.** Contempt for the Court and judicial proceedings .......................................... 21

**F.** Defendants and other cybersquatters must be deterred from future cybersquatting .............................................................................................. 21

VI.  PLAINTIFFS SHOULD RECEIVE INJUNCTIVE RELIEF. ........................................... 22

VII. PLAINTIFFS SHOULD RECEIVE THEIR ATTORNEYS' FEES ................................. 24

VIII. DEFENDANTS SHOULD PAY THE SPECIAL MASTER'S COSTS ENTIRELY ..... 24

IX.  CONCLUSION ................................................................................................. 25

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors*,
   69 F.3d 337 (9th Cir. 1995) ............................................................................................... passim

*Aztar Corp. v. MGM Casino*,
   No. NO. 00- 833-A, 2001 WL 939070, at *7 (E.D. Va. 2001) ........................................... 19

*Bellagio v. Denhammer*,
   No. CV-S-00-1475-RLH-PAL, 2001 WL 34036599 (D. Nev. Jul. 10, 2001) ..................... 22

*Century 21 Real Estate Corp. v. Sandlin*,
   846 F.2d 1175 (9th Cir. 1988) ............................................................................................. 22

*Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*,
   2020 WL 5199434, at *9 (N.D. Cal. Aug. 17, 2020) ........................................................... 23

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
   259 F.3d 1186 (9th Cir. 2001) ............................................................................................. 18

*Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*,
   133 F.R.D. 166 (D. Colo. 1990) ...................................................................................... 11, 13

*Coyne v. Los Alamos Nat'l Sec.*, LLC,
   2017 WL 3225466, at *10 (D.N.M. May 1, 2017) .............................................................. 11

*Craigslist, Inc. v. RealWorks Group LLC*,
   No. C 08–05072 JW, 2009 WL 10692489, at *5 (N.D. Cal. Oct. 29, 2009)....................... 22

*CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*,
   2017 WL 2298473, at *5 (S.D. Cal. May 26, 2017)............................................................. 15

*Diller v. Barry Driller, Inc.*,
   No. CV 12-7200 ABC EX, 2012 WL 4044732, at *10 (C.D. Cal. Sept. 10, 2012) ............ 23

*E. & J. Gallo Winery v. Spider Webs, Ltd.*,
   286 F.3d 270 (5th Cir. 2002) ............................................................................................... 22

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006)............................................................................................................. 23

*Elecs. Boutique Holdings Corp. v. Zuccarini*,
   No. CIV. A. 00-4055, 2000 WL 1622760, at *9 (E.D. Pa. 2000) ................................. 18, 20

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
   344 U.S. 228 (1952).............................................................................................................. 22

*FASA Corp. v. Playmates Toys, Inc.*,
   108 F.3d 140 (7th Cir. 1997) ............................................................................................... 24

*First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*,
   2016 WL 5870218, at *3 (N.D. Cal. Oct. 7, 2016)............................................................... 7

*Graduate Mgmt. Admission Council v. Raju*,

267 F. Supp. 2d 505 (E.D. Va. 2003) ................................................................................ 18

*Internet Specialties W., Inc. v. Milon-Digiorgio Enters.*,
559 F.3d 985 (9th Cir. 2009) ......................................................................................... 23

*Jackson v. Sturkie*,
255 F. Supp. 2d 1096 (N.D. Cal. 2003) ......................................................................... 23

*Kiva Kitchen & Bath*,
319 F. App'x 316 (5th Cir. 2009) .................................................................................. 22

*Lahoti v. Vericheck, Inc.*,
No. C06-1132JLR, 2007 WL 4269791, at *14 (W.D. Wash. Dec. 3, 2007) ............... 20, 21

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006) .................................................................................. passim

*Leon v. IDX Systems Corp.*,
2004 WL 5571412, at *5 (W.D. Wash. Sept. 30, 2004), *aff'd*, 464 F.3d 951 (9th Cir. 2006) ............. 11

*Lifted Research Group, Inc. v. Salem*,
2009 WL 1371416 at *1 (N.D. Cal. May 15, 2009) ...................................................... 23

*Malone v. United States Postal Service*,
833 F.2d 128 n. 2 (9th Cir. 1987) ............................................................................. 15, 16

*Mirage Resorts, Inc. v. Cybercom Prods.*,
228 F. Supp. 2d 1141 (D. Nev. 2002) ............................................................................ 19

*OmniGen Rsch. v. Yongqiang Wang*,
321 F.R.D. 367 (D. Or. 2017) .................................................................................. 11, 13

*Opticians Ass'n of Am. v. Independent Opticians of Am.*,
920 F.2d 187 (3d Cir. 1990) .......................................................................................... 23

*Padgett v. City of Monte Sereno*,
2007 WL 878575, at *3 (N.D. Cal. Mar. 20, 2007) ....................................................... 14

*PepsiCo., Inc. v. California Security Cans*,
238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ............................................................... 23

*Pinehurst, Inc. v. Wick*,
256 F. Supp. 2d 424 (M.D.N.C. 2003) .......................................................................... 22

*Porter v. City & Cty. of San Francisco*,
2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018) ..................................................... 7, 8

*Snap Lock Industries, Inc. v. Swisstrax Corp.*,
No. 2:17-cv-02742-RFB-BNW, 2021 WL 864054 at *2 (D. Nev. March 5, 2021) ............ 10

*Stephen W. Boney, Inc. v. Boney Services, Inc.*,
127 F.3d 821 (9th Cir. 1997) ......................................................................................... 24

*TeleVideo Sys., Inc. v. Heidenthal*,
826 F.2d 915 (9th Cir. 1987) ......................................................................................... 17

*United States v. Kitsap Physicians Serv.*,
314 F.3d 995 (9th Cir.  2002) ........................................................................................ 13

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

iv

*Valley Engineers Inc. v. Elec. Eng'g Co.*,
  158 F.3d 1051 (9th Cir. 1998) ................................................................. passim

*Verizon California Inc. v. Lead Networks Domains Private Limited*,
  No. CV 09-613-ABC, 2009 WL 10700112 at *9 (C.D.Cal. Feb. 17, 2009) ........................ 2

*Verizon California Inc. v. OnlineNIC, Inc.*,
  No. C 08-2832 JF (RS), 2009 WL 2706393 at *1 (N.D. Cal. August 25, 2009)..................... 2

*Verizon California Inc. v. OnlineNIC, Inc.*,
  647 F. Supp. 2d 1110 (N.D. Cal. 2009) ................................................... 6, 21

*Verizon California Inc., et al. v. Navigation Catalyst Systems, Inc.*,
  568 F. Supp. 2d 1088, 1096 (C.D. Cal. 2008) ............................................... 19

*Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*,
  No. 4:19-cv-01424-YGR, 2021 WL 254448, at *14 n.16 (N.D. Cal. Jan. 26, 2021)............... 23

*WeRide Corp. v. Kun Huang*,
  No. 5:18-CV-07233-EJD, 2020 WL 1967209, at *11 (N.D. Cal. Apr. 24, 2020)............ 1, 7, 10, 11

*Wyle v. R.J. Reynolds Indus., Inc.*,
  709 F.2d 585 (9th Cir. 1983) ......................................................... 12, 13, 16

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001) ...................... 16

**Statutes**

15 U.S.C Section 1125(d)(a)(D) ............................................................... 3

15 U.S.C. § 1117(a) ........................................................................ 24

15 U.S.C. § 1117(d) ........................................................................ 18

15 U.S.C. § 1117(e) ........................................................................ 19

15 U.S.C. § 1125(c) ........................................................................ 17

15 U.S.C. § 1125(d)(1)(A) ................................................................... 3

15 U.S.C. § 1125(d)(1)(D) ................................................................... 3

15 U.S.C. § 1125(d)(1)(E) ................................................................... 3

15 U.S.C. §§ 1114(1) ...................................................................... 17

15 U.S.C. §1116(a) ..................................................................... 22, 23

Fed. R. Civ. P. 26(e) ...................................................................... 16

Fed. R. Civ. P. 26(e)(1)(A) ................................................................ 16

Fed. R. Civ. P. 37 ..................................................................... 1, 10

Fed. R. Civ. P. 37(b) ...................................................................... 15

Fed. R. Civ. P. 37(b)(2)(A)(vi) ............................................................. 7

Fed. R. Civ. P. 37(c)(1) ................................................................... 16

Fed. R. Civ. P. 37(c)(1)(C) ............................................................. 7, 16

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Fed. R. Civ. P. 37(e) ................................................................................................ 7, 10

Fed. R. Civ. P. 37(e)(2) .......................................................................................... 8, 9, 10

Fed. R. Civ. P. 37(e)(2)(C) ................................................................................... 7, 9, 16

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

MOTION TO STRIKE AND FOR DEFAULT JUDGMENT
Case No. 5:19-cv-07071-SVK

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The Special Master appointed in this case has found that Defendants OnlineNIC, Inc. ("OnlineNIC") and Domain ID Shield Service Company, Ltd. ("ID Shield") (collectively, "Defendants") have intentionally destroyed and obfuscated key evidence, failed to preserve and produce responsive ESI, and disobeyed the Court's order appointing the Special Master. Special Discovery Master's Data Destroyed Or Withheld Report ("Report") at 39-40 (ECF No. 115).   Such conduct merits terminating sanctions.

Defendants' "outrageous" destruction of responsive data was widespread. *Id.* at 39.  "Defendants deleted over one-half (52.35%) of the ticket-related database records (11,059,388 records). Of these deleted records, Special Master estimates 30% of those records . . . or 3,317,816 records, were responsive." *Id.* at 2-3. And, with respect to the most responsive electronically stored information ("ESI"), "Defendants deleted 76.7% of all [ticket] attachments." *Id.* at 39. Furthermore, "Defendants' conduct was consistent and continuous. Defendants began deleting data before the complaint was filed, continued deleting responsive records during the discovery process, and even after Special Master's appointment." *Id.*

Defendants' intentional and targeted destruction of vast amounts of discoverable database records has prejudiced Plaintiffs Facebook, Inc. ("Facebook") and Instagram, LLC, ("Instagram") (collectively, "Plaintiffs") by spoliating documents crucial to Plaintiffs' case in chief. These records would have been highly relevant to Plaintiffs' claims. The Special Master concluded that "Plaintiffs suffered irreparable harm" and "will continue to suffer harm." *Id.* at 40-41. Courts hold that lesser sanctions are inappropriate in the face of mass spoliation, because it is "futile" to exclude spoliated evidence, and an adverse inference is not sufficient if the plaintiff is helpless to rebut evidence that may overcome the inference. *WeRide Corp. v. Kun Huang*, No. 5:18-CV-07233-EJD, 2020 WL 1967209, at *11 (N.D. Cal. Apr. 24, 2020).

Because nothing short of terminating sanctions can adequately cure the prejudice resulting from Defendants' discovery abuses, Plaintiffs move pursuant to Fed. R. Civ. P. 37 to strike Defendants' Answer and for a default judgment due to Defendants' failure to preserve and their intentional spoliation of ESI. Specifically, Plaintiffs seek a default judgment against Defendants for $3.5 million (reflecting the maximum statutory damages award of $100,000 for each of the 35 infringing domain names), Plaintiffs'

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1  reasonable attorneys' fees ($2,057,782.17), costs of the Special Master ($88,937), costs of the action and

2  a permanent injunction.

3  **II.    STATEMENT OF FACTS**

4  **A.    Background**

5  **1.    The parties**

6      Facebook offers a social networking website and mobile application that enables its users to create

7  their own personal profiles and connect with each other on their personal computers and mobile devices.

8  Second Amended Complaint ("SAC") (ECF. No. 109) ¶ 18. Instagram offers a photo and video sharing

9  and editing service, mobile application, and social network. Instagram users can choose to share their

10  photos and videos with their followers online. *Id.* ¶ 22. Plaintiffs own the famous and distinctive

11  trademarks FACEBOOK and INSTAGRAM (collectively, "Plaintiffs' Marks"). *Id.* ¶¶ 19-21, 23-25.

12      OnlineNIC is an ICANN accredited registrar[1] that sells, registers and transfers domain names for

13  third parties. *Id.* ¶¶ 9, 26. ID Shield provides a proxy service for OnlineNIC's customers.[2] ID Shield

14  registers domain names, as the registrant, and licenses those domain names to OnlineNIC's customers. *Id.*

15  ¶¶ 10, 27-28. ID Shield (a) has no employees, (b) has no assets, (c) does not control its own operations

16  (which are entirely controlled by OnlineNIC), (d) does not conduct regular (or any) shareholder meetings

17  and (e) has its expenses paid by OnlineNIC. *Id.* ¶¶ 30-43. Furthermore, an officer of OnlineNIC holds

18  shares of ID Shield "for the benefit of OnlineNIC." *Id.* ¶ 39. In 2009, OnlineNIC was found liable for

19  cybersquatting resulting in a judgment of $33,150,000 in damages to Verizon. *Verizon California Inc. v.*

20  *OnlineNIC, Inc.,* No. C 08-2832 JF (RS), 2009 WL 2706393 at *1 (N.D. Cal. August 25, 2009) (Judge

21  Fogel awarded $50,000 per domain name as statutory damages).

22

---

23  [1] ICANN refers to the Internet Corporation for Assigned Names and Numbers. ICANN accredits domain

24  name registrars, including OnlineNIC, to register internet domain names. OnlineNIC is "in a position of
trust by ICANN as well as the Internet community." *See Verizon California Inc. v. Lead Networks*

25  *Domains Private Limited*, No. CV 09-613-ABC, 2009 WL 10700112 at *9 (C.D.Cal. Feb. 17, 2009).

26  [2] A "'Proxy Service' is a service through which a Registered Name Holder licenses use of a Registered

27  Name to the . . . Customer in order to provide the . . . Customer use of the domain name, and the Registered
Name Holder's contact information is displayed in the Registration Data Service (Whois) or equivalent

28  services rather than the . . . Customer's contact information." ECF No. 109-4, at p. 59 (ICANN's 2013
Registrar Accreditation Agreement ("RAA"), "Specification On Privacy And Proxy Registrations § 1.3).

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

## 2.     The nature of the claims

Plaintiffs sued Defendants for cybersquatting under the Anti-Cybersquatting Consumer Protection Act ("ACPA"),[3] trademark infringement, false designation of origin and dilution. In this action, two independent bases give rise to Defendants' liability under the ACPA for cybersquatting. First, ID Shield registered (as the registrant) at least 35 domain names identified in the SAC that are identical or confusingly similar to Plaintiffs' Marks with a bad faith intent to profit from Plaintiffs' Marks (the "Infringing Domain Names"). SAC ¶¶ 56 & 60-70. The list of Infringing Domain Names include domain names like "instagram01.com" and "facebook-pw.com." *Id.* ¶ 56. In some instances, the Infringing Domain Names have been used for malicious activity or domain name abuse, including hosting websites directing visitors to other commercial sites, phishing, and selling purported tools for hacking. *Id.* ¶ 67. Some of the domain names are configured to send and receive email, strongly suggesting use for spear phishing email attacks. *Id.* ¶ 68. ID Shield is the registrant for the Infringing Domain Names in the WHOIS directory. *Id.* ¶ 57 & Ex. 7. ID Shield also trafficked in the Infringing Domain Names because, after registering the Infringing Domain Names as the registrant, it licensed the Infringing Domain Names to its customers (aka licensees), for the customers' use. *Id.* ¶ 59; *see* 15 U.S.C. § 1125(d)(1)(E).

Second, ID Shield is liable, pursuant to the domain name registration agreement with OnlineNIC, for the actual harm caused by the Infringing Domain Names. Section 3.7.7.3 of the RAA, as incorporated into OnlineNIC's Registration Agreement, requires ID Shield to disclose the contact information for its customers within seven days of being provided "reasonable evidence of actual harm" or accept liability. SAC ¶ 71 & Ex. 4. Plaintiffs sent ID Shield reasonable evidence of actual harm regarding the Infringing Domain Names; however, ID Shield failed to timely provide the necessary customer contact information. SAC ¶¶ 74 & 75. As such, ID Shield is liable for the actual harm caused by the Infringing Domain Names. OnlineNIC is equally liable for ID Shield's cybersquatting, as well as the actual harm caused by the

---

[3] Under the ACPA, 15 U.S.C. § 1125(d)(1)(A), a person is liable to the owner of a mark if that person registered, trafficked in or used a domain name that is identical or confusingly similar to a distinctive or famous mark with a bad faith intent to profit from that mark. Under 15 U.S.C. § 1125(d)(1)(D), a person is liable for using a domain name under (A) only if that person is the domain name registrant or that registrant's authorized licensee.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Infringing Domain Names, because ID Shield is the alter ego of OnlineNIC and because OnlineNIC is a direct participant in ID Shield's cybersquatting activities. *Id.* ¶¶ 12, 30-43.

### 3.     The appointment of the Special Master

Throughout this litigation, Defendants have engaged in a pattern of discovery abuses.[4] Plaintiffs served their initial document requests to Defendants on March 20, 2020. Although Plaintiffs granted several extensions of time to Defendants, Defendants failed to respond on the stipulated response date of May 11, 2020. ECF No. 58 at 2. Defendants eventually served their written responses and completed their initial production of documents on June 9, 2020. *Id.* at 2-3. This initial production of documents, however, was incomplete, unresponsive, untimely; it was also unusable because the documents contained no Bates stamp numbers, no load file, and no overlays for metadata and confidentiality designations. On July 23, 2020, Defendants produced over 271,000 images, again without proper metadata. Facebook did not have searchable files with metadata until the end of August 2020, five months after service. *Id.* at 3, 4.

Defendants did not perform either a relevance or confidentiality review on these documents before they were marked "Confidential" and produced. *Id..* at 4. This dispute resulted in motion practice, and on November 11, 2020 this Court ordered Defendants to: (i) search their production for any public documents and de-designate them as confidential; (ii) make a "robust, good faith effort to de-duplicate its production"; and (iii) file a status report supported by a declaration describing what Defendants did to comply with this order. ECF No. 54. Unable to de-duplicate the hundreds of thousands of pages of documents, Defendants then made multiple productions of their ticketing database, yet each production was missing key information (from production to production), and it appeared that Defendants had selectively deleted responsive records. *See generally*, ECF Nos. 61 & 64. Plaintiffs filed a motion requesting the Court

---

[4] For example, in response to request for financial documents, Defendants made a representation to the Court that "Domain ID Shield has no further documents." ECF No. 79, Exhibit 5.  After the Court ordered production (ECF No. 81 at 2), Defendants initially failed to produce relevant documents and Plaintiffs moved to compel. On the day Defendants responded with their portion of the joint discovery letter brief (ECF No. 96), Defendants produced financial statements and tax returns of OnlineNIC **and financial statements of ID Shield**. Although the Court denied the motion (ECF No. 104), the Court was concerned about "the early representations that there were no such records and then the production of these records." Hearing on May 11, 2021, Tr. at 8. The Court further expressed "some concerns about the reluctance and misrepresentations around getting these documents produced." *Id.*

appoint a Special Master to determine if Defendants deleted or withheld data, and to supervise portions of Defendants' ESI productions. ECF Nos. 61, 62, 64.

The Court appointed a Special Discovery Master on March 3, 2021 to "supervise and complete, with all reasonable diligence, Defendants' collection, search, and production to Plaintiffs' counsel of Defendants' support ticket database." ECF No. 72 at 1. The support ticket database contains notices received by Defendants concerning cybersquatting, which is relevant to Plaintiffs' claims that Defendants acted with a bad faith intent to profit by failing to take action upon receipt of such notices. The Special Master prepared his report to "determin[e] the adequacy of Defendants' past productions to Plaintiffs and whether Defendants destroyed or withheld data from the Kayako Ticket Database." Report at 2. To prepare the Report, the Special Master "relied on Defendants' previous productions and collected data directly from Defendants." *Id.* at 5. The Special Master investigated six different sources, as well as backups, for Defendants' support ticket database and collected information with a cumulative data size of 184 GB, comprising 545,013 files, and a total of 442,680,623 database records. *Id.* at 5-6 & Ex. 3. The Special Master then used a variety of technical tools to analyze this data to determine if Defendants withheld or destroyed any responsive ESI. *Id.* at 15-16.

## B.  The Special Master's findings in the Report[5]

The Special Master's Report concludes that Defendants have intentionally withheld evidence, obfuscated the discovery process, and most alarmingly, destroyed evidence that is vital to Plaintiffs' claims and as a result is now irrecoverable. Report at 39-41. The Special Master concluded that "Plaintiffs suffered irreparable harm" and "will continue to suffer harm" as a result of Defendants' spoliation of evidence. *Id.* at 40-41. The Report, and over 100 pages of exhibits, establish that "there is ample evidence that Defendants failed to preserve responsive ESI, deleted ESI, and withheld ESI." *Id.* at 2. In particular, the Special Master made seven key findings concerning Defendants' conduct in discovery:

- Defendants possessed the requisite IT skills and software developer knowledge to preserve ESI yet failed to do so; *id.* at 17.

---

[5] The Special Master's Report is as thorough as it is damning. For the benefit of the Court, Plaintiffs in this Motion only summarize the extensive analysis conducted by the Special Master.

MOTION TO STRIKE AND FOR DEFAULT JUDGMENT
Case No. 5:19-cv-07071-SVK

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

- Defendants' data destruction was vast, extensive and intentional; *id* at 19-20, 26.

- Defendants intentionally withheld much of the ESI they did not destroy; *id.* at 30-32.

- Defendants engaged in "data dumping" to obscure responsive data; *id.* at 3, 34-35.

- Defendants deleted and withheld records from the Special Master; *id.* at 35-36, and

- Defendants made "material misrepresentations" to the Special Master. *Id.* at 40.

Furthermore, Defendants' "[m]ost egregious [behavior] was Defendants' deletion and withholding of ticket attachments . . .  [which] arguably contained the most responsive ESI, yet Defendants deleted 76.7% of all attachments." *Id.* at 40.

**C.  OnlineNIC's conduct in this action mirrors its conduct in a prior action that resulted in a finding of contempt for discovery abuses.**

OnlineNIC's conduct in this action is particularly inexcusable because it is not the first time OnlineNIC has flouted its discovery obligations before this Court or deliberately disobeyed this Court's orders. Nor is it the first time the Court has sanctioned OnlineNIC for such conduct. In *Verizon California Inc. v. OnlineNIC, Inc.*, 647 F. Supp. 2d 1110 (N.D. Cal. 2009), Judge Fogel held OnlineNIC in civil contempt for multiple violations of court orders, finding "by clear and convincing evidence" that OnlineNIC violated court orders by producing a selective subset of data and failing to produce required documents in discovery. *Id.* at 1114, 1120-21. The Court also found that OnlineNIC violated the Modified Injunction entered in the case, "form[ing] part of a much larger pattern of noncompliance." *Id.* at 1118. OnlineNIC was sanctioned $30,600 in addition to default judgment of $33.15 million. *Id.* at 1121, 1128. Although the amount of these sanctions and judgment were significant, they did not deter OnlineNIC from continuing their discovery abuses and cybersquatting activities here.

**III.  DEFENDANTS' MISCONDUCT REQUIRES TERMINATING SANCTIONS**

The Court must sanction Defendants' discovery abuses, including their spoliation of evidence. "There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir.

T U C K E R   E L L I S   L L P
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1    2006). Terminating sanctions are appropriate under three separate sections of Fed. R. Civ. P. 37.[6]

2       First, under Fed. R. Civ. P. 37(e)(2)(C) the Court may enter a default judgment if Defendants failed

3 to preserve electronically stored information. *WeRide,* 2020 WL 1967209, at *12 (striking Defendants'

4 answers and entering default under Rule 37(e)(2)(C) due to spoliation of evidence). Second, under Fed.

5 R. Civ. P. 37(b)(2)(A)(vi), the Court may enter a default judgment if Defendants "fail[ed] to obey an order

6 to provide or permit discovery." *Leon,* 464 F.3d at 958 (default entered due to destruction of evidence.)

7 Third, under Fed. R. Civ. P. 37(c)(1)(C), the Court may enter a default judgment against Defendants for

8 their failure to supplement an earlier incomplete or incorrect discovery response pursuant to Rule 26(e).

9       Defendants' intentional violations of their various discovery obligations under Rule 37, as

10 described by the Special Master in his Report, mandate entry of a default judgment against Defendants.

11     **A.**       **Terminating sanctions are proper under Rule 37(e)(2)(C)**

12       Terminating sanctions are mandated here to remedy the irreparable harm intentionally caused to

13 Plaintiffs. Rule 37(e) sets forth three criteria to determine whether spoliation of ESI has occurred: (1) the

14 ESI "should have been preserved in the anticipation or conduct of litigation"; (2) the ESI "is lost because

15 a party failed to take reasonable steps to preserve it"; and (3) the ESI "cannot be restored or replaced

16 through additional discovery." Fed. R. Civ. P. 37(e). For dispositive sanctions, there must also be a

17 "finding that the [spoliating] party acted with the intent to deprive another party of the information's use

18 in the litigation[.]" *Id.* at Rule 37(e)(2).[7]

19       Each criteria under 37(e) is easily met here. First, "[t]he duty to preserve evidence begins when

20 litigation is pending or reasonably foreseeable." *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, 2016

21 WL 5870218, at *3 (N.D. Cal. Oct. 7, 2016). Defendants had notice of pending litigation, and thus a duty

22 to preserve ESI, as late as November 11, 2019 (when Plaintiffs' Original Complaint was served on

23

24    [6] Courts hold that the preponderance of evidence standard should apply to terminating sanctions. *WeRide,*

25 2020 WL 1967209, at *9.

26    [7] Rule 37(e)(2) "does not include a requirement that the court find prejudice to the party deprived of the

information." 2015 Advisory Committee Note to Fed. R. Civ. P. 37(e)(2); *Porter v. City & Cty. of San*

27 *Francisco*, 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018). A finding of intent supports "an inference

that the opposing party was prejudiced by the loss of information that would have favored its position."

28 2015 Advisory Committee Note to Fed. R. Civ. P. 37(e)(2).

MOTION TO STRIKE AND FOR DEFAULT JUDGMENT
Case No. 5:19-cv-07071-SVK

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1    OnlineNIC). ECF No. 15.

2        Second, Defendants failed to preserve and deleted relevant ESI for this matter after the complaint

3    was filed, "during discovery, and even after the appointment of Special Master." Report at 17.

4    "Defendants have sophisticated IT skills and infrastructure and have had ample time to implement backup

5    management software. Despite these circumstances they failed to preserve and produce relevant ESI." *Id.*

6    The Special Master found that "[n]ot only did Defendants fail to preserve ESI, but they also deleted

7    significant amounts of records." *Id.* at 19-20 (52.35% of ticket-related database records were deleted).

8    Defendants also deleted 76.70% of attachment files that "included copyright notifications; email

9    conversations; legal demands; account summaries; complaints; letters; legal information; financial

10   information; and more." *Id.* at 26.[8] The Special Master determined that "approximately 77,247 deleted

11   attachment files would have been responsive" to Plaintiffs' document requests, which sought documents

12   exposing Defendants' bad faith intent to profit from the Infringing Domain Names. *Id.* at 27.

13       Third, "responsive ESI will be unavailable because the data was destroyed and no longer exists."

14   *Id.* at 40. The data intentionally deleted by Defendants is not recoverable and the data is "lost forever to

15   Plaintiffs." *Id.* at 4. The Special Master concluded that "Defendants caused irreparable harm to Plaintiffs

16   through permanently deleted responsive database records and attachment files, that *they will never see or*

17   *know the contents*." *Id.* at 40 (emphasis added). This irreparable harm cannot be cured. "Plaintiffs will

18   continue to suffer harm with the new production [being prepared by the Special Master]. Based on the

19   new discovery protocol (with an expanded date range and more search terms), there will be a greater

20   number of missing responsive database records and attachments." *Id.* at 40.

21       And finally, Defendants' conduct was intentional. *Id.* at 26, 39, 41. "[C]ourts have found that a

22   party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable

23   to infer, that [the] party purposefully destroyed evidence to avoid its litigation obligations." *Porter*, 2018

24   WL 4215602, at *3 (collecting cases). Here, the Special Master found scripts written by Defendants "to

25   programmatically delete data directly from the database." Report at 39. Defendants' "egregious"

26   destruction of responsive data, perpetrated even after the appointment of the Special Master (*Id.* at 39)

27   
─────────────────────

28   [8] It should be noted that the attachments which Defendants produced contained virus files. *Id.* at 32.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

demonstrate this misconduct could only have been intentional.  *Id.* at 26. The deletion of this data and attachment files requires a user to "have special permissions, and more importantly, expertise, to delete database records or attachment files wither directly from the database or the file system." *Id.*  The Special Master concluded that "[t]he deleted attachment files and records *cannot have happened by accident.*" *Id.* (emphasis added). Indeed, Defendants attempted (in vain) to hide their deletion activity. *Id.* at 21. The "consistent and continuous" deletion of records and information throughout the discovery process evidences Defendants' intent to deprive Plaintiffs of the information's use in the litigation. *Id.* at 39.

Defendants intentionally attempted to thwart justice by deleting ESI that it had a known duty to preserve. The Court must not countenance this behavior. "The remedy should fit the wrong, and the severe measures authorized by [Rule 37(e)(2)] should not be used when the information lost was relatively unimportant or lesser measures . . . would be sufficient to redress the loss." 2015 Advisory Committee Note to Fed. R. Civ. P. 37(e)(2). The Court should enter a default judgment pursuant to Rule 37(e)(2)(C) because the data spoliated was important to Plaintiffs' case and lesser sanctions cannot redress the loss and harm to Plaintiffs.

### 1.    Defendants intentionally deleted information important to Plaintiffs' case

The data that Defendants intentionally deleted is crucial to Plaintiffs' ability to prove their case. In support of the allegation that Defendants registered the Infringing Domain Names with a bad faith intent to profit, Plaintiffs alleged that Defendants intentionally provided a haven for cybercriminals, choosing to consciously ignore notices containing reasonable evidence of actionable harm. SAC ¶ 2. Defendants permanently deleted files that would have shown any notices or other legal complaints received by Defendants concerning cybersquatting, and would have allowed Plaintiffs to prove that Defendants failed to take action upon receipt of such notices. "Plaintiffs suffered irreparable harm" in light of the fact that "responsive ESI will be unavailable because the data was destroyed and no longer exists." Report at 40.

Defendants deleted 331,390 (76.70%) attachment files, which comprise various non-database files related to the database records, and which "[c]ritically, . . . may be the most important part of a ticket, much like an email attachment may be more important than the email message itself." *Id.* at 26. The Special Master found "[t]he most relevant instances of known deleted records involve tickets, ticket posts, ticket notes, and attachment files" with "attachment files . . . particularly noteworthy because they

9

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

frequently contain the most material information in a ticket. In this case, over 432,033 attachments once existed in the Ticket Database . . . . [leaving] 100,643 surviving attachments." *Id.* at 3. The deleted notifications, email conversations, and legal demands all speak to the number, timing, and nature of any notices or other legal complaints received by Defendants concerning cybersquatting and Defendants' subsequent action or—more likely—inaction upon receipt of such notices. These files coupled with the account summaries potentially would have shown a pattern of bad faith intent to profit by Defendants and their customers. Defendants also have deleted their customer communications supporting—whether expressly or tacitly—those customers' unlawful activities, including the agreement to hide their identities. The deletion of these records intentionally attempts to bury the level of complicity Defendants had in harboring cybercriminal activity. Further, Defendants have identified as their customers for the Infringing Domain Names a number of alleged domain name resellers. Yet, Defendants deleted files with the true names and identities of their customers, like Jenry Haris (which appears to be an alias to hid the true identity of the customer), and failed to produce relevant files or records. *Id.* at 28. Thus, it is now impossible to know relevant information concerning Defendants' customers and those customers' underlying activities. These are but a few examples of the manner and extent to which the data destroyed by Defendants were important to Plaintiffs' case.

### 2.   Lesser sanctions cannot remedy the irreparable harm to Plaintiffs

Lesser sanctions, like an adverse jury instruction or the exclusion of evidence, are inappropriate in the face of mass spoliation. *Leon,* 464 F.3d at 960; *WeRide*, 2020 WL 1967209, at *11.[9] For example, it would be "futile" to exclude spoliated evidence. As significantly, an adverse inference jury instruction would not be sufficient if the plaintiff is helpless to rebut evidence that may overcome the inference.

---

[9] *Leon* involved terminating sanctions under the Court's inherent authority, not Fed. R. Civ. P. 37. One factor Courts use in determining terminating sanctions under the Court's inherent authority is the availability of less drastic sanctions. *See Leon,* 464 F.3d at 958 & n.4 (citing *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)). The 2015 Advisory Committee Note to Rule 37(e)(2) also instructs Courts to examine whether lesser sanctions would be sufficient to redress the loss. Even though Rule 37(e) "'forecloses reliance on inherent authority or state law to determine when' sanctions should be imposed," *Snap Lock Industries, Inc. v. Swisstrax Corp.,* No. 2:17-cv-02742-RFB-BNW, 2021 WL 864054 at *2 (D. Nev. March 5, 2021), an examination of this *Anheuser-Busch* factor is nonetheless instructive.

*WeRide*, 2020 WL 1967209, at *11; *Leon,* 464 F.3d at 960; *OmniGen Rsch. v. Yongqiang Wang*, 321 F.R.D. 367, 371 (D. Or. 2017) (citing *Leon*); *see also Coyne v. Los Alamos Nat'l Sec.*, LLC, 2017 WL 3225466, at *10 (D.N.M. May 1, 2017) (terminating sanctions appropriate under 37(e)(2) where party both spoliated evidence and changed her testimony). Here, any lesser sanction would be inadequate to address the damage resulting from Defendants' misconduct since Defendants have spoliated relevant evidence necessary to show Defendants' bad faith intent to profit. *See WeRide,* 2020 WL 1967209, at *11 (jury instructions or exclusion of evidence could not cure Defendant's intentional mass spoliation).

"It is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct." *Anheuser-Busch*, 69 F.3d at 352. Defendants' discovery sanctions in *Verizon* did not deter their spoliation here. Rather, the Special Master found that Defendants have "a history of untruthfulness" (Report at 19) and that their misconduct was "consistent and continuous." *Id.* at 39. This misconduct included (a) the destruction of data even after the Special Master was appointed, (b) data dumping, (c) the obfuscation of data, (d) withholding ESI from the Special Master and (e) material misrepresentations to the Special Master. Report at 39-41. *See also* Section II.A.3, *supra*. Accordingly, it is appropriate for this court to reject lesser sanctions given the possibility of continued deceptive misconduct.

Finally, as explained in *Leon*, "[s]anctioning spoliators serves a punitive and a prophylactic function. By punishing a spoliator, the Court ensures that he will not profit through his misdeeds. Additionally, those who might be tempted to emulate the spoliator's behavior will be deterred. Where a spoliator's behavior is egregious, dismissal or default is appropriate." *Leon v. IDX Systems Corp.,* 2004 WL 5571412, at *5 (W.D. Wash. Sept. 30, 2004), *aff'd*, 464 F.3d 951 (9th Cir. 2006) (*citing Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 168 (D. Colo. 1990)). Defendants' extensive destruction of responsive data committed throughout the discovery process, and even after the appointment of the Special Master, is egregious and warrants the imposition of default judgment.

### B.   Terminating sanctions are proper under Rule 37(b)(2)(A)(vi)

Terminating sanctions are appropriate here because Defendants have deliberately violated Court orders and willfully deceived the Court.  On March 3, 2021, in response to one of the parties' discovery disputes, this Court issued an order appointing the Special Master and requiring Defendants to "provide the Special Master unencumbered access to their entire Support Ticket Database, any backup copies of

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

the Support Ticket Database, and any third-party vendor hosting or storing the Support Ticket Database or any backup copies for Defendants" ECF No. 72 at 2. Defendants failed to comply with this Order. "[O]n multiple occasions, Defendants withheld and deleted records from Special Master, even though the Special Master has documentation in server directory lists to show the files did exist on the server within the past two months." Report at 40. For example, the Special Master found that Defendants failed to disclose to him a number of database servers. *Id.* at 30. In addition, Defendants made "material misrepresentations regarding their backups and other ESI items to Special Master." *Id.* at 40.

Defendants' intentional failure to comply with the Court's Order warrants sanctions under Rule 37(b) and by the inherent power of this Court. *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) (upholding dismissal of complaint pursuant to court's inherent power where plaintiff's denials of material fact were knowingly false and plaintiff willfully failed to comply with discovery orders).

When considering a terminating sanction under Rule 37(b) or by the Court's inherent authority, the Court should consider: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch,* 69 F.3d at 348 (the "*Anheuser-Busch* factors").[10] The Court need not make an explicit finding regarding each of these factors, but must make a finding of "willfulness, fault, or bad faith" in order for a terminating sanction to be proper. *Id.* "What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision of the case.'" *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007) (quoting *Valley Engineers*, 158 F.3d at 1057). Finally, "due process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the

---

[10] "Like most elaborate multifactor tests, our test has not been what it appears to be, a mechanical means of determining what discovery sanction is just. The list of factors amounts to a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything, and not a script for making what the district judge does appeal-proof." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1  case.'" *Anheuser-Busch,* 69 F.3d at 348 (quoting *Wyle,* 709 F.2d at 591).

2        **1.**      **Plaintiffs have been irreparably prejudiced by Defendants' data destruction**

3        The third *Anheuser-Busch* factor (risk of prejudice to the party seeking sanctions) is "[t]he most

4  critical factor to be considered in case-dispositive sanctions." *Connecticut Gen. Life Ins. Co.,* 482 F.3d at

5  1097. In fact, dispositive sanctions may be awarded on a strong enough showing of prejudice alone,

6  regardless of the other factors. *See Valley Engineers,* 158 F.3d at 1058; *OmniGen,* 321 F.R.D. at 371.

7        Plaintiffs have suffered "irreparable harm" and will "continue to suffer harm" based on

8  Defendants' destruction of data. Report at 40-41. *See also* Section III.A.1, *supra.* The evidence deleted

9  included key evidence, such as email conversations, legal notices, customer communications, and

10  customer information, necessary for Plaintiffs to show Defendants' and their customers' bad faith intent

11  to profit. Complaints about the malicious nature of specific domains, Defendants' knowledge of such

12  activity and their communications with customers about the same (or lack thereof), and the continued

13  harm associated with their dereliction of duties under the RAA, have now been destroyed. "Destroying

14  the best evidence relating to the core issue in the case inflicts the ultimate prejudice upon the opposing

15  party." *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990).

16        **2.**      **Defendants were willful, at fault, and acted in bad faith in violating the Court's**

17               **Order regarding the Special Master.**

18        Defendants acted willfully when they violated the Court's Order.  "A party's destruction of

19  evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially

20  relevant to the litigation before they were destroyed.'" *Leon*, 464 F.3d at 959 (quoting *United States v.*

21  *Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)) (internal quotation marks and citation

22  omitted). The Special Master found that Defendants withheld data from him, deleted the data while he

23  was trying to collect it, and made material misrepresentations to him in attempts to obfuscate their records.

24  Report at 39-41. "Defendants' programmers created specific PHP and SQL scripts to delete database

25  records and attachment files. . . . Special Master can only conclude that Defendants programmatically

26  deleted files using PHP and SQL scripts, and tried to hide evidence of their use by deleting the scripts

27  themselves." *Id.* at 28-29. Given the level of expertise and special permissions required to delete records

28  from their database, Defendants' decision to programmatically delete records "must have been

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1    intentional." Report at 26. *See Leon,* 464 F.3d at 959 (finding bad faith after plaintiff carefully wrote a

2    program to delete data after receiving notice to preserve data).

3         Defendants were also at fault for their failure "to preserve potentially relevant ESI for this

4    matter . . . . during discovery, and even after the appointment of the Special Master." Report at 17.[11]

5    Although Defendants are sophisticated programmers who had the time, ability and infrastructure to

6    preserve and produce relevant ESI, they did not. *Id.* Defendants' failure "constitutes the kind of 'fault'

7    sufficient to warrant sanctions, including dismissal, under the Court's inherent powers." *Padgett v. City*

8    *of Monte Sereno*, 2007 WL 878575, at *3 (N.D. Cal. Mar. 20, 2007) (finding Defendants failed to take

9    adequate precautions to preserve computer equipment).

10        Finally, Defendants actions have delayed the Special Master's Report on data destruction, and

11   have delayed the production of relevant documents in response to Plaintiffs' discovery requests. "A party

12   demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order."

13   *Leon*, 464 F.3d at 961. The Special Master was appointed on March 3, 2021. ECF No. 72. However, given

14   Defendants' "material misrepresentations" to the Special Master, deletion and obfuscation of documents

15   even after the Special Master was appointed (Report at 40), the Special Master could not deliver his report

16   on data destruction until more than 4 months later. This delay, solely caused by Defendants' intentional

17   acts, evidences Defendants' bad faith in this litigation, and toward the Court and the Court's orders.

18        Based on this misconduct, detailed in the Special Master's Report, Defendants have exhibited "bad

19   faith, willfulness or fault."

20        **3.    The remaining *Anheuser-Busch* factors**

21        Where, as here, a Court order is violated, the first two *Anheuser-Busch* factors (the public's interest

22   in expeditious resolution of litigation and the court's need to manage its dockets) support sanctions. *Valley*

23   *Engineers*, 158 F.3d at 1057. As a result of Defendants' intentional spoliation of evidence, "significantly

24   more hours of the Parties' and the Court's time [is] going to be devoted to this matter solely due to

---

[11] Defendants were on notice to preserve relevant documents when they were served with the Complaint in November 2019, and when Plaintiffs served their initial document requests to Defendants on March 20, 2020. Defendants also had a fiduciary obligation as an accredited registrar to maintain these documents.

MOTION TO STRIKE AND FOR DEFAULT JUDGMENT
Case No. 5:19-cv-07071-SVK

Defendant's misconduct." *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2017 WL 2298473, at *5 (S.D. Cal. May 26, 2017). Moreover, where the spoliation occurs on such a large scale "the sheer breadth of the misconduct means that terminating the case would essentially be a cleaner and more expedient disposal given the high number of issue and evidentiary sanctions the Court will award." *Id.* Defendants' "consistent and continuous" discovery abuses have resulted in numerous discovery motions, Court orders, and the instant motion for sanctions. *See* ECF Nos. 47, 52, 54, 61, 72, 78, 79, 81, 96 & 104. "The court's need to manage its docket counsels in favor of termination, especially given the tremendous resources this case has already taken away from other, deserving litigants, and the numerous discovery issues already presented and continuing to be presented." *CrossFit, Inc.*, 2017 WL 2298473, at *5.

The fourth *Anheuser-Busch* factor (the public policy favoring disposition of cases on their merits), standing alone, "is not sufficient to outweigh the other four factors." *Malone v. United States Postal Service,* 833 F.2d 128, 133 n.2 (9th Cir. 1987). Moreover, this factor "slightly weighs in favor of terminating sanctions" where the spoliating party has made misrepresentations in discovery. *See CrossFit, Inc.*, 2017 WL 2298473, at *5. Defendants made "material misrepresentations" to the Special Master. Report at 40. And Defendants made misrepresentations to the Court when it stated that ID Shield had no further financial documents to produce (ECF No. 79, Exhibit 5), but then went on to produce more documents on the day they added their portion of the joint discovery letter brief to the Court. ECF No. 96. "There is no point to a lawsuit, if it merely applies law to lies." *Valley Engineers*, 158 F.3d at 1058. If Plaintiffs are forced to rely on incomplete data at trial, this case will not be resolved on the merits, but on the limited evidence extracted from Defendants' tainted records. *See Anheuser-Busch,* 69 F.3d at 354. As a result of Defendants' misconduct, the true merits of this case can never be known. This public policy cannot, therefore, outweigh the remaining considerations in ordering sanctions.

The final *Anheuser-Busch* factor is "the availability of less drastic sanctions."[12] As discussed in

_____

[12] To evaluate this factor under the Court's inherent power and Rule 37(b), a court will also examine: "(1) whether the district court explicitly discussed the feasibility of less drastic sanctions and explained why such alternate sanctions would be inappropriate; (2) whether the district court implemented alternative sanctions before ordering dismissal; and (3) whether the district court warned the party of the possibility of dismissal before ordering dismissal." *Anheuser-Busch,* 69 F.3d at 352. Courts hold that "it is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning"

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

detail, above, in the context of Rule 37(e)(2)(C), courts hold that lesser sanctions are inappropriate in the face of mass spoliation. *Leon,* 464 F.3d at 960. *See* Section III.A.2., *supra.* The Court should enter a default judgment because every *Anheuser-Busch* factor weighs in favor of imposing terminating sanctions in this case.

### 4.   Terminating sanctions would not violate due process

Here, Defendants destroyed important documents central to Plaintiffs' case in chief. "Sanctions interfering with a litigant's claim or defenses violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." *Wyle*, 709 F.2d at 591. However, "[w]here a party so damages the integrity of the discovery process that there can never be an assurance of proceeding on the true facts, a case dispositive sanction may be appropriate." *Conn. Gen. Life Ins. Co.,* 482 F.3d at 1097. Defendants' vast destruction of responsive ESI in this case has ensured that the true facts will never come to light. Defendants obfuscated, withheld, and deleted an estimated 3,317,816 responsive records (Report at 20) that were relevant to this case (*id.* at 3). From Defendants' extensive efforts to prevent Plaintiffs' access to its records, "one may reasonably infer that [Defendants'] case is lacking in merit." *Anheuser-Busch*, 69 F.3d at 355. As such, "due process concerns are not implicated" and an entry of default judgment against Defendants is warranted. *Id.*

### C.   Terminating sanctions are proper under Rule 37(c)(1)(C)

Under Rule 37(c)(1)(C), this court may also enter default judgment against Defendants for their failure to supplement an earlier incomplete or incorrect discovery response pursuant to Rule 26(e). Thus, Rule 37(c)(1) "gives teeth" to the requirement that a party supplement its disclosures and responses to interrogatories, requests for production, and requests for admission if it learns that the disclosure or response is incomplete of incorrect. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); Fed. R. Civ. P. 26(e)(1)(A). In ordering sanctions under Rule 37(c), courts in the Ninth Circuit weigh the very same considerations at issue under Rule 37(b). These factors weigh in favor

---

prior to issuing a dismissal sanction. *Valley Engineers Inc.*, 158 F.3d at 1057; *see also Malone,* 833 F.2d at 133 ("A plaintiff can hardly be surprised by a harsh sanction in response to willful violation of a pretrial order" even where district court did not explicitly warn plaintiff that dismissal would follow violation of the pretrial order).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1  of sanctions. *See* Section III.B., *supra*. Here, notable inconsistencies in Defendants' discovery productions

2  reviewed by the Special Master led him to conclude that Defendants' intentionally withheld responsive

3  documents from Plaintiffs throughout the discovery process. Report at 39. For example, "Defendants used

4  inaccurate date filters and did not search all ticket-related tables and columns" resulting in withheld

5  records." *Id.* at 40. Critically, the Special Master found that Defendants (a) failed to disclose relevant

6  servers (*Id.* at 30), "used overly restrictive searches that excluded entire years' worth of records" (*Id.* at

7  3), and (c) failed to produce files or records related to one of Defendants' customers (*Id.* at 28).

8  Defendants' misconduct is in violation of their general duty to disclose under Rule 26(e) and, as such, an

9  entry of default judgment against them is warranted under Rule 37(c)(1).

10  **IV.     ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANTS IS WARRANTED**

11         As a result of Defendants' intentional spoliation of evidence, violation of the Court's Order

12  regarding the Special Master and other discovery abuses, the Court should strike Defendants' Answer and

13  enter default judgment against Defendants. Upon default, the factual allegations of the complaint will be

14  taken as true, except those relating to the amount. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18

15  (9th Cir. 1987). Specifically, the Court should find that:

16         1.     The Plaintiffs' Marks are famous and distinctive.

17         2.     The Infringing Domain Names are identical or confusingly similar to Plaintiffs' Marks.

18         3.     OnlineNIC is the direct participant in ID Shield's cybersquatting activities and Defendants

19  are alter egos of each other. Each is responsible for the harms caused by the Infringing Domain Names.

20         4.     Defendants and Defendants' licensees willfully registered, trafficked in and used the

21  Infringing Domain Names with a bad faith intent to profit in violation of the ACPA.

22         5.     Defendants and Defendants' licensees infringed the rights of Plaintiffs in the Plaintiffs'

23  Marks in violation of 15 U.S.C. §§ 1114(1) and 1125(a), and diluted the federally registered trademarks

24  of Plaintiffs in violation of 15 U.S.C. § 1125(c).

25         6.     As the registrant, Defendants are liable for the actual harm caused by the Infringing

26  Domain Names because Defendants did not timely provide Plaintiffs with contact information of

27  Defendants' licensees after notice as required by § 3.7.7.3 of the RAA, as incorporated into OnlineNIC's

28  Registration Agreement.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

7.    Defendants have irreparably harmed the general public, and will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

## V.    PLAINTIFFS SHOULD RECEIVE STATUTORY DAMAGES OF $100,000 PER DOMAIN NAME FOR DEFENDANTS' VIOLATIONS OF THE ACPA

Under the ACPA, a prevailing "plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). In drafting the ACPA, Congress expressly provided for these statutory damages "both to deter wrongful conduct and to provide adequate remedies for trademark owners who seek to enforce their rights in court." *See* S. Rep. No. 106-140, at 8 (1999); *see also* H.R. Conf. Rep. No. 106-464, at 38 (1999).

### A.    Determining statutory damages

The Court is granted wide discretion in determining the amount of statutory damages within the specified range. *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001) (citations omitted) (discussing statutory damages provisions of the Copyright Act). As discussed in greater detail below, an analysis of prior cases in which courts have awarded statutory damages under the ACPA shows that the following considerations are among the most important in determining the amount of statutory damages: the egregiousness of the defendant's conduct, the registration of additional domain names after notice of the suit, the defendant's use of false contact information, whether the defendant has engaged in a pattern of registering and using large numbers of domain names that infringe the rights of many different parties, and the defendant's other behavior that shows an attitude of contempt for the court and the proceeding. Numerous courts have awarded statutory damages at the high-end of the specified range in ACPA cases. *See, e.g., Elecs. Boutique Holdings Corp. v. Zuccarini*, No. CIV. A. 00-4055, 2000 WL 1622760, at *9 (E.D. Pa. 2000) (awarding $100,000 per infringing domain name)*; Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 512-513 (E.D. Va. 2003) (awarding $100,000 per domain name).

### B.    Egregiousness of Defendants' conduct

In determining the appropriate amount of statutory damages under the ACPA, courts consider the

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1  egregiousness of the defendant's cybersquatting. *See Aztar Corp. v. MGM Casino*, No. NO. 00- 833-A,

2  2001 WL 939070, at *7 (E.D. Va. 2001) (awarding $100,000 per domain name when defendant's willful

3  and bad faith infringement was especially deceptive and continued even after plaintiff put defendant on

4  notice of the infringing conduct); *Mirage Resorts, Inc. v. Cybercom Prods.,* 228 F. Supp. 2d 1141, 1142-43

5  (D.  Nev. 2002) (awarding maximum statutory damages on default of $100,000 per domain name).

6  Defendants registered and trafficked in at least 35 domain names that are identical or confusingly

7  similar to Plaintiffs' Marks (i.e., the Infringing Domain Names). SAC ¶¶ 56 & 59.  Defendants also

8  utilized ID Shield's proxy service to hide the true identity of Defendants' customers, who licensed and

9  used each of the Infringing Domain Names. *Id*. ¶ 58. In view of the similarity between the Infringing

10  Domain Names and Plaintiffs' Marks, Defendants' intent was to divert consumers searching for Plaintiffs'

11  websites. *Id*. ¶ 67. The only reason that consumers would access the websites at any of the Infringing

12  Domain Names is because these domain names are misspellings or mistypings of Plaintiffs' Marks, like

13  *login-1nstagram.com,* or the domain names are generic words appended to the Plaintiffs' Marks, like

14  *m-facebook-login.com*.[13] "It is clear that [Defendants'] intent was to profit from the poor typing abilities

15  of consumers trying to reach Plaintiffs' sites: what other value could there be in a name like

16  ve3rizon.com?" *Verizon California Inc. v. Navigation Catalyst Systems, Inc.*, 568 F. Supp. 2d 1088, 1096

17  (C.D. Cal. 2008). Defendants thus intended to create a likelihood of confusion in order to capitalize, for

18  their own commercial gain, on the mistakes of consumers looking for Plaintiffs' websites or their services.

19  Importantly, many of the Infringing Domain Names were used for malicious activity, including hosting

20  websites directing visitors to other commercial sites, phishing, and selling purported tools for hacking.

21  SAC ¶ 67 and Exhibit 8. Statutory damages of $100,000 per domain name is proper in this case because

22  of the nature and extent of Defendants' cybersquatting against Plaintiffs and the Plaintiffs' Marks.

23  **C.**   **Defendants use false identities and proxy services to hide cybersquatting activities**

24  Defendants' actions are also willful and egregious because Defendants employed various means

25  to conceal both their own identity when cybersquatting and the identity of their customers. *See*

26  15 U.S.C. § 1117(e) (willfulness is presumed if defendant knowingly provided materially false contact

27  _____

28  [13] The Facebook login page for mobile users is m.facebook.com/login.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

information in the registration of infringing domain names). This is not the first time that Defendants have concealed the names of the users of infringing domain names.[14] Even when Plaintiffs' authorized representatives sent at least five notices to ID Shield with evidence that the Infringing Domain Names caused Plaintiffs actionable harm and requested that ID Shield disclose the identities of the registrant(s), Defendants did not identify their customers. SAC ¶ 74. Defendants' intentional use of false identities, knowingly providing materially false contact information in the registration of domain names, and hiding the identity of their cybersquatting customers, support a high statutory damages award.

### D. Defendants' pattern of unlawful cybersquatting against famous marks

In determining the appropriate amount of statutory damages under the ACPA, courts also consider whether the defendant has engaged in a pattern of registering and using large numbers of domain names that infringe the rights of many different parties. When excessive numbers of infringing domain names have been registered and used, courts have awarded high statutory damages. *See, e.g. Elecs. Boutique Holdings Corp.,* 2000 WL 1622760 at *9 (awarding $100,000 per infringing domain name, noting Mr. Zuccarini's pattern of registering names that "are misspellings of famous names and infringe on the marks of others," recognizing the significant number of cases brought by other trademark owners for the same type of infringement, and commenting on Mr. Zuccarini's new registrations of infringing domain names after notice); *Lahoti v. Vericheck, Inc.*, No. C06-1132JLR, 2007 WL 4269791, at *14 (W.D. Wash. Dec. 3, 2007), *vacated,* 586 F.3d 1190 (9th Cir. 2009) (awarding $100,000 per infringing domain name in part because of the defendant's "pattern and practice of registering domain names that incorporate the trademarks of others").

In *Verizon*, the Court explained the scope of Defendants' massive cybersquatting operation: "Verizon discovered that OnlineNIC had registered an extraordinary 14,700 domain names that infringed the mere twenty-six representative marks selected. While OnlineNIC denies that it operates a massive

---

[14] In a previous case before this Court, Judge Fogel found "OnlineNIC engaged in such a pattern of concealment" and that "[e]ven starker evidence of OnlineNIC's use of false identities is found in its practice of "kiting" domain names–i.e., registering and un-registering domain names during ICANN's five day cancellation period in order to avoid the payment of fees and detection by trademark owners." *Verizon California Inc. v. OnlineNIC, Inc.,* 2009 WL 2706390 at *4-5. Judge Fogel concluded that "[t]his conduct further supports a large award of statutory damages." *Id.* at *5.

cybersquatting operation, it has offered no evidence to contradict the factual record presented by Verizon. OnlineNIC's status as a serial cybersquatter further supports a per-violation award of $50,000." 2009 WL 2706393 at *5. "It is clear that 'a recidivists may be punished more severely than a first offender[,] [since] . . . repeated misconduct is more reprehensible than an individual instance of malfeasance.'" *Id.* at 9. Yet, despite this large judgment against them, Defendants were undeterred. Defendants have done little if anything to stop their cybersquatting activities, including registering the Infringing Domain Names, and assisting and hiding other cybersquatters, including their customers. Each of the Infringing Domain Names, which Defendants have registered in their own name, violate Plaintiffs' rights in the Plaintiffs' Marks. Because Defendants are unrepentant serial cybersquatters, the Court should award the maximum statutory damages of $100,000 per domain name.

### E.     Contempt for the Court and judicial proceedings

Courts will award high statutory damages where a defendant's behavior shows a lack of respect for the judicial system. *See Lahoti*, 2007 WL 4269791, at *14 (relying in part on defendant's "disregard for the submission of inaccurate answers to interrogatories" as a basis for finding defendant's conduct to be "malicious, fraudulent, deliberate or willful" and awarding $100,000 per domain name). Defendants have a long and clear history of contempt for the Court and judicial proceedings. In fact, in *Verizon,* Judge Fogel, held in civil contempt OnlineNIC for multiple violations of court orders that flowed from OnlineNIC's discovery abuses. *Verizon*, 647 F. Supp. 2d 1110. In this case, given Defendants' intentional destruction of evidence, intentional withholding of evidence in discovery, misrepresentations to the Court and the Special Master, and violations of the Court's Order to provide the Special Master all of their database files and backups in this case, the Court should award statutory damages of $100,000 per domain name.

### F.     Defendants and other cybersquatters must be deterred from future cybersquatting

In drafting the ACPA, Congress expressly provided for statutory damages to "provide clear deterrence" against bad faith and abusive conduct. *See* S. Rep. 106-140, at 7-8 (1999) (stating "legislation is needed to clarify the rights of trademark owners with respect to bad faith, abusive domain name registration practices, to provide clear deterrence to prevent bad faith and abusive conduct, and to provide adequate remedies for trademark owners in those cases where it does occur"). Courts also have

21

recognized the deterrence goal in the ACPA's statutory damages provisions. *See, e.g., E. & J. Gallo Winery v. Spider Webs, Ltd*., 286 F.3d 270, 278-279 (5th Cir. 2002) (analogizing deterrent effect of the statutory damages provisions of the Copyright Act to the ACPA)*; Kiva Kitchen & Bath v. Capital Distributing, Inc.*, 319 F. App'x 316, 320 (5th Cir. 2009) (noting that one goal of the ACPA's statutory damages provision is "to discourage wrongful conduct"); *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 432 (M.D.N.C. 2003) (quoting discussion of the deterrent purpose within the congressional record). As the Supreme Court explained with respect to the analogous statutory damages provision in the Copyright Act, an award of statutory damages crafted to deter the infringing conduct will "vindicate the statutory policy." *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952).

The Court should send a clear signal to cybersquatters, including and especially to Defendants, who willfully and flagrantly disregard United States laws and Court orders that such action will not be tolerated. This signal should be even stronger when cybersquatting is being perpetrated by an ICANN accredited registrar, like OnlineNIC, who is placed in a position of trust. *See Lead Networks*, 2009 WL 10700112 at *9 ("the Registrar Defendants are abusing this trust by registering and using domain names for their own benefit and pecuniary interest . . . . [and] by hiding the identities of other registrants"). An award of statutory damages must be substantial to deter the conduct and vindicate the statutory policy. As such, the maximum statutory damages of $100,000 per domain name would deter further wrongful conduct.

## VI.    PLAINTIFFS SHOULD RECEIVE INJUNCTIVE RELIEF.

"It is appropriate to grant an injunction on an application for default judgment" consistent with the demands of the Complaint. *Craigslist, Inc. v. RealWorks Group LLC*, No. C 08–05072 JW, 2009 WL 10692489, at *5 (N.D. Cal. Oct. 29, 2009); SAC ¶¶ 100, 110, 120, 134. Injunctive relief is specifically authorized under 15 U.S.C. §1116(a) to prevent violations under the ACPA. Moreover, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988); *Bellagio v. Denhammer*, No. CV-S-00-1475-RLH-PAL, 2001 WL 34036599 (D. Nev. Jul. 10, 2001) (granting plaintiff permanent injunction prohibiting Defendants from registering any other domain names that contain the Plaintiff's mark or

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

variations thereof). Courts have granted injunctive relief even in situations of default. *See, e.g.*, *PepsiCo., Inc. v. California Security Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002); *Lifted Research Group, Inc. v. Salem*, 2009 WL 1371416 at \*1 (N.D. Cal. May 15, 2009); *Jackson v. Sturkie*, 255 F. Supp. 2d 1096, 1103 (N.D. Cal. 2003). This "remedy of choice" is appropriate when (1) the plaintiff risks suffering irreparable harm; (2) monetary remedies are inadequate to compensate for plaintiff's injury; (3) the balance of hardships favors the plaintiff; and (4) the public interest would not be disserved by an injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Here each factor favors an injunction.

As to the first two factors, Plaintiffs are presumed as a matter of law to have suffered—and to continue to suffer—irreparable harm to their reputation and goodwill. 15 U.S.C. § 1116(a); *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, No. 4:19-cv-01424-YGR, 2021 WL 254448, at \*14 n.16 (N.D. Cal. Jan. 26, 2021) (discussing December 27, 2020 amendment to 15 U.S.C. § 1116 to create a rebuttable presumption of irreparable harm); SAC ¶¶ 98, 108, 120, and 132. As to the next factor, the balance of hardships tips sharply in Plaintiffs' favor. "It is no hardship to cease intentionally infringing someone else's trademark rights." *Diller v. Barry Driller, Inc.*, No. CV 12-7200 ABC EX, 2012 WL 4044732 at \*10 (C.D. Cal. Sept. 10, 2012); *see also Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, 2020 WL 5199434 at \*9 (N.D. Cal. Aug. 17, 2020) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration.") (quotation marks omitted). Finally, the public interest would be served by an injunction because there is strong public interest in preventing consumer confusion. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990); *see also Internet Specialties W., Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 993-94 (9th Cir. 2009). A permanent injunction is thus warranted.

Therefore, Plaintiffs respectfully request that this Court order a permanent injunction enjoining Defendants, and those working in concert with Defendants, from: (a) registering, trafficking in, or using, in any manner, any Internet domain name that incorporates, in whole or in part, Plaintiffs' Marks, or any name, mark, or designation confusingly similar thereto; (b) using Plaintiffs' Marks, or any other name,

23

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

mark, designation, or depiction in a manner that is likely to cause confusion regarding whether Defendants are affiliated or associated with or sponsored by Plaintiff; and (c) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of these activities. Plaintiffs also request that this Court order Defendants, and those working in concert with them, to: (a) relinquish all rights, title, and interest, in all domain names under their control which are identical or confusingly similar to Plaintiffs' Marks, including the Infringing Domain Names, and to transfer those domain names to Plaintiffs.

## VII.   PLAINTIFFS SHOULD RECEIVE THEIR ATTORNEYS' FEES

Defendants' actions show that this is an exceptional case under 15 U.S.C. § 1117(a) and that Plaintiffs should receive their reasonable attorney fees of $2,057,782.17. The Ninth Circuit explained that, "[g]enerally, a trademark case is exceptional for purposes of an award of attorney's fees when the infringement is malicious, fraudulent, deliberate, or willful." *Stephen W. Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 825-826 (9th Cir. 1997). Further, "bad faith of one of the parties may [ ] be part of those exceptional circumstances warranting a fee award under section [1117](a)." *Id.* at 827 (citing *FASA Corp. v. Playmates Toys, Inc.*, 108 F.3d 140, 143 (7th Cir. 1997)).

Here, Defendants' cybersquatting was willful and deliberate. Defendants registered and licensed domain names which are identical or confusingly similar to famous or distinctive trademarks with a bad faith intent to profit. As significantly, Defendants intentionally hid the identity of their cybersquatting customers even after Plaintiffs sent notice of the cybersquatting. Finally, Defendants have spoliated and intentionally withheld evidence, made misrepresentations to the Court and the Special Master, and violated the Court's Order to provide the Special Master unencumbered access to its entire database and any backup copies. As such, the Court should find that this is an exceptional case.[15]

## VIII.   DEFENDANTS SHOULD PAY THE SPECIAL MASTER'S COSTS ENTIRELY

When the Court appointed the Special Master, it ordered as an interim allocation of costs, that Plaintiffs and Defendants would each pay half of the Special Master's fees. ECF No. 72 at 4. The Court, however, noted during the hearing on Plaintiffs' motion to appoint the Special Master that Plaintiffs could return at the appropriate time to request that all of the Special Master's fees be borne by Defendants. Given

---

[15] *See* Declaration of David J. Steele itemizing the attorneys' fees Plaintiffs have incurred in this matter.

24

1  the Special Master's findings that Defendants intentionally destroyed and obfuscated vast amounts of

2  responsive ESI, and that the need for the Special Master's diligence (and extra diligence) was necessitated

3  by Defendants' discovery malfeasance, Plaintiffs respectfully request that the Court order Defendants to

4  reimburse Plaintiffs $88,937, which represents Plaintiffs' payments to the Special Master.

5  ## IX.  CONCLUSION

6  Defendants' improperly treated its discovery obligations as game of hide-and-seek. Defendants

7  intentionally destroyed data crucial to this case. Defendants withheld responsive and relevant data from

8  Plaintiffs and the Special Master. Defendants made material misrepresentations to the Special Master and

9  to this Court. Defendants data dumped to obfuscate the relevant evidence they did produce. Defendants

10  committed their discovery abuses after the complaint was filed, after the Special Master was appointed

11  and those abuses continue to this day. Enough is enough. Defendants will not cease their abusive discovery

12  tactics in the face of anything but terminating sanctions, which are warranted given the irreparable

13  prejudice Defendants have caused Plaintiffs with respect to their ability to prove their case in chief.

14  Accordingly, Plaintiffs respectfully request the Court to: (1) strike Defendants' Answer and enter default

15  judgment against Defendants in the amount of $3.5 million, reflecting the maximum available statutory

16  damage award of $100,000 per domain name (totaling $3.5 million), and costs of the action; (2) enter a

17  Permanent Injunction as specified in Plaintiffs' [Proposed] Judgment; (3) find that this is an exceptional

18  case and award Plaintiffs' reasonable attorneys' fees ($2,057,782.17); and (4) order Defendants to

19  reimburse Plaintiffs for the costs Plaintiffs paid to the Special Master ($88,937).

20  DATED: July 13, 2021                    Tucker Ellis LLP

21                                          By:  /s/David J. Steele
22                                               David J. Steele
                                                 Howard A. Kroll
23                                               Steven E. Lauridsen

24                                          Davis Polk & Wardwell, LLP
                                                 Ashok Ramani
25                                               Micah G. Block
                                                 Cristina M. Rincon
26
27                                               Attorneys for Plaintiffs,
                                                 FACEBOOK, INC. and INSTAGRAM, LLC
28

25