1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

12
13
14

FACEBOOK, INC. and INSTAGRAM, LLC,

        Plaintiffs,

   v.

15
16

ONLINENIC INC. and DOMAIN ID SHIELD SERVICE CO., LIMITED,

17
        Defendants.

Case No. 5:19-cv-07071-SVK

**[PROPOSED] DEFAULT JUDGMENT**

18
19
20
21
22
23
24
25
26
27
28

[PROPOSED] DEFAULT JUDGMENT
CASE NO. 5:19-CV-07071-SVK

Plaintiffs Facebook, Inc. ("Facebook") and Instagram, LLC's ("Instagram" and, collectively with Facebook, "Plaintiffs") Motion to Strike Defendants' Answer and for Default Judgment as to Defendants OnlineNIC, Inc. ("OnlineNIC"), Domain ID Shield Service Co., Limited ("ID Shield" and, collectively with OnlineNIC, "Defendants") is before the Court. Having considered the law, and finding that the requirements for a default judgment have all been met,

**IT IS HEREBY ORDERED** that Plaintiffs' motion is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Answer be stricken and that default judgment be entered as set forth below.

I.     STATEMENT OF FACTS

1. Facebook is a Delaware corporation with its principal place of business in Menlo Park, California.

2. Facebook offers a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.

3. Facebook owns the exclusive rights to several trademarks and service marks to provide its online services, including the distinctive FACEBOOK word mark and stylized mark, and has used the marks in connection with its services since 2004.

4. In addition to its extensive common law rights, Facebook owns numerous United States registrations for its FACEBOOK marks, including: United States Registration Number 3,122,052 and United States Registration Number 3,881,770. Facebook's common law and registered trademarks are collectively referred to as the "Facebook Trademarks."

5. Facebook's use of the Facebook Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Facebook has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Facebook and the Facebook Trademarks. As a result of Facebook's efforts and use, the Facebook Trademarks are famous (and have been famous since at least as early as 2011) as they are recognized within the US and around the world as signifying high-quality, authentic goods and services provided by Facebook.

6. Instagram, LLC is a Delaware limited liability company with its principal place of business

in Menlo Park, California.

7. Instagram offers a photo and video sharing and editing service, mobile application, and social network. Instagram users can choose to share their photos and videos with their followers online.

8. Instagram owns the exclusive rights to the distinctive INSTAGRAM word mark and stylized mark, having used the marks in connection with its goods and services as early as 2010.

9. In addition to its extensive common law rights, Instagram owns numerous United States registrations for the INSTAGRAM marks, including:

    a. United States Registration Number 4,795,634;

    b. United States Registration Number 4,146,057;

    c. United States Registration Number 4,756,754;

    d. United States Registration Number 5,566,030;

    e. United States Registration Number 4,170,675;

    f. United States Registration Number 4,856,047;

    g. United States Registration Number 4,822,600;

    h. United States Registration Number 4,827,509;

    i. United States Registration Number 4,863,595; and

    j. United States Registration Number 5,019,151.

10. Instagram's use of the Instagram Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Instagram has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Instagram and the Instagram Trademarks. As a result of Instagram's efforts and use, the Instagram Trademarks are famous (and have been famous since at least as early as 2014) as they are recognized within the US and around the world as signifying high-quality, authentic goods and services provided by Instagram. Instagram's common law and registered trademark rights are collectively referred to as the "Instagram Trademarks."

11. OnlineNIC is a California corporation with its principal place of business in San Leandro, California. OnlineNIC is a domain name registrar that sells, registers and transfers domain names for third parties.

12. OnlineNIC is accredited by ICANN and subject to ICANN's Registrar Accreditation

Agreement ("RAA").

13. ID Shield is a Hong Kong, China limited company. ID Shield provides a proxy service for OnlineNIC's customers. ID Shield registers domain names, as the registrant, and licenses these domain names to OnlineNIC's customers for their use (the "Licensees").

14. ID Shield is the registrant of the domain name, and is listed as the registrant in the WHOIS directory.

15. ID Shield has no bank accounts or assets and is undercapitalized.

16. ID Shield has no employees.

17. ID Shield does not conduct regular shareholder meetings and does not maintain corporate records.

18. OnlineNIC controls the operations of ID Shield.

19. OnlineNIC controls the policy decisions made by ID Shield.

20. OnlineNIC controls which agreements into which ID Shield enters.

21. OnlineNIC pays all of the expenses of ID Shield.

22. OnlineNIC collects all revenue from ID Shield's domain name registration proxy service.

23. OnlineNIC and ID Shield do not engage in arms-length transactions when they conduct transactions with each other.

24. Carrie Yu aka Carrie Arden aka Yu Hongxia ("Carrie Yu") owns ID Shield for the benefit of OnlineNIC.

25. Carrie Yu is a director and officer for both ID Shield and OnlineNIC.

26. The domain names domainidshield.com and onlinenic.com are hosted on the same IP address, and their websites contain links to each other.

27. The Licensees purchase and pay for the ID Shield services directly from their OnlineNIC user account.

28. ID Shield is a *de facto* subsidiary of OnlineNIC.

29. OnlineNIC and ID Shield registered, used, or trafficked in, at least the following 35 domain names that are identical or confusingly similar to the Facebook Trademarks and the Instagram Trademarks (the "Infringing Domain Names"):

| 1. buyinstagramfans.com | 19. hackingfacebook.net |
| --- | --- |
| 2. face2bouk.com | 20. hacksomeonesfacebook.com |
| 3. facebook-alkalmazasok.net | 21. iiinstagram.com |
| 4. facebook-chat-emoticons.com | 22. instaface.org |
| 5. facebook-fans-buy.com | 23. instagram01.com |
| 6. facebook-login-signup.com | 24. instakram.com |
| 7. facebook-mails.com | 25. Iamsocialfacebook.net |
| 8. facebook-pass.com | 26. learntohackfacebook.com |
| 9. facebookphysician.com | 27. login-lnstargram.com |
| 10. facebook-pw.com | 28. m-facebook-login.com |
| 11. facebookvideodownload.net | 29. ofacebooklogin.com |
| 12. facebux2.com | 30. singin-lnstargram.com |
| 13. facekhook.com | 31. trollfacebook.com |
| 14. facessbook.com | 32. watch-facebook.com |
| 15. faecb00k-page.com | 33. www-facebook-login.com |
| 16. faecbook-page.com | 34. www-facebook-pages.com |
| 17. findfacebookid.com | 35. www-instagram.net |
| 18. hackfacebook-now.com | |

30. ID Shield is the registrant for each of the Infringing Domain Names.

31. ID Shield trafficked in the Infringing Domain Names by licensing these domain names to the Licensees for their use.

32. OnlineNIC has a history of cybersquatting on famous and distinctive trademarks.

33. OnlineNIC and ID Shield profit from the sale of the ID Shield proxy service, including providing the service to the end users of the Infringing Domain Names and to OnlineNIC.

34. OnlineNIC and ID Shield profit from the sale of the ID Shield proxy service by collecting fees from the sale of that service.

35. The Licensees of the Infringing Domain Names intended to divert consumers to websites using domain names that were confusingly similar to the Facebook Trademarks and the Instagram Trademarks.

36. The Infringing Domain Names have been used for malicious activity, including hosting websites directing visitors to other commercial sites, phishing, and selling purported tools for hacking.

37. The Licensees also used some of the Infringing Domain Names in connection with email services, which is usually an indication that the domain name was used for phishing or other scams. Specifically, at least the following domain names had domain name servers configured to facilitate email: facebook-mails.com, facebook-pass.com, facebook-pw.com, facebookvideodownload.net, findfacebookid.com, hackingfacebook.net, hacksomeonesfacebook.com, login-lnstargram.com, m-facebook-login.com, and singin-lnstargram.com, trollfacebook.com.

38. Defendants have registered multiple domain names that they know are identical or confusingly similar to marks of others that were distinctive at the time of registration of the domain names, or dilutive of famous marks of others that were famous at the time of registration of the domain names.

39. Plaintiffs' Facebook Trademarks and Instagram Trademarks were distinctive and famous, when Defendants registered, used or trafficked in the Infringing Domain Names.

40. Under § 3.7.7.3 of the RAA, which is incorporated into OnlineNIC's registration agreement with registrants, OnlineNIC agreed that ID Shield "shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing [ID Shield] reasonable evidence of actionable harm."

41. Plaintiffs' authorized representatives sent at least five notices to ID Shield with evidence that the Infringing Domain Names caused Plaintiffs actionable harm and requesting that ID Shield disclose the identities of the registrant(s) ("Plaintiffs' Notices").

42. ID Shield failed to timely disclose the identity or any contact information of the licensee when presented with reasonable evidence of actionable harm by Plaintiffs or their authorized representatives that one or more domain names infringed or cybersquatted on the Facebook Trademarks and Instagram Trademarks.

II. **CONCLUSIONS OF LAW**

43. Upon default, the factual allegations of the Second Amended Complaint will be taken as

6

true.

44. The Court has federal question jurisdiction over the federal causes of action alleged in this complaint pursuant to 28 U.S.C. § 1331.

45. The Court has personal jurisdiction over Defendant OnlineNIC, and its alter ego ID Shield, because OnlineNIC maintains and operates its business in California.

46. ID Shield is an alter ego of OnlineNIC and OnlineNIC is liable for ID Shield's unlawful acts.

47. OnlineNIC is the direct participant in the unlawful acts of ID Shield, and thus is liable for the harm caused.

**A.    Defendants are liable for Cybersquatting on Plaintiffs' Trademarks Under 15 U.S.C. § 1125(d).**

48. The Facebook Trademarks and Instagram Trademarks (collectively, "Plaintiffs' Trademarks") were distinctive or famous and federally registered at the United States Patent and Trademark Office at the time Defendants and Licensees registered, trafficked in or used the Infringing Domain Names.

49. The Infringing Domain Names are identical or confusingly similar to Plaintiffs' Trademarks.

50. The Infringing Domain Names are dilutive of the Facebook Trademarks or Instagram Trademarks.

51. Defendants and Licensees registered, used, or trafficked in one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

52. Defendants and Licensees do not have any trademark or other intellectual property rights in the Infringing Domain Names.

53. The Infringing Domain Names do not consist of the legal name of any of the Defendants or Licensees, nor do they consist of a name that is otherwise commonly used to identify them.

54. Defendants and Licensees have not made any prior use of any of the Infringing Domain Names in connection with the *bona fide* offering of any goods or services.

55. Defendants and Licensees have not made any *bona fide* noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

56. With actual knowledge, Defendants and Licensees registered, used, and trafficked in one or more of the Infringing Domain Names to divert consumers from Plaintiffs' legitimate websites to a website accessible under the Infringing Domain Names for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of their websites.

57. With actual knowledge, Defendants and the Licensees registered multiple domain names which the Licensees knew were identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names.

58. Defendants and the Licensees have provided material and misleading false contact information for the Infringing Domain Names.

59. Defendants' and Licensees' registration, use, and/or trafficking in the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiffs to relief.

60. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices as required by ICANN prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' registration, use, and/or trafficking in the Infringing Domain Names in violation of the ACPA.

**B.  Defendants are liable for their Licensees' Trademark and Service Mark Infringement of Plaintiffs' Trademarks Under 15 U.S.C. § 1114.**

61. The Licensees have used Plaintiffs' Trademarks in interstate commerce.

62. The Licensees' use of Plaintiffs' Trademarks is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval by Plaintiffs of the Licensees' websites.

63. The above-described acts of the Licensees constitute trademark and service mark infringement in violation of 15 U.S.C. § 1114(1) and entitle Plaintiffs to relief.

64. The Licensees have unfairly profited from the alleged trademark and service mark infringement.

65. By reason of the Licensees' acts of trademark and service mark infringement, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Trademarks.

66. Defendants repeatedly failed to take appropriate steps to investigate and respond appropriately to any reports of domain name abuse as required by the RAA and failed to provide abusive domain name registrants' names and contact information to victims of online domain name abuse as required by ICANN.

67. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees as required by ICANN in response to Plaintiffs' Notices prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

**C.   Defendants are liable for their Licensees' False Designation of Origin Under 15 U.S.C. § 1125(a)**

68. Plaintiffs' Trademarks are distinctive marks that are associated with Plaintiffs and exclusively identify their respective businesses, products, and services.

69. The Licensees' use in commerce of Plaintiffs' Trademarks, and variations thereof, is likely to cause confusion, or to cause mistake, or to deceive the relevant public that the Licensees' goods and services are authorized, sponsored, or approved by, or are affiliated with, Plaintiffs.

70. The Licensees' acts constitute trademark and service mark infringement of Plaintiffs' Trademarks, as well as false designation of origin, in violation of 15 U.S.C. § 1125(a), entitling Plaintiffs to relief.

71. The Licensees have unfairly profited from their conduct.

72. By reason of the above-described acts of the Licensees, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Trademarks.

73. Plantiffs have a legitimate interest in investigating, enforcing, and protecting their customers and products and services from domain name abuse and fraud.

74. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices as required

by ICANN prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

### D. Defendants are liable for their Licensees' Dilution of the Facebook Trademarks and Instagram Trademarks Under 15 U.S.C. § 1125(c)

75. The Facebook Trademarks and Instagram Trademarks are famous, as that term is used in 15 U.S.C. § 1125(c), and they were famous before the Licensees' use of them and variations of the trademarks in commerce. This fame is based on, among other things, the inherent distinctiveness and federal registration of each of the Facebook Trademarks and Instagram Trademarks as well as the extensive and exclusive worldwide use, advertising, promotion, and recognition of them.

76. The Licensees' use of the Facebook Trademarks and Instagram Trademarks, and variations thereof, in commerce is likely to cause dilution by blurring or dilution by tarnishment of these trademarks.

77. The Licensees' acts constitute dilution by blurring and dilution by tarnishment in violation of 15 U.S.C. § 1125(c), entitling Facebook and Instagram to relief.

78. The Licensees have unfairly profited from their conduct.

79. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices as required by ICANN prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

## III. DAMAGES, ATTORNEYS FEES AND COSTS

80. Defendants' and Licensees' registration, use, and/or trafficking in the Infringing Domain Names willfully cybersquatted in violation of 15 U.S.C. § 1125(d).

81. Defendants employed various means to conceal both their own identity when cybersquatting and the identity of the Licensees.

82. Defendants have shown a pattern and practice of unlawful cybersquatting against famous trademarks.

83. Defendants spoliated and withheld evidence, violated this Court's orders and made material misrepresentations to the Court and to the Special Master. Defendants' behavior shows a lack of

respect for the judicial system and Defendants must be deterred from future cybersquatting.

84. By permanently deleting millions of records, including records that pertained to Defendants' trouble tickets related to complaints of domain name abuse, cybersquatting, and interactions with its customers, Defendants not only irreparably and intentionally harmed Plaintiff's ability to prosecute this case, but interfered with countless other trademark holders and law enforcement agencies investigating crimes or protecting their trademarks under law.

85. Defendants used their proxy services to conceal the identities of customers engaged in cybercrime and malicious use of domain names and obstruct the Plaintiff's legitimate investigations.

86. Plaintiffs are awarded $100,000 in statutory damages per infringing domain in accordance with the provisions of 15 U.S.C. § 1117(d).

87. Judgment shall be awarded $3,500,000 in favor of Plaintiffs and against Defendants.

88. This is an exceptional case, entitling Plaintiffs to an award of reasonable attorneys' fees under 15 U.S.C. § 1117.

89. Plaintiffs are awarded their reasonable attorneys' fees of $_____ pursuant to 15 U.S.C. § 1117 and any other applicable provision of law.

90. Plaintiffs are awarded their costs of suit incurred herein.

91. Defendants shall reimburse Plaintiffs $88,937, which represents Plaintiffs' payments to the Special Master.

## IV. PERMANENT INJUNCTION

92. Defendants and Licensees have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiffs and their federally registered trademarks and service marks.

93. Defendants and Licensees, have irreparably harmed the general public, which has an interest in being free from confusion, mistake, and deception.

94. As a result of the unlawful actions of Defendants and the Licensees, Plaintiffs have suffered and continue to suffer irreparable harm to their reputation and goodwill.

95. Plaintiffs' remedy at law is not adequate to compensate it for the injuries Defendants and Licensees inflicted on Plaintiffs.

96. The balance of hardships favor the Plaintiffs.

97. The public interest would be properly served by an injunction.

98. Accordingly, Plaintiffs are entitled to permanent injunctive relief pursuant to 15 U.S.C. § 1116.

99. Therefore, Defendants and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, are permanently enjoined and restrained from:

    a. Registering, trafficking in, or using, in any manner, any Internet domain name that incorporates, in whole or in part, Plaintiffs' Marks, or any name, mark, or designation confusingly similar thereto;

    b. Using Plaintiffs' Marks, or any other name, mark, designation, or depiction in a manner that is likely to cause confusion regarding whether Defendants are affiliated or associated with or sponsored by Plaintiff;

    c. Engaging in any activity which lessens the distinctiveness or tarnishes the Facebook Trademarks or the Instagram Trademarks;

    d. Transferring any Infringing Domain Name to a third party;

    e. Cease enabling cybercrime and fraud by concealing the identities of their customers involved in domain name abuse and trademark infringement;

    f. Continuing to provide domain name registration services to the Licensees; and

    g. Transferring funds, domain names or other assets to avoid satisfaction of judgment; and

    h. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of these activities.

100. Furthermore, Defendants and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, are Ordered to:

    a.  Relinquish all rights, title, and interest, in all domain names under their control which are identical or confusingly similar to Plaintiffs' Marks, including the Infringing Domain Names, and to transfer those domain names to Plaintiffs within 10 days of notice from Plaintiffs;

    b.  Provide accurate identifying information for each Licensee and beneficial user who has registered any of the Infringing Domain Names;

    c.  Identify all additional domain names sponsored by Defendants that are identical or confusingly similar to any of Plaintiffs' Marks and all information related to them;

    d.  To ensure compliance with this injunction, disclose the complete and accurate beneficial user information of any customer or licensee of any proxy or privacy service used or made available by domain names sponsored by Defendants within 24 hours of a submission by Plaintiffs of notice of harm;

    e.  Upon notice from Plaintiffs (or based on automatic scan for Plaintiffs' marks at the time of domain name registration), suspend within 24 hours any domain name infringing on Plaintiffs' Marks, as well as all other domains in that customer's account that are identical or confusingly similar to Plaintiffs' Marks or are used for phishing, malware, fraud and other types of domain name abuse;

    f.  To ensure compliance with this injunction, provide unrestricted WHOIS access (including the non-public contact information) to Plaintiffs or their attorneys and agents for Plaintiffs' legitimate interests, include investigating and enforcing against instances of cybersquatting and other IP enforcements and the prevention of fraud and domain name abuse involving Plaintiff's trademarks;

    g.  Publish on their website and comply with their anti-abuse processes and publish enforcement statistics;

    h.  Comply with ICANN's requirements under the Registrar Accrediation Agreement to respond to domain name abuse notifications and to disclose the information for the beneficial users or customers of any privacy or proxy service used or made available by Defendants or their affiliates within seven days of receipt of notice of actionable harm;

   i. Ensure and maintain accurate customer information listed either in public or non-public WHOIS database or in the contact information that is collected through any privacy or proxy service used or made available by Defendants;

   j. Consistent with ICANN's requirements, cease the deletion of business records and back-ups, and maintain proper back-up of their ticketing system and domain name registration databases, except as required by law; and

   k. Disclosing to the Court and to all parties within 72 hours any funds, domain names or other assets transferred from Defendants since June 1, 2021 and to whom those assets were transferred.

DATED: _____   _____

              Susan van Keulen
              U.S. Magistrate Judge