TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:      213.430.3400
Facsimile:       213.430.3409

DAVIS POLK & WARDWELL LLP
Ashok Ramani SBN 200020
ashok.ramani@davispolk.com
Micah G. Block SBN 270712
micah.block@davispolk.com
Cristina M. Rincon (*Pro Hac Vice*)
Cristina.rincon@davispolk.com
1600 El Camino Real
Menlo Park, CA 94025
Telephone:      650.752.2000
Facsimile:       650.752.2111

Attorneys for Plaintiffs,
FACEBOOK, INC. and INSTAGRAM, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ONLINENIC INC.; DOMAIN ID SHIELD SERVICE CO., LIMITED; and XIAMEN 35.COM INTERNET TECHNOLOGY CO., LTD., <br><br> Defendants. | Case No. 5:19-cv-07071-SVK <br><br> **PLAINTIFFS' EMERGENCY EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER FREEZING DEFENDANTS' ASSETS;** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Hon. Susan van Keulen |

**NOTICE OF EX PARTE APPLICATION**

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Civil Local Rule 7-10 and Rule 65 of the Federal Rules of Civil Procedure, this Court's inherent authority, and the All Writs Act, Plaintiffs Facebook, Inc. and Instagram, LLC hereby move ex parte for a temporary restraining order to prevent Defendants from dissipating their assets pending payment in full of the court-appointed Special Master in this action as well as to ensure satisfaction of any judgment that may be entered resulting from Plaintiffs' unopposed motion for default judgment.

The grounds for this ex parte application are that Defendants have stated they intend to cease all business operations five days from today on July 25, 2021 despite the fact that Defendants owe a substantial sum to the Special Master for his investigation into Defendants' mass spoliation of evidence and despite the fact that Defendants have filed a notice of non-opposition (ECF No. 120) to Plaintiffs' motion for terminating sanctions (ECF No. 117), which seeks a substantial default judgment. Defendant OnlineNIC has a history of violating court orders and attempting to dissipate its assets to avoid financial responsibilities in other actions, raising concerns that OnlineNIC and its alter ego Domain ID Shield will dissipate their assets to avoid their liabilities.

This ex parte application is based on this Notice, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of David J. Steele ("Steele Decl."), any oral argument heard by the Court, such additional evidence as may be submitted to the Court, matters as to which the Court may take judicial notice, and such other matters as the Court deems proper. Plaintiffs' counsel met and conferred with Defendants' counsel and gave notice prior to this application's filing with further notice being delivered via CM/ECF upon the filing of this application.

DATED: July 21, 2021

Tucker Ellis LLP

By: /s/David J. Steele
   David J. Steele
   Howard A. Kroll
   Steven E. Lauridsen

Davis Polk & Wardwell, LLP
   Ashok Ramani
   Micah G. Block
   Cristina M. Rincon

   Attorneys for Plaintiffs,
   FACEBOOK, INC. and INSTAGRAM, LLC

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................... 1

II. STATEMENT OF FACTS WARRANTING EMERGENCY RELIEF ..................... 4

    A. Defendants are notorious cybersquatters and alter egos of one another. .......... 4

    B. A Special Master was appointed to investigate Defendants' discovery misconduct. ...................................................................................................... 4

    C. Defendants ceased paying the Special Master for his services once the Special Master found that they intentionally destroyed vast amount of evidence relevant to this case. ........................................................................ 5

    D. Plaintiffs filed an unopposed motion for terminating sanctions and for entry of default judgment against Defendants. ................................................ 6

    E. Defendants have a history of dissipating their assets to avoid paying liabilities. ........................................................................................................... 6

III. EMERGENCY RELIEF IS APPROPRIATE TO PREVENT DEFENDANTS FROM DISSIPATING THEIR ASSETS. ................................................................ 7

    A. The Court has the equitable power and inherent authority to freeze Defendants' assets. ........................................................................................... 7

    B. Emergency relief freezing Defendants' asserts is warranted and necessary. ........................................................................................................ 8

IV. CONCLUSION ...................................................................................................... 11

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters Local 70,*
  415 U.S. 423 (1974) .................................................................................................................. 8

*Microsoft Corp. v. A-Tech Corp.,*
  855 F. Supp. 308 (C.D. Cal. 1994) ........................................................................................... 8

*N. Hollywood Marble Co. v. Superior Court,*
  157 Cal. App. 3d 683 (Cal. App. 2d Dist. 1984) ...................................................................... 8

*Reebok Int'l Ltd. v. Marnatech Enters.,*
  970 F.2d 552 (9th Cir. 1992) .................................................................................................... 7

*Republic of the Philippines v. Marchos,*
  862 F.2d 1355 (9th Cir. 1988) .................................................................................................. 7

*United States v. First Nat'l City Bank,*
  379 U.S. 378 (1965) .................................................................................................................. 8

*United States v. New York Tel. Co.,*
  434 U.S. 159 (1977) .................................................................................................................. 8

*Verizon Cal. Inc. v. Lead Networks Domains Private Limited,*
  No. CV 09-613-ABC, 2009 WL 10700112 (C.D.Cal. Feb. 17, 2009) ..................................... 4

*Verizon Cal. Inc. v. OnlineNIC, Inc.,*
  647 F. Supp. 2d 1110 (N.D. Cal. 2009) ............................................................................... 1, 7

*Verizon Cal. Inc. v. OnlineNIC, Inc.,*
  No. C 08-2832 JF (RS), 2009 WL 2706393 (N.D. Cal. Aug. 25, 2009) .................................. 4

**Statutes**

15 U.S.C. § 1116(a) ........................................................................................................................ 7

Cal. Civ. P. § 483.010 .................................................................................................................... 8

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

**Rules**

Fed. R. Civ. P. 64(a) ........................................................................................................................ 8

Fed. R. Civ. P. 64(b) ........................................................................................................................ 8

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Emergency relief from the Court is essential because Defendants OnlineNIC, Inc. and Domain ID Shield Service Co., Limited ("Defendants") are serial cybersquatters who recently began to dissipate their assets—namely, their domain name portfolio—to avoid paying their liabilities both to the court-appointed Special Master in this action and in satisfaction of the default judgment for which Plaintiffs have moved. Plaintiffs are particularly concerned that Defendants will continue to dissipate their assets in light of the following:

*First*, Defendants began dissipating their assets on July 19, 20201. Through their own investigation and due diligence conducted on July 20, 2021, Plaintiffs discovered that Defendants initiated the transfer of their domain name portfolio on July 19 and 20, 2021 away from OnlineNIC to another registrar. Steele Decl. ¶ 5.

*Second*, Defendants owe the Special Master $74,812, and they have informed the Court that they cannot pay that invoice.

*Third*, Defendants filed a declaration with the Court stating that they intend to cease business operations on July 25, 2021. ECF No. 121-2.

*Fourth*, Plaintiffs' motion for default judgment, which Defendants do not oppose, seeks over $5.5 million in damages, attorneys' fees, and costs; and

*Fifth*, Defendants previously have been sanctioned by this Court for dissipating their assets in violation of a Court order. *Verizon Cal. Inc. v. OnlineNIC, Inc.*, 647 F. Supp. 2d 1110, 1117-19 (N.D. Cal. 2009).

Given that Defendants have begun to dissipate their assets and Defendants intend to cease doing business on July 25, Plaintiffs fear that Defendants are likely to destroy, move, hide, or otherwise make their assets inaccessible, thereby both shirking their obligations to pay the Special Master for his work and also frustrating Plaintiffs' ability to recover any judgment that the Court may enter. Consequently, Plaintiffs request that the Court issue a temporary restraining order freezing certain of Defendant's assets as follows:

1. Defendants shall immediately provide to the Court an accounting of all of their assets, including, but not limited to, (a) all of Defendants' bank account numbers and those accounts' respective balances as of the date the temporary restraining order is entered; (b) Defendants' ownership interest in any other companies; and (c) any other assets including cash balances, real estate, physical property, accounts receivable, or income.

2. Except to pay costs directly necessary to maintain the day-to-day operations[1] of their business (e.g., renewing customer domain names, paying for servers, paying any employees), Defendants, as well as their officers, agents, servants, employees, or attorneys, or any other person who is in active concert or participation with them, ***shall not*** transfer, dissipate, abscond, hide, secret away, borrow against, or pledge any of Defendants' assets, including by:

   a) Transferring, releasing, deleting, or assigning any domain names owned or controlled by Defendants, including but not limited to the domain names listed in Exhibit 1 to the Steele Declaration (the "Defendants' Domain Names");

   b) Transferring or withdrawing any funds from any bank account;

   c) Transferring or using any funds from PayPal accounts and any other third-party payment processor, except that those funds may be deposited into one of Defendants' bank accounts identified by Defendants in response to (1) above;

   d) Transferring or using any funds from Visa, MasterCard, American Express, or any other credit card company as well as any credit card processing company, except that those funds may be deposited into one of Defendants' bank accounts identified by Defendants in response to (1) above;

   e) Transferring or using any funds held in any attorney-client trust account;

   f) Selling, leasing, loaning, pledging, or otherwise encumbering any physical assets or infrastructure, including any computer server or equipment of value;

   g) Assigning any employee compensation or benefit plan or requesting any return of

---

[1] Any payment to Xiamen 35.com Internet Technology Co., Ltd. a/k/a 35.CN ("35.CN") for any purpose must first be approved by Plaintiffs' counsel.

such funds from the plan coordinator;

  h) Selling, assigning, or otherwise transferring any equity Defendants own in any other companies identified by Defendants in response to (1) above; and

  i) Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of these activities.

3. An independent domain name broker ("Broker") mutually agreed upon by counsel for Plaintiffs and Defendants shall liquidate Defendants' Domain Names within forty-five days and hold the proceeds in escrow. If counsel cannot agree on a Broker within five court days, the parties shall provide the Court with their respective proposed Broker, and the Court shall select the Broker. This liquidation shall otherwise proceed as follows:

  a) The registry operator of record for each of Defendants' Domain Names shall change the registrar of record for each of Defendants' Domain Names to a registrar selected by the Broker;

  b) The registrar of record selected by the Broker shall place Defendants' Domain Names into a user account controlled by the Broker;

  c) The Broker shall serve a copy of the temporary restraining order on the appropriate registry operators and registrars as necessary to facilitate the transfer of Defendants' Domain Names;

  d) The Broker shall use his or her best judgment[2] to maximize the proceeds obtained from the liquidation, including by bundling one or more of Defendants' Domain Names together for the sale, renewing or not renewing certain of Defendants' Domain Names from the proceeds of any sales, and monetizing certain of Defendants' Domain Names;

  e) The Broker shall provide periodic status reports of the Broker's efforts;

---

[2] The Broker is empowered to exercise his/her discretion to avoid the sale of any domain names included in the Defendant's Domain Names that pose a known cybersecurity or a cybersquatting risk.

3

EMERGENCY EX PARTE APPLICATION FOR TRO FREEZING DEFENDANTS' ASSETS
Case No. 5:19-cv-07071-SVK

   f) At the conclusion of the liquidation, the Broker shall provide an accounting to the Court; and

   g) The Broker's fees shall be paid from the proceeds of the liquidation, and the remaining proceeds shall be held in escrow by the Broker until instructed by the Court.

## II. STATEMENT OF FACTS WARRANTING EMERGENCY RELIEF

### A. Defendants are notorious cybersquatters and alter egos of one another.

OnlineNIC is an ICANN accredited registrar[3] that sells, registers and transfers domain names for third parties. Second Amended Complaint ("SAC") ¶¶ 9, 26. ID Shield provides a proxy service for OnlineNIC's customers.[4] ID Shield registers domain names, as the registrant, and licenses those domain names to OnlineNIC's customers. *Id.* ¶¶ 10, 27-28. ID Shield (a) has no employees, (b) has no assets, (c) does not control its own operations (which are entirely controlled by OnlineNIC), (d) does not conduct regular (or any) shareholder meetings and (e) has its expenses paid by OnlineNIC. *Id.* ¶¶ 30-43. Furthermore, an officer of OnlineNIC holds shares of ID Shield "for the benefit of OnlineNIC." *Id.* ¶ 39. In 2009, OnlineNIC was found liable for cybersquatting resulting in a judgment of $33,150,000 in damages to Verizon. *Verizon Cal. Inc. v. OnlineNIC, Inc.*, No. C 08-2832 JF (RS), 2009 WL 2706393 at *1, *5, *9 (N.D. Cal. Aug. 25, 2009) (finding that "OnlineNIC runs a 'massive cybersquatting operation'" and awarding $50,000 per domain name as statutory damages).

### B. A Special Master was appointed to investigate Defendants' discovery misconduct.

Throughout this litigation, Defendants have engaged in a pattern of discovery abuses.[5] Following

---

[3] ICANN refers to the Internet Corporation for Assigned Names and Numbers. ICANN accredits domain name registrars, including OnlineNIC, to register internet domain names. OnlineNIC is "in a position of trust by ICANN as well as the Internet community." *See Verizon Cal. Inc. v. Lead Networks Domains Private Limited*, No. CV 09-613-ABC, 2009 WL 10700112 at *9 (C.D.Cal. Feb. 17, 2009).

[4] A "'Proxy Service' is a service through which a Registered Name Holder licenses use of a Registered Name to the . . . Customer in order to provide the . . . Customer use of the domain name, and the Registered Name Holder's contact information is displayed in the Registration Data Service (Whois) or equivalent services rather than the . . . Customer's contact information." ECF No. 109-4, at p. 59 (ICANN's 2013 Registrar Accreditation Agreement ("RAA"), "Specification On Privacy And Proxy Registrations § 1.3).

[5] For example, in response to request for financial documents, Defendants made a representation to the

a number of motions on these discovery issues, the Court appointed a Special Discovery Master on March 3, 2021 to, *inter alia*, "supervise and complete, with all reasonable diligence, Defendants' collection, search, and production to Plaintiffs' counsel of Defendants' support ticket database." ECF No. 72 at 1. The Special Master prepared his report to "determin[e] the adequacy of Defendants' past productions to Plaintiffs and whether Defendants destroyed or withheld data from the Kayako Ticket Database." *Special Discovery Master's Data Destroyed or Withheld Report* ("Report"), ECF No. 115, at 2. The parties agreed on the selection of the Special Master and also agreed to split his costs 50/50.[6] The Court subsequently entered its order adopting this agreement and appointing the Special Master. ECF No. 72.

### C. Defendants ceased paying the Special Master for his services once the Special Master found that they intentionally destroyed vast amount of evidence relevant to this case.

The Special Master's Report concluded that Defendants have intentionally withheld evidence, obfuscated the discovery process, and most alarmingly, destroyed evidence that is vital to Plaintiffs' claims and, as a result, is now irrecoverable. Report at 39-41. The Special Master further concluded that "Plaintiffs suffered irreparable harm" and "will continue to suffer harm" as a result of Defendants' spoliation of evidence. *Id.* at 40-41. The Report, and over 100 pages of exhibits, establish that "there is ample evidence that Defendants failed to preserve responsive ESI, deleted ESI, and withheld ESI." *Id.* at 2.

On June 9, 2021, the Special Master provided to the parties his draft Report containing these preliminary findings, and on June 23, 2021, the Special Master issued an invoice for his unpaid work to date. Plaintiffs promptly paid their share of this invoice and of all subsequently issued invoices such that

---

Court that "Domain ID Shield has no further documents." ECF No. 79, Ex. 5. After the Court ordered production (ECF No. 81 at 2), Defendants initially failed to produce relevant documents and Plaintiffs moved to compel. On the day Defendants responded with their portion of the joint discovery letter brief (ECF No. 96), Defendants produced financial statements and tax returns of OnlineNIC **and financial statements of ID Shield**. Although the Court denied the motion (ECF No. 104), the Court was concerned about "the early representations that there were no such records and then the production of these records." Hearing on May 11, 2021, Tr. at 8. The Court further expressed "some concerns about the reluctance and misrepresentations around getting these documents produced." *Id.*

[6] Although the parties agreed upon a 50/50 interim division of the Special Master's costs and fees, the Court stated that Plaintiffs could later seek reimbursement for their share at the appropriate juncture.

they have a zero balance with the Special Master. Defendants, however, have not made *any* payments to the Special Master since their initial deposit of funds and have, in fact, declared their inability to pay the Special Master at all. *See, e.g.*, ECF Nos. 116 at 6 n.5, 118 at ¶¶ 6-7. Defendants made their representation concerning their inability to pay the Special Master despite having retained an independent expert to unsuccessfully challenge the Special Master's findings (Hr'g Tr., 12:20-13:21, Jul. 20, 2021), thus indicating that Defendants have funds (*id.* at 15:9-16) but that they simply do not wish to use those funds to pay the Special Master for uncovering their malfeasance or to satisfy any judgment against them.

### D.   Plaintiffs filed an unopposed motion for terminating sanctions and for entry of default judgment against Defendants.

Based on the Special Master's findings of mass spoliation of evidence by Defendants, Plaintiffs filed on July 13, 2021 a motion for terminating sanctions requesting the Court to: (1) strike Defendants' Answer and enter default judgment against Defendants in the amount of $3.5 million, reflecting the maximum available statutory damage award of $100,000 per domain name (totaling $3.5 million), and costs of the action; (2) enter a permanent injunction; (3) find that this is an exceptional case and award Plaintiffs' reasonable attorneys' fees ($2,057,782.17); and (4) order Defendants to reimburse Plaintiffs for the costs Plaintiffs paid to the Special Master ($88,937). ECF No. 117 at 25.

Rather than oppose this motion, Defendants filed a notice of non-opposition (ECF No. 120) and further informed the Court that they no longer intended to defend this action and would instead simply cease doing business on July 25, 2021. ECF No. 118 ¶¶ 7-8. Defendants' actions make clear that they do not intend to honor legal process, the agreements they have made, or their obligations as a litigant before this Court. Rather, because their misdeeds have come to light and the consequences are unfolding, they intend to simply elide the liabilities coming due and engage in self-help out of court by tying up their corporate affairs and ceasing to exist without even declaring bankruptcy. A temporary restraining order is thus necessary to prevent Defendants from dissipating their assets—which they have alarmingly begun to do even after the July 20, 2021 case management conference—in order to avoid paying the Special Master and any judgment the Court may enter.

### E.   Defendants have a history of dissipating their assets to avoid paying liabilities.

OnlineNIC's conduct in this action is particularly inexcusable because it is not the first time

OnlineNIC has flouted its discovery obligations before this Court, attempted to dissipate its assets, or deliberately disobeyed this Court's discovery and anti-dissipation orders. Nor is it the first time the Court has sanctioned OnlineNIC for such conduct. In *Verizon Cal. Inc. v. OnlineNIC, Inc.*, 647 F. Supp. 2d 1110 (N.D. Cal. 2009), Judge Fogel held OnlineNIC in civil contempt for multiple violations of court orders, finding "by clear and convincing evidence" that OnlineNIC violated court orders by producing a selective subset of data and failing to produce required documents in discovery. *Id.* at 1114, 1120-21. The Court also found by clear and convincing evidence that OnlineNIC violated the Modified Injunction entered in the case to prevent OnlineNIC from dissipating its assets, "form[ing] part of a much larger pattern of noncompliance." *Id.* at 1118. OnlineNIC was sanctioned $30,600 in addition to having default judgment of $33.15 million entered against it. *Id.* at 1121, 1128. Apparently, these sanctions and this judgment, while substantial, were insufficient to deter OnlineNIC from similar conduct here, thus making the issuance of a temporary restraining order all the more necessary and pressing.

## III.  EMERGENCY RELIEF IS APPROPRIATE TO PREVENT DEFENDANTS FROM DISSIPATING THEIR ASSETS.

### A.  The Court has the equitable power and inherent authority to freeze Defendants' assets.

In trademark cases, the Court has the power to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116(a). The Ninth Circuit has particularly recognized the Court's power to issue an order to prevent a defendant from dissipating assets and to protect a plaintiffs' right to recovery. *Republic of the Philippines v. Marchos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (the "court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies"); *Reebok Int'l Ltd. v. Marnatech Enters.,* 970 F.2d 552, 558-59 (9th Cir. 1992) ("[Section] 1116(a) might authorize a pre-judgment freeze of a defendant's assets if such action is necessary to protect a plaintiff's right to recovery of § 1117 profits and damages and to ensure that a defendant my not benefit by willfully engaging in illegal trademark activity.") (en banc), *cert denied*, 490 U.S. 1035 (1989).

Further, the United States Supreme Court has "repeatedly recognized the power of a federal court

to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977).

Finally, the Court has the authority, once personal jurisdiction of a party is obtained, to freeze property to preserve the *status quo* and prevent dissipation of assets. *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965). In fact, Rule 64(a) of the Federal Rules of Civil Procedure makes available to district courts "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action." In addition, Rule 64(b) lists attachment as one such available remedy, along with "other corresponding or equivalent remedies, however designated." *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters Local* 70, 415 U.S. 423, 436 n.10 (1974) ("[L]ong-settled federal law provide[s] that in all cases in federal court, . . . state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to secure satisfaction of the judgment ultimately entered."). Defendants' obligation to pay the Special Master $74,812, is a claim subject to attachment under California law. *See* Cal. Civ. P. § 483.010.

In a trademark case, an asset freeze order is essentially a writ of attachment under California state law. *Microsoft Corp. v. A-Tech Corp.*, 855 F. Supp. 308, 312 (C.D. Cal. 1994) ("There can be little disagreement that an asset freeze order in a trademark case has the same force and effect of an attachment pursuant to state law, and for all intents and purposes they are the same procedural device even though each derives its existence from separate legal sources."). Further, attachment is used to ensure that the alleged debtor's assets are not dissipated prior to the enforcement of a judgment. *N. Hollywood Marble Co. v. Superior Court*, 157 Cal. App. 3d 683, 690, 204 Cal. Rptr. 55, 60 (Cal. App. 2d Dist. 1984) ("The primary purpose of the remedy of attachment is to allow unsecured creditors a procedure ancillary to their action by which to ensure that the alleged debtor's assets are not dissipated prior to the time the creditor can obtain and enforce the anticipated judgment on his claim.").

**B.  Emergency relief freezing Defendants' asserts is warranted and necessary.**

Emergency relief from this Court is both warranted and necessary. In fact, through their own investigation and due diligence conducted on July 20, 2021, Plaintiffs discovered that Defendants began dissipating their assets by initiating the transfer of their domain name portfolio on July 19 and 20, 2021

8

EMERGENCY EX PARTE APPLICATION FOR TRO FREEZING DEFENDANTS' ASSETS
Case No. 5:19-cv-07071-SVK

away from OnlineNIC to another registrar.[7] Steele Decl. ¶ 5. These domain names have tremendous value if sold by an independent Broker. *Id.* ¶ 7.

This pattern of conduct confirms Plaintiffs' concerns that Defendants intend to walk away from their liabilities in this case.  In fact, Defendants have essentially telegraphed to the Court that they intend to do so here, because they have stated that they purportedly cannot pay the Special Master while also stating that they intend to cease doing business in five days, despite their representations to the Court that they are cash flow positive (Hr'g Tr., 15:9-16, Jul. 20, 2021). Additionally, with the electronic nature of certain assets—such as domain name portfolios—that make those assets subject to quick, easy, and untraceable movement and destruction, a temporary restraining order freezing Defendants assets is necessary. Moreover, it is consistent with Defendants' history of circumventing court orders and dissipating their assets to avoid paying cybersquatting judgments.

Plaintiffs therefore request that the Court enter a temporary restraining order freezing certain of Defendant's assets as follows:

1. Defendants shall immediately provide to the Court an accounting of all of their assets, including, but not limited to, (a) all of Defendants' bank account numbers and those accounts' respective balances as of the date the temporary restraining order is entered; (b) Defendants' ownership interest in any other companies; and (c) any other assets including cash balances, real estate, physical property, accounts receivable, or income.

2. Except to pay costs directly necessary to maintain the day-to-day operations of their business (e.g., renewing customer domain names, paying for servers, paying any employees), Defendants, as well as their officers, agents, servants, employees, or attorneys, or any other person who is in active concert or participation with them, ***shall not*** transfer, dissipate, abscond, hide, secret away, borrow against, or pledge any of Defendants' assets, including by:

   a) Transferring, releasing, deleting, or assigning any domain names owned or controlled by Defendants, including but not limited to the domain names listed in

---

[7] Following a late-night call between the parties' respective counsel on July 20, 2021 once Plaintiffs discovered these transfers, Defendants' counsel stated he had just learned about the transfers at 6:00 p.m. that evening and had instructed his clients to cease all such transfers. Steele Decl. ¶ 8.

       Exhibit 1 to the Steele Declaration (the "Defendants' Domain Names");

  b) Transferring or withdrawing any funds from any bank account;

  c) Transferring or using any funds from PayPal accounts and any other third-party payment processor, except that those funds may be deposited into one of Defendants' bank accounts identified by Defendants in response to (1) above;

  d) Transferring or using any funds from Visa, MasterCard, American Express, or any other credit card company as well as any credit card processing company, except that those funds may be deposited into one of Defendants' bank accounts identified by Defendants in response to (1) above;

  e) Transferring or using any funds held in any attorney-client trust account;

  f) Selling, leasing, loaning, pledging, or otherwise encumbering any physical assets or infrastructure, including any computer server or equipment of value;

  g) Assigning any employee compensation or benefit plan or requesting any return of such funds from the plan coordinator;

  h) Selling, assigning, or otherwise transferring any equity Defendants own in any other companies identified by Defendants in response to (1) above; and

  i) Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of these activities.

3. An independent domain name broker ("Broker") mutually agreed upon by counsel for Plaintiffs and Defendants shall liquidate Defendants' Domain Names within forty-five days and hold the proceeds in escrow. If counsel cannot agree on a Broker within five court days, the parties shall provide the Court with their respective proposed Broker, and the Court shall select the Broker. This liquidation shall otherwise proceed as follows:

  a) The registry operator of record for each of Defendants' Domain Names shall change the registrar of record for each of Defendants' Domain Names to a registrar selected by the Broker;

  b) The registrar of record selected by the Broker shall place Defendants' Domain Names into a user account controlled by the Broker;

c) The Broker shall serve a copy of the temporary restraining order on the appropriate registry operators and registrars as necessary to facilitate the transfer of Defendants' Domain Names;

d) The Broker shall use his or her best judgment to maximize the proceeds obtained from the liquidation, including by bundling one or more of Defendants' Domain Names together for the sale, renewing or not renewing certain of Defendants' Domain Names from the proceeds of any sales, and monetizing certain of Defendants' Domain Names;

e) The Broker shall provide periodic status reports of the Broker's efforts;

f) At the conclusion of the liquidation, the Broker shall provide an accounting to the Court; and

g) The Broker's fees shall be paid from the proceeds of the liquidation, and the remaining proceeds shall be held in escrow by the Broker until instructed by the Court.

## IV.    CONCLUSION

To ensure that Defendants immediately cease their dissipation of assets in an effort to avoid paying their share of the Special Master's costs and any potential judgment the Court may enter, Plaintiffs respectfully request that the Court grant this application and enter a temporary restraining order freezing Defendants' assets.

DATED: July 21, 2021                                      Tucker Ellis LLP

By: /s/David J. Steele
David J. Steele
Howard A. Kroll
Steven E. Lauridsen

Davis Polk & Wardwell, LLP
Ashok Ramani
Micah G. Block
Cristina M. Rincon

Attorneys for Plaintiffs,
FACEBOOK, INC. and
INSTAGRAM, LLC