Perry J. Narancic, SBN 206820
LEXANALYTICA, PC
3000 El Camino Real
Bldg. 4, Suite 200
Palo Alto, CA  94306
www.lexanalytica.com
pjn@lexanalytica.com
Tel: 650-655-2800

Attorneys for Defendants
ONLINENIC, INC. and DOMAIN ID SHIELD SERVICE
CO., LIMITED

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>ONLINENIC, INC. and DOMAIN ID SHIELD SERVICE CO., LIMITED.<br><br>　　　　　Defendants. | Case No. 19-CV-07071-SVK<br><br>**DEFENDANTS' OPPOSITION RE: PLAINTIFFS' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AT DKT. NO. 129** |

Defendants OnlineNIC, Inc. and Domain ID Shield Service Co., Limited ("Defendants") partially oppose Plaintiffs' Ex Parte Application for a Temporary Restraining Order at Dkt. No. 129 ("TRO Application").  There are essentially two parts to the TRO Application: (a) a general asset freeze ("Asset Freeze"), and (b) a specific provision for transferring certain domains to an independent domain name broker for sale ("Broker Order").

　　　　**1.　　There is no justification for a general asset freeze**

Plaintiffs justify their TRO Application on the grounds that Defendants are allegedly trying to sell domains in order to avoid paying the Special Master (TRO Application., 11:1-7; 6: 17-26). That is inaccurate. Defendants transferred some domains that they own (the "Defendant Domains") to a registrar called "Ename" (www.ename.com)  - which is the largest domain broker platform in

- 1-

1   China.  Declaration of Carrie Yu in Support of Defendants' Opposition Re: Plaintiffs' Ex Parte
2   Application For A Temporary Restraining Order ("Yu Decl."), ¶ 3. Defendants intended to auction
3   the Defendant Domains for the purpose of paying the Special Master in this case. Yu Decl., ¶ 5-6.
4   At the request of Plaintiffs, Defendants voluntarily cancelled or reversed these registrar transfers.
5   Yu Decl., ¶ 8. For clarity, Defendants did not transfer *ownership* of the domains; they just
6   changed where they were registered. By having the domains moved to the registrar that was being
7   used to sell the domains, the auction and transfer process would have been seamless. Yu Decl., ¶ 3.
8       It is important to note that Defendants' commitment to paying the Special Master is not
9   "new found" religion.  In fact, on June 29, 2021 (before a large part of the Special Master's last
10  invoice amount was incurred), Defendants wrote to the Special Master asking him to *suspend his*
11  *work until conferring with the Court*:



25      The June 29 email specifically states that Defendants' intended to pay the Special Master's
26  invoice from cash flow from business operation.  When OnlineNIC decided to no longer defend
27  the litigation on July 13, 2021, the only way to pay the Special Master was to start selling the
28  Defendant Domains.  With this in mind, OnlineNIC started transferring Defendant Domains on

- 2-

Facebook, Inc. v. OnlineNIC, Inc.      Case No. 19-cv-7071-SVK
Defendants' Statement Re Plaintiffs' TRO Application at Dkt. No. 129

July 19, 2021 and July 20, 2021 to Ename.  Yu Decl., ¶ 5-6. To be clear, Defendant had contingency plans to pay the Special Master in the event that business operations ceased. As discussed below, OnlineNIC has already secured an offer to purchase the Defendant Domains in an amount sufficient to pay the Special Master.  Accordingly, an asset freeze is not justified.

### 2. An asset freeze would undermine the ability of OnlineNIC to be sold as a going concern.

OnlineNIC staff wish to stay together because they have worked together for years.  In addition, selling the company as a going concern would be in the best interest of customers, since this would avoid transfers of registration data to new parties.  For these reasons, in a letter to Plaintiffs sent on July 21, 2021, Defendants re-iterated their earlier proposal to Plaintiffs that Plaintiffs should allow OnlineNIC, Inc. to be sold as a going concern, which would maximize return for all parties:

> Further to today's case management conference, I write to you to revisit Defendants' proposal about continuing business operations, which we previously discussed. As you recall, Defendants sought Facebook's consent to continue business operations until its business could be sold as a going concern.  This would solve a lot of problems, including getting the Special Master paid and maximizing any recovery for Plaintiffs.  I have not yet re-connected with my clients, but I believe that 6 months would be sufficient to find a buyer.

Plaintiff's have apparently not agreed with that proposal, because Plaintiffs' proposed Asset Freeze would effectively block the sale of the company as a going concern, since few buyers would bother working through the legal constraints of an asset freeze to which the seller is subject.

### 3. The Asset Freeze is overbroad

Even if the Asset Freeze is granted, it should not prevent OnlineNIC from paying reasonable legal fees and costs associated with finalizing this litigation. Like any client, OnlineNIC is entitled to a vigorous defense within the bounds of the law.  *Hawk v. Superior Court*, 42 Cal. App. 3d 108, 126, ("The duty of a lawyer, both to his client and to the legal system, is to represent his client zealously within the bounds of the law").  Stripping Defendants of their property, and their ability to pay legal counsel, verges on the precipice of unconstitutionality.

The proposed Asset Freeze is also fraught with uncertainty and ambiguity.  Plaintiffs provide a carve out for "day-to-day operations", but what are those?  Plaintiffs admit that this

- 3-

Facebook, Inc. v. OnlineNIC, Inc.                                                                          Case No. 19-cv-7071-SVK
Defendants' Statement Re Plaintiffs' TRO Application at Dkt. No. 129

includes "paying employees" – but Plaintiffs also propose that they have a veto over any payments to 35.CN, even though Plaintiffs know that 35.CN provides employees to OnlineNIC pursuant to an Outsourcing Agreement dating back years.  All of the Operating Agreements were provided to Plaintiff's in discovery.  Yu Decl., ⁋ 7. Therefore, Plaintiffs should not have any veto rights when it comes to making payments to 35.CN for ordinary payments made under the operative Outsourcing Agreement.  However, Defendants can agree not to make any payments to 35.CN beyond the contractual amounts due under the Outsourcing Agreements.

**4.     Defendants stipulate to the Broker Order if another buyer does not purchase the Defendant Domains within 7 days.**

*Before* the TRO was filed, Defendants agreed to stipulate to parts of the TRO, as set forth in a July 21, 2021 letter:

> Also, as discussed, Defendants will agree to deliver control over domain names that it controls to a neutral third-party, so that they can be sold and the proceeds used to pay the Special Master. If you have a proposal on such a neutral third-party, please let me know. For your reference, I attach a spreadsheet with the domain names that are currently registered to "Anthonny".

Declaration of Perry J. Narancic in Support of Defendants' Opposition Re: Plaintiffs' Ex Parte Application For A Temporary Restraining Order ("Narancic Decl."), ⁋ 1, Ex. A. However since this letter was written, Defendants have identified a buyer for the Defendant Domains who is willing to pay approximately $70,000 for the portfolio.  Yu Decl., ⁋ 9. These are funds that could be quickly available to pay the Special Master, and Defendants ask that any Broker Order become effective only after July 30, 2021.  If the proposed transaction does not close before then, and if the Special Master is not paid by then,  Defendants will transfer the Defendant Domains in accordance with the Broker Order.  In that case, Defendants request that the Broker Order specifically state that all proceeds first go to pay the Special Master, with any remainder to be impounded.

- 4-

Facebook, Inc. v. OnlineNIC, Inc.                                                                                   Case No. 19-cv-7071-SVK
Defendants' Statement Re Plaintiffs' TRO Application at Dkt. No. 129

- 5 -

| | |
|---|---|
| | Respectfully Submitted, |
| DATED: July 23, 2021 | LEXANALYTICA, PC |
| | By: /s/ Perry J. Narancic |
| | Attorneys for Defendants<br>ONLINENIC, INC. and DOMAIN ID SHEILD SERVICE CO., LIMITED |