TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:        213.430.3400
Facsimile:        213.430.3409

DAVIS POLK & WARDWELL LLP
Ashok Ramani SBN 200020
ashok.ramani@davispolk.com
Micah G. Block SBN 270712
micah.block@davispolk.com
Cristina M. Rincon (*Pro Hac Vice*)
Cristina.rincon@davispolk.com
1600 El Camino Real
Menlo Park, CA 94025
Telephone:    650.752.2000
Facsimile:    650.752.2111

Attorneys for Plaintiffs,
FACEBOOK, INC. and INSTAGRAM, LLC

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC, | Case No. 3:19-cv-07071-SI |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO 35.CN'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| v. | |
| ONLINENIC INC.; DOMAIN ID SHIELD SERVICE CO., LIMITED; and XIAMEN 35.COM INTERNET TECHNOLOGY CO., LTD., | DATE: December 3, 2021
TIME: 10:00 a.m.
CTRM: 1 – 17th Floor |
| Defendants. | Hon. Susan Illston |
| | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   35.CN'S FED. R. CIV. P. 12(B)(2) MOTION SHOULD BE DENIED. .................... 3

    A.    12(b)(2) Motion to Dismiss Standard ................................................ 3

    B.    General personal jurisdiction exists over 35.CN in California because it is
    the alter ego of OnlineNIC, a California company. ........................................ 3

        1.    Unity of Interest ................................................................ 4

        2.    Failure to disregard 35.CN's and OnlineNIC's separate identities
        would result in fraud or injustice. ................................................ 10

    C.    35.CN is subject to specific jurisdiction in California. ............................... 11

        1.    35.CN purposefully availed itself of the benefits of doing
        business in California. ......................................................... 12

        2.    Plaintiffs' claims against 35.CN arise out of its California
        activities. ...................................................................... 13

        3.    Exercising jurisdiction over 35.CN is reasonable. ........................... 14

III.  35.CN'S FED. R. CIV. P. 12(B)(6) MOTION TO DISMISS SHOULD BE DENIED. .............. 15

    A.    Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Standard ............................. 15

    B.    Plaintiffs have stated a claim under the ACPA. ........................................ 16

        1.    Plaintiffs pleaded that Defendants registered, trafficked in, or
        used the Infringing Domain Names with bad faith intent to profit. .............. 16

        2.    Plaintiffs pleaded Defendants acted with bad faith intent to profit
        from Plaintiffs' Marks. ......................................................... 19

        3.    35.CN is not entitled to the ACPA's safe harbor. ........................... 20

    C.    35.CN is directly liable for ID Shield's actions as a direct participant. ................... 21

    D.    ID Shield is an alter ego of 35.CN. ...................................................... 22

    E.    ID Shield contractually agreed to accept liability on behalf of its
    Licensees under the OnlineNIC Registration Agreement. ........................... 22

IV.   CONCLUSION ....................................................................................................... 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*,
  No. CV 10-3738 ABC (CWX),
  2013 WL 12122689 (C.D. Cal. June 21, 2013) ................................................................. 17

*Allen v. Amer. Cap. Ltd.*,
  287 F. Supp. 3d 763 (D. Ariz. 2017) ............................................................................ 21

*Associated Vendors, Inc. v. Oakland Meat Co.*,
  210 Cal. App. 2d 825,
  26 Cal. Rptr. 806 (Ct. App. 1962) ...................................................................... passim

*Ballard v. Savage*,
  65 F.3d 1495 (9th Cir. 1995) .......................................................... 11, 12, 13, 14

*Balsam v. Tucows Inc.*,
  627 F.3d 1158 (9th Cir. 2010) .................................................................... 24

*Barker v. Riverside County Office of Ed.*,
  584 F.3d 821 (9th Cir. 2009) .................................................................. 15, 22

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 556 (2007) ............................................................................ 15

*Bosley Med. Inst., Inc. v. Kremer*,
  403 F.3d 672 (9th Cir. 2005) ...................................................................... 16

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................ 11, 13

*Cadence Design Sys., Inc. v. Syntronic AB*,
  No. 21-CV-03610-SI,
  2021 WL 4222040 (N.D. Cal. Sept. 16, 2021) ............................................ 25

*Cher v. Forum Int'l, Ltd.*,
  692 F.2d 634 (9th Cir. 1982) ...................................................................... 21

*CollegeSource, Inc. v. AcademyOne, Inc.*,
  653 F.3d 1066 (9th Cir. 2011) ...................................................................... 3

*Dell Inc. v. BelgiumDomains, LLC*,
  No. 07-22674-CIV, 2007 WL 6862342 (S.D. Fla. Nov. 21, 2007) ............................ 11, 19

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) .............................................................. 3, 5, 10

*Esmark, Inc. v. Nat'l Labor Relations Bd.*,
  887 F.2d 739 (7th Cir. 1989) ...................................................................... 21

*Facebook Inc. v. Namecheap Inc.*,
No. CV-20-00470-PHX-GMS,
2020 WL 6585534 (D. Ariz. Nov. 10, 2020) ................................................ 16, 23, 24

*Fed. Reserve Bank of San Francisco v. HK Sys.*,
No. C-95-1190 MHP, 1997 WL 227955 (N.D. Cal. Apr. 24, 1997) ........................ 4

*Ford Motor Co. v. Greatdomains.com, Inc.*,
177 F. Supp. 2d 635 (E.D. Mich. 2001) .................................................................. 20

*Forsythe v. Clark USA, Inc.*,
864 N.E.2d 227 (Ill. 2007) ...................................................................................... 21

*FT Travel--New York, LLC v. Your Travel Ctr., Inc.*,
112 F. Supp. 3d 1063 (C.D. Cal. 2015) ............................................................. 19, 22

*Greenspan v. LADT, LLC*,
191 Cal. App. 4th 486,
121 Cal. Rptr. 3d 118 (2010) .............................................................................. 10, 11

*Harris Rutsky & Co. v. Bell & Clements Ltd.*,
328 F.3d 1122 (9th Cir. 2003) ........................................................................... passim

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) .................................................................................................. 3, 15

*In re Packaged Seafood Prods. Antitrust Lit.*,
277 F. Supp. 3d 1167 (S.D. Cal. 2017) .................................................................. 10

*Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean–Up Service, Inc.*,
736 F.2d 516 (9th Cir. 1984) .................................................................................... 6

*Lucas Nursery and Landscaping, Inc. v. Grosse*,
359 F.3d 806, 809 (6th Cir. 2004) .......................................................................... 19

*McGee v. Int'l Life Ins. Co.*,
355 U.S. 220 (1957) ................................................................................................. 13

*Ranza v. Nike*,
793 F.3d 1059 (9th Cir. 2015) ............................................................................... 1, 3

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ................................................................................ 3, 12

*Sher v. Johnson*,
911 F.2d 1357 (9th Cir. 1990) ................................................................................ 12

*Sinatra v. Nat'l Enquirer*,
854 F.2d 1191 (9th Cir. 1988) ................................................................................ 14

*Solid Host, NL v. Namecheap, Inc.*,
652 F. Supp. 2d 1092 (C.D. Cal. 2009) ........................................................ 20, 23, 24

Starr v. Baca,
652 F.3d 1202 (9th Cir. 2011) ........................................................................... 15, 17

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

iii

*Toho-Towa Co. v. Morgan Creek Prods., Inc.*,
   217 Cal. App. 4th 1096,
   159 Cal. Rptr. 3d 469 (2013) ................................................................................ 10, 11

*Transamerica Corp. v. Moniker Online Services, LLC*,
   672 F. Supp. 2d 1353 (S.D. Fla. 2009) ................................................................... 20

*Verizon Cal. Inc. v. OnlineNIC, Inc.*,
   No. C 08-2832 JF (RS), 2009 WL 2706393 (N.D. Cal. Aug. 25, 2009) .......................... 1, 8

*Vizer v. Vizernews.com*,
   869 F. Supp. 2d 75 (D.D.C. 2012) ........................................................................ 20

*Yahoo! v. La Ligue Contre Le Racisme*,
   433 F.3d 1199, 1206 (9th Cir. 2006) ..................................................................... 12

**Statutes**

15 U.S.C § 1125(d)(1)(b)(i) ...................................................................................... 19

15 U.S.C. § 1125(d) ................................................................................................ 1

15 U.S.C. § 1125(d)(1) ........................................................................................... 16

15 U.S.C. § 1125(d)(1)(A) ....................................................................................... 17

15 U.S.C. § 1125(d)(1)(D) ....................................................................................... 21

15 U.S.C. § 1125(d)(1)(E) .................................................................................... 2, 17

18 U.S.C. § 1956 .................................................................................................... 7

18 U.S.C. § 1960 .................................................................................................... 7

Cal. Civ. Proc. Code § 410.10 .................................................................................... 3

Cal. Corp. C § 212(a) ............................................................................................... 9

Cal. Corp. C. § 312(a) .............................................................................................. 9

**Rules**

Fed. R. Civ. P. 12(b)(2) ............................................................................................. 1

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1, 15

Fed. R. Civ. P. 30(b)(6) ............................................................................................. 7

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Plaintiffs brought this cybersquatting action against OnlineNIC, Inc. ("OnlineNIC"), a company that "operates a massive cybersquatting operation," *Verizon Cal. Inc. v. OnlineNIC, Inc.*, No. C 08-2832 JF (RS), 2009 WL 2706393, at *5 (N.D. Cal. Aug. 25, 2009),[1] and its alter egos Domain ID Shield Service Co. Limited ("ID Shield") and Xiamen 35.com Internet Technology, Ltd. ("35.CN"). (Second Amended Complaint ("SAC") (ECF No. 109) ¶¶ 3, 5–6, 12, 14, 26–55.) During the course of this litigation, OnlineNIC and ID Shield have intentionally destroyed and obfuscated key evidence, failed to preserve and produce responsive ESI, and made material misrepresentations to the Special Master. (Special Discovery Master's Data Destroyed or Withheld Report ("Report"; ECF No. 115) at 39–40.) *Employees of 35.CN perpetrated these acts* because the "day-to-day operations" of both OnlineNIC and ID Shield, "including all technical support and customer support, are carried out by employees of 35.CN." (*See* SAC ¶¶ 45–46; Answer to SAC ("SAC Answer")[2] ¶¶ 45–46 (admitting).)[3]

Despite its employees' involvement in the spoliation of evidence in this case on behalf of its alter egos OnlineNIC and ID Shield, 35.CN moves to dismiss the SAC under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (ECF No. 174; ("Motion").) However, 35.CN is subject to general personal jurisdiction as an alter ego of OnlineNIC. *See Ranza v. Nike*, 793 F.3d 1059, 1073 (9th Cir. 2015). 35.CN is also subject to specific jurisdiction based on its extensive contacts with OnlineNIC, and other California corporations, which form the basis for Plaintiffs' claims in this case.

35.CN's Motion under Fed. R. Civ. P. 12(b)(6) must also fail. As alleged in the SAC, ID Shield is

---

[1] OnlineNIC was found liable in that case for cybersquatting under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), resulting in a judgment of $33,150,000 in damages to Verizon. *Id.* at *1 (awarding $50,000 per domain name).

[2] Pursuant to stipulation, the Court ordered that OnlineNIC and ID Shield's Answer to the First Amended Complaint (ECF No. 88) is the operative responsive pleading to the SAC (ECF No. 108 at 2:23–24).

[3] This admission directly contradicts Zhang WeiWei's Declaration that "35.CN does not control, manage or run the operations or decisions of OnlineNIC or ID Shield, and 35.CN did not participate in the actions of OnlineNIC or ID Shield as alleged in the SAC." (ECF No. 174-1; "WeiWei Decl." at ¶ 5.)

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

a proxy service[4] that violated the ACPA by registering (as the registrant) at least 35 domain names (the "Infringing Domain Names") that are identical or confusingly similar to FACEBOOK and INSTAGRAM (collectively, "Plaintiffs' Marks") with a bad faith intent to profit from Plaintiffs' Marks. (SAC ¶¶ 56, 60–70.)[5] ID Shield also trafficked in the Infringing Domain Names in violation of the ACPA because, after registering the Infringing Domain Names as the registrant, it licensed the Infringing Domain Names to Defendants' customers (a.k.a. "Licensees") for the customers' use. *Id.* at ¶ 59; *see* 15 U.S.C. § 1125(d)(1)(E). In addition, ID Shield is liable for the harm caused by the Infringing Domain Names (*i.e.* cybersquatting, trademark infringement, false designation of origin, and dilution) because, as a proxy service, ID Shield failed to timely and accurately disclose the current contact information and identity of Defendants' customers. (SAC ¶¶ 71–75, 97, 111, 123, 135.)[6] Finally, Plaintiffs allege that OnlineNIC and 35.CN are equally and directly liable for their customers' wrongful conduct because they are alter egos of ID Shield and direct participants in ID Shield's own unlawful actions. (SAC ¶¶ 6, 12, 26–55.) Despite these allegations, 35.CN argues ID Shield is not a "registrant" under the ACPA or a "proxy service," and that 35.CN is not the alter ego of OnlineNIC or ID Shield. (Mot. 1–2, 8–11.) On a motion to

---

[4] OnlineNIC is a domain name registrar accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN"). OnlineNIC entered into the 2013 Registrar Accreditation Agreement ("RAA") with ICANN, which sets the policies and requirements applicable to domain name registrations. Plaintiffs allege that ID Shield is a proxy service, as defined by ICANN in the RAA, because it registers domain names, as the registrant, in its own name and not in the name of its customers. Plaintiffs further allege that, as a proxy service, ID Shield licenses use of domain names to OnlineNIC's customers. (SAC ¶¶ 3, 10, 27–28, 58—59; *see* SAC Ex. 4 at 59.)

[5] ID Shield is listed as the registrant in the public WHOIS directory for each Infringing Domain Name. *Id.* at ¶ 57 & Ex. 7. The Infringing Domain Names include "instagram01.com," "login-1nstagram.com," "facebook-login-signup.com," and "facebook-pw.com." *Id.* at ¶ 56. In some instances, Infringing Domain Names have been used for malicious activity or domain name abuse, including hosting websites directing visitors to other commercial sites, phishing, and selling purported tools for hacking. *Id.* at ¶ 67. Some of the domain names are configured to send and receive email, strongly suggesting use for spear phishing email attacks. *Id.* ¶ 68.

[6] ID Shield is liable for the harm caused by its Licensees' use of the Infringing Domain Names under the terms of OnlineNIC's domain name registration agreement ("OnlineNIC Registration Agreement"; SAC Ex. 1). Section 3.7.7.3 of the RAA, as incorporated into the OnlineNIC Registration Agreement, requires ID Shield to disclose the contact information for its customers within seven days of being provided "reasonable evidence of actionable harm" or to accept liability for the harm. (SAC ¶ 71 & Ex. 4.) For each Infringing Domain Name, Plaintiffs sent ID Shield reasonable evidence of actual harm, and ID Shield failed to timely provide the necessary customer contact information. (SAC ¶¶ 74–75.)

1  dismiss, however, the court accepts the complaint's factual allegations as true, *Hemi Grp., LLC v. City of*

2  *New York,* 559 U.S. 1, 5 (2010), and, as such, the Court should deny 35.CN's Motion.

3  **II.    35.CN'S FED. R. CIV. P. 12(b)(2) MOTION SHOULD BE DENIED.**

4      **A.    12(b)(2) Motion to Dismiss Standard**

5      On a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff must demonstrate

6  jurisdiction is appropriate. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).

7  "Where, as here, there is no applicable federal statute governing personal jurisdiction, the law of the state

8  in which the district court sits applies." *Harris Rutsky & Co. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129

9  (9th Cir. 2003). Because California's long-arm statute, Cal. Civ. Proc. Code § 410.10, is coextensive with

10  federal due process requirements, the jurisdictional analyses under state and federal law are the same.

11  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Plaintiffs need only make

12  a prima facie showing that jurisdiction is proper to defeat 35.CN's motion. *Harris*, 328 F.3d at 1129. The

13  court accepts Plaintiffs' uncontroverted allegations as true. *Id.* A court may also consider extrinsic

14  evidence outside of the pleadings, including affidavits submitted by the parties. *Doe v. Unocal Corp.*, 248

15  F.3d 915, 922 (9th Cir. 2001), *holding limited on other grounds by Daimler AG v. Bauman*, 571 U.S. 117,

16  135–36 (2014); *Schwarzenegger*, 374 F.3d at 800. Courts must resolve conflicts between the parties'

17  positions in the plaintiff's favor. *Id.*

18      **B.    General personal jurisdiction exists over 35.CN in California because it is the alter**

19          **ego of OnlineNIC, a California company.**

20      As OnlineNIC's alter ego, 35.CN is subject to general personal jurisdiction in OnlineNIC's state

21  of incorporation and principal place of business, California. (SAC ¶ 9.) While it "is well-established that

22  a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent

23  for jurisdictional purposes," an exception to this general rule exists, and "a subsidiary's contacts may be

24  imputed to the parent where the subsidiary is the parent's alter ego." *Harris*, 328 F.3d at 1134; *see also*

25  *Ranza*, 793 F.3d at 1073 (explaining "the alter ego test may be used to extend personal jurisdiction to a

26  foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic

27  affiliate"). A prima facie case for alter ego requires allegations "(1) that there is such unity of interest and

28  ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

3

1    their separate identities would result in fraud or injustice." *Harris*, 328 F.3d at 1134 (alteration and

2    quotation marks in original omitted). Both requirements are easily met here.

3                    1.    **Unity of Interest**

4            In analyzing the unity of interest prong, courts consider a variety of non-exclusive factors. *See*

5    *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838–40, 26 Cal. Rptr. 806, 813–15

6    (Ct. App. 1962); *Fed. Reserve Bank of San Francisco v. HK Sys.,* No. C-95-1190 MHP, 1997 WL 227955,

7    at *6 n.7 (N.D. Cal. Apr. 24, 1997). "Not all of the enumerated factors must be found. They merely suggest

8    those matters that may be considered in analyzing the two-prong test." *HK Sys.,* 1997 WL 227955, at *6

9    n.7. Here, a unity of interest exists between 35.CN and OnlineNIC because (1) 35.CN's employees control

10   OnlineNIC's operations from 35.CN's offices in China; (2) 35.CN and OnlineNIC commingle funds;

11   (3) OnlineNIC is inadequately capitalized; (4) OnlineNIC diverts its assets to non-corporate uses;

12   (5) OnlineNIC conceals and misrepresents the identity of its owner; and (6) OnlineNIC disregards

13   corporate and legal formalities by failing to maintain minutes, adequate corporate records, and loan

14   documents involving 35.CN and others.

15                    a)    **35.CN controls OnlineNIC's operations, and the two entities share**

16                          **employees in a manner that misleads and disregards formalities.**

17           OnlineNIC admits that its own day-to-day operations, including all technical and customer

18   support, are carried out by employees of 35.CN. (SAC ¶ 45; SAC Answer ¶ 45.) These employees are

19   paid by 35.CN and work out of 35.CN's offices in a building 35.CN owns. (July 13, 2021, Deposition of

20   the Person Most Qualified of OnlineNIC, Inc., Carrie Yu, Vol. I ("Yu Dep. I"; attached as Exhibit 2 to

21   Declaration of Howard A. Kroll ("Kroll Decl.")) at 50:10–51:5; July 14, 2021 Deposition of the Person

22   Most Qualified of OnlineNIC, Inc., Carrie Yu, Vol. II ("Yu Dep. II"; Kroll Decl. Ex. 3) at 10:6–8, 45:22–

23   46:25.) Indeed, OnlineNIC's entire management team is made up of 35.CN employees who work out of

24   35.CN's offices in China and are paid by 35.CN. (Yu Dep. I 50:10–22; Yu Dep. II 22:15–24, 26:24–25,

25   30:20–31:2, 45:22–25, 46:7–12.)

26           The Vice President of OnlineNIC, Carrie Yu, also known as Hongxia Yu ("Ms. Yu"), is an

27   employee and director of 35.CN and is paid solely by 35.CN to oversee the management of OnlineNIC.

28   (Yu Dep. I 66:14–67:6, 69:23–70:5, 70:16–24.) Ms. Yu verified interrogatory responses for OnlineNIC

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

and ID Shield and also participated in the mediation of this case on their behalf. (Kroll Decl. ¶¶ 5, 6 and Ex. 5.) Furthermore, Ms. Yu was designated as the 30(b)(6) witness for OnlineNIC and ID Shield (although she failed to appear for ID Shield's deposition). (Kroll Decl. ¶¶ 3, 4 and Ex. 4.) (July 14, 2021, Certificate re Nonappearance of Carrie Yu 1:13–4:12).) As a director of 35.CN, Ms. Yu runs both OnlineNIC and 35.CN's software outsourcing center. (Yu Dep. I 66:14–67:6, 69:23–70:5, 70:16–24.) Ms. Yu performs her work for both 35.CN and OnlineNIC from her office on the third floor of 35.CN's office building. (Yu Dep. I 51:1–5, 51:25–52:4.) Ms. Yu also has been an active participant in 35.CN's relationship with ICANN. In

[7] Thus, Ms. Yu not only supervised 35.CN's registrar business, she also manages OnlineNIC's registrar business. OnlineNIC and 35.CN's use of "the same office or business location" and "employment of the same employees," including OnlineNIC being operated by 35.CN's employees, are facts supportive of an alter ego determination. *Associated Vendors*, 210 Cal. App. 2d at 839.

### b)    35.CN comingles funds with and inadequately capitalizes OnlineNIC.

In responses to Special Court Ordered Interrogatories,[8] verified by Ms. Yu, OnlineNIC states that

*See Associated Vendors*, 210 Cal. App. 2d at 839 ("the disregard of legal formalities and the failure to maintain arm's length relationships among related entities," is one factor supportive of alter ego).

*See Unocal*, 248 F.3d at 927–28 ("Evidence

---

[7]

[8] The Special Court Ordered Interrogatories were propounded on OnlineNIC and ID Shield in order to gain a better understanding of the financial documents produced by them as well as the relationship between them and 35.CN. (May 11, 2021, Order (ECF No. 104).)

5

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

that a parent provides interest free loans without observing corporate formalities by documenting those loans with promissory notes supports a finding that the parent is the subsidiary's alter ego." (citing *Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean–Up Service, Inc.*, 736 F.2d 516, 524 (9th Cir. 1984))).



"Commingling funds and other assets" is another factor supporting an alter ego determination. *Associated Vendors*, 210 Cal. App. 2d at 838.

OnlineNIC is also inadequately capitalized and has been underfunded consistently since at least 2009



c) **OnlineNIC diverts its assets to non-corporate uses.**

represents an "unauthorized diversion of corporate funds or assets to non-corporate uses," *Associated Vendors*, 210 Cal. App. 2d at 838, further supporting an alter ego finding.

---

[11] (*See* Plaintiffs' Special Court Ordered Notice of Deposition of OnlineNIC Pursuant to Fed. R. Civ. P. 30(b)(6), Category 10, attached to Kroll Decl., as Ex. 1.)

[12] and potentially also 18 U.S.C. § 1960 (prohibiting unlicensed money transmitting businesses) and 18 U.S.C. § 1956 (prohibiting laundering of monetary instruments). Another factor weighing in favor of an alter ego finding is use of "a corporation as a subterfuge of illegal transactions." *Associated Vendors*,

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis



d)    **OnlineNIC has repeatedly misrepresented and concealed the identity of its owner.**

Even to its management, OnlineNIC's actual ownership remains shrouded in contradictory and potentially false transactions such that it appears inscrutable.[14] For example,

OnlineNIC's discovery responses and deposition testimony that Mr. Gong had sold his shares to Zippo Chen ("Ms. Z. Chen") in 2009 for            pursuant to an oral contract. (Yu Dep. I 32:1–3; Yu Dep. II 15:4–12, 39:10–15, 42:6–19           , 43:7–44:8                              )[15] These representations are

---

210 Cal. App. 2d at 840. Further discovery is necessary to determine the ultimate legality of these transactions.

[13]

[14] In *Verizon*, Judge Fogel found "OnlineNIC has made multiple false or misleadingly incomplete representations to Verizon and the Court over the course of this litigation . . . [including] ***evidence of OnlineNIC's repeated misrepresentations concerning the nature of its relationship with [35.CN]***." 2009 WL 2706393, at *6 (emphasis added). Judge Fogel concluded that "throughout the course of this litigation, OnlineNIC has engaged in misrepresentations and perpetuated half-truths in an attempt to shield itself from the consequences of its illegal actions." *Id.* at *10.

[15]            OnlineNIC's disregard of legal formalities—            —is another factor supporting an alter ego finding. *Associated Vendors*, 210 Cal. App. 2d at 839.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

further contradicted by 35.CN's Initial Public Offering, which represented that Mr. Gong had sold his interest in OnlineNIC to Mr. Liu in 2007 for $10,000. (Yu Dep. II 73:14–74:9, 75:4–9, 76:15–77:10 & Ex. 15 at 239, Ex. 16 at 307.)[16] Finally, as an ICANN registrar, OnlineNIC was required to inform ICANN of any transfers of ownership. (*See* RAA §§ 3.17, 7.3.2 & Registrar Information Specification ¶ 15 (SAC Ex. 4 at 23, 37, 66).) Despite this requirement, OnlineNIC never filed a document informing ICANN that Mr. Gong sold OnlineNIC to either Ms. Z. Chen in 2009 (Yu Dep. II at 16:15–17:13) or to Rex Liu in 2007 (Kroll Decl., ¶ 19). The conflicting evidence regarding the ownership of OnlineNIC (between ███ ███, Mr. Liu, and Ms. Z. Chen) demonstrates OnlineNIC's consistent misrepresentations and concealment regarding its ownership, which further supports the unity of interest between OnlineNIC and 35.CN. *Associated Vendors*, 210 Cal. App. 2d at 839–40.

### e)    Disregard of corporate formalities

OnlineNIC fails to follow corporate formalities by failing to maintain minutes or adequate corporate records. For example, in response to Plaintiffs' request for documents "relating to the corporate formation and maintenance" of OnlineNIC (RFP No. 25 (attached as Exhibit 14 to Kroll Decl.)), Defendants produced only 4 documents.[17] OnlineNIC did not produce any bylaws, corporate resolutions, minutes of meetings of its directors or shareholders, or documents reflecting maintenance of stock or membership ledgers, despite its obligation to produce such records leaving only the conclusion that they do not exist. (Kroll Decl. ¶ 21.) OnlineNIC is also in violation of California corporate law, which requires corporations to have at least one director. Cal. Corp. C § 212(a). Ms. Yu, OnlineNIC's 30(b)(6) designee, testified that OnlineNIC *does not have a director*. (Yu Dep. II at 35:7–10.) Nor does OnlineNIC have a Chief Financial Officer ("CFO") or Secretary, as required by California law. Cal. Corp. C. § 312(a).[18]

---

[16] 35.CN continues to misrepresent and conceal the ownership of OnlineNIC in its Motion by citing solely to this purported sale to Mr. Liu in 2007 and failing to mention the sale to Ms. Z. Chen in 2009 or ████████████████████████████████████ (Mot. 5–6.)

[17] Specifically, OnlineNIC produced its Articles of Incorporation, Amended Articles of Incorporation, and its 2017 and 2019 Statement of Information filed with the California Secretary of State. (Kroll Decl. ¶ 21 & Ex. 15.)

[18] OnlineNIC's Statement of Information to California's Secretary of State purports to identify Mr. Liu as OnlineNIC's Secretary and Sily Chen as its CFO. (Kroll Decl., Ex. 15.) Ms. Yu testified, however, that *this information is inaccurate*. (Yu Dep. II 25:16–24, 26:12–16.)

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1    These failures to observe corporate formalities required under California law demonstrate the unity of

2    interest between OnlineNIC and 35.CN. *Cf. Unocal*, 248 F.3d at 928 (noting significance of corporate

3    formalities in holding parent directly involved in subsidiary's decision-making was not alter ego because

4    they "observe all of the corporate formalities necessary to maintain corporate separateness").

**2.    Failure to disregard 35.CN's and OnlineNIC's separate identities would**

**result in fraud or injustice.**

7    Based on the allegations and facts presented above, Plaintiffs have shown a unity of interest and

8    ownership between 35.CN and OnlineNIC. To the extent 35.CN challenges these allegations, such

9    conflicts must be resolved in Plaintiffs' favor. *Harris*, 328 F.3d at 1129. At the pleading stage, a plaintiff

10   need only "plausibly allege" an inequitable result to satisfy the second prong of the alter ego test. *See In*

11   *re Packaged Seafood Prods. Antitrust Lit.*, 277 F. Supp. 3d 1167, 1188 (S.D. Cal. 2017). Treating

12   OnlineNIC and 35.CN as separate identities would result in fraud or injustice by denying Plaintiffs the

13   recovery to which they are entitled. *See Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 507, 121

14   Cal. Rptr. 3d 118, 134 (2010) ("To add [a non-party] as a judgment debtor would be based, not on a

15   finding he breached the agreement, but on his control of the Shy Trust and its companies to such an extent

16   that his failure to satisfy the judgment would promote injustice"); *Toho-Towa Co. v. Morgan Creek Prods.,*

17   *Inc.*, 217 Cal. App. 4th 1096, 1109, 159 Cal. Rptr. 3d 469, 481 (2013) (upholding alter ego finding when

18   defendant structured financial operations such that operating defendant did not receive adequate money

19   from business operations and "thus would not have funds to meet its payment obligations under the

20   agreement"). In sum, it is inequitable to permit a company to shift liability to its alter ego after ensuring

21   the alter ego would have inadequate funds to pay its liabilities. *Id.*

22   Here, failing to recognize 35.CN's status as alter ego of OnlineNIC would yield an inequitable

23   result and should be avoided. OnlineNIC and Domain ID—███████████████████

24   ████—claim insolvency and plan to cease business operations as a result of this lawsuit. (*See* Supp.

25   Joint CMS (ECF No. 118) at ¶¶ 1, 7–8.) With an anticipated multi-million dollar default judgment looming

26   (ECF Nos. 176–176-4, 177), both entities represent that they are "in financial distress," and have "ran out

27   of operating funds" (ECF No. 118 at ¶¶7–8). Observing 35.CN's separate corporate existence (and thus

28   permitting it to escape jurisdiction and liability completely) while its alter egos, OnlineNIC and ID Shield,

10

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

dissolve due to inadequate capitalization and dissipation of assets through undocumented loans and other undocumented transactions would perpetrate a fraud and injustice. As Judge van Keulen noted, "Defendants may not simply 'pick up their toys and go home.'" (Tr. of Hearing on July 20, 2021, (ECF No. 127) at 9:14–17.) These are the exact circumstances under which the alter ego doctrine should be applied to prevent a culpable defendant from escaping liability for which they are equitably responsible. *See Greenspan v. LADT, LLC*, 191 Cal. App. 4th at 507; *Toho-Towa*, 217 Cal. App. 4th at 1109.

Here, the complicity between OnlineNIC and ID Shield with 35.CN is brazen and shocking, and it was perpetrated by employees of 35.CN: they have destroyed evidence and made material misrepresentations to (a) the Court and the Special Master, (b) Plaintiffs in OnlineNIC's discovery responses, (c) the California Secretary of State, (d) ICANN, and (e) federal and state tax authorities. Defendants have abused their position of trust as a registrar to the detriment of Plaintiffs, the public, and other trademark owners. *See generally Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV, 2007 WL 6862342, at *10 (S.D. Fla. Nov. 21, 2007). Permitting 35.CN to hide behind a corporate veil would not only promote fraud and injustice, it would award behavior that should be sanctioned. *See* Plaintiffs' Motion to Strike Defendants' Answer and for Default Judgment (ECF No. 176).

### C.    35.CN is subject to specific jurisdiction in California.

35.CN is also subject to specific personal jurisdiction in California. Specific personal jurisdiction is appropriate when three requirements are met: (1) a defendant purposefully directed his activities or consummated some transaction with the forum or a resident thereof, or performed some act by which he purposefully availed himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable. *Harris*, 328 F.3d at 1129. If a plaintiff satisfies the first two prongs of this test, the court presumes the exercise of personal jurisdiction is reasonable, and the burden shifts to the defendant to "present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (emphasis in original)).

1

2

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

### 1.    35.CN purposefully availed itself of the benefits of doing business in California.

The purposeful availment prong[19] of the minimum contacts test requires a "qualitative evaluation of the defendant's contact with the forum state," to determine whether the defendant should reasonably anticipate being hauled into court there. *Harris*, 328 F.3d at 1130. Purposeful availment exists where the defendant performs some type of affirmative act that "allows or promotes the transaction of business within the forum state." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990). Physical contact with the forum state is not required. *Harris*, 328 F.3d at 1130. The Ninth Circuit has "held that the 'purposeful availment' requirement is satisfied if the defendant has taken deliberate action within the forum state *or if he has created continuing obligations to forum residents*." *Ballard*, 65 F.3d at 1498 (emphasis added).

Here, 35.CN directs significant activity to California through its operation of OnlineNIC, which is incorporated in California, and these activities relate to the acts that give rise to this case. 35.CN claims that it "lacks contacts in California and the United States," and that it "does not have any . . . business in California or even in the United States." (WeiWei Decl. ¶ 4.) This is plainly false. 35.CN's employees run and operate the registrar business of OnlineNIC. 35.CN pays these employees and the management team of OnlineNIC. In addition, 35.CN has entered into numerous "service agreements" with OnlineNIC, and receives monthly payments from OnlineNIC for these services. Due to its continuous relationship with a California company, 35.CN purposefully availed itself of the privilege of conducting activities in California, invoking the benefits and protections of California's laws. *Yahoo!*, 433 F.3d at 1205–06.

In addition, 35.CN entered into the RAA with ICANN, in which 35.CN agreed that in all litigation "jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles, California." RAA § 5.8. (attached as Ex. 7 to Kroll Decl.) Indeed, 35.CN has paid ICANN $232,633 since 2017. (Kroll

---

[19] A plaintiff may establish that an out-of-state defendant "*either* purposefully availed itself of the privilege of conducting activities in [the forum state], *or* purposefully directed its activities toward" the forum. *Schwarzenegger*, 374 F.3d at 802 (emphasis added). The Ninth Circuit further clarified in *Yahoo! v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006), that the first prong "includes *both* purposeful availment and purposeful direction. It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; *or by some combination thereof*." (emphasis added). While courts "typically" inquire into one set of factors or the other based on the type of claims presented, both sets of factors may be used to establish jurisdiction. *Id.*

Decl., ¶ 22 and Ex. 22.) As a registrar, 35.CN also would have entered into contracts with registries throughout the United States, like Verisign, Inc., and Public Interest Registry (each located in Virginia), GoDaddy Registry (located in Arizona), Afilias Limited (located in Pennsylvania), and XYZ.COM (located in Nevada). (Kroll Decl., ¶ 23.) Furthermore, 35.CN entered into a contract ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████ Equally significant, 35.CN owns a trademark, 35.COM, which was registered by the United States Patent and Trademark Office. In 2018, Mr. Gong, as President of 35.CN, signed an affidavit stating that the 35.COM mark was being used in commerce in the United States. *See* Section 71 Declaration of Continued Use for 35.COM (attached as Exhibit 18 to Kroll Decl.).

35.CN has purposefully availed itself of the benefits of doing business in California and has substantial connections with California. It is thus reasonable to anticipate 35.CN would be sued in California regarding the subject matter of its extensive connections to the forum. *See Burger King*, 471 U.S. at 479 (noting "franchise dispute grew directly out of 'a contract which had a substantial connection with'" the forum state) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)); *id.* at 481–82 (holding out of state defendant "purposefully availed himself of the benefits and protections of Florida's laws by entering into contracts expressly providing that those laws would govern franchise disputes," which also demonstrated "reasonable foreseeability of possible litigation there" (internal quotation marks omitted)).

### 2. Plaintiffs' claims against 35.CN arise out of its California activities.

The Ninth Circuit uses a "but for" test to determine whether claims arise out of the out-of-state defendant's forum contacts. *Harris*, 328 F.3d at 1131–32. This test asks: "but for" the defendant's contacts with the forum, would the plaintiff's claims against the defendant have arisen? *See Ballard*, 65 F.3d at 1500. In other words, is the lawsuit asking the defendant to account for actions it directed towards the forum? *See Burger King*, 471 U.S. at 473–74. Here, 35.CN's service contracts with OnlineNIC and provision of services under those contracts form the basis of the unlawful conduct at issue in this case. The registering, use, and trafficking in of the Infringing Domain Names—the acts that form the basis of this lawsuit—could not have occurred but for 35.CN's employees operating and running OnlineNIC and

13

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1    ID Shield and having ID Shield register those Infringing Domain Names as the registrant.

2            **3.       Exercising jurisdiction over 35.CN is reasonable.**

3          Because 35.CN purposefully availed itself of the benefits of doing business in California, and

4    Plaintiffs' lawsuit arises out of 35.CN's activities in California, 35.CN may only avoid specific personal

5    jurisdiction if it can demonstrate a *compelling case* that some other considerations would render

6    jurisdiction unreasonable. *Ballard*, 65 F.3d at 1500. Courts analyzing this prong look to seven factors in

7    weighing reasonableness: "(1) the extent of the defendants' purposeful interjection into the forum state's

8    affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the

9    sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most

10   efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest

11   in convenient and effective relief; and (7) the existence of an alternative forum." *Harris*, 328 F.3d at 1132.

12   An evaluation of these factors does not suggest this is an extraordinary case where personal jurisdiction

13   over 35.CN would be unreasonable, and 35.CN has failed to carry its burden to the contrary.

14         First, 35.CN has extensively interjected itself into California's affairs because 35.CN paid

15   employees to run and operate a California-based business.

16         Second, 35.CN argues it would suffer a "unique burden[]" if it were forced to litigate in the United

17   States. (Mot. 23–24.) But the Ninth Circuit has long recognized that "modern advances in communications

18   and transportation have significantly reduced the burden of litigating in another country." *Sinatra v. Nat'l*

19   *Enquirer*, 854 F.2d 1191, 1199 (9th Cir. 1988). Given that 35.CN's employees already run a company in

20   California from China, it cannot seriously contend that litigating in California is unduly burdensome.

21         Third, 35.CN does not argue that litigating this dispute in California would conflict with the

22   sovereignty of China; rather, it argues that "it would strain diplomatic relations between the U.S. and

23   China." (Mot. 24:22–25.) But, 35.CN contracted with ICANN and others to litigate disputes in California

24   under California law. 35.CN's consent to a California forum and California law negates any argument

25   regarding a conflict or strain of diplomatic relations.

26         Fourth, and contrary to 35.CN's assertion (Mot. 24–25), California courts cannot effectively

27   adjudicate a dispute solely "against the original Defendants" when 35.CN is an alter ego of those

28   defendants. 35.CN's employees are the ones who perpetrated the infringing acts, and the original

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

14

Defendants now claim insolvency. Further, 35.CN suggests Plaintiffs should have resolved this dispute by filing a UDRP complaint instead of a federal lawsuit. But a UDRP complaint is neither an exclusive or exhaustive remedy. Plaintiffs properly elected to protect their famous marks in federal court, which allows (unlike UDRP proceedings), a determination of alter ego liability, monetary damages, and claims for trademark infringement, false designation of origin, and dilution—none of which can be brought in a UDRP proceeding.

Fifth, 35.CN suggests that China would be a more efficient forum for litigating this dispute, claiming the relevant witnesses and evidence are located in China. Yet, Ms. Yu, a director of 35.CN who is also an officer of OnlineNIC, has been deposed already, and there would be no problem similarly deposing other such individuals. Contrary to 35.CN's representation that Plaintiffs have "expansive resources in China," (Mot. 22) both the Facebook and Instagram apps are banned in China. (Kroll Decl. ¶ 26.) Furthermore, there is no certainty that a Chinese Court can adequately interpret and apply U.S. laws like the ACPA and the Lanham Act. Given the unavailability of Plaintiffs' services in China, and Defendants' ties to California, California courts are best positioned to adjudicate the claims in this lawsuit.

Sixth, litigating a dispute involving three California companies (Facebook, Instagram, and OnlineNIC) in California serves Plaintiffs' interests in convenient, effective relief.

Seventh, 35.CN has not identified any alternative jurisdiction in the United States. Because this lawsuit concerns domain name registrations that took place pursuant to U.S.-based contracts, there is no proper alternative forum.

## III. 35.CN'S FED. R. CIV. P. 12(b)(6) MOTION TO DISMISS SHOULD BE DENIED.

### A. Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Standard

On a Rule 12(b)(6) motion to dismiss, the court accepts the complaint's factual allegations as true. *Hemi Grp.*, 559 U.S. at 5. All reasonable inferences from the alleged facts are drawn in the plaintiff's favor. *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009). When allegations are capable of more than one inference, the court must adopt any plausible inference that supports a valid claim. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). At the motion to dismiss stage, courts do not evaluate whether the allegations will be proven true; they merely ask whether the pleadings, if proven, would support a plausible claim for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

15

**B.      Plaintiffs have stated a claim under the ACPA.**

To state an ACPA cybersquatting claim, a plaintiff must allege (1) ownership of a valid mark; (2) that the mark is distinctive or famous; (3) the existence of a domain name that is identical or confusingly similar to, or in the case of a famous mark, dilutive of, the owner's mark; and (4) that a defendant registered, trafficked in, or used the domain name; (5) with bad faith intent to profit from the mark. *See* 15 U.S.C. § 1125(d)(1); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005). 35.CN does not dispute that Plaintiffs adequately alleged ownership of valid marks, that those marks are distinctive or famous, and that the Infringing Domain Names are identical, confusingly similar to, and/or dilutive of Plaintiffs' Marks. (Mot. 13:8–18.)

**1.      Plaintiffs pleaded that Defendants registered, trafficked in, or used the Infringing Domain Names with bad faith intent to profit.**

**a)      ID Shield registered each Infringing Domain Name.**

The ACPA uses the term "registrant," and ICANN use the terms "registrant" and "registered name holder" interchangeably, to refer to a person who registers and owns a domain name. OnlineNIC and ID Shield admit that ID Shield is listed as the registrant in the WHOIS directory for the Infringing Domain Names. (SAC ¶ 27; SAC Answer ¶ 27); *see Facebook Inc. v. Namecheap Inc.*, No. CV-20-00470-PHX-GMS, 2020 WL 6585534, at *3 (D. Ariz. Nov. 10, 2020) (holding plaintiffs plausibly alleged proxy service provider was domain name registrant because it was listed as registrant in WHOIS directory for each domain name at issue). Indeed, the ID Shield Service Agreement states that "each domain name registration which you control and which you designate ***will thereafter be registered in the name of [ID Shield] as registrant.***" (SAC Ex. 6 at 1) (emphasis added). And later, the ID Shield Service Agreement confirms that the customer "will not be listed as the registrant for the" domain names. *Id.* at 2. Finally, ID Shield's webpage confirms that it is the registrant for the domain names by stating: "We replace your registrant, technical, admin and billing information." (SAC Ex. 5).

35.CN does not dispute these facts in its Motion. Rather, 35.CN states, without legal or factual support, that "the named 'registrant' listed in public WHOIS records is not necessarily the legal 'registrant' of a domain name." (Mot. 9.) Indeed, 35.CN claims that the customer, not ID Shield, is the person who 'registered' the Infringing Domains within the meaning of the ACPA. Defendants are mistaken. Footnote

16

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

5 of 35.CN's Motion, referencing ICANN's responses to frequently asked questions, actually confirms that just because someone pays the domain name registration fees, they are not the Registered Name Holder unless they are "listed as the official Registrant of record for the domain name." *See* ICANN, General Question #4, available at https://www.icann.org/resources/pages/faqs-84-2012-02-25-en#4 (last accessed Oct. 12, 2021) (attached as Ex. 19 to Kroll Decl.) Since ID Shield is listed as the official Registrant of record for each of the Infringing Domain Names, ID Shield "registered" those domain names under the ACPA. Moreover, the Court must adopt all inferences in Plaintiffs' favor that ID Shield registered, as the registrant, the Infringing Domain Names based on the WHOIS contact information found in SAC Exhibit 7 and confirmed by the ID Shield Service Agreement (SAC Ex. 6). *See Starr*, 652 F.3d at 1216.

> **b)**     **ID Shield is a proxy service that licensed use of Infringing Domain Names to customers and thus trafficked in Infringing Domain Names.**

ID Shield provides a proxy service for OnlineNIC's customers. (SAC ¶¶ 10, 27). This is significant because, as a proxy service, ID Shield is liable under the ACPA for registering the Infringing Domain Names as the registrant. ID Shield is also liable under the ACPA for trafficking in the Infringing Domain Names because ID Shield licensed use of the Infringing Domain Names to its customers.[20] Finally, ID Shield, as a proxy service, is liable under the OnlineNIC Registration Agreement, which incorporates Section 3.7.7.3 of the RAA, because it did not timely provide the contact information of its customers after receiving notice of actionable harm from Plaintiffs.

ID Shield is a proxy service because it registers domain names, as the registrant, in its own name and not in the name of its customers. ICANN defines a proxy service as "a service through which a

---

[20] "Trafficking in" is a separate and distinct liability-producing act under the ACPA. *See Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-3738 ABC (CWX), 2013 WL 12122689, at *6 (C.D. Cal. June 21, 2013) ("The ACPA imposes liability for 'register[ing], traffic[king] in, or us[ing]' a domain name that is identical to or confusingly similar to a distinctive mark. 15 U.S.C. § 1125(d)(1)(A). The disjunctive 'or' shows that only one type of conduct is sufficient to establish liability."). Section 1125(d)(1)(E) defines "traffics in" as engaging in "transactions that include but are not limited to, sales, purchases, loans, pledges, ***licenses***, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." (emphasis added). Plaintiffs allege, with factual support, that ID Shield registered each Infringing Domain Name and licensed it to Licensees. (SAC ¶¶ 10, 27, 28, 57, 59 & Ex. 7.)

---

17

Registered Name Holder licenses use of a Registered Name to the . . . Customer in order to provide the . . . Customer use of the domain name, ***and the Registered Name Holder's contact information is displayed in the Registration Data Service (Whois) or equivalent services rather than the . . . Customer's contact information***." (SAC Ex. 4 at 59 (RAA, "Specification On Privacy And Proxy Registrations" § 1.3) (emphasis added).) *See also* ICANN, Information for Privacy and Proxy Service Providers, Customers and Third-Party Requesters, available at: https://www.icann.org/resources/pages/pp-services-2017-08-31-en (last accessed Oct. 12, 2021) ("***The proxy service provider is the registrant of record (the registered domain name holder)*** and provides alternative, reliable contact information. . . . The proxy service provider licenses use of the domain name to the customer via its agreement with the customer.") (emphasis added) (attached as Ex. 20 to Kroll Decl.) Indeed, the webpage title and URL of the ID Shield Service Agreement, shown on the header and footer of each page of Exhibit 6 to the SAC, states that it is the "OnlineNIC Privacy And Proxy Agreement." (SAC Ex. 6; Ex. 21 to Kroll Decl.)

In order to avoid liability under the ACPA, 35.CN maintains, however, that ID Shield is a privacy service and not a proxy service.[21] Again, 35.CN is mistaken because a privacy service lists in the WHOIS directory the beneficial user (*i.e.* customer) as the Registered Name Holder and not the privacy service. (SAC Ex. 4 at 55 (RAA, "Specification On Privacy And Proxy Registrations" § 1.2)); *see also* ICANN, Information for Privacy and Proxy Service Providers, Customers and Third-Party Requesters, available at: https://www.icann.org/resources/pages/pp-services-2017-08-31-en (last accessed Oct. 12, 2021) *(a proxy service* **"is legally distinct from a privacy service because the proxy service provider is the registered domain name holder (which attaches certain legal rights and responsibilities for a domain)"***) (emphasis added) (attached as Ex. 20 to Kroll Decl.) Since ID Shield, and not its customers, is listed in the WHOIS directory as the Registered Name Holder for the Infringing Domain Names, ID Shield is a proxy service and is liable under the ACPA for trafficking in the Infringing Domain Names.

---

[21] To support this argument, 35.CN misrepresents to the Court that "Plaintiffs concede that ID Shield is a 'domain name privacy service' for 'OnlineNIC customers. (SAC ¶ 10)." (Mot. 10.) 35.CN's deception is based on selective omission of a key clause in the SAC, in which Plaintiffs allege that ID Shield is a proxy service. Specifically, Plaintiffs allege that ID Shield "provides ***a type of*** domain name privacy service, ***specifically a proxy service***, for OnlineNIC's customers." (SAC ¶ 10 (emphasis added).)

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

### 2.      Plaintiffs pleaded Defendants acted with bad faith intent to profit from Plaintiffs' Marks.

The SAC contains extensive allegations of Defendants' bad faith under the statutory factors Congress included in the ACPA. 15 U.S.C § 1125(d)(1)(b)(i); (SAC ¶¶ 60–70). "An analysis of whether a defendant's actions constitute bad faith within the meaning of the ACPA usually begins with consideration of several factors, nine of which are listed in the ACPA." *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004). Plaintiffs allege, and defendants do not dispute,[22] nor can they, that (a) they have no trademark or intellectual property rights in the Infringing Domain Names, (b) the Infringing Domain Names do not consist of Defendants' legal name or a name commonly used to identify them, (c) Defendants have not made any prior use of any Infringing Domain Name in connection with the *bona fide* offering of any goods or services and (d) Defendants have not made any *bona fide* noncommercial or fair use of Plaintiffs' Marks on a website accessible at any of the Infringing Domain Names. (SAC ¶ 82–85.) Furthermore, Plaintiffs allege that Plaintiffs' Marks are distinctive and famous. (SAC ¶¶ 19, 21, 23, 25.) And there can be no dispute that OnlineNIC, given the prior adverse cybersquatting judgment against it in *Verizon*, knew it had registered as the registrant multiple domain names, and continued to do so after notice, that were identical or confusingly similar to marks of others that were distinctive at the time of registration. Finally, the parking pages found in SAC Exhibit 8 demonstrate that the Infringing Domain Names were used in commerce to divert consumers from Plaintiffs' legitimate websites to different websites accessible under the Infringing Domain Names. *See* 15 U.S.C § 1125(d)(1)(b)(i)(I)–(IX).

Defendants also exhibited their bad faith intent to profit by concealing their identities and their unlawful activities. *See BelgiumDomains*, 2007 WL 6862342, at *10 ("Here, Defendant registrars are in a position of trust as ICANN-accredited registrars. By concealing their unlawful activities, however, they have grossly abused their position of trust to the detriment of Plaintiffs' customers and the general public,

---

[22] Because 35.CN does not dispute any of these allegations in their opening memorandum, it has waived any argument to the contrary in its reply. *FT Travel--New York, LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015) ("Courts decline to consider arguments that are raised for the first time in reply.")

OPPOSITION TO 35.CN'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 3:19-CV-07071-SI

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

as well as Plaintiffs and countless other trademark owners. This abuse of trust further supports, and indeed amplifies, Defendants' bad-faith intent."). Once a plaintiff alleges facts that would establish a prima facie showing of bad faith intent to profit, as Plaintiffs do here, their pleading is sufficient to survive a motion to dismiss on the bad faith element. *Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 643 (E.D. Mich. 2001) ("Because defendants easily can conjure up a 'legitimate' use for a domain name that incorporates a trademark, plaintiffs frequently will find it difficult, if not impossible, to obtain evidence probative of 'bad faith intent' without court sanctioned discovery. Indeed, obtaining information relevant to almost all of the bad faith factors set forth in the statute requires direct testimony from the defendant.")

### 3.      35.CN is not entitled to the ACPA's safe harbor.

Plaintiffs allege that ID Shield is the registrant of the Infringing Domain Names and that 35.CN, as the alter ego of ID Shield and OnlineNIC, should also be treated as the registrant of the Infringing Domain Names. (SAC ¶¶ 26–55.) 35.CN argues, however, that it is immune from liability because it is a domain name registrar. (Mot. 12.) But the limited safe harbor for domain name registrars applies only to their activities *as registrars*. When a registrar is also the registrant of a domain name, the safe harbor does not apply to that registrant activity. *See Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1105 (C.D. Cal. 2009) ("Indeed, to the extent that Name-Cheap was the registrant of the domain name and 'used' the name, this section would support the imposition of liability on it, not a grant of immunity to it."); *Transamerica Corp. v. Moniker Online Services, LLC*, 672 F. Supp. 2d 1353, 1365 (S.D. Fla. 2009) (holding ACPA safe harbor does not apply when a registrar is also the registrant). Therefore, as the imputed registrant of the infringing domain names, 35.CN cannot shield itself from liability under the limited safe harbor the ACPA affords registrars *only for their registrar activities*.[23]

---

[23] Furthermore, ID Shield cannot qualify for safe harbor in any event because it is neither a registrar nor other "domain name authority." *See Vizer v. Vizernews.com*, 869 F. Supp. 2d 75, 82–83 (D.D.C. 2012) (explaining "domain name authority" under the statute "covers only entities that perform the functions of the registrar and registry by registering or assigning domain names"). Rather, courts recognize that value-added services that registrars provide, including proxy services, are not registrar services and do not fall under the ACPA's safe harbor. *Solid Host*, 652 F. Supp. 2d at 1103–05 (rejecting registrar Namecheap's argument that its proxy service qualified for ACPA safe harbor).

C.    **35.CN is directly liable for ID Shield's actions as a direct participant.**

35.CN is directly liable for all of ID Shield's actions[24] because 35.CN is a direct participant in ID Shield's unlawful activities. (SAC ¶¶ 12, 26–55.) Under the direct participant theory, even if all of the acts alleged in the SAC were committed solely by ID Shield, 35.CN would still be directly liable as a direct participant.[25] The direct participation theory is distinct from Plaintiffs' alter ego theory. "[A] significant body of case law supports the direct participant theory of liability." *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 233–34 (Ill. 2007) (collecting state and federal cases); *see also Allen v. Amer. Cap. Ltd.*, 287 F. Supp. 3d 763, 806 (D. Ariz. 2017) ("A parent company can be liable for a subsidiary's acts where the parent directly participates [in] and directs the subsidiary's harmful activities."). Under this theory, a "parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark, Inc. v. Nat'l Labor Relations Bd.*, 887 F.2d 739, 756 (7th Cir. 1989); *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 640 (9th Cir. 1982) (finding parent liable for actions of subsidiary where parent owned 80% of subsidiary's stock and participated in tortious conduct).

Plaintiffs allege that ID Shield (a) has no employees, (b) has no assets, (c) does not control its own operations (which are entirely controlled by OnlineNIC), (d) does not conduct regular (or any) shareholder meetings and (e) has its expenses paid by OnlineNIC. Furthermore, Ms. Yu, a director and employee of 35.CN, owns ID Shield for the benefit of OnlineNIC. (SAC ¶¶ 30–43; SAC Answer ¶¶ 31–41 (admitting).) Plaintiffs also allege, and Defendants further admit, that the day-to-day operations of OnlineNIC and ID Shield, including all technical support and customer support, are run by employees of 35.CN. (SAC ¶¶ 44–

---

[24] Plaintiffs allege that ID Shield is directly liable for violating the ACPA because ID Shield registered and licensed the Infringing Domain Names with a bad faith intent to profit from the Plaintiffs' Marks. Plaintiffs also allege that ID Shield is directly liable under the OnlineNIC Registration Agreement for the harm caused by the Licensees' use of the Infringing Domain Names (*i.e.* the ACPA and Lanham Act) because ID Shield failed to disclose the contact information of the Licensees after receiving notice from Plaintiffs.

[25] Contrary to 35.CN's position, Plaintiffs' claims against 35.CN are not based on secondary liability. (Mot. 16–17.) Rather, 35.CN is directly liable for violations of the ACPA and the Lanham Act because 35.CN is a direct participant in the actions of and alter ego of ID Shield, the registrant of the Infringing Domain Names. *See* 15 U.S.C. § 1125(d)(1)(D) ("A person shall be liable for using a domain name . . . only if that person is the domain name registrant or that registrant's authorized licensee.").

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

46; SAC Answer ¶¶ 45–46 (admitting).) As such, 35.CN directly participated in the unlawful activities of ID Shield. 35.CN's Motion fails to address Plaintiffs' direct participant allegations and thus concedes for purposes of its Motion that 35.CN is a direct participant in ID Shield's activities and is liable for ID Shield's actions. *See FT Travel*, 112 F. Supp. 3d at 1079.

**D.      ID Shield is an alter ego of 35.CN.**

Despite 35.CN's arguments to the contrary, and as discussed above at Section III.C, the SAC contains numerous allegations that if proven true would establish that ID Shield is the alter ego of 35.CN (SAC ¶¶ 30–54.) OnlineNIC and ID Shield have admitted most of these allegations. (SAC Answer ¶¶ 31–41, 45-46 (admitting).) Although 35.CN disputes that it controls the operations of and policy decisions made by OnlineNIC and ID Shield, such conflicts must be resolved in Plaintiffs' favor at this stage. *Barker*, 584 F.3d at 824.

**E.      ID Shield contractually agreed to accept liability on behalf of its Licensees under the OnlineNIC Registration Agreement.**

OnlineNIC is an ICANN-accredited domain name registrar subject to ICANN's RAA. (SAC ¶¶ 3, 26.) ICANN requires every registrant of a domain name to enter into a Registration Agreement with an ICANN-accredited domain name registrar. (*Id.* ¶ 26 & Ex. 4.) As the registrant of the Infringing Domain Names, ID Shield was thus required to enter into the OnlineNIC Registration Agreement and be bound by its terms.

OnlineNIC is also required to include certain material terms in its Registration Agreement, including the language from RAA § 3.7.7.3. (*Id.* Ex. 4 at 16–17.) OnlineNIC, ID Shield, and 35.CN do not dispute, nor could they, that the OnlineNIC Registration Agreement contains all the terms required by ICANN, including RAA § 3.7.7.3. Therefore, anyone who registers a domain name with OnlineNIC, including ID Shield, agrees:

> A Registered Name Holder licensing use of a Registered Name according to this provision ***shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee*** and the identity of the licensee within seven (7) days to a party providing the Registered Name Holder reasonable evidence of actionable harm.

(SAC Ex. 4 at 16–17 (RAA § 3.7.7.3) (emphasis added).) ID Shield contractually agreed under the

OnlineNIC Registration Agreement to accept liability if it failed to disclose Licensees' contact information within seven days of being provided reasonable evidence of trademark infringement. ID Shield is thus liable for the cybersquatting, infringement, false designation of origin, and dilution of its customers because ID Shield refused to disclose the Licensees' contact information after Plaintiffs sent notice of the Infringing Domain Names. (*Id.* ¶¶ 71–75.)[26]

Contrary to 35.CN's argument (Mot. 15–16), the Licensees host websites directing visitors to other commercial sites. Other websites sell purported tools for hacking. And some of the Infringing Domain Names are configured to send and receive email, strongly suggesting use for spear phishing email attacks. (SAC ¶¶ 67, 68, 104, 116, 128.) The Licensees' use of Plaintiffs' Marks in connection with the Infringing Domain Names thus constitutes a use in commerce prohibited by the Lanham Act. As such, the Licensees are liable for trademark infringement, false designation of origin, and dilution; and ID Shield, pursuant to OnlineNIC's Registration Agreement, has accepted liability for the harm caused by the Licensees.[27]

In opposing this basis of liability, 35.CN ignores that the OnlineNIC Registration Agreement **must** incorporate language required under ICANN's Registrar Accreditation Agreement and that the OnlineNIC Registration Agreement **does** in fact incorporate the required language. 35.CN further ignores case law holding the language in OnlineNIC's Registration Agreement confers a third party benefit on parties in Plaintiffs' position. *See Solid Host*, 652 F. Supp. 2d at 1119 (denying Namecheap's motion to dismiss because language from RAA § 3.7.7.3 mandatorily incorporated into separate domain name registration agreement is inferred to confer a third party benefit at motion to dismiss stage; "Because they involve factual questions of intent, third party beneficiary claims are often not appropriate for resolution via motion to dismiss."); *see also Namecheap*, 2020 WL 6585534, at *3–4 (denying proxy service provider's motion to dismiss because plaintiffs plausibly alleged proxy service provider was party to registration agreement, § 3.7.7.3's language conferred third-party beneficiary status on plaintiffs, registrar's registration agreement incorporated §3.7.7.3 language, and § 3.7.7.3's language made proxy service

---

[26] Defendants do not dispute that these notices constituted "reasonable evidence of actionable harm."

[27] 35.CN is directly liable for the harm caused by the Licensees because it is the alter ego of and direct participant in the actions of ID Shield.

1    provider liable).

2        Rather than directly confront these truths, 35.CN attacks a straw man not advanced in the SAC,

3    pointing to *Balsam v. Tucows Inc.*, 627 F.3d 1158 (9th Cir. 2010), and arguing that Plaintiffs' claims fail

4    because the RAA (but not the OnlineNIC Registration Agreement) does not create any third party rights.

5    (Mot. 19–20.) But here, unlike in *Tucows*, Plaintiffs seek to enforce the provision **in OnlineNIC's**

6    **Registration Agreement** that the RAA **required** OnlineNIC to include in its own contract. *See Tucows*,

7    627 F.3d at 1162 n.2 (noting that Balsam did "not allege that Tucows failed to enter into a separate

8    agreement with the registered name holder, in violation of ¶ 3.7.7 of the RAA" and implying plaintiff's

9    proper recourse was to enforce the mandated language in the registration agreement, not the RAA itself);

10   *Solid Host*, 652 F. Supp. 2d at 1119 (holding plaintiff stated claim for breach of separate registration

11   agreement between registrar and registrant based on language registrar's agreement incorporated from

12   RAA ¶ 3.7.7.3 and denying motion to dismiss); *Namecheap*, 2020 WL 6585534, at *3–4 (noting registrar

13   defendant's alleged proxy service provider "breached Section 3.7.7.3 of the RAA, as incorporated into the

14   Registration Agreement," and rejecting proxy service provider's argument "that Section 3.7.7.3 does not

15   confer a right to third parties because the RAA contains a 'No Third Party Beneficiary' clause," because

16   "Plaintiffs do not argue that they are trying to enforce the RAA itself, but the RAA as incorporated in the

17   Registration Agreement").

18       Here, Plaintiffs have alleged OnlineNIC's Registration Agreement incorporates RAA § 3.7.7.3,

19   that Plaintiffs fit into the category of third party beneficiaries contemplated by that language, that

20   ID Shield entered into OnlineNIC's Registration Agreement to register each Infringing Domain Name,

21   and that by failing to timely disclose the Licensees' contact information upon notification of reasonable

22   evidence of actionable harm, ID Shield agreed to accept liability for the harm caused by the use of the

23   Infringing Domain Names. (SAC ¶¶ 71–75); *see Solid Host*, 652 F. Supp. 2d at 1119; *Namecheap*, 2020

24   WL 6585534, at *3–4. Plaintiffs have therefore sufficiently alleged that ID Shield agreed to accept liability

25   for the harm caused by the Licensees' use in commerce of the Infringing Domain Names, including under

26   the ACPA and Lanham Act.

27   IV.    **CONCLUSION**

28       This Court should deny 35.CN's Motion as to both personal jurisdiction and failure to state a claim.

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1   If this Court is not satisfied personal jurisdiction exists over 35.CN, it should permit Plaintiffs to conduct

2   jurisdictional discovery on 35.CN. Specifically, Plaintiffs would seek further discovery regarding the

3   misrepresentations Defendants have made as to the ownership of OnlineNIC, the identity of those

4   individuals providing loans to OnlineNIC, those individuals receiving payments from OnlineNIC for those

5   loans, the payments from OnlineNIC to 35.CN, the payments from 35.CN to OnlineNIC, how 35.CN

6   controls the operations of OnlineNIC, and the role that Mr. Gong has played in running 35.CN and

7   OnlineNIC. *See Cadence Design Sys., Inc. v. Syntronic AB*, No. 21-CV-03610-SI, 2021 WL 4222040, at

8   *7 (N.D. Cal. Sept. 16, 2021) (permitting jurisdictional discovery on alter ego and general personal

9   jurisdiction). Plaintiffs would also seek discovery regarding 35.CN's corporate structure, corporate

10  records, contracts, ownership structure (including persons and entities who profit from or control the

11  functions of the business), financial records, business locations and assets, employees and contractors,

12  customers and its contacts with California and the United States. *See Harris*, 328 F.3d at 1135 (holding

13  district court erred in denying motion for jurisdictional discovery to allow plaintiff to develop record and

14  make prima facie showing of jurisdictional facts regarding whether alter ego or agency tests were met to

15  establish jurisdiction).

16          Additionally, if this Court is not satisfied Plaintiffs have stated a claim against 35.CN, Plaintiffs

17  should be granted leave to amend to add additional allegations as to the bases for 35.CN's liability.

18

19  DATED: October 26, 2021                    Tucker Ellis LLP

20                                             By: /s/David J. Steele

21                                                 David J. Steele
                                                   Howard A. Kroll
22                                                 Steven E. Lauridsen

23                                             Davis Polk & Wardwell, LLP
                                                   Ashok Ramani
24                                                 Micah G. Block
                                                   Cristina M. Rincon
25

26                                                 Attorneys for Plaintiffs,
                                                   FACEBOOK, INC. and INSTAGRAM, LLC
27

28