TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone: 213.430.3400
Facsimile: 213.430.3409

DAVIS POLK & WARDWELL LLP
Ashok Ramani SBN 200020
ashok.ramani@davispolk.com
Micah G. Block SBN 270712
micah.block@davispolk.com
Cristina M. Rincon (*Pro Hac Vice*)
Cristina.rincon@davispolk.com
1600 El Camino Real
Menlo Park, CA 94025
Telephone: 650.752.2000
Facsimile: 650.752.2111

Attorneys for Plaintiffs,
FACEBOOK, INC. and INSTAGRAM, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ONLINENIC INC.; DOMAIN ID SHIELD SERVICE CO., LIMITED; and XIAMEN 35.COM INTERNET TECHNOLOGY CO., LTD.,<br><br>Defendants. | Case No. 3:19-cv-07071-SI<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE ANSWER AND FOR DEFAULT JUDGMENT AGAINST DEFENDANTS ONLINENIC AND DOMAIN ID SHIELD**<br><br>Hon. Susan Illston |

# Table of Contents

Page

I. INTRODUCTION ................................................................................................................ 1

II. DEFENDANTS' MISCONDUCT REQUIRES TERMINATING SANCTIONS ............. 3

    A. The Special Master's Findings Not Disputed By The Freeman Declaration .................................................................................................. 3

    B. Statements In The Freeman Declaration Were Previously Rejected By The Special Master In The Report .................................................................. 4

    C. Defendants Destroyed Data After The Complaint Was filed .......................... 5

    D. Defendants' Intentional Destruction Of Evidence Irreparably Harmed Plaintiffs .......................................................................................................... 5

    E. Lesser Sanctions Cannot Remedy The Irreparable Harm To Plaintiffs ........... 7

III. ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANTS IS WARRANTED ................................................................................................................... 8

IV. CONCLUSION ................................................................................................................. 11

**Cases**

*Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*,
   No. CV 10-3738 ABC (CWX), 2013 L 12122689, at *6 (C.D. Cal. June 21, 2013) ........................... 10

*Annheuser-Busch, Inc. v. Natural Beverage Distributors,*
   69 F.3d 337 (9th Cir. 1995) ................................................................................................. 2, 6, 8

*Cher v. Forum Int'l, Ltd.*,
   692 F.2d 634 (9th Cir. 1982) ........................................................................................................ 10

*Esmark, Inc. v. Nat'l Labor Relations Bd.*,
   887 F.2d 739 (7th Cir. 1989) ........................................................................................................ 10

*Facebook Inc. v. Namecheap Inc.*,
   No. CV-20-00470-PHX-GMS, 2020 WL 6585534, at *3 (D. Ariz. Nov. 10, 2020) ............................ 9

*Garcia v. City of Santa Clara,*
   No. 10-cv-02424-SI, 2017 WL 1398263 (N.D. Cal. April 19, 2017)........................................................ 6

*Leon v. IDX Sys. Corp.,*
   464 F.3d 951 (9th Cir. 2006) .............................................................................................................. 3

*Leon v. IDX Systems Corp.,*
   2004 WL 5571412 at *5 (W.D. Wash. Sept. 30, 2004), *aff'd* 464 F.3d 951 (9th Cir. 2006) ................... 8

*Leon,* 464 F.3d at 960 .................................................................................................................. 6, 8

*Verizon California Inc. v. OnlineNIC, Inc.,*
   647 F. Supp. 2d 1110 (N.D. Cal. 2009) ................................................................................................ 8

*WeRide Corp. v. Kun Huang*,
   No. 5:18-CV-07233-EJD, 2020 WL 1967209 at *11 (N.D. Cal. April 24, 2020) ............................. 2, 8

**Statutes**

15 U.S.C. § 1125(d)(1) .................................................................................................................. 9
15 U.S.C. § 1125(d)(1)(A) ........................................................................................................... 10
15 U.S.C. § 1125(d)(1)(B)(i)(VIII)................................................................................................. 7
15 U.S.C. § 1125(d)(1)(D) ........................................................................................................... 10
17 U.S.C. § 1125(d)(1)(B)(i) ......................................................................................................... 7
Fed. R. Civ. P. 37(b) ..................................................................................................................... 6
Fed. R. Civ. P. 37(e) .............................................................................................................. 2, 3, 8
Fed. R. Civ. P. 37(e)(2)................................................................................................................. 6

## I. INTRODUCTION

Defendants OnlineNIC, Inc. ("OnlineNIC") and Domain ID Shield Service Company, Ltd. ("ID Shield") (collectively, "Defendants") have engaged in gamesmanship and deceptive behavior throughout this litigation, including their repudiation of past positions taken with the Court. They claimed to be going out of business on July 26, 2021 (ECF 121.02 at ¶ 3) and failed to pay the Special Master's fees. *See* Transcript of July 20, 2021 Hearing ("Transcript") (ECF 127 at 7 ("There are not words to capture the Court's grave concern and dismay at this situation and at the position of . . . OnlineNIC . . with regards to unpaid invoices"); yet, Defendants continue in business to this day. On July 20, 2021, Defendants' attorney filed a motion to withdraw as counsel based on ethical reasons (ECF 121); yet, despite those ethical issues, he has not renewed his motion before Judge Illston and continues to represent Defendants and file documents on their behalf. On July 20, Defendants also filed a Non-Opposition to Plaintiffs' Motion for Default (ECF 120), tacitly admitting that Plaintiffs' ACPA claims are valid and that entry of a monetary judgment and permanent injunction against Defendants are proper. Yet, 3 months later, Defendants sought to withdraw their Non-Opposition (ECF 185) and now claims that they have not violated the ACPA. Defendants also gave Notice and made admissions to the Court on July 20 that it does not object to the Special Master's Report (ECF 126 and Transcript at 7); yet, without seeking permission from the Court, and 4 months later, Defendants object to the Report in their Opposition (ECF 201 and 202). Another more significant example of Defendants' corrupt and unethical practices is Defendants' wholesale destruction of relevant data—data that goes to the heart of Plaintiffs' ACPA claims that Defendants had a bad faith intent to profit from the registration, trafficking in and use of the 35 Infringing Domain Names.

The Special Discovery Master's Data Destroyed Or Withheld Report (the "Report") (ECF 115), the findings of which were adopted by the Court (ECF 151), supports granting Plaintiffs' Motion to Strike Defendants' Answer and for Default Judgment (the "Motion") (ECF 176). The Special Master concluded: "Defendants did not do what they should have done (preserve and produce responsive ESI) yet did do what they should not have done (delete and obfuscate). Based on the sum of the evidence, Special Master concludes Defendants' behavior was intentional." (Report at 39.) Furthermore, "Defendants . . . continued deleting responsive records during the discovery process, and even after Special Master's appointment."

(*Id.*) Finally, the Special Master found that Plaintiffs suffered "irreparable harm" because Defendants "permanently deleted responsive database record and attachment files, that [Plaintiffs] will never see or know the contents." (*Id.* at 40.)

Defendants must be held accountable for their intentional destruction of relevant ESI that cannot be replaced. Terminating sanctions are appropriate here because, as the Special Master found, (a) the ESI should have been preserved by Defendants, (b) the ESI was lost because Defendants did not take reasonable steps to preserve ESI, (c) the ESI cannot be restored or replaced, and (d) Defendants acted with the intent to deprive Plaintiffs of use of the ESI. Fed. R. Civ. P. 37(e). Furthermore, given Defendants' massive destruction of responsive data, perversion of their discovery obligations, prior history of being sanctioned for their discovery abuses and the likelihood that Defendants will continue their deceptive misconduct, any lesser sanction should be rejected. *See WeRide Corp. v. Kun Huang*, No. 5:18-CV-07233-EJD, 2020 WL 1967209 at *11 (N.D. Cal. April 24, 2020) (lesser sanctions "inappropriate here because the spoliation occurred on such a massive scale"); *Annheuser-Busch, Inc. v. Natural Beverage Distributors,* 69 F.3d 337, 348 (9th Cir. 1995) ("It is appropriate to reject lesser sanctions where the court anticipates continued deceptive conduct.") .

Defendants' Opposition challenging the Special Master's conclusions are untimely and unavailing and should be rejected by the Court. These challenges are based, in part on the Declaration of Leon Freeman (the "Freeman Declaration"), which contains almost identical language and screenshots found in an earlier objection by Defendants to a preliminary draft of the Report.[1] Thus, the arguments raised by the Freeman Declaration are stale—they were reviewed and specifically rejected by the Special Master in the final Report to which Defendants did not object. *See* Report at 36-39.  Based on the well-founded conclusions reached by the Special Master, and the factual and legal support for Plaintiffs' allegations that Defendants violated the ACPA, the Court should grant Plaintiffs' Motion and enter default judgment against Defendants.

---

[1] Defendants' earlier objections can be found in a letter to the Special Master from Defendants' counsel on July 8, 2021, (the "Letter"), and which is attached as Exhibit 44 to the Report. Defendants informed the Court, at the July 20, 2021 hearing, that the Letter "is the extent of the comments and questions and objections that OnlineNIC has." (Transcript, at 7).

## II. DEFENDANTS' MISCONDUCT REQUIRES TERMINATING SANCTIONS

### A. The Special Master's Findings Not Disputed By The Freeman Declaration

Fed. R. Civ. P. 37(e) permits terminating sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." The Report shows that these elements have been met by Defendants. The Special Master found, and Defendants do not dispute, that Defendants had sophisticated IT skills to both preserve and delete the required ESI and "had ample time to implement backup management software." (Report at 17-18, 19). Yet, Defendants "failed to preserve and produce relevant ESI" and deleted 11,059,388 records of which 30%, or 3,317,816, were responsive to the agreed past discovery protocol. (*Id.* at 19-20). The Special Master also found that Defendants deleted 76.7% of all ticket attachments, or 331,390 attachment files.[2] (*Id.* at 3, 26). The Special Master estimated 77,247 of those deleted files would have been most responsive to Defendants' discovery requests. (*Id.* at 27, 39-40). Again, Defendants do not dispute any of these findings. *See, e.g.,* Freeman Declaration, ¶ 5 ("OnlineNIC does not dispute that certain database records were deleted from the production Kayako Database after the complaint in this case was filed on October 28, 2019").

The Special Master also found that Defendants attempted to hide evidence that they destroyed data. "[A]udit logs were deleted by Defendants to hide their deletion activity." (Report at 21). Defendants also deleted records using advanced PHP and SQL scripts and then "tried to hide evidence of their use by deleting the scripts themselves." (*Id.* at 29). *See Leon v. IDX Sys. Corp.,* 464 F.3d 951, 959 (9th Cir. 2006) (willful spoliation found because party "intentionally deleted many files and then wrote a program to write over deleted documents"). In addition, Defendants withheld two years' worth of ESI they did not destroy (*Id.* at 30-32) and engaged in "data dumping" by producing 27,823,240 non-responsive records to hide

---

[2] Defendants' trouble ticket database, sometimes referred to as the Kayako Ticket Database, contains correspondence between Defendants and individuals who had complaints or other issues with Defendants regarding domain names. This ticket database would thus contain emails, notices and customer communications that Defendants sent or received regarding cybersquatting, phishing, infringement, or other unlawful acts. Defendants' knowledge of their customers' unlawful behavior, and failure to act or stop that behavior, is evidence of Defendants' bad faith intent to profit under the ACPA.

5,096 responsive records (*Id.* at 3, 34-35). As significantly, the Special Master found that Defendants made "material misrepresentations" to and withheld and deleted documents from the Special Master. (*Id.* at 35, 40).

The Opposition and the Freeman Declaration do not dispute any of these findings. As such, terminating sanctions are appropriate and the Court should grant Plaintiffs' Motion.

**B.**   **Statements In The Freeman Declaration Were Previously Rejected By The Special Master In The Report**

The Court has not given Defendants leave to withdraw their Notice informing the Court that they "shall not file formal objections to the" Report. (ECF 126.). Nor has the Court permitted Defendants to file objections to the Report. Therefore, Defendants' challenges to the Report, reflected in the Freeman Declaration and the Opposition, should be stricken by the Court.

Even if the Court were to accept these late challenges, the statements in the Freeman Declaration, are almost an identical word-for-word copy of the Letter and were previously rejected by the Special Master. *See* Freeman Declaration, ¶¶ 5-14; Exhibit 44 to Report at 160-162, 164-167. The Report confirms that the Special Master reviewed and rejected Defendants' explanation and justification for the deletion of records. "***Special Master carefully reviewed Defendants' comments. In many ways, Defendants' responses support the most important concerns Special Master raised in the Report. In fact, Defendants do not dispute deleting records, they instead try to justify why Defendants deleted data post case filing, during discovery, after productions, and after Special Master's appointment.***" (Report at 37) (emphasis added).

For example, the Freeman Declaration claims that the "Kayako support ticket database is a legacy product that is no longer supported. Over the course of years of operation, the database became unwieldy and stuffed with spam and voluminous, old support data – resulting in a very slow database which was difficult to search and manage." (Freeman Decl. ¶ 5). The Special Master concluded that these statements were false, noting that "Defendants continue to use the Ticketing Database" and that the Special Master "did not notice performance issues with the larger Consolidated Database." (Report at 38).

Furthermore, the Special Master noted that "Defendants do not explain why they would delete records directly from the database (causing orphaned records) instead of via the Application" or "why

they data-dumped 27,818,144 non-responsive records on Plaintiffs." Nor did Defendants "address why so many attachment files and database records were deleted, why surviving attachment files were not searched, or why they were provided to Plaintiffs with viruses." (*Id.* at 38).

The Court, should reject Defendants' untimely and unavailing justifications for Defendants' intentional destruction of relevant data, like the Special Master did.

### C. Defendants Destroyed Data After The Complaint Was filed

The Special Master found that "Defendants' conduct was consistent and continuous. Defendants began deleting data before the complaint was filed, continued deleting responsive records during the discovery process, and even after the Special Master's appointment." (Report at 39). In the Opposition, Defendants cherry pick the Report and improperly focus solely on the first part of the Special Master's findings, asking "how can pre-litigation conduct constitute 'spoliation'?" (Opposition at 2.) Defendants' failure to address the Special Master's findings regarding their post-filing spoliation of relevant data is especially telling as to the impropriety of their data destruction. Indeed, Defendants admit that data was destroyed after the complaint was filed. Freeman Declaration, ¶ 5

Next, Defendants highlight the Special Master's admission that he did not know the specific date when many of the records were deleted, **but ignore** the Special Master's explanation that his failure was caused by the Defendants' actions: "This is because Defendants deleted audit logs and failed to provide regular backups of Ticket Databases and attachment file directories. *However, what is clear, is that Defendants deleted data during discovery after previous productions to both Plaintiffs and Special Master.*" (Report at 40) (emphasis added). Defendants have not provided any evidence to the contrary. Nor should Defendants be given any favorable presumption as to when the destruction of data occurred since they are responsible for the uncertainty caused by their destructive acts.

Given the well-founded findings of the Special Master, however, that Defendants' intentional destruction of evidence occurred after the complaint was filed, terminating sanctions are appropriate.

### D. Defendants' Intentional Destruction Of Evidence Irreparably Harmed Plaintiffs

As the Special Master found, Defendants intentionally destroyed relevant data. *See* Fed. R. Civ. P. 37(e)(2) (the court may enter a default judgment "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation"). "The deleted attachment

files and records cannot have happened by accident. Therefore, Special Master concludes it must have been intentional." (Report at 26). *See also* Report at 39 ("Based on the sum of the evidence, Special Master concludes Defendants' behavior was intentional."). As significantly, the Special Master concluded that "based on Defendants' widespread activities involving ESI deletion, information withholding, and data dumping there is no other conclusion than Defendants acted intentionally to avoid producing responsive ESI to Plaintiffs." (*Id.* at 40). A finding of intent supports "an inference that the opposing party was prejudiced by the loss of information that would have favored its position." 2015 Advisory Committee Note to Fed. R. Civ. P. 37(e)(2).[3]

Nevertheless, the Special Master's findings fully support the inference that Defendants' destruction of data prejudiced Plaintiffs. "Defendants caused irreparable harm to Plaintiffs through permanently deleted and responsive database records and attachment files, that they will never see or know the contents." (Report at 40). Defendants intentionally destroyed 331,390 attachment files, which "crucially . . . . may be the most important part of a ticket, much like an email attachment may be more important than the email message itself." (*Id.* at 26.) Responsive documents were destroyed, no longer exists, and are therefore unavailable. "Furthermore, Special Master cannot indicate whether or how much of the non-recoverable ESI was responsive or not; a record that cannot be seen, cannot be searched." (*Id.*) *See Leon,* 464 F.3d at 960 ("Leon's spoliation 'threatened to distort the resolution' of the case . . . because any number of the 2,200 files could have been relevant to [Defendant's] claims or defenses, although it is impossible to identify which files and how they might have been used.")

In their Motion, Plaintiffs explained that these deleted records would have contained key evidence, including email conversations, legal notices, customer communications and customer information, regarding notices or other legal complaints that Defendants received regarding cybersquatting by their

---

[3] In contrast, when considering terminating sanctions under Fed. R. Civ. P. 37(b), or by the Court's inherent authority, the Court should find that the destroyed data related to the matters in controversy such that the destruction interfered with the rightful decision of the case. *Annheuser-Busch,* 69 F.3d at 348. In the Opposition, Defendants cite to *Garcia v. City of Santa Clara,* No. 10-cv-02424-SI, 2017 WL 1398263 (N.D. Cal. April 19, 2017) to support their claim that the Court should analyze whether any relevant, useful evidence was spoliated. (Opposition at 5). The *Garcia* case, however, analyzed sanctions under Fed. R. Civ. P. 37(b) and not 37(e).

customers. (Motion, at 9-10, 12). The records also could have shown Defendants' knowledge that the Infringing Domain Names at issue in this case were used for phishing or other types of fraud, and, despite that knowledge, Defendants continued to let their customers misuse Defendants' services. Such evidence might also show that Defendants and their customers had a bad faith intent to profit from the Infringing Domain Names. *See* 17 U.S.C. § 1125(d)(1)(B)(i) (itemizing nine non-exclusive factors to determine bad faith intent to profit under the ACPA).[4] In addition, the deleted records could have shown that Defendants or their affiliates or aliases were the beneficial owners of the Infringing Domain Names, and support Plaintiffs' allegations that Defendants used the Infringing Domain Names in violation of the ACPA.

The Opposition does not dispute the conclusion that Defendants "intentionally" destroyed evidence. Rather, Defendants argue that terminating sanctions are inappropriate because "plaintiffs never did any significant analysis on *how* the allegedly spoliated evidence impacted their claims on the Infringing Domain Names." (Opposition, at 3). Defendants further claim that "Plaintiffs fail to articulate what they think was deleted or how that information was relevant to their case." (Opposition, at 6). As shown above, Defendants are mistaken. Also given the inference that Defendants' intentional destruction of data prejudiced Plaintiffs, it is Defendants' burden to show that the destroyed documents were irrelevant to Plaintiffs' case in proving a violation of the ACPA. Defendants have not met their burden. Nor could they since only one conclusion emerges as to why Defendants intentionally destroyed relevant ESI after the filing of the complaint, withheld multiple years' worth of ESI and dumped volumes of irrelevant data on Plaintiffs: Defendants sought to hide relevant and unfavorable evidence from Plaintiff and create unnecessary discovery burdens in order to stall litigation on the merits of their liabilities in this case. As such, terminating sanctions are appropriate here.

### E.  Lesser Sanctions Cannot Remedy The Irreparable Harm To Plaintiffs

Rule 37(e) permits the imposition of terminating sanctions when, as here, Defendants intentionally destroyed relevant evidence after the Complaint was filed. In the face of mass spoliation of evidence,

---

[4] Defendants claim that missing data relating to "other legal complaints" are irrelevant because they involve "matters ***not*** related to the Infringing Domain Names. (Opposition at 6). Yet, one of the ACPA's bad faith factors include the registration of other domain names that infringe the marks of others. 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).

lesser sanctions, like an adverse jury instruction or the exclusion of evidence, are found to be inappropriate. *WeRide*, 2020 WL 1967209 at *10, 11 ("mass destruction of email has irredeemably prejudiced WeRide's case"); *Leon,* 464 F.3d at 959, 960 (destruction of data on laptop). Defendants propose an even lesser sanction—a jury instruction changing the burden of proof to show that Defendants registered, trafficked or used the Infringing Domain Names (Opposition at 2). The Court should reject this proposal for several reasons. First, such a jury instruction is not directed to the evidence destroyed, namely whether Defendants had a bad faith intent to profit from the Infringing Domain Names. And second, such a jury instruction would not be proper since Plaintiffs would be helpless to rebut evidence that may overcome the inference given the spoliation at issue here. *Leon,* 464 F.3d at 960.

Furthermore, Defendants have been sanctioned in the past for violating its discovery obligations and violating multiple court orders. *Verizon California Inc. v. OnlineNIC, Inc.,* 647 F. Supp. 2d 1110 (N.D. Cal. 2009). These sanctions did not deter Defendants from continuing their discovery abuses here, and making misrepresentations to the Court and the Special Master. There is no indication that Defendants will change their behavior if terminating sanctions are not granted. *See Annheuser-Busch,* 69 F.3d at 352 ("It is appropriate to reject lesser sanctions where the court anticipates continued deceptive conduct.") Indeed, Defendants' behavior throughout this litigation—claiming to go out of business, having their attorney threaten to withdraw for ethical reasons, unwillingness to pay the Special Master's fees—suggests that Defendants will continue to engage in gamesmanship and dishonesty.

Finally, public policy supports terminating sanctions here in order to ensure that Defendants do not profit through their misdeeds. Terminating sanction will also deter others from emulating Defendants' spoliative behavior. *Leon v. IDX Systems Corp.,* 2004 WL 5571412 at *5 (W.D. Wash. Sept. 30, 2004), *aff'd* 464 F.3d 951 (9th Cir. 2006). "Where a spoliator's behavior is egregious, dismissal or default is appropriate." *Id.*

### III.   ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANTS IS WARRANTED

A default judgment finding Defendants liable for cybersquatting under the ACPA is warranted. To state an ACPA cybersquatting claim, a plaintiff must allege (1) ownership of a valid mark; (2) that the mark is distinctive or famous; (3) the existence of a domain name that is identical or confusingly similar to, or in the case of a famous mark, dilutive of, the owner's mark; and (4) that a defendant registered,

trafficked in, or used the domain name; (5) with bad faith intent to profit from the mark. *See* 15 U.S.C. § 1125(d)(1).

Defendants claim that they neither registered, trafficked in or used the Infringing Domain Names. (Opposition at 1, 6.) Defendants ignore their admission that ID Shield is listed as the registrant in the WHOIS directory for the Infringing Domain Names. (SAC ¶ 27; SAC Answer ¶ 27).[5] *See Facebook Inc. v. Namecheap Inc.*, No. CV-20-00470-PHX-GMS, 2020 WL 6585534, at *3 (D. Ariz. Nov. 10, 2020) (holding plaintiffs plausibly alleged proxy service provider was domain name registrant because it was listed as registrant in WHOIS directory for each domain name at issue).[6] Indeed, the ID Shield Service Agreement states that "each domain name registration which you control and which you designate *will thereafter be registered in the name of [ID Shield] as registrant.*" (SAC Ex. 6 at 1) (emphasis added). And later, the ID Shield Service Agreement confirms that the customer "will not be listed as the registrant for the" domain names. *Id.* at 2. Finally, ID Shield's webpage confirms that it is the registrant for the domain names by stating: "We replace your registrant, technical, admin and billing information." (SAC Ex. 5).

ID Shield also provides a proxy service for OnlineNIC's customers. (SAC ¶¶ 10, 27).[7] This is significant because, as a proxy service, ID Shield is liable under the ACPA for registering the Infringing Domain Names as the registrant.[8] ID Shield is also liable under the ACPA for trafficking in the Infringing

---

[5] Pursuant to stipulation, the Court ordered that Defendants' Answer to the First Amended Complaint (ECF No. 88) is the operative responsive pleading to the SAC (ECF No. 108 at 2:23–24).

[6] The ACPA uses the term "registrant," and ICANN uses the terms "registrant" and "registered name holder" interchangeably, to refer to a person who registers and owns a domain name.

[7] ID Shield is a proxy service because it registers domain names, as the registrant, in its own name and not in the name of its customers. ICANN defines a proxy service as "a service through which a Registered Name Holder licenses use of a Registered Name to the . . . Customer in order to provide the . . . Customer use of the domain name, *and the Registered Name Holder's contact information is displayed in the Registration Data Service (Whois) or equivalent services rather than the . . . Customer's contact information*." (SAC Ex. 4 at 59 (RAA, "Specification On Privacy And Proxy Registrations" § 1.3) (emphasis added).

[8] Under 15 U.S.C. § 1125(d)(1)(D), the domain name registrant or its authorized licensee is liable for the infringing use of the domain name.

Domain Names because ID Shield licensed use of the Infringing Domain Names to its customers.[9] Furthermore, ID Shield, as a proxy service, is liable under the OnlineNIC Registration Agreement, which incorporates Section 3.7.7.3 of the RAA, because it did not timely provide the contact information of its customers after receiving notice of actionable harm from Plaintiffs. Although Defendants claim that they did respond to a few of Plaintiffs' numerous notices (Opposition, at 7-8), those limited responses **did not contain the necessary** contact information of its customers and therefore liability under 3.7.7.3 would still accrue. And, more importantly, since these "responses" were cherry picked from the Kayako database where the bulk of the attachments and correspondence were deleted, Plaintiffs have been prejudiced in their ability to conduct discovery, rebut or understand the full circumstances of these incomplete responses.

Finally, OnlineNIC is directly liable for all of ID Shield's actions because OnlineNIC is the alter ego of ID Shield. (SAC ¶¶ 12, 26–55.)[10] Plaintiffs allege, and Defendants admit, that ID Shield (a) has no employees, (b) has no assets, (c) does not control its own operations (which are entirely controlled by OnlineNIC), (d) does not conduct regular (or any) shareholder meetings and (e) has its expenses paid by OnlineNIC. Furthermore, Ms. Carrie Yu owns ID Shield for the benefit of OnlineNIC. (SAC ¶¶ 30–43; SAC Answer ¶¶ 31–41 (admitting).) Plaintiffs also allege, and Defendants further admit, that the day-to-

---

[9] "Trafficking in" is a separate and distinct liability-producing act under the ACPA. *See Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-3738 ABC (CWX), 2013 WL 12122689, at *6 (C.D. Cal. June 21, 2013) ("The ACPA imposes liability for 'register[ing], traffic[king] in, or us[ing]' a domain name that is identical to or confusingly similar to a distinctive mark. 15 U.S.C. § 1125(d)(1)(A). The disjunctive 'or' shows that only one type of conduct is sufficient to establish liability."). Section 1125(d)(1)(E) defines "traffics in" as engaging in "transactions that include but are not limited to, sales, purchases, loans, pledges, *licenses*, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." (emphasis added). Plaintiffs allege, with factual support, that ID Shield registered each Infringing Domain Name and licensed it to Licensees. (SAC ¶¶ 10, 27, 28, 57, 59 & Ex. 7.)

[10] Plaintiffs also allege that OnlineNIC is a direct participant in ID Shield's unlawful activities. Under the direct participant theory, even if all of the acts alleged in the SAC were committed solely by ID Shield, OnlineNIC would still be directly liable as a direct participant. Under this theory, a "parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark, Inc. v. Nat'l Labor Relations Bd.*, 887 F.2d 739, 756 (7th Cir. 1989); *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 640 (9th Cir. 1982) (finding parent liable for actions of subsidiary where parent owned 80% of subsidiary's stock and participated in tortious conduct).

day operations of OnlineNIC and ID Shield, including all technical support and customer support, are run by employees of 35.CN. (SAC ¶¶ 44–46; SAC Answer ¶¶ 45–46 (admitting).) In their Opposition, Defendants ignore Plaintiffs' alter ego and direct participant allegations and thus concede their liability on these grounds.

Defendants claim that they "produced a large amount of exculpatory data to Plaintiffs during discovery." (Opposition at 7.)[11] Of course, even if that were true (and, as shown above, it is not) Defendants should not be rewarded for this production since they engaged in data dumping by producing 27,823,240 non-responsive records to bury 5,096 responsive records. Again, Defendants seek to be rewarded for their improper behavior. The Court should reject Defendants' claims and enter a default judgment against them.

## IV.    CONCLUSION

Defendants must be sanctioned for their massive destruction of relevant evidence and attempts to hide that destruction. Defendants must be sanctioned for destroying the most critical evidence found in the ticket database and attachments, evidence which goes to the heart of Plaintiffs' claim that Defendants infringed the ACPA with a bad faith intent to profit. Defendants must be sanctioned for their other discovery abuses, like data dumping and withholding two year's worth of relevant ESI from production. Based on these intentional, prejudicial and damaging acts, as well as Defendants' prior history of being sanctioned for discovery abuses, a terminating sanction is the only proper remedy.

For these reasons, Plaintiffs respectfully request the Court to grant the Motion and (1) strike Defendants' Answer and enter default judgment against Defendants in the amount of $3.5 million, reflecting the maximum available statutory damage award of $100,000 per domain name (totaling $3.5 million), and costs of the action; (2) enter a Permanent Injunction as specified in Plaintiffs' [Proposed] Judgment; (3) find that this is an exceptional case and award Plaintiffs' reasonable attorneys' fees; and (4) order Defendants to reimburse Plaintiffs for the costs Plaintiffs paid to the Special Master ($88,937).

---

[11] Over a year after the Complaint was filed, Defendants now claim that only one of the 35 Infringing Domain Names was registered by a third party and is legitimate basing it on unsubstantiated information contained in a purported email by an alleged customer. (Opposition, at 7). Again, in the face of data dumping and mass destruction of evidence, Plaintiffs cannot effectively rebut this cherry picked example by Defendants.

Defendants did not address, and thus must concede, that the amount of the statutory damage award, attorneys' fees and reimbursable costs for the Special Master is appropriate.

DATED: December 10, 2021             Tucker Ellis LLP

By: /s/David J. Steele
    David J. Steele
    Howard A. Kroll
    Steven E. Lauridsen

Davis Polk & Wardwell, LLP
    Ashok Ramani
    Micah G. Block
    Cristina M. Rincon

    Attorneys for Plaintiffs,
    FACEBOOK, INC. and INSTAGRAM, LLC