Pages 1 - 52

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Alex G. Tse, Magistrate Judge

FACEBOOK, INC. *et al.*,        )
                                )
          Plaintiffs,           )
                                )
     vs.                        )        **NO. 3:19-CV-07071-IS**
                                )
ONLINENIC, INC., *et al.*,      )
                                )
          Defendants.           )
_____  )

                                San Francisco, California
                                Wednesday, July 20, 2022

**<u>TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS</u>**

(APPEARANCES ON FOLLOWING PAGE)

TRANSCRIPTION SERVICE BY:     Dipti Patel, CET-997
                              Liberty Transcripts
                              7306 Danwood Drive
                              Austin, Texas 78759
                              (847) 848-4907

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

TUCKER ELLIS LLP
515 South Flower Street, 42nd Floor
Los Angeles, California 90071
**BY: JEFFREY SINDELAR, ATTORNEY AT LAW**
**HOWARD KROLL, ATTORNEY AT LAW**

For Defendant Xiamen 35 Internet Technology Co.:

KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, California 94108
**BY: KARL KRONENBERGER, ATTORNEY AT LAW**
**LEAH VULIC, ATTORNEY AT LAW**

1    <u>**Wednesday - July 20, 2022**</u>                                    **2:32 P.M.**

2                          **P R O C E E D I N G S**

3                                ---OoO---

4        **THE CLERK:**  Please come to order.  This Court is again in

5    session.  The Honorable Alex Tse presiding.

6        Calling Civil Action 19-CV-7071, Facebook, Inc., *et al.* vs.

7    OnLineNic Inc., *et al.*

8        Counsel, beginning with plaintiff, state your appearances

9    now.

10       **MR. SINDELAR:**  This is Jeff Sindelar with Tucker Ellis LLP

11   along with my colleague Howard Kroll on behalf of plaintiffs Meta

12   Platforms Inc. and Instagram, LLC.

13       **THE COURT:**  Okay.  Good afternoon.

14       **MR. SINDELAR:**  Good afternoon.

15       **MR. KRONENBERGER:**  Good afternoon, Your Honor.  This is Karl

16   Kronenberger and Leah Vulic representing CN 35 Internet

17   Technology Corp.

18       **THE COURT:**  Okay.  Anybody else?

19       Is there anybody from -- I don't see anybody here, counsel

20   for OnLine or Domain ID Shield.

21       **MR. KRONENBERGER:**  Correct, Your Honor.

22       **THE COURT:**  All right.  And they weren't signatories to the

23   letter.  So I didn't expect you.

24       Okay.  So I've taken a look at your letter brief to me.  And

25   let me just make sure I understand, which I think I have an

4

1    understanding of just where the posture of the case is.

2         So Judge Illston has already ruled and found relevant

3    discovery that's related to jurisdiction in alter ego.  So

4    today's discussion doesn't need to spend any time debating

5    whether or not that kind of discovery is relevant.  And my

6    understanding is that that's what the discovery has been

7    propounded thus far.  It's all related to those two issues.  So

8    that's undisputed, as well.

9         And that discovery has been outstanding for months now, fair

10   to say?  February?  And but there's no scheduling order.  So

11   there's no deadline.  That doesn't mean that that's the end of

12   the inquiry.  It's we seem to have reached an impasse regarding

13   what the obligations are to comply with the discovery that I

14   imagine if the case, you know, continues, might be an inquiry

15   that extends if the Court finds that there's jurisdiction.

16        The case continues, and there's going to be other discovery

17   that hinge upon whether or not the Chinese authorities will

18   authorize this discovery.  So my first question is under the --

19   and I think you've reached or you have an agreement here that the

20   first line of inquiry is whether or not the Chinese, the proper

21   Chinese authority has ruled that the discovery should not be

22   responded to.

23        And I note that there's dueling declarations from law firms

24   that are opining on Chinese law.  But let's hear from -- first of

25   all, what is the appropriate Chinese authority?  Is it the

5

1    Chinese Ministry of Justice or something else.  We'll start with

2    the moving party.

3        **MR. SINDELAR:**  Yes, Your Honor.  Thank you very much.

4        So 35.CN has not come forward and told us what the

5    appropriate Chinese authority here is.  In other cases in which a

6    Court has found that Chinese law prohibited discovery, usually

7    the party resisting discovery produces a letter from the Chinese

8    authority confirming the fact that the Chinese government will

9    not permit discovery to take place under Chinese law.

10       We don't have that in this case.  And plaintiffs, or

11   Mr. Kronenberger has informed us that we should not expect such a

12   letter to be forthcoming.  In addition to that, in other cases --

13       **THE COURT:**  Let me back up.

14       I mean, how am I supposed to determine that there is an

15   appropriate authority that's been identified, and what that

16   authority is?  And I mean, am I supposed to just take the word of

17   representation from counsel that this is the authority, and by

18   the way, you're not going to get anything from them?

19       How do I confirm that in fact that is the proper authority

20   and is that something that I can research independently?  Is that

21   something that has to be argued before me with authority?  How do

22   we determine who the authority is for this first prong?

23       **MR. SINDELAR:**  So the question of Chinese law is a question

24   of law that Your Honor determines.  And the burden is upon the

25   party resisting the discovery --

1    **THE COURT:**  Okay.

2    **MR. SINDELAR:**  -- to establish the fact that there is a

3    relevant authority, who that is --

4    **THE COURT:**  Okay.

5    **MR. SINDELAR:**  -- and that they are prohibiting discovery.

6    **THE COURT:**  Okay.  Okay.  And so your position,

7    Mr. Sindelar --

8    **MR. SINDELAR:**  Sindelar.

9    **THE COURT:**  -- is that Mr. Kronenberger has said that do we

10   even have an understanding of who that authority is and that

11   we're not going to get it?

12   **MR. KRONENBERGER:**  We do.

13   **THE COURT:**  Okay.  So go ahead, Mr. Kronenberger.  Go ahead

14   and answer the question.

15   **MR. KRONENBERGER:**  Yeah.  So we know that our client has

16   submitted a great number of documents to the Cyberspace

17   Administration of China.  So it's this acronym CAC that you'll

18   see from time to time in the case law.

19   **THE COURT:**  Okay.

20   **MR. KRONENBERGER:**  When our client received the discovery

21   requests, we advised them and they did immediately started to

22   gather documents, consulted with their counsel in China who

23   recommended that they immediately deliver the documents to the

24   Cyberspace Administration of China, CAC.

25   **THE COURT:**  And what's the authority for that?  Why is that

1    the appropriate authority from your client's perspective?

2        **MR. KRONENBERGER:** Well, that is the exact authority that

3    was recommended by their counsel. There's --

4        **THE COURT:** That's their counsel. I mean, I'm not saying

5    this happened here. But if their counsel said you know what,

6    let's go to this obscure authority no one's ever heard of and

7    let's see what they have to say, I mean, how is it that I'm

8    supposed to verify that in fact it was the appropriate authority

9    that you're seeking clearance from?

10       **MR. KRONENBERGER:** You know what? Well, Your Honor, we can

11   provide some additional sort of background for why the documents

12   went to CAC --

13       **THE COURT:** I don't have any understanding or belief that

14   the record demonstrates that they somehow manufactured what

15   you're representing to me. But I don't have an answer right now

16   as to why that authority, the CAC, is the appropriate authority

17   to make the call on the disclosure of these documents and it

18   isn't, for example, the Chinese Ministry of Justice.

19       **MR. KRONENBERGER:** Well I think that all I can tell you,

20   Your Honor, is that our assumption the entire time has been it's

21   the CAC which required this additional --

22       **THE COURT:** And I hear you, and I believe you.

23       But why is it that that's the authority? What's the

24   authority for your going to that authority? Is it just because

25   your client told you it was, and then you're representing to the

8

1    Court that that's what they told you?  I believe you.

2        But I don't have any insurance that that's the proper

3    authority to make this decision which is a fairly drastic one

4    which is to say no, you don't have to produce any of that.  I

5    don't -- I mean, do they admit in some document that they have

6    authority over the review of these documents, and based upon

7    their review they prohibit disclosure?

8        It sounds like I'm not going to get anything, or that you're

9    being told at least from your client that don't expect anything

10   from this agency other than some kind of verbal declination.

11       **MR. KRONENBERGER:**  They're not getting any indication that

12   about what the result is going to be of the review.

13       **THE COURT:**  Okay.  Okay.  So we don't have any understanding

14   of what's forthcoming other than what has been submitted as

15   Exhibit 11 which is a letter from your client's counsel, outside

16   counsel is all that I have before me.  And I will point out that

17   as to one, this is on Page 3 of Exhibit 11 which I think is on

18   the docket.  It's Document 247-11, Page 4 of 8.

19       Number four says very clearly that what are the possible

20   consequences in China to provide or not provide the information

21   and documents.  And it seems very clear that it says it may

22   violate the relevant provisions of the data security law and the

23   personal information protection law.

24       So if I'm to assume that that's the law that governs here

25   and that's what was analyzed by the authority in China to say

9

1    don't produce it, this seems pretty clear to say that it may

2    violate it.  There's no categorical prohibition.  And it sounds

3    like a lawyer writing something that honestly it's hedging.

4        **MR. KRONENBERGER:**  I can see your point.  And by the way, I

5    do believe that in our attorney letter --

6        **THE COURT:**  Okay.

7        **MR. KRONENBERGER:**  -- it does mention the Cyberspace

8    authority.  I think it's -- I can get you a -- I think it's

9    Page 4.

10       **THE COURT:**  Okay.

11       **MR. KRONENBERGER:**  But it does mention the Cyberspace

12   authority.  And from our client's perspective, they're a public

13   domain.  And they need to comply with the rules that apply to

14   them.  The only way they can determine what rules they need to

15   follow is to talk to their counsel.

16       Frankly, I don't think you can find an attorney anywhere in

17   China that would say yes, you can definitely produce this.

18   Except if they're paid by Facebook or maybe some other plaintiff,

19   you are not going to find that.

20       The opinions are uniform.  You do not produce.  On top of

21   that, these are new laws.  So Facebook, even in its letter,

22   admits there's no implementing regulation.  It's a completely

23   vague, unclear, but the stakes are high with imprisonment, fines,

24   civil liability as well.

25       So when it comes to these opinions from Counsel, there's

1    really only one opinion right now.  You know, that said, Your

2    Honor, I feel as if that the way that you're analyzing it may

3    overlook our attempts, I'll call my client 35, 35's attempts to

4    work around this.

5         Our client does not want to be in this situation where

6    there's a conflict between an order of a federal court and the

7    Chinese regulatory authority.  So what we have done is we've

8    tried to avoid this.  The way we tried to avoid it is one, to do

9    exactly what Facebook recommends that all companies do, submit

10   the documents.

11        But we've also combed through an enormous amount of Chinese

12   public documents.  And many of those documents are responsive to

13   the requests.  And I am frankly very encouraged that we're going

14   to get to the point where there's a very small subset of the

15   total documents requested that may not be able to be produced.

16   We're not there yet because it's horribly time consuming,

17   different languages.

18        Our firm has engaged Chinese language counsel.  We're

19   dealing with our client's Chinese language, doesn't speak

20   English.  And we do not have this so-called privilege log which

21   we want, which is in the end what I was going to suggest today is

22   that we can create a list of what's at issue because we're still

23   producing, we're still reviewing documents.

24        It's very time-consuming.  And our client does not want to

25   be in this dispute right now where there's this potential

11

1    conflict.

2    **THE COURT:**  Let me follow up with some things that you said.

3    And that is that you think that there are public documents that

4    would not run afoul of the Chinese law, thereby allowing your

5    client to produce them.  And will those documents though answer

6    the question that the Court wants to hear, which is whether or

7    not there's personal jurisdiction and whether or not there's

8    alter ego liability because I will tell you, Mr. Sindelar is

9    going to want to know that he has all the documents in possession

10   to demonstrate alter ego liability which are very fact-intensive.

11   I don't know if those are ever going to be public documents.

12       And that's what we're trying to get at.  But why are you so

13   confident that you can -- I'm confident that you can produce

14   documents that are public and you're not going to run afoul of

15   the Chinese law.  But are you satisfied from your perspective

16   that you're going to produce all the documents that would answer

17   and go to the question of jurisdiction and alter ego because

18   that's the bottom line here.

19       **MR. KRONENBERGER:**  You're right, Your Honor.

20       But I think what's important is the perspective here to step

21   back because there's a proportionality analysis under the federal

22   rules.  The perspective is this case is about 35 domain names.

23   It's just happenstance that our company's name is 35.  But it's

24   also 35 domain names that are at issue.

25       And they weren't registered by our client.  They weren't

1  registered by this co-defendant OnLineNic.  They were registered

2  by third parties and there's liability arguably through this

3  mechanism of this registrar agreement.

4      So there's an alter ego argument where we have our client

5  who's alleged alter ego that's multiple steps removed from this

6  wrongdoing.  And on top of that, there's a personal jurisdiction

7  argument in play.  And when there's personal jurisdiction in

8  play, requests have to be narrowly tailored.

9      So considering that the importance of this case, of these 35

10  domain names and the position of our client, we -- that is

11  informing our argument that the requests as they stand now are

12  horribly overbroad, you know, asking for 20 years of

13  communications, again with certain parties, that sort of thing.

14  Not proportional in any way, especially considering there's

15  personal jurisdiction involved and we're only focused on alter

16  ego.

17      And then it's also redundant and cumulative because Facebook

18  is asking for documents many of which are in the hands of third

19  parties.  So if there's a dilemma here, should Facebook get the

20  documents from 35 in China, or should they get them from ICANN in

21  Los Angeles.  The answer should be --

22      **THE COURT:**  But where are the documents?  Are the documents

23  in China?

24      **MR. KRONENBERGER:**  So getting to your exact question --

25      **THE COURT:**  Yeah.

1    **MR. KRONENBERGER:**  -- I don't believe we are going to get to

2    that position where every single document that Facebook wants

3    will be turned over.  But what I do believe is that we can get to

4    the point where --

5        **THE COURT:**  You don't get to decide that.

6        **MR. KRONENBERGER:**  Yes.  I know.

7        **THE COURT:**  If Facebook wants documents, and I find that

8    they should have them, they will get them or -- so go ahead.  You

9    might not have documents that are responsive, but you don't get

10   to decide.  Your client doesn't get to decide what they're going

11   to hand over or not.

12       **MR. KRONENBERGER:**  Yes.

13       **THE COURT:**  They're not the final decider on that.

14       **MR. KRONENBERGER:**  But I should restate that.

15       **THE COURT:**  I understood what you meant to say.  I just

16   wanted to be very clear that I'm not --

17       **MR. KRONENBERGER:**  Yeah.

18       **THE COURT:**  -- conceding authority to your client.

19       **MR. KRONENBERGER:**  Absolutely.

20       **THE COURT:**  All right.  And I didn't interpret you to mean

21   that.  Go ahead.

22       **MR. KRONENBERGER:**  What we would like to do is put you in a

23   position where we've carved out the core group of requests that

24   are at issue, where they're vital to the case because they have

1    to be vital under the case law, and they'll narrowly tailor these

2    documents Facebook really absolutely needs them.  At that point,

3    we apply the balancing test.

4         So it's very difficult for us to apply this balancing test

5    at this point because we don't know for certain what documents

6    are out there because, like, as attorneys, I have not seen the

7    documents.  They have gone to Chinese counsel.

8         But what you will see on our responses is that we say that

9    we will produce documents upon approval from the Chinese

10   authority.  And then often, in most of the responses it says as

11   of today, we are not aware of any documents.  So with most of the

12   requests, I don't think there are going to be any documents.

13        But I don't know for example if there's some interest in

14   real property that 35 has in the United States.  We say we don't

15   know, we're not aware of any documents.  But we make this

16   statement about the Chinese authorities because I haven't seen

17   those documents, and we need to get some confirmations.

18        And eventually, we're going to get to the point where

19   everything is narrowed down to a small group of requests for you

20   to look at.  And that's what we need is this privilege log so to

21   speak because this, I do believe the requests are horribly

22   overbroad and cumulative and seeking documents that where that

23   can be sought from third parties that are not in China.

24        So I know I'm -- I think I'm speaking too much here, Your

25   Honor, so I --

1    **THE COURT:**  No, no, no.  You're helping me make a decision.

2    So, but where I think where the rubber meets the road here

3    is it's not going to be the first prong because we're going to

4    get stalled on that.  And you don't think there's any way there's

5    going to be an authority that's going to approve it, or prove it

6    sufficient that you think that they're going to be willing to

7    risk violating Chinese law.

8    You think that the analysis is going to be all in the second

9    prong which is going to be the factors and balancing.  And --

10   **MR. KRONENBERGER:**  I don't necessarily agree with you on

11   that.

12   **THE COURT:**  Okay.

13   **MR. KRONENBERGER:**  But I think maybe some people's gut

14   feeling is the Chinese government is not approving anything.  And

15   I can't disagree with that.  I --

16   **THE COURT:**  I certainly can see why they think that.

17   **MR. KRONENBERGER:**  Well, in the case law, some courts have

18   commented about that.

19   **THE COURT:**  Yeah.

20   **MR. KRONENBERGER:**  And so I can't -- so of course I want to

21   be hopeful, but I want to be realistic as well.  And because

22   of --

23   **THE COURT:**  Well, let me -- in terms of getting to the --

24   you know, if your client is truly going to argue the Court lacks

25   jurisdiction, I mean, isn't it to your interest to get this

1   discovery off the ground and get that teed up?

2        MR. KRONENBERGER:  Yes, but --

3        THE COURT:  I don't know what that discovery looks like

4   because that discovery could be -- or your position on why the

5   Court lacks jurisdiction is an absence of record, or information

6   would prove --

7        MR. KRONENBERGER:  I agree, Your Honor.

8        THE COURT:  -- lack of jurisdiction.  Yeah, but --

9        MR. KRONENBERGER:  I agree --

10       THE COURT:  -- the idea is that you should be motivated not

11  to delay this, but to get it going and how to most efficiently go

12  there.  I'm convinced Facebook would like to get this going too

13  because they feel the law has been broken and they want a remedy

14  here.  Okay.  So --

15       MR. KRONENBERGER:  If I could make --

16       THE COURT:  Yes.  Go ahead and make your final point because

17  I do want to give the plaintiffs an opportunity too.

18       MR. KRONENBERGER:  You stated, when you summarized where we

19  were, that there was an impasse.  We don't believe there's an

20  impasse because we believe we can make more progress.  And I know

21  that Facebook wants to move forward.  I know that they're

22  frustrated.  We're frustrated as well because we want to move

23  forward, especially on merits issues.

24       But it's taking a long time.  And we feel that it would be

25  easier for the Court to address this with a narrow group of

1    requests that the Court is looking at in making its decision.

2        **THE COURT:**  Oh, I don't disagree that it would help

3    everybody.  But the issue is what you're telling me is you get to

4    do that on your own time.  It's a lot of work on your side.  And

5    you're getting to it.  I don't have any reason to dispute that,

6    but I'm confident Facebook has an opinion about that.

7        And the issue is the Court is just -- and that could be

8    true.  It could be true that really nothing is really -- I can

9    issue an order today and say documents need to be -- privilege

10   log needs to be forthcoming in two weeks, documents thereafter in

11   four.  And then the real question is what happens if that you

12   can't meet that.

13       **MR. KRONENBERGER:**  Yes --

14       **THE COURT:**  And I don't believe you could say anything other

15   than we'll try.  But we're --

16       **MR. KRONENBERGER:**  I think that --

17       **THE COURT:**  -- dealing with, you know, documents in China

18   which I don't think I still -- the documents are in China or not

19   in China?  This actually is relevant --

20       **MR. KRONENBERGER:**  They are in China.

21       **THE COURT:**  They're all in China?

22       **MR. KRONENBERGER:**  They're all in China.

23       **THE COURT:**  So they're physically in China, or on some

24   computer in China?

25       **MR. KRONENBERGER:**  Physically -- both, I would think.

1    **THE COURT:**  So if the documents can be accessed here in the

2    United States through a computer, does that mean the documents

3    are in China or in the United States?

4    **MR. KRONENBERGER:**  You know, I actually have not seen

5    anything except the public documents because our client is

6    working with their counsel in China.  They produced it to the

7    government.  We're --

8    **THE COURT:**  Well, that doesn't mean that you can't access it

9    from a computer here in the United States.

10    **MR. KRONENBERGER:**  They are not allowing counsel in the US

11    to view the documents, which is actually consistent --

12    **THE COURT:**  Your client isn't allowing you to review

13    documents --

14    **MR. KRONENBERGER:**  Correct, because --

15    **THE COURT:**  -- that are not here.  Okay.  Okay.

16    **MR. KRONENBERGER:**  So, but I think what we want to do is we

17    want to allow you to do the balancing test.  And we don't believe

18    you can do the balancing test at this point because there's more

19    information we want to provide to you.  We --

20    **THE COURT:**  And when can you provide that to me?

21    **MR. KRONENBERGER:**  What we've proposed, and this is of

22    course, you know, somewhat risky here for me to say that we're

23    relying upon third parties, we have proposed to provide a

24    privilege log so to speak, privilege not just attorney/client

25    privilege.  But what we argue is are the problem documents,

1   providing this log on August 30th.  That's what we, I believe we

2   proposed in our letter.

3        **THE COURT:**  And provide that to Facebook?

4        **MR. KRONENBERGER:**  To Facebook.

5        **THE COURT:**  To Facebook to comment.  And dispute whatever

6   characterization you have of whether or not that is a problem

7   document from your perspective.  That's --

8        **MR. KRONENBERGER:**  That's -- there's also one other piece.

9        **THE COURT:**  Sure.

10       **MR. KRONENBERGER:**  We are still producing documents.  And

11  there are in the high hundreds of Chinese language documents that

12  we have not reviewed yet that may be responsive.  These are

13  public documents, may be responsive to some of the requests.  And

14  we just are not --

15       **THE COURT:**  So these are publically available documents.  On

16  what basis are you going to not produce these documents?

17       **MR. KRONENBERGER:**  We can -- well --

18       **THE COURT:**  Why do they even have to be reviewed?

19       **MR. KRONENBERGER:**  We've given Facebook access to all of

20  them.  It's a log in.  We've given it.  But --

21       **THE COURT:**  Okay.

22       **MR. KRONENBERGER:**  -- I thought it was our responsibility to

23  go through and look.  And there's also an incentive that we

24  have --

25       **THE COURT:**  Yeah, you are required to hand over responsive

1  documents.  That is true.  You're not required -- but if you're

2  talking about in the high hundreds, a hundred documents, what's

3  the volume of that?

4    **MR. KRONENBERGER:**  Under -- just under -- I think it was

5  initially 1,700 documents.  And --

6    **THE COURT:**  Is that one banker's box?

7    **MR. KRONENBERGER:**  It's all -- they're Chinese language PDF

8  documents.

9    **THE COURT:**  But is the volume like one banker's box?

10    **MR. KRONENBERGER:**  I don't know about that.  And --

11    **THE COURT:**  I think it might be less.  If you take one -- I

12  mean, assuming that, you know, one document is one page, you

13  know, each little packet of paper is 500.  That's three packets.

14  That's a half of a banker's box.

15    So what you're telling me is you have to get these

16  translated, you have to get these reviewed.  I mean, I don't

17  understand why you just don't hand -- they're public.  They're

18  not privileged.

19    **MR. KRONENBERGER:**  We have handed them over to Facebook

20  already.

21    **THE COURT:**  So they have it.  So they have these documents.

22    **MR. KRONENBERGER:**  Yes.

23    **THE COURT:**  So, okay.  So maybe we don't even need to talk

24  about it.  They've been handed over.

25    **MR. KRONENBERGER:**  As long as they --

1    **THE COURT:**  Now maybe they're going to come back and say

2    what is this responsive to.  And I think that --

3    **MR. KRONENBERGER:**  I can give you an example --

4    **THE COURT:**  -- that's a fair interpretation of the code

5    requiring that.

6    **MR. KRONENBERGER:**  Yeah.  I can give you an example --

7    **THE COURT:**  Go ahead.

8    **MR. KRONENBERGER:**  One problem would be we produce a public

9    financial statement --

10    **THE COURT:**  Okay.

11    **MR. KRONENBERGER:**  -- for, let's see, 2019.

12    **THE COURT:**  Okay.

13    **MR. KRONENBERGER:**  Let's say that there are some private

14    financial statements that are very similar or identical in the

15    possession of our client.  We would argue that the financial

16    statement that was public is responsive, and the documents that

17    are in the possession of our client are not vital to the case

18    under the Inventus decision.

19    So, and there may be a fight about that.  There may not be a

20    fight about it.  I don't think it's worth it for Facebook to

21    fight about --

22    **THE COURT:**  But is this document which is private that your

23    client has exactly the same as the public document?

24    **MR. KRONENBERGER:**  It may be, but maybe it's slightly

25    different.  Maybe it's formatted --

1      **THE COURT:**  Well, then that's a problem, I mean, because

2  then --

3      **MR. KRONENBERGER:**  Yeah.

4      **THE COURT:**  Arguably what you're presenting to the public

5  isn't necessarily what the client has.  And so therefore, I think

6  that's responsive.  And then, but then this private document is

7  what you're going to assert is what the Chinese government

8  prohibits disclosure.

9      **MR. KRONENBERGER:**  That's right.  And --

10      **THE COURT:**  And that would be the problem.

11      **MR. KRONENBERGER:**  That is the problem.  But then when you

12  apply the balancing test --

13      **THE COURT:**  Whether or not it's worth the squeeze to order

14  the production of that private --

15      **MR. KRONENBERGER:**  Yeah.  Yes.

16      **THE COURT:**  -- financial information.

17      **MR. KRONENBERGER:**  Yeah.  Is it vital.  And we would say

18  it's not vital because they have other -- they have a very

19  similar piece of evidence that will serve the same purpose.

20  It's --

21      **THE COURT:**  Well, how do we know?  You've already -- they

22  don't -- I mean, how is Facebook supposed to know that because

23  the document that you have that they haven't seen, I haven't

24  seen, nobody has seen but your client could be materially

25  different than the public information.  If it's materially

1    different than the publically available document, I would say

2    it's vital.  Why isn't it vital?

3        **MR. KRONENBERGER:**  Well --

4        **THE COURT:**  Let's hear --

5        **MR. KRONENBERGER:**  Well, we are dealing with a personal

6    jurisdiction argument.

7        **THE COURT:**  Okay.

8        **MR. KRONENBERGER:**  And there's discovery that's

9    jurisdictional in nature --

10       **THE COURT:**  Right.

11       **MR. KRONENBERGER:**  -- that needs to -- there can't be

12   fishing expeditions for every potential document out there that

13   may be responsive to --

14       **THE COURT:**  Well, I can articulate a reason for the

15   financial document probably pretty easily.  And that goes to

16   alter ego.

17       **MR. KRONENBERGER:**  What would that argument be?

18       **THE COURT:**  That the financial relationship between company

19   and the subsidiary, if that's referenced in the document.  I

20   haven't even seen the document.  But financials are going to be

21   very hard to believe are not relevant here to alter ego --

22       **MR. KRONENBERGER:**  Yeah.  I understand --

23       **THE COURT:**  -- because the relationship between sub and CN

24   35 is critically at issue here.  Judge Illston has already made

25   it clear that she's seen enough to say that she wants discovery

24

1  to happen.

2      **MR. KRONENBERGER:**  I would think that if that's the case, we

3  would need some work around.  We would not -- I don't want to put

4  -- I wouldn't put myself in that position where the documents are

5  different on the issue of the subsidiary.  I --

6      **THE COURT:**  Well, I don't know what work around you're

7  talking about.  The documents are what they are.  You either --

8  you have public documents.  Those have been handed over as you've

9  represented to me.  There are documents that are not handed over

10  that you believe qualify as documents that the Chinese government

11  would not allow, will not allow according to your client.

12      And that might be different, you don't know in what way, but

13  might be different.  They might not be vital, as you put it.  But

14  as I pose, might be materially different that it is vital.  So we

15  could -- we could be going a round on that.  And the issue is you

16  need a work around for what?  You need a work around to find a

17  way to get that document to them that doesn't involve the Chinese

18  government saying you can't disclose it and how to get that

19  information?

20      **MR. KRONENBERGER:**  That's my --

21      **THE COURT:**  In which case might have to go to the second

22  analysis, second prong of the analysis which is the balancing

23  test.  I mean, that's --

24      **MR. KRONENBERGER:**  I assume we're there.  I assume that

25  we're -- whenever there's anything --

**THE COURT:** I don't know where there is. What are you talking about, we're there?

**MR. KRONENBERGER:** We're at the balance --

**THE COURT:** Okay. So you're --

**MR. KRONENBERGER:** We're --

**THE COURT:** -- position is, and I think from your -- that's what I'm hearing from you is that your position is the Chinese government, everything you've heard from your side is Chinese government says no. Therefore, we go to the balancing test. And your way of characterizing the balancing test is the balance is in favor of your client, that you should not have to disclose.

Or you might not have to disclose certain documents at least, and some you might have to. But that's what we're going to have to do. And we're going to have to do that, what, document by document?

**MR. KRONENBERGER:** Well, I think it would have to be document by document. And that's why we want to narrow this down. And that's why I think it's premature because we have some cryptic responses in our discovery responses where it says upon approval of the Chinese government, we will produce, and then second we have a statement that says we're not aware of any documents.

So I feel like we can get you to a much better position, Your Honor, where you can look at a smaller group of documents and have this -- some better prospective in applying a balance.

1    **THE COURT:**  Okay.  All right.  Let's give Facebook an

2    opportunity.  They've been very patient and quiet here.  Yeah, go

3    ahead.

4    **MR. SINDELAR:**  Thank you, Your Honor.  If you have specific

5    questions, I'd be happy to respond to those, or I can just

6    respond in general to the conversation you've had.

7    **THE COURT:**  You can either respond in general, I don't have

8    specific questions for you yet.  But I guess the first question I

9    have is there is I guess a proposal on the table that Facebook is

10   going to get some kind of winnowed down universe of potential

11   documents that constitute as a quasi-privilege log, although I

12   don't know exactly what that means.  But at least it gets us to a

13   smaller subset.

14       What are your reactions to that?

15   **MR. SINDELAR:**  I appreciate what 35.CN's counsel is saying.

16   But we've been dealing with this same loop of promises of a

17   narrowed set of documents --

18   **THE COURT:**  Yeah.

19   **MR. SINDELAR:**  -- for over four months now.  We propounded

20   discovery in February.  We did not hear about these Chinese laws

21   until March.  And then we've continually being told if we just

22   give them another two weeks or another month, they're going to

23   narrow the issues, they're going to get us another set of

24   documents, they're going to somehow find a work around for this

25   Chinese law that on the one hand they claim prohibits them from

1    producing documents, but somehow they're going to find a work

2    around that allows them to produce the documents anyways.

3         Facebook really wants to get on with discovery in this case

4    as quickly as possible.  We do not think that 35.CN has met its

5    burden under the first prong to show that Chinese law actually

6    prohibits them from providing any of these documents.  They have

7    not substantiated that the Chinese government has told them so.

8    They have not substantiated that they have been in contact with

9    the Chinese government.  Further, they have not shown cases where

10   --

11        **THE COURT:**  Well, what you've heard today, let me just get

12   your reaction to that because I heard today that they have been

13   sending it to the CAC and that -- so that seems to me that they

14   actually have reached out.  Again, I still have a question is

15   that the right authority.  I don't know.

16        But I'm assuming, let's assume that that is the correct

17   authority, and that now we're also hearing that that authority

18   isn't going to respond, or certainly isn't going to respond with

19   any clarity or any speed, or certainly not going to say oh, by

20   the way, you can hand it over, or you can't hand it over maybe.

21        So assuming that they actually have reached out to the CAC,

22   is that enough?  Does that satisfy their obligation under the

23   first prong?

24        **MR. SINDELAR:**  I don't think that it satisfies their

25   obligation.

1        **THE COURT:**  Okay.

2        **MR. SINDELAR:**  Just, I mean, just because I believe that

3    that is what 35.CN has told it's attorneys.  But without seeing

4    actual documentation to back that up, I don't think they've met

5    their burden of establishing that they are working with the

6    Chinese government, or that we should expect the Chinese

7    government to issue any type of decision on whether or not

8    documents can be produced.

9        And we have it from other recent court cases that the

10   Chinese government does provide documentation of this form.  In

11   some of the cases, the Chinese government even sent a letter to

12   the United States court or the U.S. Department of Justice saying

13   that the Chinese government objected to the discovery that the

14   Court had ordered.

15       We don't have that here.  And we don't have any proof or

16   substantiation that parties are actually being punished or

17   prosecuted under these Chinese laws.  Without that --

18       **THE COURT:**  But is that what is required?  I know that you

19   said in your papers that there are no consequences that were

20   identified.

21       **MR. SINDELAR:**  Yes, Your Honor.  So there was a 2015 case in

22   the Southern District of New York involving **Gucci** as a trademark

23   case.  The citation for that is 135 F. Supp. 3d 87.  And in that

24   case, the Court ordered the Bank of China to produce documents

25   because the Bank of China had not shown that any Chinese party

1  had actually been prosecuted or faced penalties for providing

2  discovery in a U.S. case.

3      **THE COURT:** All right. Go on.

4      **MR. SINDELAR:** So in addition to the alter ego and the

5  personal jurisdiction issues which it's important to note that

6  those are interrelated because the 35.CN and OnLineNic alter ego

7  relationship first forms a basis for general personal

8  jurisdiction over 35.CN in the United States. So you can't

9  separate those issues. They're entwined very closely.

10     In addition to that, Judge Illston has noted that given the

11  document destruction by OnLineNic and Domain ID Shield, and the

12  fact that 35.CN performs all of the work, the actual physical

13  human beings at the keyboards doing the work is all performed by

14  employees of 35.CN.

15     And she noted that that also raises issues of whether 35.CN

16  was involved in the destruction of evidence, and whether there

17  should be some consequences for 35.CN based on its employees

18  engaging in that type of conduct. So I think it's important to

19  keep in mind that's another basis for discovery in this case.

20     **THE COURT:** So if I were to agree with you that the first

21  prong has not been met, that there is no authority, Chinese

22  authority that puts a prohibition on the disclosure, then you're

23  saying that I have the authority to then say hand over all the

24  discovery on this timeline?

25     **MR. SINDELAR:** Yes, Your Honor. And I would go even further

1   than that.  Even if the Chinese government says that 35.CN cannot

2   produce the documents, U.S. law is clear that when a U.S. corp

3   has personal jurisdiction over a party, it can order the

4   production even if that foreign party is ordered by another

5   government not to engage in the production.

6        So the U.S. Government and the U.S. court's authority here

7   is clear that a Chinese statute cannot limit this Court's

8   authority to enforce the Federal Rules of Civil Procedure once

9   there's been a finding of personal jurisdiction.

10       **THE COURT:**  But that hasn't happened yet, has it?  The

11  personal jurisdiction finding.

12       **MR. SINDELAR:**  Well, the Court did preliminarily find in

13  35.CN --

14       **THE COURT:**  There was enough that we can go on with the

15  discovery.

16       **MR. SINDELAR:**  Yes.  We stated --

17       **THE COURT:**  Okay.  And so --

18       **MR. SINDELAR:**  -- a prima facie case --

19       **THE COURT:**  So the case in which you're relying on that says

20  once there is personal jurisdiction, I don't have to care about

21  the Chinese statute, I can go ahead and compel the discovery.

22       **MR. SINDELAR:**  Correct.

23       **THE COURT:**  Okay.  Okay.  Go on.

24       **MR. SINDELAR:**  And then we're also getting answers that are

25  inconsistent as to where these documents are located.  For one

1    thing, a lot of the documents deal with communications between

2    OnLineNic and 35.CN.  And we've sought documents from online that

3    they have destroyed documents and refused to produce documents.

4    And that is why they're currently facing the prospect of

5    terminating sanctions.

6        So it's not a simple request that we go to OnLineNic

7    instead.  That's not an option here really.  But 35.CN, if they

8    maintain the documents that are located somewhere else in the

9    United States, and they have an obligation to produce them, I

10   think 35.CN should have to go and track down those documents in

11   the United States rather than forcing Meta to go and find where

12   those documents may be when we've already sought discovery from

13   OnLineNic and ICANN in this case.

14       Counsel for 35.CN stated that for instance, they don't know

15   and can't confirm whether or not 35.CN owns any real property in

16   the United States.  Certainly real property located in the United

17   States is by definition property in the United States.  And I

18   don't see how Chinese law could prevent an answer on a discovery

19   request like that.

20       In addition to our request for production, we have RFAs and

21   interrogatories.  And the answer we get for every one of those is

22   an objection based on Chinese law, and then a statement that we

23   can look at publically available documents and try to figure out

24   the answer for ourselves.  That clearly is another example of

25   where 35.CN has not met its discovery obligations in this case.

1    **THE COURT:**  And just to be clear, with respect to the non-

2    document production discovery, the non-document discovery, RFAs,

3    interrogatories, I'm assuming there's some agreement that there's

4    an extension of time to respond.

5    **MR. SINDELAR:**  We had --

6    **THE COURT:**  This isn't a case where for example they're not

7    responding and therefore objections are waived.

8    **MR. SINDELAR:**  We've previously provided extensions.

9    **THE COURT:**  Okay.

10   **MR. SINDELAR:**  They've provided answers with objections.

11   The problem is that those answers and responses are deficient

12   and --

13   **THE COURT:**  I see.  Okay.

14   **MR. SINDELAR:**  -- those are the subject of ongoing meet and

15   confers.

16   **THE COURT:**  Okay.  Okay.  So what is live before me in terms

17   of the sufficiency of the response that you feel you've done and

18   you've reached the end of your meet and confer are the document

19   requests.

20   **MR. SINDELAR:**  No, Your Honor.  That's not correct.  The

21   document requests, the RFAs, and the interrogatories.

22   **THE COURT:**  And -- so everything, even though you're meeting

23   and conferring?

24   **MR. SINDELAR:**  Yeah.  We're attempting to further meet and

25   confer and winnow those down further.  But as of this point, they

1    still have not meaningfully responded.  And the critical issue is

2    really the objections based on --

3        **THE COURT:**  So I'm going to put a timeline on both of you

4    that I want that meet and confer done because why should I spend

5    my time and my precious law clerk time going through things that

6    you might be able to reach an agreement.

7        **MR. SINDELAR:**  I believe, Your Honor, we've reached an

8    impasse there.  But --

9        **THE COURT:**  That's all?  You're done meeting and conferring?

10   I'm not satisfied that you are.  You just said that --

11       **MR. SINDELAR:**  Okay.

12       **THE COURT:**  Until I raised my objection to it, then you took

13   a different position.  I'm going to order you to meet and confer.

14   It's not going to be long.

15       **MR. SINDELAR:**  Okay.

16       **THE COURT:**  Okay?  So with respect to the further narrowing

17   of at least what is -- what I have to turn my attention to, you

18   have two weeks to complete your meet and confer.  You can get

19   more if you think it's productive.  But I will order you to, in

20   two weeks, to respond in writing in a joint letter with a list by

21   number of document requests, RFA, and rog that you have not been

22   able to reach an agreement on.  Okay?  So two weeks.

23       Let me ask you because you're raising it, and I believe that

24   was in a report and recommendation from Magistrate Judge van

25   Keulen.  So nothing is final.  I know you had a hearing on that.

1    But let me ask you is the outcome of that report and

2    recommendation as a determination by Judge Illston going to have

3    any bearing on this discovery?  Should we wait for that to

4    happen?

5        And if however it plays out, is that going to impact the

6    outcome of this discovery dispute, change it in any way, make it

7    a bigger case, a smaller case?

8        **MR. SINDELAR:**  I don't think it will, Your Honor.  We're

9    still going to have --

10       **THE COURT:**  Okay.  And why not?

11       **MR. SINDELAR:**  -- the same issues.

12       **THE COURT:**  Okay.

13       **MR. SINDELAR:**  We're still going to have --

14       **THE COURT:**  Same issues.

15       **MR. SINDELAR:**  -- the same issues of --

16       **THE COURT:**  Okay.

17       **MR. SINDELAR:**  -- tying 35.CN to that conduct based on --

18       **THE COURT:**  Okay.

19       **MR. SINDELAR:**  -- alter ego direct participant.

20       **THE COURT:**  Okay.  Mr. Kronenberger, on that very narrow

21   question, is the outcome of that report and recommendation as

22   heard by Judge Illston I believe last week going to have any

23   bearing on the discovery dispute before me?

24       **MR. KRONENBERGER:**  No, it is not, because --

35

1      **THE COURT:**  Okay.

2      **MR. KRONENBERGER:**  -- Facebook has already admitted and

3  taken the position that the only thing outstanding is alter ego.

4      **THE COURT:**  Okay.  Great.  Well, for now.  But yeah, great.

5  Okay.  So great.  So then I can focus on not what's coming.  That

6  will be maybe helpful down the road, but it's not going to be

7  something I need to drop everything and analyze.  But in two

8  weeks, I want to know what I have to work with.

9      And I will encourage you to meet and confer, not just to

10  report back that you're done, but a genuine meet and confer to

11  try and narrow it.  Okay.  All right.

12      Continue.  I know I'm stopping and going with you,

13  Mr. Sindelar.  But go ahead.

14      **MR. SINDELAR:**  No.  That's quite all right, Your Honor.  The

15  one or two last things I wanted to raise.  One, an issue here is

16  that the laws that 35.CN is relying on, they admit that they're

17  vague, they're not definite.  And as I believe you pointed out,

18  the letter from 35.CN's counsel says that they may run afoul of

19  these laws, or there may be an issue --

20      **THE COURT:**  Yeah.

21      **MR. SINDELAR:**  -- if they don't go around.  We don't have

22  the type of definitiveness we really need here to say that they

23  cannot produce documents in this case.  And the Chinese

24  government still has not defined the different categories of

25  general, important, and core data that need to come out through

1    implementing regulations.

2         So there's no way really to even know what 35.CN is

3    purportedly prohibited from doing.  And neither 35.CN nor its

4    counsel can make such an argument.  And I think ultimately what

5    we're dealing with here is the case of a Chinese company that has

6    intentionally entered into a contract with a U.S. based company

7    where they perform all of the services for that company including

8    their customer support and their technical support.

9         They take benefit of doing business in the United States.

10   And now when they're called to answer for that conduct in the

11   United States court, they want to run back to China and say that

12   they don't have to play by the rules of our court system.  The

13   U.S. Government and the U.S. courts have a very strong interest

14   in enforcing U.S. laws, especially for conduct that is directed

15   at the United States, and when a United States court has

16   jurisdiction over the matter.

17        So I think we cannot set a policy here where Chinese

18   companies can intentionally do business with U.S. companies and

19   U.S. customers and then refuse to participate in our civil

20   litigation system.

21        **THE COURT:**  Okay.  Mr. Kronenberger, do you have anything

22   you want to say?

23        **MR. KRONENBERGER:**  Just briefly.

24        On the <u>Gucci</u> case, that was 2015.  So that was prior to the

25   new laws.  Our arguments are all based on the new laws from, you

37

know, Q4 of last year.

And regarding the document destruction by OnLineNic, the document destruction was limited to their customer service database.  So you know, what happened is that there was a, you know, a 10- or 15-year-old customer service database that was so massive because it was getting a decade of spam, the only way that it could be -- they could do searches is to cut out all the spam.

When they did that, they cut out most likely some demand letters from random attorneys over the years.  And they shouldn't have done it.  They screwed up.  It was before we got, you know, even got in the case as counsel.  But when it came to this Special Master and the Court, OnLineNic was at the time on life support and almost gave up.

They didn't even -- I mean, they gave their arguments.  But I just think this whole argument of document destruction is misplaced because OnLineNic has responded.  And they produced a lot of documents, enormous amount.  I mean, I think we've got like over 100 gig of documents that OnLineNic produced.

So Facebook absolutely can go to OnLineNic.  They're now participating in the litigation.  They'll respond to discovery.  They have responded to discovery.  And this is an important point because Facebook has asked a great number of questions about OnLineNic, and even things that 35 wouldn't even have a role in.

And it's a bit frustrating because they're just not going to

38

1    OnLineNic.  They're choosing not to do it, and they're going to

2    35 instead.  And so I just think the argument regarding document

3    destruction is misplaced.

4    **THE COURT:**  So let me just put a pin because I can easily

5    see that both sides want to discuss more about that document

6    destruction.  And it might actually -- it may not have bearing on

7    this particular precise discovery dispute, but it could down the

8    road.

9    I don't want to spend the bandwidth talking about that if we

10    don't need to right now.  I don't want to make any -- give you

11    any hints about how I feel that influences decisions to be made.

12    So I'll put a pause on the document destruction, understanding

13    that if it does become relevant and germane to a decision that I

14    need to make, I will give both sides a fair opportunity to

15    respond however they wish to on that issue.

16    But I can already sense that there's a lot to be discussed

17    too -- there was a lot of work done in connection with the

18    Special Master, I can see already.

19    Okay.  Anything else?

20    **MR. KRONENBERGER:**  One other just request for maybe some

21    clarification on moving forward.  What would really help our

22    firm, especially communicating with our client, give a good

23    roadmap is we want to get to the point where we can deliver this

24    so-called privilege log.  And so I want --

25    **THE COURT:**  I don't see anything that I've said that should

1    stop you from doing what you were planning to do, regardless.

2         The only thing that might change is in my order I might be

3    telling you to speed that up.  But right now you're telling me

4    that you can get it to the other side by August 30.  And the

5    other side, when they get it, could very well say thank you, but

6    this means nothing to us.

7         And so that's the peril of what you're doing.  But that is

8    something that you believe will hopefully narrow the dispute.

9    And I'm not going to tell you not to do that.  But I don't know

10   if that's going to help your effort at the end of the day.

11        I don't see how the Court, by intervening in this and saying

12   -- and putting the Court's *imprimatur* on your privilege

13   discussion is going to further anything.  I certainly can't stop

14   you from doing it.  You weren't intending to not do it.  Sounds

15   like you wanted to do it.

16        And that's something that, quite frankly, if you think is

17   going to make this dispute either go away or crystalize to focus

18   on what it is that's needed, then I would encourage you to do

19   that, and if not should do it as soon as you can.

20        But so I don't know what more you want in terms of the

21   Court's guidance on the 30th.  I'm not saying that that's going

22   to be the end of my relief though, if that's what you're

23   thinking.  If you're thinking, like, well maybe this is going to

24   satisfy the Court, it could.  But I haven't heard what Facebook's

25   reaction to it.  And they haven't seen it, so maybe they want to

40

1    wait for it.  Maybe they don't.

2        I don't know.  Mr. Sindelar, do you have just right now, I

3    know you've heard about this in principal.  But if you want to

4    tell me right now that we don't care if they do it, we think it's

5    a waste of time, we want the Court to order production even

6    without seeing this, then I get to weigh whether or not I think

7    it's a prudent exercise of court authority to expedite production

8    if in fact it's warranted when there's this possibility that

9    Mr. Kronenberger's proposing that is a little over a month away

10   to produce a privilege log, for lack of a better description.

11       **MR. SINDELAR:**  Your Honor, I think it's almost certain that

12   this supposed privilege log is just going to be a further delay

13   and a waste of time.  I don't see how it's going to get us closer

14   to having the documents we need to litigate this case.  I think

15   this is just 35.CN trying to drag this process out further and

16   further.  It's going to push us down another month and we're

17   going to be right back where we are today.

18       **THE COURT:**  Okay.  Well right now I'm not intending to wait

19   on anything.

20       And if what Mr. Kronenberger, what I think he's saying

21   though is this has a possibility of disclosing to you what these

22   documents are that I guess you're not going to get, but that if

23   you see anything there that you want that will help you, they can

24   find a way to get the information relayed in that document to you

25   another way.  That's what I interpret you to say, Mr.

41

1    Kronenberger.

2        **MR. KRONENBERGER:**  Yes.  It's also narrowing it.  So instead

3    of Your Honor --

4        **THE COURT:**  Well, I understand it's narrowing it from your

5    perspective.  But if you were to put yourself in Facebook's

6    position, then what they're doing is they're saying so we're just

7    going to wait for them to tell us what they think -- what they

8    want us to know as opposed to what's out there.  And that's not

9    what discovery's about.

10       **MR. KRONENBERGER:**  Well, it's more than that.  I think it's

11   there are a lot of requests where we're just, in the end we're

12   going to say nothing exists.  There are -- many of our responses

13   say we're not aware of documents.  What we're hoping to do is to

14   confirm that.  Like for example, there's probably no real estate

15   owned in the United States.  So that's an example, and there's

16   many like that.

17       So another, instead of looking --

18       **THE COURT:**  Okay.  But have those been responded to already?

19   It's just now they're coming back, Facebook has come back and

20   said, you know, we're moving to compel on that insufficient

21   response?

22       **MR. KRONENBERGER:**  That's right.

23       **THE COURT:**  So you have already responded to discovery that

24   says no such documents exist.  After a reasonable, diligent

25   search, no such documents exist.  And --

1    **MR. KRONENBERGER:**  Incorrect.  We did not say --

2    **THE COURT:**  Okay.

3    **MR. KRONENBERGER:**  What we said is that --

4    **THE COURT:**  Well, why can't you do that?

5    **MR. KRONENBERGER:**  Because we have not looked at the --

6    **THE COURT:**  You haven't done your diligent search yet.

7    **MR. KRONENBERGER:**  So we have not looked at the documents

8    that are in the possession of the Chinese government.  Now what I

9    believe is that, what I'm trying to get to --

10    **THE COURT:**  And so then the possession of the Chinese

11    government or your client?

12    **MR. KRONENBERGER:**  Well actually both.  Yeah.

13    **THE COURT:**  So you are responsible for going through your

14    documents in your client's custody and control.  So you can at

15    least do that to verify whether or not documents exist.  I think

16    Facebook -- I don't know how much more I can do.  Let's say I

17    were to order, produce all documents related to real estate in

18    the United States.  Your response to that is okay, we'll answer

19    that.  No such documents exist.

20        If that is what's going to happen, then I don't see what

21    more I can do unless there's evidence that there has been an

22    inadequate search.  And maybe that's what's going to come later

23    on.  But I think until you've reached that point where you've

24    actually answered and done the search and answered, then I'm not

25    sure what -- and you're putting the Court in the position of I

43

1    might have to do that.

2        **MR. KRONENBERGER:**  We don't want you looking at 300 requests

3    for the balancing test.  We want you looking at, like, 10 or 20

4    requests.  That is where we want to be.  We do not -- we feel we

5    can narrow this down by saying these documents don't exist for

6    most of the requests.

7        **THE COURT:**  So Facebook has already said all X number,

8    they're all.  They haven't conceded yet that any of them should

9    be narrowed.  They want them all.  You're saying --

10        **MR. KRONENBERGER:**  What I'm --

11        **THE COURT:**  And you're saying that you think that there

12    should be only a subset are truly relevant.  So there is a

13    dispute.  You've reached an impasse.  There's no way that we're

14    going to -- I'm going to get you to -- further meet and confer

15    isn't going to change that outcome?

16        **MR. KRONENBERGER:**  I think another way to look at it is that

17    we said documents probably don't exist for a bunch of the

18    requests.  But as an attorney, I have not seen my client's

19    documents because they do not permit me to look at them because

20    of the Chinese law.  So --

21        **THE COURT:**  Well then how do you know they don't exist?

22    Because just factually you know they don't own real estate in the

23    United States, so of course there can't be documents?

24        **MR. KRONENBERGER:**  Yes.

25        **THE COURT:**  But you haven't, like, poured over their

44

1  documents in China, that's why --

2      **MR. KRONENBERGER:**  That's correct.

3      **THE COURT:**  -- you can't verify that?  But isn't the --

4      **MR. KRONENBERGER:**  I could be --

5      **THE COURT:**  Don't you have a client representative who's

6  willing to verify and sign as a verification that they've done a

7  search?

8      **MR. KRONENBERGER:**  That's a --

9      **THE COURT:**  Who's going to be on the hook from the company?

10  I'm not just going to take yours.  Somebody from the company has

11  got to say we've done a diligent search.

12      **MR. KRONENBERGER:**  Absolutely.  Absolutely.

13      **THE COURT:**  So why aren't they doing that?  Have they done

14  that?

15      **MR. KRONENBERGER:**  We will do that.

16      **THE COURT:**  Okay.  So they haven't done that yet.

17      **MR. KRONENBERGER:**  They have done the search already.  The

18  search is done.  And the documents --

19      **THE COURT:**  Okay.  So they've done it.  But again, okay.  So

20  they've done it.  So why do you have to do it again?  You're not

21  going to be able to do it.  They're not going to let you do it

22  from what I understand.

23      **MR. KRONENBERGER:**  I feel that --

24      **THE COURT:**  You're outside counsel from the United States,

1    they're not going to give anything to you.  So I don't know

2    what's -- I'm a little puzzled as to what more work you need to

3    do.  If your clients who are going to sign the verification have

4    verified they've done a search and no documents exist, it seems

5    to me to narrow the field, that's how you should be responding,

6    like, ASAP.  And that takes it off the table.

7         But it sounds like you want to do what?  You personally want

8    to have confidence that a diligent search has been done?  I think

9    that is something you should be doing.  But how --

10        **MR. KRONENBERGER:**  I think that --

11        **THE COURT:**  -- what does that entail?

12        **MR. KRONENBERGER:**  A diligent search has been done because

13   we've been involved in instructing the client --

14        **THE COURT:**  Okay.

15        **MR. KRONENBERGER:**  -- what --

16        **THE COURT:**  And that's perfectly --

17        **MR. KRONENBERGER:**  But we're not --

18        **THE COURT:**  -- normal.  But you're telling me you need to

19   actually lay eyes on a lack of documents?  Like, what more do you

20   need to do to respond to there's no real estate in the United

21   States?  You said --

22        **MR. KRONENBERGER:**  When I asked --

23        **THE COURT:**  Yeah.

24        **MR. KRONENBERGER:**  When I asked my client whether or not it

25   owns any funds that invested in real estate in the U.S., I need

46

1   them to say no.  And they, on my limited knowledge of the client,

2   I just don't think it exists.  But there's --

3       **THE COURT:**  But they haven't answered that question to you?

4       **MR. KRONENBERGER:**  Yes, because they're worried about --

5       **THE COURT:**  Without getting into any attorney/client

6   communication.

7       **MR. KRONENBERGER:**  Yes.

8       **THE COURT:**  You're asking questions to your client regarding

9   the discovery.  You need to be satisfied that they've done the

10  search, answered it properly.  And that's reasonable.  But how

11  much time is that going to take because it seems that Facebook's

12  been waiting for that, especially if your response is going to be

13  no documents exist, or the answer is no.

14      **MR. KRONENBERGER:**  I agree that time is going by and

15  Facebook is --

16      **THE COURT:**  Well, you're telling me you want to narrow the

17  scope of this and you want to try to do that for me.  I

18  appreciate it.  But you can do that.  Why can't you narrow the

19  field?  Why can't you streamline the request so that everybody

20  has less work to fuss over?  But what's the hangup here?

21      **MR. KRONENBERGER:**  The hangup is with dealing with Chinese

22  language attorneys.  We have our counsel that our firm hired.

23  There's counsel that was hired directly by 35.  And --

24      **THE COURT:**  Okay.

25      **MR. KRONENBERGER:**  -- it's, it just --

1          **THE COURT:**  Well here's what's going to happen.  What's

2     going to happen is if I order production, I'm going to give a

3     date, and that's it.  And I'm not going to be receptive to we

4     have to hire an interpreter, the language barrier makes it long.

5     I'm not going to be -- not in this day and age.  Not with the

6     sophisticated clients that are at issue here.  That's not going

7     to be an excuse that flies.

8          So just strap in for that.  It's not going to be this

9     leisurely pace if I feel like production needs to happen.  So the

10    more that you can work on narrowing the field, and one way to do

11    it is to take off the table that there's no discovery available,

12    I would urge you to do that because --

13         **MR. KRONENBERGER:**  We --

14         **THE COURT:**  -- that's going to be in your interest and your

15    client's interest.  If there's a lot of them, and it sounds like

16    there's not an insignificant amount of discovery that's going to

17    result in no discovery or no answer, get that off the table now.

18         **MR. KRONENBERGER:**  I'll do that.  And I will do -- I should

19    also note, and hopefully we can deal with this in the meet and

20    confer session, is that a big part of our letter just dealt with

21    the requests themselves under federal rules.  They're, you know,

22    asking for 20 years of communications, essentially all of certain

23    people's inboxes.  It's just horribly overbroad.  We do --

24         **THE COURT:**  Well, there's a way to tee up if you're going to

25    launch a burden proportionality argument.  There's certainly ways

48

1    to do that.  But just saying that it's overly broad and

2    burdensome isn't -- that's not enough.  There's plenty of law

3    developed to how to get there.  But right now it's we're not

4    talking about relevance anymore.  We're talking about, you know,

5    what it is to get the information over.

6        MR. KRONENBERGER:  Well, our argument was partly about

7    relevance because we went into this --

8        THE COURT:  I don't see how I can find none of this is

9    relevant.  Judge Illston's made it very clear what she's charged

10   the parties to go forward in discovery.  Unless there's something

11   that's clearly beyond the scope of jurisdiction and alter ego, I

12   don't see how I'm going to say it's not relevant.

13       MR. KRONENBERGER:  I can give you an example, 20 years of

14   communications with --

15       THE COURT:  It might be burdensome.  That doesn't say it's

16   not relevant.

17       MR. KRONENBERGER:  Okay.  Okay.

18       THE COURT:  You know, information from a witness that is an

19   officer that's in both companies, how is that not relevant?

20       MR. KRONENBERGER:  I think it's relevant.  But asking for

21   massive --

22       THE COURT:  Right, it's -- well, it might be burdensome.  I

23   will entertain that.  But relevant, we're beyond that.

24       MR. KRONENBERGER:  Understood.

25       THE COURT:  Okay?  All right.  Submitted?

49

1        **MR. KROLL:**  Your Honor?

2        **THE COURT:**  Yes, Mr. Kroll?  Wow, I'm sorry.  I did not give

3    you any opportunity, and you've been the most patient of all.  So

4    what would you like to add?

5        **MR. KROLL:**  Well, I think Mr. Sindelar has handled it very

6    well.  I'm' just confused by the order that the Court recently

7    just issued with respect to requiring the parties to meet and

8    confer.

9        **THE COURT:**  Right.

10       **MR. KROLL:**  Because I am confused as to what we're supposed

11   to meet and confer about.

12       **THE COURT:**  So the representation --

13       **MR. KROLL:**  The --

14       **THE COURT:**  What I heard is that there was still meet and

15   confer going on about the scope of RFAs, sufficient responses to

16   interrogatories and RFAs.  And that -- is this just about

17   documents, no.  But with respect to everything else, if there's

18   still an opportunity to meet and confer and that's still ongoing,

19   Mr. Kronenberger nodded his head that that was in fact the case.

20       So to the extent there's any meet and confer that can help

21   to reduce the amount of -- because an order that I'm going to

22   issue, if I order production or supplementation of responses,

23   it's going to have to cover by number, not just theoretically but

24   by number the requests.  And if some of those are still in play

25   and you can resolve that, I want you to do that.

1    I don't want to spend my time doing something that the

2    parties have ultimately can reach an agreement on.  You might

3    not.  And that's why I gave you two weeks.  I don't want this to

4    go on for months that you're still negotiating.  But to the point

5    there's still ongoing discussions, finish it up.  Get it done.

6    And let me know what's left.

7        So simply that.

8        **MR. KROLL:**  I understand that, Your Honor.

9        All of the supplemental responses that would be the subject

10   of a meet and confer, the supplemental responses that we just

11   recently received, they have the same objections with respect to

12   the Chinese law and 35.CN's refusal to produce documents based on

13   the Chinese law.

14       So the focus then, what I hear from you is that the focus of

15   the meet and confer is if Mr. Kronenberger makes the

16   representation to us that there are no documents, there's -- or

17   that he has fully responded, notwithstanding the objections, we

18   just take that off the table for the Court.

19       **THE COURT:**  That's a very good example of what might --

20       **MR. KROLL:**  Okay.

21       **THE COURT:**  -- be worthwhile to do so that I don't have to,

22   in a final order, say you have to respond to something that

23   Mr. Kronenberger has satisfied you and you don't need the Court

24   to rule on that particular discovery request.

25       **MR. KROLL:**  And therefore, Your Honor, would it be helpful

51

1    in the written report to Your Honor to just, to either identify

2    the only interrogatories, RFAs, document requests that are at

3    issue, or --

4        **THE COURT:**  Yes.

5        **MR. KROLL:**  -- perhaps probably simpler, the ones that are

6    no longer at issue?

7        **THE COURT:**  Well, if it's going to be what I think you're

8    saying to me is that it's going to be very small what's taken off

9    the table.

10       **MR. KROLL:**  Yes.

11       **THE COURT:**  Then yeah.  I mean, whatever can clearly be

12   communicated to me that it's live, I will take that and

13   incorporate that into a final order.

14       But I want to give the lawyers today the benefit of today's

15   discussion that might, who knows, maybe it doesn't at all, but to

16   the extent it helps crystalize where things should go, then maybe

17   we can narrow the field.

18       **MR. KROLL:**  All right.  Thank you, Your Honor.

19       **THE COURT:**  Okay.  All right.  Any other questions?  All

20   right.  We're submitted.  Thank you.  Again, two weeks.  And

21   we'll look forward to your submission.

22       **MR. SINDELAR:**  Thank you, Your Honor.

23       **THE COURT:**  Okay.  All right.

24       **MR. KRONENBERGER:**  Thank you.

25       **THE COURT:**  Thank you.

52

1      **MR. KROLL:**  Thank you, Your Honor.

2         (Proceedings adjourned at 3:37 p.m.)

3                    ---oOo---

4

5              **C E R T I F I C A T E**

6      I certify that the foregoing is a correct transcript from

7  the official electronic sound recording of the proceedings in the

8  above-entitled matter.

9

10

11  _____

12  DIPTI PATEL, CET-997

13  LIBERTY TRANSCRIPTS                    Date: July 27, 2022

14

15

16

17

18

19

20

21

22

23

24

25