UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

|  |  |  |
|---|---|---|
| **Facebook, Inc., et al.,** | ) | |
| | ) | No. 3:19-cv-07071-SI |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | San Francisco, California |
| | ) | July 11, 2023 |
| **OnLineNic, Inc., et al.,** | ) | 11:39 a.m. |
| | ) | |
| Defendant. | ) | **(AMENDED)** |
| _____ | ) | **(SEALED)** |

BEFORE:  THE HONORABLE SUSAN ILLSTON, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS VIA HYBRID ZOOM WEBINAR</u>

<u>MOTION FOR SUMMARY JUDGMENT</u>

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC (By Zoom Webinar)
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                         **A P P E A R A N C E S**

2   For the Plaintiff Facebook, Inc.:
        TUCKER ELLIS, LLP
3       By:   **Mr. Howard Alan Kroll, Esq.**
              **Mr. David Steele, Esq.**
4             **Ms. Dina Roumiantseva, Esq.**
              **Ms. Helena Guye, Esq.**
5       515 South Flower Street, Forty-Second Floor
        Los Angeles, California  90071-2223
6

7   For the Defendant Xiamen 35.com Internet Technology Co., Ltd.:
        KRONENBERGER ROSENFELD, LLP
8       By:   **Mr. Karl Stephen Kronenberger, Esq.**
              **Ms. Liana Chen, Esq.**
9             **Ms. Leah Vulic, Esq.**
        150 Post Street, Suite 520
10      San Francisco, California  94108

11  For the Defendant OnLineNic, Inc.:
        LExAnalytica, PC
12      By:   **Mr. Perry J. Narancic, Esq.**
        3000 El Camino Real, Building 4, Suite 200
13      Palo Alto, California  94303

14

15

16

17

18

19

20

21

22

23

24

25

# **P R O C E E D I N G S**

1

2              (Court was called to order by the courtroom deputy.)

3              (Sealed proceedings begin at 11:38 a.m.)

4              THE COURTROOM DEPUTY:  Now calling Civil Matter

5    19-cv-7071, Facebook, Incorporated, vs. OnLineNic,

6    Incorporated, et al.

7              Counsel, please approach the podium and state your

8    appearances for the record.

9              MR. KROLL:  Good morning, Your Honor.  Howard Kroll,

10   along with my colleagues, David Steele, Dina Roumiantseva, and

11   Helena Guye with Tucker Ellis on behalf of the plaintiffs, Meta

12   Platforms, Inc.  And also from Meta are Margie Milam and Jimmy

13   Doan.

14             THE COURT:  Good morning.

15             MR. KROLL:  Good morning.

16             MR. KRONENBERGER:  Good morning, Your Honor.  Karl

17   Kronenberger from Kronenberger Rosenfeld on behalf of Xiamen

18   35.CN.  I'm here with my colleagues Liana Chen and Leah Vulic.

19             THE COURT:  Good morning.

20             Is anyone here for the On- -- OnLineNic defendants?

21             THE COURT REPORTER:  I didn't hear the appearance.

22   I'm sorry.

23             MR. NARANCIC:  Yes.  Good morning, Your Honor.  Perry

24   Narancic for the OnLineNic defendants.

25             THE COURT:  Good morning.

1          MR. NARANCIC:  Thank you.

2          THE COURT:  This is the plaintiffs' motion for summary

3     judgment on alter ego liability with respect to 35.CN and

4     OnLineNic defendants.

5          I've read your voluminous materials.  Thank you.  And

6     we don't urge you to repeat anything that's in there.  But I do

7     have some questions, and then I'll be happy to hear from both

8     of you.  These are -- these are kind of specific questions,

9     most of which are directed to 35.CN.

10          We said that -- and I'm going to butcher some of these

11     names.  I apologize in advance.

12          Shaohui Gong -- is that right?  Is that how you say

13     it?

14          MR. KRONENBERGER:  Yes, Your Honor.

15          THE COURT:  Okay.

16          -- was no longer CEO as of 2020; correct?

17          MR. KRONENBERGER:  Yes.

18          THE COURT:  So who is CEO?

19          MR. KRONENBERGER:  I don't have his name, Your Honor.

20     However, the person who signed our declarations, Zhang Weiwei,

21     has acted --

22          THE COURT:  Yeah.

23          MR. KRONENBERGER:  -- as CEO.  He has a different

24     title, which is manager of the -- of the company.  But I --

25     he's who we've interfaced with.  And if there is an actual CEO

above him, I am -- I'm not aware who that is, but it's clearly

not Mr. Gong.

THE COURT:  But you don't know who it is?

MR. KRONENBERGER:  I can -- I can get that information

very quickly, Your Honor.  It's -- it's public information.

And I -- off of my head and at the tip of my tongue here, I

don't have his --

THE COURT:  Okay.  All right.

MR. KRONENBERGER:  -- his name.

THE COURT:  Who is Minghe Wang?

MR. KRONENBERGER:  Minghe Wang.

THE COURT:  Okay.

MR. KRONENBERGER:  We call him Steve Wang.  He's in

Cupertino.  He's an English speaker.  He's an employee of

OnLineNic.  He's never been an employee or anything in

association with 35.CN.  He was really the three decision

makers for OnLineNic over the period of time at issue.

You -- you do have, Your Honor, attached, I believe

it's declarations in support of the surreply, his W-2

information that shows his residence in Cupertino and how he's

an employee of OnLineNic.

THE COURT:  So what's his title?

MR. KRONENBERGER:  His -- his title was, I believe,

manager.  The way that it's been described in this litigation

is that there was a chart that was created by 35.CN.  And it

6

1    essentially directed all of its staff members around OnLineNic

2    to report to Steve Wang.  And this division of 35 was the -- I

3    think the -- the software -- software development division, I

4    believe.

5           So what Facebook has argued is --

6           THE COURT:  No, no.  I want to know what the facts are

7    from your side.

8           So you said there was a -- an order from CN -- 35.CN

9    that all of the 35.CN employees on loan to OnLineNic should

10   report to Steve Wang?

11          MR. KRONENBERGER:  Yes.

12          THE COURT:  Do we have a copy of that in the file?

13          MR. KRONENBERGER:  Yes, we do.  And it's attached to

14   Mr. Kroll's declaration.  I can tell you that -- the exact

15   citation.

16          THE COURT:  Okay.

17          MR. KRONENBERGER:  It's the second Kroll declaration.

18   Paragraph 8 it's described, and then it's Exhibit 4.  And that

19   is essentially an org chart that has been translated into

20   English.

21          THE COURT:  Incidentally, do counsel jointly request

22   that this hearing be sealed?

23          MR. KRONENBERGER:  Yes, Your Honor.

24          MR. KROLL:  No, Your Honor.  We haven't requested that

25   the --

1          THE COURT:  Okay.  Because right now the door's
2   locked --
3          MR. KROLL:  Right.
4          THE COURT:  -- so --
5          MR. KROLL:  We have no objection to it being sealed,
6   but we're not affirmatively moving for it.  In fact, Your
7   Honor, once this became a motion for summary judgment, then the
8   standard somewhat changes as to whether there's a compelling
9   reason to have this hearing closed.
10          I know that Mr. Kronenberger has requested it.
11          THE COURT:  And why do you request it?
12          MR. KRONENBERGER:  The reason we requested it is that
13   this litigation has been somewhat of a tightrope that 35 has
14   been walking because a significant amount of information that
15   has been handed over in discovery and that what we want to talk
16   about today is arguably confidential under Chinese law, and
17   there's a prohibition on disclosing it outside of China.
18          So in an abundance of caution, we have designated a
19   significant amount of information as confidential.  And it's
20   the agreement that we reached with our client, which was
21   somewhat of a risk assessment that they conducted.  They do not
22   want to be in a position where a federal judge is telling them
23   to produce documents but they're not because of Chinese law.
24   So the compromise was that we would designate these documents
25   as confidential.

1          THE COURT:  All right.  Well, I'm going to grant your

2     request and that the hearing be treated the same.  I'm going to

3     grant your request for the present time.  But after all the

4     dust settles, if either of you or somebody else requests that

5     the Court unseal it, then I'll take a harder look at the

6     various issues that may or may not be involved.

7          MR. KROLL:  Thank you, Your Honor.

8          THE COURT:  So this Exhibit Number 4 is an org chart,

9     you say.

10          So I'm looking at Exhibit 4, the translation.  So this

11     says:  Organization Chart of Software Outsourcing Center.

12          MR. KRONENBERGER:  Yes, Your Honor.

13          THE COURT:  And is that 35.CN's?

14          MR. KRONENBERGER:  Yes.  That is a division of 35.CN.

15     And this, frankly, caused quite a commotion with 35 -- the

16     35.CN side of this litigation when the argument that was made

17     by Facebook was that Steve Wang was an employee of 35, which is

18     absolutely false because Facebook had his W-2 and -- and --

19          THE COURT:  But you just said outsourcing -- this

20     outsourcing center is a division of 35.CN.

21          MR. KRONENBERGER:  Correct.

22          THE COURT:  And this shows the director as Mr. Wang.

23          MR. KRONENBERGER:  It -- the person at the top of the

24     chart is Mr. Wang because all of the staff members of 35 were

25     required to report to Mr. Wang, who was an employee of

1  OnLineNic.  He was a W-2 employee.  And he has no association

2  with 35.  And that's in --

3          THE COURT:  To be at the top of its org chart.

4          MR. KRONENBERGER:  Its -- its -- org chart is my

5  phrase, Your Honor.  This was direction to the employees of

6  35.CN about who to report to, not OnLineNic.

7          THE COURT:  And how do we know that?

8          MR. KRONENBERGER:  We -- we have -- one, we have a W-2

9  that -- that we've provided that shows that Mr. Wang is a W-2

10  employee, lives in Cupertino, he's an English speaker, goes by

11  Steve Wang.

12          We also have a declaration from Mr. Zhang on behalf of

13  35 that says Wang has never been an employee or officer or had

14  any association with 35.

15          And our argument today, Your Honor, is that over the

16  course of the history of OnLineNic, there had been three main

17  decision makers; Rex Liu, Minghe Wang, and Xhippo Chen.

18          THE COURT:  All right.  Those were my specific

19  questions.  But I will tell you my -- my preliminary view is

20  that I'm going to grant the motion, so you may want to go

21  first.

22          MR. KRONENBERGER:  Sure.  My --

23          THE COURT:  Sure.

24          MR. KRONENBERGER:  My water, please.

25          Your Honor, this is -- obviously we here about alter

1   ego and looking at the case law that's been cited, but pretty

2   much all the case law about alter ego in California.  There's a

3   focus on digging deep into the facts what -- regarding the

4   universe, the capitalization, how the companies were run.  It's

5   very a fact-intensive focus, which is really hard to do.  And

6   at the same time in a summary judgment, but, regardless, it is

7   very fact focused.  So there's a bit of context that I would

8   like to condense, not restate.  I would like to condense what's

9   it's important for this analysis.

10          There are -- there are, obviously, two businesses

11  here; 35 and OnLineNic.  We have to go back 24 years --

12          THE COURT:  Well, you say obviously, but, anyway --

13          MR. KRONENBERGER:  There are --

14          THE COURT:  -- continue.

15          MR. KRONENBERGER:  According to the pleadings here, in

16  terms of defendants, there are -- we have 35 and we have

17  OnLineNic.  We have -- we also have IDShield.  I'm lumping

18  IDShield in with OnLineNic.

19          We have to go back 24 years to 1999.  That is when

20  OnLineNic was formed.  It was formed by Mr. Gong, who you

21  were -- you were asking about.  It was formed for a fairly

22  narrow purpose, to register domain names.  And at that point it

23  set up bank accounts, filed taxes, ran its businesses for

24  years -- actually five years before 35 even existed as a

25  company.

1        Moving forward to 2004, 35 was formed by the same

2    individual, Mr. Gong.  Now, this company, 35, had a broader

3    scope.  And it involved eCommerce, websites, domains, office

4    automation.  It was much broader than just domain names.  It

5    had a domain name business, but it's mostly Chinese, not CN

6    domains, for the most part.

7        Dash -- move forward a few more years, Mr. Gong and

8    the other investors wanted to go public, but there was a

9    problem.  And we have detailed this in the first Kronenberger

10   declaration, Exhibit D.  We have some excerpts from public

11   filings that have been translated into English.  The problem

12   was potential horizontal competition prohibitions.  So Mr. Gong

13   sold the company to an individual named Rex Liu.

14        THE COURT:  Sold what company?

15        MR. KRONENBERGER:  OnLineNic.

16        So Mr. Gong divested himself of OnLineNic and sold

17   this company to Mr. Lieu.  This was not an ordinary sale,

18   though, because 35 was about to go public.  And they engaged in

19   negotiations, which are detailed in this Exhibit D, with the

20   China Securities Regulation Commission.  And there were

21   requirements that this Commission forced 35 into, specifically

22   making a lot of disclosures and confirmations and verifications

23   that Gong and 35 did not control OnLineNic.

24        There is a significant amount of information compared

25   it to U.S. standards on public filings about the history of

1   OnLineNic, the history of 35.  Regarding the sale, there was a

2   copy of the sale contract that -- that was included in the

3   public filings.  There was an analysis, which was a five-part

4   analysis in an opinion letter from a Chinese attorney, about

5   how the sales price from Mr. Gong to Mr. Liu was fair.  There

6   was even discussion about litigation that OnLineNic was in,

7   because OnLineNic settled with Verizon, and because there was

8   litigation between OnLineNic and Verizon.  And there was an

9   analysis to confirm that Mr. Gong and 35 did not pay that

10  settlement amount.  This is all in Exhibit D to this, the first

11  Kronenberger declaration.

12          Importantly, just to restate this, there were -- there

13  were verifications in these three different opinion letters

14  that 35 did not control OnLineNic; Mr. Gong did not control

15  OnLineNic.  For example, the opinion read -- and if you look

16  at -- this is Docket 174-2 around page 875.  The opinion letter

17  states that the sale of the company was legal and effective.

18  There's no relationship between 35 and OnLineNic.  The

19  business -- the two businesses are independent of each other.

20  And the amount that was paid by Mr. Liu to buy this company was

21  relatively small.  It was a small -- compared to the revenues

22  of 35.

23          Additionally, 35 disclosed in these public filings

24  that it was continuing to do work through a contract with

25  OnLineNic.  It described the services agreement that's been at

1  the foot -- at the center of this litigation.

2          THE COURT:  Going back to what you just said, the

3  public filing said that Mr. Gong sold it -- sold OnLineNic to

4  Rex Liu for $███████; right?

5          MR. KRONENBERGER:  Correct.

6          THE COURT:  But then OnLineNic says that Mr. Gong sold

7  OnLineNic to Xhippo Chen in 2009; right?

8          MR. KRONENBERGER:  Those are both correct.  And in

9  2007, Mr. Gong sold OnLineNic to Rex Liu.

10         THE COURT:  Yeah.

11         MR. KRONENBERGER:  Two years later -- around two years

12  later, we don't know the exact date, Rex Liu sold --

13         THE COURT:  Well, this says Mr. Gong sold it to Xhippo

14  Chen.

15         MR. KRONENBERGER:  That is incorrect.  And that is --

16         THE COURT:  That's a -- that's --

17         MR. KRONENBERGER:  It's --

18         THE COURT:  -- in the discovery response.

19         MR. KRONENBERGER:  There's also deposition testimony

20  by Ms. Carrie Yu, who's a key indicator --

21         THE COURT:  This contradicts her --

22         MR. KRONENBERGER:  Yes.  It's -- it was a mistake.

23  And it was sort of like Carrie Yu saying, well --

24         THE COURT REPORTER:  I'm sorry.  I'm sorry.  You're

25  breaking up.  I apologize.

```
 1              (Interruption by court reporter due to audio issues.)
 2              MR. KRONENBERGER:  It was like Carrie Yu saying that
 3      the Golden Gate Bridge is located in the state of Nevada, even
 4      though there's documentation that it is not located in the
 5      state of Nevada.  And then Carrie Yu could perhaps correct
 6      herself later and say that the Golden Gate Bridge is located in
 7      the state of California.
 8              That's what we have here.  There are voluminous public
 9      filings talking about the sale.  I don't know why Carrie said
10      what she did, but it was just wrong.  She's -- she's not a
11      member -- or a member of OnLineNic, and she's taking direction
12      from them.  And she was just not up to date on who sold what to
13      whom when.
14              But what's -- we have a copy of a contract in 2007.
15      Mr. Gong's selling it to Rex Liu.  And we have an American law
16      firm that's actually confirmed that exact sale.  That -- and
17      that -- that law firm provided an opinion letter that was filed
18      publicly as well.
19              THE COURT:  By who?
20              MR. KRONENBERGER:  Roczinko.  And confirmed the exact
21      date of sale and the exact number of shares that were
22      transferred from Mr. Gong to Rex Liu.  And this -- this
23      document, this -- this letter from this American law firm, was
24      attached to Mr. Kroll's declaration.  It was also included in
25      the public filings back in 2009.  There's a -- there's multiple
```

1    years of public filings.  Every year there would be additional

2    filings.

3              THE COURT:  In China.

4              MR. KRONENBERGER:  Yes, in China.  In Chinese.  The

5    letter is actually in English from Crone Roczinko, but it was

6    attached, you know, to these public filings that were mostly in

7    Chinese.

8              Then this letter from Crone Roczinko, it's Exhibit 19

9    of the first Kroll declaration on page 10.

10             THE COURT:  But then there are tax filings in 2013 and

11   2014 that list Mr. Gong as the 100 percent shareholder of the

12   company.

13             MR. KRONENBERGER:  Your Honor.  It's, frankly,

14   sloppiness.

15             THE COURT:  Oh.

16             MR. KRONENBERGER:  It's -- it's -- these are -- it's

17   obviously incorrect.  Mr. Gong had sold his interest years ago.

18   And we -- and, again, this is -- I represent 35 here, and we

19   don't know why that was filed.  Was it just, you know, forms

20   provided to whoever to sign and they signed?

21             We don't know why they said that.  It's -- it's just

22   incorrect.  Straight up incorrect.

23             THE COURT:  Or on purpose or not, you're saying?

24             MR. KRONENBERGER:  The important thing is that

25   Mr. Gong doesn't own OnLineNic, and there is a significant

1    amount of analysis starting back in 2007 through 2009 showing

2    that Mr. Gong and 35 do not own or control OnLineNic.

3           The -- Your Honor, the reason why I'm bringing this up

4    is that it's different from so many of the other alter ego

5    cases that the Court will look at, because we're lucky enough

6    to have a great amount of detail about the formation of these

7    two companies, about what the businesses were, about who

8    sold -- who's -- the sale of OnLineNic verified by multiple law

9    firms and filed publicly in China.  It's -- it's a --

10          THE COURT:  Verified by a law firm.  Well, I guess

11   then we accept it.

12          MR. KRONENBERGER:  I -- I think so, but, Your Honor,

13   it's just one of -- of multiple factors that we'd want to

14   consider.

15          I think that to -- to sort of dig into the history

16   just a bit more just to finish out on this -- this context.

17          THE COURT:  Okay.

18          MR. KRONENBERGER:  So we have these two companies that

19   have been doing business for quite some time.

20          THE COURT:  Five years.

21          MR. KRONENBERGER:  OnLineNic has been in business

22   since 1999.  And since 2004, 35 has been doing business.

23          This Venn diagram was in the -- in our briefing

24   multiple times, but it's important because their primary

25   argument of -- of 35 is that there's some single business

enterprise.  They're all in on this argument using a particular

case that they've cited many times in their brief.  This

Venn -- Venn diagram illustrates from a revenue standpoint that

they're very different businesses.

35.CN over a ten-year period -- we went back to 2009

because those were the first public filings for 35 so we can --

we can talk about it publicly in court.  So we have a ten-year

period, 2009 to 2019.  In that period of time, 35.CN generated

$███████████  in revenue.  OnLineNic --

THE COURT REPORTER:  Sorry.  Please restart.

MR. KRONENBERGER:  OnLineNic over this same period

generated $███████████.

As you can tell, there's the words "little overlap."

The question is, what is little?

What we did is that we scoured the filings of the

plaintiff for every allegation of money going either way

between these two companies.  We tallied that up, and that's in

Exhibit B of the second Kronenberger declaration, and then it

goes $███████████.  OnLineNic was paying 35 over the years for

technical services for its staff.  35 was paying for various

U.S.-based services.  This is the amount.

This is all detailed in the second Carrie Yu

declaration, by the way, in paragraph 2.

35 also did the same calculation, and their

calculation is $███████████ as opposed to $███████████.

1          Maybe we'll just give Facebook the benefit of the

2    doubt.  And I won't place this on the chart.  Let's just assume

3    for the purpose of argument that the overlap is $███████.

4    That percentage of revenue, this overlap, this -- this business

5    they're doing together, we aggregate it altogether is less than

6    1 percent of 35.CN revenue.

7          THE COURTROOM DEPUTY:  If I could interrupt for one

8    second.

9          If anybody's using Wi-Fi on your laptop, can you

10   please turn that off, otherwise the court reporter does not

11   have enough Internet bandwidth to get an accurate transcript.

12         MR. KRONENBERGER:  This amount, $███████, it is

13   5.31 percent of the total revenue of OnLineNic.

14         And I will come back to this chart, but it's powerful

15   evidence that these are two separate companies and that there's

16   not really any reason for 35 to want to control a company due

17   to -- that was only responsible and related to less than

18   1 percent of its revenue.

19         The last bit of context, Your Honor, is

20   decision-making.  And, as I stated before, there are three

21   decision makers in the history of OnLineNic.  And OnLineNic,

22   it's a digital business, and it's described the public filings

23   because it had to be fully described and compared to 35.  But

24   you don't need that many people to run it, or at least

25   initially one did not, as a domain registration business.

1   And -- but -- so there is a very few number of decision makers,

2   and people from 35 on chronic contract helping out mostly with

3   technical -- with customer service.

4        So digging into the two factors for alter ego, the

5   first part -- there's a -- there's a two-step test.  The first

6   test -- the first prong, I should say, in that first prong one

7   flavor or type of argument that is often made is the single

8   business enterprise argument.  As I mentioned, Facebook is all

9   in on this argument.  They mention it six pages -- on six pages

10  of the motion and three pages in reply referencing a case

11  *Toho-Towa vs. Morgan Creek Productions*.  We are -- there was a

12  single business enterprise that was alleged, and then they

13  added someone to the judgment after the fact.

14        In this case of Toho-Towa, the entities were both

15  owned by the same person.  That same person resolved all the

16  legal disputes for both companies.  They were the company that

17  was added.  There were new employees, new bank accounts.

18  Employees from Company A did business for -- deals for

19  Company B, but the money went back to Company A.  And then

20  there was complete control over litigation by one person.

21        It was essentially a sham.  The Court found that this

22  company that was brought in after the fact existed solely for

23  contracting asset holding purposes and to shield the other

24  companies from liability.  And it found that there was such a

25  domination of finances, policies, and practices that it was a

1    single business enterprise.

2          Compared to this case, Your Honor, we have different

3    owners, separate bank accounts, separate business operations,

4    and different offices, which I'll get to in a bit, different

5    decision makers, different attorneys.

6          I turn back to the chart, Your Honor.  Does this look

7    like a single business enterprise to you?

8          These are two separate businesses.  And, remember, in

9    the public filing it explains what these businesses do.

10   They're fairly different.  They both register domain names as

11   part of their business, but 35 is focused primarily on China;

12   OnLineNic is focused primarily outside of China.

13         There's another flavor of argument for prong 1, which

14   is sometimes called the unity of interest theory.  This was

15   cited by Facebook in the -- the *Ranza vs. Nike* case a few times

16   in the briefing.  And in this -- with this theory, the question

17   is if one -- if one company is just the mere instrument of

18   another, then there is alter ego.  The test is pervasive

19   control.

20         And so with the Nike case, there is actually the same

21   ownership, identical ownership.  And regarding management, it

22   had Nike employees going back and forth between Nike and the

23   Nike subsidiary, just randomly willy-nilly going back and

24   forth.

25         THE COURT:  Were there any employees of OnLineNic that

1    weren't employees of 35.CN?

2           MR. KRONENBERGER:  Absolutely.  The three decision

3    makers that I told you.  The three decision makers, Rex Liu,

4    Steve Wang, Xhippo Chen, are -- have never been employees,

5    officers, directors of 35 ever.

6           And that -- that's just sort of the -- this business

7    model from their perspective.  It's a -- it's a completely

8    digital business.  They can have a limited number of those

9    decision makers, and they can hire 35 to get the job done,

10   to do customer service, to help with technical support.

11          So -- so with the Nike case, they're actually the same

12   owner.

13          So I submit to you, Your Honor, that Mr. Gong and --

14   is not the owner of OnLineNic.

15          THE COURT:  Well, except for the tax filings that says

16   he owns --

17          MR. KRONENBERGER:  Yes --

18          THE COURT:  -- the --

19          MR. KRONENBERGER:  -- but I'm addressing your -- this

20   comment, Your Honor.  It might be incorrect, but let's assume

21   it's true, which it's not.  Under the Nike case, it's just one

22   factor.  You can have complete ownership.  You can -- ownership

23   could be identical, and there's still not alter ego in those

24   circumstances because this is a multifactor analysis.

25          Regarding the cases overall, regarding the -- the --

1    that deal with alter ego in California, there -- there are a

2    handful of factors that most cases go through, and Facebook has

3    gone through them.  The -- one of the important ones is -- is

4    corporate formalities.  Facebook says that OnLineNic did not

5    follow corporate formalities, and 35 says that OnLineNic  --

6    we've presented all the OnLineNic corporate filings filed with

7    the Secretary of State.

8          What's really important for Facebook is that Facebook

9    says that there was no stock issued with OnLineNic.  However,

10    there is evidence that we're -- there was stock issued.

11          As I've mentioned, that letter from Crone Roczinko,

12    the San Francisco law firm, confirmed that Mr. Gong sold 43,557

13    shares of common stock in OnLineNic to Rex Liu on November 28,

14    2007.  Of the outstanding shares, consisting of 42,557 shares

15    of common stock, they were transferred.

16          So there is evidence --

17          THE COURT:  So we -- do we have a declaration from

18    Mr. Liu about that?

19          MR. KRONENBERGER:  We -- we have -- this letter is on

20    Exhibit 19, page 10.

21          THE COURT:  Yeah.  From Mr. Liu?  Do we have a

22    statement from --

23          MR. KRONENBERGER:  We don't have a statement from

24    Mr. Liu.

25          THE COURT:  Do we have a statement from Mr. Gong?

1          MR. KRONENBERGER:  Mr. Gong has -- has -- we don't

2    have a statement from Mr. Gong.

3          THE COURT:  How about Mr. -- the third guy, Xhippo?

4          MR. KRONENBERGER:  Xhippo?

5          THE COURT:  Do we have a declaration from him?

6          MR. KRONENBERGER:  Not on this, because this was a

7    transaction that happened in 2007.  These are from highly

8    scrutinized public filings, the information that was provided

9    to -- to the Chinese Government.

10          THE COURT:  I know.  But it's from a law firm, so it's

11    got to be true?

12          MR. KRONENBERGER:  There's an email --

13          THE COURT:  Okay.

14          MR. KRONENBERGER:  -- regarding stock and tax returns.

15          So Exhibits 23 to 43 of the first Kroll declaration,

16    there are ten tax returns.  They're not full tax returns.

17    They're excerpts.  But on Schedule L, line 22B of every tax

18    return it says that the company has 43,557 shares of common

19    stock outstanding.

20          THE COURT:  That's -- are these -- are these

21    OnLineNic --

22          MR. KRONENBERGER:  Yes.

23          THE COURT:  -- tax returns?

24          MR. KRONENBERGER:  These are OnLine --

25          THE COURT:  Those are accurate.  But the one that says

```
1    Mr. Wong owns 100 percent of it, that's inaccurate?

2         MR. KRONENBERGER:  It's it's inaccurate.  It's sort of

3    bizarre, frankly.  Like why would -- it's years of public

4    filings Mr. Gong is saying he doesn't own it, and all of a

5    sudden these tax returns that has his name on it?

6         It doesn't make sense.  He's -- it's -- it was a

7    mistake.

8         But my point is, Your Honor, these --

9         THE COURT:  These other tax returns are correct?

10        MR. KRONENBERGER:  Well, there's -- there's multiple

11   factors to consider, Your Honor.  There's -- there's

12   sloppiness, no doubt, here.  But the point is we're talking

13   about corporate formalities.  Facebook makes a huge deal how

14   there were no shares issued.  There were shares issued.

15        THE COURT:  Do you have anything besides the tax

16   returns that documents that?

17        MR. KRONENBERGER:  We have the opinion letterer from

18   Crone Roczinko.

19        THE COURT:  Okay.  We have the lawyer saying it

20   happened?

21        MR. KRONENBERGER:  Yes.

22        THE COURT:  Do we have anybody saying:  Here.  Look at

23   this, these are the shares.  This is the the ledger

24   transaction.

25        Anything like that.
```

1        MR. KRONENBERGER:  We do -- we do not --

2        THE COURT:  Okay.

3        MR. KRONENBERGER:  -- but keep in mind, Your Honor,

4   that I represent 35, and OnLineNic is a separate litigant

5   that -- and I -- I don't want to apologize for it, what

6   happened with that -- with that discovery.

7        I mean, you can look at the other alter ego cases.

8   You're talking about -- that have been mentioned in this

9   briefing.  You're talking about extreme situations where

10  there's nothing, like there's -- there's no employees, no bank

11  accounts, no public filings.

12       And, yes, there's sloppiness here, but there -- there

13  is evidence to show on the issue of corporate formalities that

14  stock was issued.

15       And the issue of legal formalities --

16       THE COURT:  The evidence is a lawyer says so; right?

17       MR. KRONENBERGER:  Sure.

18       THE COURT:  And then there's some tax filings that say

19  it?

20       MR. KRONENBERGER:  Yes.  Yes, Your Honor.  It wasn't

21  just a lawyer saying so.  It was an opinion letter, which --

22       THE COURT:  Which is a lawyer saying so.

23       MR. KRONENBERGER:  It is a lawyer saying something.

24  He's probably insured for it.  Opinion letters to provide to

25  public companies.  It's -- it's what we have, Your Honor.

1              THE COURT:  Okay.

2              MR. KRONENBERGER:  It's the evidence that we have.

3         And regarding the legal formalities --

4              THE COURT:  I guess I'm more interested in the

5    evidence that you don't have.  I don't understand how you don't

6    have all the rest of that.

7              MR. KRONENBERGER:  Well, a lot of the evidence we

8    don't have is -- is evidence that was in the possession of

9    OnLineNic.  But let's just assume, Your Honor, that a lot of

10   that stuff doesn't exist.  It's -- we're -- we're talking about

11   individual --

12             THE COURT:  If it doesn't exist, then how did the

13   lawyer write the letter?  What did he see that said to him, oh,

14   it's 672,498, or whatever he said?

15             MR. KRONENBERGER:  Well, this was back in 2007, Your

16   Honor --

17             THE COURT:  Right.

18             MR. KRONENBERGER:  -- and, you know, that law firm

19   actually is no longer in business.

20             THE COURT:  Ooh.

21             MR. KRONENBERGER:  I don't -- and we tried to get as

22   much as we could.  We dug with our client, and there's just

23   certain documents they don't have.

24             Again, this is a transaction between Mr. Gong and

25   OnLineNic.  It wasn't a transaction with 35.  So we -- we are

1    doing our best here, but the point is --

2    THE COURT:  By the way, do we have a declaration from

3    Mr. Gong?

4    MR. KRONENBERGER:  We do not.

5    THE COURT:  Yeah.  Okay.

6    MR. KRONENBERGER:  Regarding legal formalities, we

7    have the -- you have the agreements, Your Honor, that Mr. Kroll

8    attached.

9    THE COURT:  You're nearing the end of your time, so

10   just if you could --

11   MR. KRONENBERGER:  Yes, Your Honor.

12   THE COURT:  I don't mean speak fast, though.  The

13   court reporter would get really mad at me if you did that.

14   MR. KRONENBERGER:  Yes, Your Honor.

15   We -- I'm going to skip through some of these -- these

16   factors.

17   Regarding commingling of assets, Facebook defines

18   commingling as if there's not a contract to show that a certain

19   amount should be paid, it's automatically commingling.  And we

20   submit it's a dictionary term.  One bank account.  Two

21   companies put money into the same bank account, and they

22   commingle funds.  There is no evidence whatsoever of that in

23   this case.

24   Regarding the capitalization of OnLineNic, because

25   this is a big argument, Facebook saying they really weren't

1    capitalized.  The fact that OnLineNic did $███████ over ten

2    years really speaks for itself that this company is not

3    capitalized.  It was able to do business for that long.

4    But the big argument that Facebook essentially creates saying

5    that there's something called negative --

6              THE COURT REPORTER:  I'm sorry.  Negative what?

7              (Interruption by court reporter due to audio issues.)

8              MR. KRONENBERGER:  Negative retained earnings.

9         And these are in tax returns.  And Facebook argues

10   that this is some -- for some reason this is evidence of

11   undercapitalization.  And they cite two cases, *U.S. vs.*

12   *Healthwin* and *Oceans II vs. Skinnervision*.  That concept is not

13   mentioned in any way in those cases.  Nothing.

14        But if Your Honor would take a look at the tax

15   returns.  And the good thing is there's only two pages per tax

16   return, so you're not digging through hundreds of pages.

17   There -- and there are ten years of tax returns.  For nine of

18   the ten years OnLineNic was making money.  There was taxable

19   income for nine of the ten years.  So how is OnLineNic

20   undercapitalized?

21        What happened in 2009, there was a large amount that

22   was -- I'm not sure.  There was a loss, $██████ loss.  It

23   resulted in a massive $██████ in negative retained

24   earnings.  Every year after that, every single year there was

25   profit.  ██████ the next year.  The next year, ██████.  The

1   good thing is they had a massive net operating loss that could

2   be carried over year after year after year.

3          THE COURT:  To whom did they owe the money?

4          MR. KRONENBERGER:  That's disclosed.  There are --

5   they have loans.

6          THE COURT:  So the loans from --

7          MR. KRONENBERGER:  There's $██████████ in loans,

8   which 35 is not on the list.

9          But the point is that before applying this massive net

10  operating loss, they were making money every year.  So this

11  argument that negative retained earnings is evidence of

12  capitalization, it doesn't factor in the fact that net

13  financing.  And that's what OnLineNic did, and it had that

14  profit year after year after year, mostly in the $███████ a

15  year range.

16         THE COURT:  And do we have documentation for the

17  loans?

18         MR. KRONENBERGER:  This is an OnLineNic thing.  What

19  we have is -- what's been provided is a list of people who had

20  the loans.  And, again, this has nothing to do with 35.  35

21  didn't loan this money.  And we -- it's -- this is actually in

22  the Kroll declarations, a list of every single person who

23  loaned money.  And it's not 35.  That gets us to the -- it's

24  $██████████.

25         So Mr. Kroll -- and not just Mr. Kroll.  I guess

1    Facebook argues that's a huge debt saying they needed to stay

2    in business.  But $▮▮▮▮▮▮ over ten years for a company

3    that's making -- that made ▮▮▮▮▮▮ in revenue seems sort of

4    reasonable.

5          So my -- our argument that this -- this allegation of

6    negative retained earnings, it's not supported in case law

7    whatsoever.  The tax returns should control.  And the tax

8    returns show a profit every year except 2009.  And for the net

9    operating losses, it is supplied.

10          So the --

11          THE COURT:  You have about five minutes.

12          MR. KRONENBERGER:  I'm going to just mention that

13    there -- with all these factors that Courts usually assess,

14    Facebook left out a bunch because they didn't have any

15    evidence.  There was no evidence of a company -- one company

16    holding itself out as liable for the debts of another.  There

17    was no identical ownership.  There was no -- that one entity

18    was not using one as a conduit for the other.  We see that

19    here.  Not the case.

20          So these factors, Your Honor, if you go through them

21    one by one, they cut toward no alter ego.  Is there sloppiness?

22    Yes.  We can't -- we can't deny that.  But a lot of it 35

23    couldn't control.

24          The second test, Your Honor, is -- and this will be

25    very brief, is -- the second part of the test is injustice.

UNITED STATES DISTRICT COURT

1    Facebook hasn't made any argument about injustice except they
2    can't get paid.  They want to get paid.  And OnLineNic has
3    assets.  There's a valuable portfolio.  That is not an argument
4    under California law.

5          Now, Facebook does point to this fact that the -- the
6    people who were involved in the discovery process, which led to
7    the -- the sanction, were employees of 35.  However, there's no
8    evidence of any sort of specific manipulation or any specific
9    knowledge of any officer or director of -- of 35 or anybody
10   with any decision-making power.  And to suggest that -- that
11   somebody at 35, an officer, director, anybody who had the
12   ability to make any decisions approved or knew that one company
13   from another company was about to delete a line in a database,
14   that's preposterous.

15         THE COURT:  And that's because your org chart, which
16   is your word, shows Mr. Wang at the top, but he's not really --
17   now, who do you say Mr. Wang worked for?

18         MR. KRONENBERGER:  OnLineNic.  He was an employee of
19   OnLineNic.

20         THE COURT:  And so everybody else who was an employee
21   of 35.CN was doing whatever they were doing, but they told
22   Mr. Wang, and he's not really a 35.CN person, so --

23         MR. KRONENBERGER:  The point is there's no evidence
24   that Mr. Wang or Xhippo Chen directed anybody to delete
25   anything in the database.  There's no evidence.  The record

completely devoid of that.  But if you look at the Tatung case,
for example, on this issue of injustice, there needs to be
specific manipulative conduct.  And not only do we not have it,
but we don't have it from anybody other than a lower-level
employee.  But to hold 35 responsible for what a lower-level
employee --

THE COURT:  As 35 did.

MR. KRONENBERGER:  Yes, correct.   Correct.

But, Your Honor, there's no single business
enterprise.  You've seen the revenue.  You've heard about the
business models.  They're completely different businesses.
There's no unified entity.  The altar ego factors cut toward no
alter ego, and there's no injustice that Facebook can identify.

THE COURT:  All right.  Thank you.

MR. KRONENBERGER:  Thank you.

THE COURT:  Very briefly, Mr. Kroll.

What about that Venn diagram?

MR. KROLL:  Frankly, Your Honor, I don't understand
the Venn diagram and what it purports to show.  It shows a
little overlap of revenue, which, to me, is actually a
definition of commingling of funds; that together they operated
something, and collectively they made money for each other.

But that's not the argument that we have with respect
to commingling funds.  Our argument with respect to commingling
funds deal with the unexplained transfers of money from 35.CN

1    to OnLineNic, the unexplained transfer of money from OnLineNic

2    to 35.CN, the loans given out to -- loans given from 35.CN

3    employees to OnLineNic.

4              THE COURT:  So is that who the list of people are --

5              MR. KROLL:  Yes.

6              THE COURT:  -- that he was talking about as the names

7    of the lenders, even though we don't have documentation of

8    those themselves?

9              MR. KROLL:  Right.  There's no evidence.  There's --

10   there's no loan documentation.  So we don't know what the terms

11   are, which is also evidence of failure to meet legal

12   formalities.  It also shows failure of an arm's-length

13   transaction.

14             But putting that aside, we identified a number of

15   35.CN employees who loaned money to OnLineNic.  OnLineNic

16   sometimes paid them back but sometimes paid other people.

17   These are the unexplained transfers of money.

18             And it's interesting because -- for example, two loans

19   come to mind.  One is Shaohui Gong, the owner, the majority

20   shareholder of 35.CN, loaned money to OnLineNic.  Another was a

21   company that Shaohui Gong owned, which was called Intra.  Intra

22   loaned I think it was $     to OnLineNic.  OnLineNic paid

23   them back $     So that's in a sense $     that were

24   sent by Intra that was not -- to OnLineNic that was not repaid.

25   What do we know about Intra?  Intra was owned by Shaohui Gong.

Shaohui Gong and another shareholder of 35.CN were the officers
of Intra.

Okay.  And how did 35.CN respond to that information?
The way they responded to that information is not a declaration
from Mr. Gong regarding that loan but a declaration from Carrie
Yu saying that Intra doesn't exist.  It never operated.  In
other words, it's a sham corporation.  And that's what we have
here.  It's consistent with setting up IDShield as a sham
corporation.  It's setting up OnLineNic as a shell company.  We
don't who the owner is of OnLineNic.  We have a lot of
different information, tax returns.

Mr. Kronenberger said something that I would like to
point out.  And I understand that we're limited with time.  So
let me just focus on Carrie Yu, who is the current director of
the 35.CN Software Outsourcing Center; right?

We were looking at Exhibit 4 in my declaration, which
is the organization chart.  And if you look at the organization
chart, Ms. Yu is the -- I can't remember if it's -- assistant
to the director.  It has Minghe Wang at the top, and right
underneath it has her Chinese name, Hongxia Yu.

THE COURT:  Assistant to the director.

MR. KROLL:  Yes.  Carrie Yu currently is the director
of the 35.CN Software Outsourcing Center.  Did she replace
Minghe Wang?  Unclear.  We believe she -- she did.  She became
the director of the software outsourcing center in 2017

1   according to her deposition testimony.  The deposition

2   testimony -- she was listed -- she was identified as the

3   30(b)(6) witness for OnLineNic.  She was -- she was the person

4   to have the most knowledge on all the topics that we were

5   talking about.  One of the topics we were talking about is the

6   sale of -- from Shaohui Gong to Xhippo Chen in 2009, which she

7   confirmed happened for $50,000.  She confirmed it was an oral

8   contract.

9        And, in fact, in her deposition -- and, unfortunately,

10  I don't believe it's a -- a -- it's a part of the transcript

11  that we've submitted to the Court, but representation to you is

12  at the beginning of the second day of the deposition she

13  testified that she talked to Shaohui Gong, she talked to Xhippo

14  Chen to confirm that there was a sale.

15       Mr. Kronenberger said in his statement that Shaohui

16  Gong sold to Rex Liu in 2007 and that Rex Liu sold OnLineNic to

17  Xhippo Chen in 2009.  That is contrary to the deposition

18  testimony of OnLineNic.

19       And, in fact --

20       THE COURT:  Although there were declarations later on

21  that clouded that issue.

22       MR. KROLL:  Even then, if -- Your Honor, if you were

23  to look carefully at those declarations, none of those

24  declarations state that Rex Liu sold OnLineNic to Xhippo Chen.

25  In fact, the only person who talks about it is Carrie Yu again.

And Carrie Yu just says:  I made a mistake.  Didn't know about 2007, but I do know that Xhippo Chen is the owner in 2009.

She doesn't connect the dots of who sold what to Xhippo Chen in 2009.  But we do have the deposition testimony, the 30(b)(6) deposition testimony of OnLineNic.

Other -- I can go on, forever, Your Honor.  So I know you're limited in time.  And if you have any questions, I'm happy to -- to respond, because there was a lot described here.

The -- what I also find is interesting is we've identified the four individuals, the employees of 35.CN who we believe were involved in the destruction of evidence.  And that testimony goes from the special master who identified four individuals with their OnLineNic email address.  We were able to take their OnLineNic email addresses and show that they are actually current employees of 35.CN.

THE COURT:  Yeah, but Mr. -- he didn't deny that.

MR. KROLL:  He hasn't denied that at all.  He hasn't -- he hasn't provided -- he?  I'm sorry.  35.CN has not provided a declaration from any of those individuals saying, I did not destroy the evidence.  No declaration.

THE COURT:  I don't feel like that issue is really up for relitigation at this time anyway.

MR. KROLL:  I -- we agree with you, Your Honor.  We believe that that issue has been --

THE COURT:  Yeah.

1          MR. KROLL:  -- foreclosed.

2          There's no declaration from either Minghe Wang or Rex

3    Liu or Xhippo Chen saying, we never told them to destroy

4    evidence or we told them to destroy evidence.

5          All we know is that we have 35.CN employees who were

6    being managed by Carrie Yu, who's the director of the software

7    outsourcing center of 35CN, who destroyed the evidence.

8          Your Honor, I -- I -- we can discuss the --

9          THE COURT:  No.

10         MR. KROLL:  -- inadequate --

11         THE COURT:  I think I have -- I think I have a grip on

12   it, so I'm going to take all of this under submission.  Thank

13   you very much for your presentations today.

14         Somebody's handing you a yellow slip.

15         MR. KROLL:  I was told --

16         THE COURT:  Yes.

17         MR. KROLL:  -- that we actually did submit the

18   deposition section when Carrie Yu talked to Shaohui Gong and

19   Xhippo Chen to confirm, and that's on Exhibit 7 at pages 29 and

20   30.

21         THE COURT:  Okay.  Thank you.

22         MR. KRONENBERGER:  Your Honor, you asked a couple

23   questions of just identities of people at the beginning --

24         THE COURT:  Yes.

25         MR. KRONENBERGER:  -- of the hearing.

1          THE COURT:  Yes.

2          MR. KRONENBERGER:  I have that information.

3          THE COURT:  Oh, okay.  Thank you.

4          MR. KRONENBERGER:  The CEO of 35 is Cici Cai.  That's

5    C-I-C-I, C-A-I.

6          THE COURT:  Two words?

7          MR. KRONENBERGER:  Two words.  Cicic Cai.  And --

8          THE COURT:  He or she is the current CEO?

9          MR. KRONENBERGER:  Correct.

10          THE COURT:  Okay.

11          MR. KRONENBERGER:  And the -- and I mentioned that

12    Steve Wang was director, and that was correct.  And his title

13    was director at OnLineNic.

14          THE COURT:  His title was director.  And you got all

15    of this information from your colleagues?

16          MR. KRONENBERGER:  Just now, Your Honor, yes.  Well,

17    Cici Cai, it's public information on the Internet, and so --

18          THE COURT:  Well, if it's on the Internet then --

19          MR. KRONENBERGER:  Yes.

20          THE COURT:  -- it must be true?

21          MR. KRONENBERGER:  Yeah.

22          THE COURT:  Okay.

23          MR. KRONENBERGER:  Thank you.

24          MR. KROLL:  Your Honor, if I just may briefly --

25          THE COURT:  Yeah.

1        MR. KROLL:  -- talk about Minghe Wang, who's listed --

2        THE COURT:  Minghe Wang?

3        MR. KROLL:  -- the director -- the -- who was --

4        THE COURT:  Or Steve?

5        MR. KROLL:  Steve Wang --

6        THE COURT:  Okay.

7        MR. KROLL:  -- right.  That he was a director of

8  OnLineNic.

9        THE COURT:  Right.

10       MR. KROLL:  In written discovery, we asked OnLineNic:

11  Identify your directors.

12       He was not mentioned.  He was identified as an

13  employee; right?  But OnLineNic has admitted that it has no

14  employees who run the day-to-day operations of the registrar

15  business.  So to suggest that Mr. Wang controlled decisions of

16  the day-to-day operations of the registrar business is actually

17  inconsistent with prior written discovery.

18       THE COURT:  All right.

19       MR. KROLL:  Thank you, Your Honor.

20       MR. KRONENBERGER:  There's obviously disagreement,

21  Your Honor.

22       THE COURT:  Yeah.  Okay.  Thank you all.

23       (Proceedings conclude at 12:38 p.m.)

24                         ---oOo---

25

1

2

3

4

5                        **C E R T I F I C A T E**

6

7            I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter.

9            I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14           DATED this 14th day of July, 2023.

15

16

17

                        s/Cathy J. Taylor_____
18                      Cathy J. Taylor, RMR, CRR, CRC

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT