Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

```
FACEBOOK, INC., et al.,        )
                               )
            Plaintiffs,        )
                               )
    VS.                        )      NO. 3:19-CV-07071-SI
                               )
ONLINENIC, INC., et al.,       )
                               )
            Defendants.        )
_____)
```

San Francisco, California
Friday, May 3, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    TUCKER ELLIS, LLP
                    515 South Flower Street, Forty-Second Floor
                    Los Angeles, CA 90071
            **BY:  HOWARD A. KROLL
                    DAVID J. STEELE
                    ATTORNEYS AT LAW**

For Defendants:
                    KRONENBERGER ROSENFELD, LLP
                    548 Market Street, Ste 85399
                    San Francisco, CA 94104
            **BY:  KARL S. KRONENBERGER
                    LIANA W. CHEN
                    LEAH R. VULIC
                    ATTORNEYS AT LAW**

                    LEXANALYTICA, PC
                    3000 El Camino Real, Building 4, Suite 200
                    Palo Alto, CA 94303
            **BY:  PERRY J. NARANCIC, ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE

| | |
|---|---|
| 1 | **Friday - May 3, 2024**                                    **10:12 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE COURT:**  Please be seated. |
| 5 | **THE COURTROOM DEPUTY:**  Now calling civil matter |
| 6 | 19-CV-7071.  Counsel, please approach the podiums and make your |
| 7 | appearances on the record starting with the plaintiff. |
| 8 | **MR. KROLL:**  Good morning, Your Honor.  Howard Kroll |
| 9 | with Tucker Ellis. |
| 10 | **MR. STEELE:**  And good morning, Your Honor.  David |
| 11 | Steele also with Tucker Ellis for plaintiffs. |
| 12 | **THE COURT:**  Good morning. |
| 13 | **THE COURTROOM DEPUTY:**  Defendants? |
| 14 | **MR. KRONENBERGER:**  Good morning, Your Honor.  Karl |
| 15 | Kronenberger of Kronenberger Rosenfeld.  I'm here with my |
| 16 | partner, Liana Chen and associate Leah Vulic. |
| 17 | **THE COURT:**  Good morning. |
| 18 | **MR. NARANCIC:**  Good morning, Your Honor.  Perry |
| 19 | Narancic for defendants OnLineNic and defendant I.D. Shield. |
| 20 | **THE COURT:**  Good morning. |
| 21 | Well, we are here to resolve plaintiffs' motion for |
| 22 | default judgment.  As I indicated, I'm inclined to grant the |
| 23 | motion.  I have questions or had questions about some of the |
| 24 | terms of the proposed default judgment that the plaintiffs had |
| 25 | given me, and I have just, and I mean just, received the |

1    document you filed concerning -- or lodged, I guess, concerning

2    some agreements that you've reached.  So I first wanted to talk

3    with you about that, and then we can go back, you can argue

4    whatever you'd like to argue, but ...

5            So this version of the proposed default judgment, there is

6    agreement on D, E and F now?

7            **MR. KROLL:**  Howard Kroll, Your Honor.

8            Yes, Your Honor.  With respect to Paragraph 91D, E and F,

9    the parties met and conferred Wednesday, Thursday, this morning

10   to come up with a resolution that was agreeable to everyone,

11   and it's only with respect to 91D and E and F, and that's what

12   we've lodged with the Court.

13           **THE COURT:**  Thank you.

14           Well, that's very helpful to me, and I am stunned and

15   happy that you were able to do that.  I know it's probably not

16   easy, but you did your jobs.  So thank you very much for that.

17   I do appreciate it.

18           **MR. KROLL:**  Thank you, Your Honor.

19           **MR. KRONENBERGER:**  Your Honor, indeed it was not

20   easy.  We did get some final approval over the phone last night

21   from our client, it's during a Chinese holiday.

22           I do want to, even though we are withdrawing our

23   objections regarding these three paragraphs, it is sub' --

24   there is a carve-out for Chinese law, specifically the last

25   three or four words in the last paragraph.  We have not done a

1  formal analysis regarding whether or not that last paragraph

2  would potentially violate Chinese law.  We think it likely does

3  not.

4          **THE COURT:**  You're talking about F?

5          **MR. KRONENBERGER:**  F, Your Honor.

6      It's an unrestricted access to a WhoIs database, and we

7  believe in our negotiations that that is possible to do that.

8  We have not finished any sort of review of Chinese law.

9  Sometimes there is a security assessment required by the

10  national cyberspace administration, and certain certifications

11  need to be made.  However, because of the carve-out, we felt

12  comfortable withdrawing this objection.  I don't want to agree

13  to a judgment, but I think it's fair to withdraw the objection

14  to simplify and streamline these proceedings.

15          **THE COURT:**  All right.  Thank you.

16      And I had a couple of questions for you before we get

17  going.

18      First off -- and this would be you, Mr. Kronenberger, I

19  think.  Is it correct that 35CN has formally changed its name?

20          **MR. KRONENBERGER:**  Yes, Your Honor.

21      We had a few footnotes in our -- in the last few filings

22  that we made.  They have changed their name to Lease End

23  Technology.  And I may not have the full name at hand, but

24  we've listed it in our briefing.  They've also pivoted their

25  business model to a solar energy business model.  They're

1  slowly exiting the business model regarding domain

2  registrations.  So consistent with that new vision of the

3  company they've changed their name, and we've inserted

4  footnotes about that just alerting the Court and the plaintiff

5  in the case.

6          THE COURT:  Well, with respect to that name, except

7  for the footnotes, I don't think we have a formal notice of

8  that in this case.

9          MR. KRONENBERGER:  If that's required, we would be

10 happy to provide it.

11         THE COURT:  I think that would be helpful, yeah.

12         MR. KRONENBERGER:  Okay.

13         THE COURT:  So it's going to do solar energy now?

14         MR. KRONENBERGER:  That's right.  It's -- it is still

15 a technology company, and it still has a small domain

16 registration business focused on Chinese domain names, but it's

17 changing its focus, not necessarily because of this litigation.

18 But, in other words, the name change is consistent with the

19 business strategy.  It's not an effort to wiggle out of a

20 judgment.

21         THE COURT:  Good.

22     All right.  Well, having clarified that, and you'll get a

23 notice in, a formal notice to the Court, because it needs

24 somehow to be incorporated into this, whatever we do next.  So

25 having said that, if -- it's plaintiffs' motion, but the

1    defendants -- I'm intending to grant it.  So would you like to

2    go first, Mr. Kronenberger?

3              **MR. KRONENBERGER:**  Yes, Your Honor.

4         For the most part, Your Honor, we will rely on our

5    briefing, but we would like to address one important issue for

6    the defendant, and that is the issue of attorney's fees.  The

7    report and recommendation provided a limited scope award of

8    attorney's fees.  It deemed the case an exceptional case

9    because of the spoliation in the case and not because of

10   overall litigation conduct.  In other words, there were

11   legitimate defenses.  There were motions that even OnLineNic

12   won before 35 was in the case, and Magistrate van Keulen came

13   down with this limited scope award, which frankly is consistent

14   not just with the *Octane* case, but also the *Goodyear* and *Fox*

15   cases, which I will discuss in a moment.

16        As a backdrop to this, I want to emphasize how 35 had some

17   legitimate defenses, and it was a fairly complex case.  We're

18   dealing with unique and novel issues here, like a registrar's

19   liability as a privacy or proxy service, especially liability

20   arising out of contracts that the parties entered into with

21   third parties, where the plaintiffs are a third-party

22   beneficiary; conduct of the registrar being use in commerce or

23   trafficking under the Lanham Act.  Of course, we have the

24   alterego allegations which dealt with discovery going back

25   decades.

1          So this was a difficult case, and these were unique

2    issues.  I would argue they are issues of first impression.

3    And as an attorney who practices in this area of domain name

4    litigation, it's quite interesting to deal with these new

5    issues and how they were pled in this case.  So, and the reason

6    I am pointing this out is because I argue that 35 had

7    legitimate defenses, and there are also some arguments we had

8    on things that haven't been decided yet.  I know the plaintiffs

9    are upset at me constantly talking about notices, how all the

10   notices weren't received.  There's no final ruling on that.  We

11   didn't -- it just didn't happen.  There was a ruling on

12   alterego before that.  But the point is these are good

13   arguments that 35 had.  These are legitimate good-faith

14   arguments.  So, and this is important considering the case law

15   that I'm going to go into in a moment.

16          Also 35, in addition to OnLineNic, prevailed on a number

17   of issues dealing with the -- even starting out with personal

18   jurisdiction, where that decision was put off until later.

19   There are a variety of discovery decisions that 35 prevailed

20   on, and if this is an issue, there are multiple discovery

21   orders, one at Docket 261 and one at Docket 286, where they are

22   clear statements that where 35 is prevailing on decisions.  The

23   Court cannot order 35 to produce documents it doesn't have,

24   Judge Tse said.

25          35.com need not embrace Facebook's litigation position by

1    responding to these RFPs.  The Court can't order 35.cn to

2    produce documents it doesn't have.  And I can go on and on,

3    Your Honor.  There's four or five more.  But the point is that

4    this was a difficult case when it comes to discovery.  We have

5    a Chinese public company that's subject to Chinese law,

6    including some new privacy laws that came out while this case

7    was pending.  And as an attorney, my primary objective was to

8    make sure that we didn't have a situation where Judge Tse

9    argued that 35 had to produce something that 35 could not do

10   that because of Chinese privacy laws.  It would have been a

11   disaster.  And luckily we were able to get through that issue,

12   and it was a sticky situation involving negotiation with

13   outside counsel in China, and we were able to compromise mostly

14   using the protective order of the Court.  So I was happy that

15   we weren't in that situation.  But the point is these are real

16   issues, Your Honor, and we struggled with them, and we're

17   not -- they're obviously not frivolous.

18        Now, to dig into the case law a bit.

19        So the issue is whether or not there should be the ability

20   for a limited finding of attorney's fees if there's a finding

21   of an exceptional case under the Lanham Act.  35 puts forward

22   two important cases, the *Goodyear versus Haeger* case and the

23   *Fox versus Vice* case.  They're both Supreme Court cases.

24        And the *Goodyear* case says that, you know, fees cannot be

25   punitive.  Courts can sanction bad faith, but if they go beyond

1    that it's punitive.  And they really fleshed out a but-for test

2    to protect against anything that would be punitive in nature.

3        The plaintiffs attack, you know, our application of

4    *Goodyear* to this case, but what's more important is the case

5    that preceded *Goodyear*.  Both cases were authored by Justice

6    Kagan.

7        The *Fox versus Vice* case in 2011, Justice Kagan addressed

8    a civil rights statute with a fee-shifting provision.  And the

9    problem was there were frivolous and nonfrivolous claims, and

10   the issue was should fees cover all the fees that were incurred

11   involving both frivolous and nonfrivolous claims or just the

12   frivolous claims.

13       Justice Kagan had some real-world metaphors.  Litigation

14   is not like the movies.  It's not like there's someone who's

15   rotten to the core and someone who's an absolute saint, and

16   they sue each other, the saint wins and they get all their

17   money.  Litigation is often not like that.  And she says:  "But

18   in the real world litigation is more complex involving multiple

19   claims for relief that implicate a mix of legal theories that

20   have different merits.  In short, litigation is messy, and

21   courts must deal with this untidiness in awarding fees."  So

22   Justice Kagan outlined a but-for analysis in fee-shifting

23   statutes involving misconduct, and the Court held that:  "A

24   court may grant fees, but only for fees and costs that the

25   defendant would not have incurred but for the frivolous

1    claims."

2        Fast-forward to *Goodyear* six years later.

3            **THE COURT:**  Just read that sentence again.

4            **MR. KRONENBERGER:**  Yes.  "The Court may grant fees,

5    but only for fees that the defendant would not have incurred

6    but for the frivolous claims."

7            **THE COURT:**  So this is a civil rights case, and the

8    defendant is being awarded fees.

9            **MR. KRONENBERGER:**  That's correct, Your Honor.

10        So fast-forward to *Goodyear* six years later.  In the

11    *Goodyear* case, it was a fee-shifting case for bad-faith conduct

12    under the Court's inherent power.  Not under the Lanham Act,

13    not under the civil rights statute, but it was litigation

14    misconduct generally addressed the Court's inherent power, and

15    Justice Kagan adopted the same but-for test.  Brought it over

16    from *Fox*.  And the -- some of the key language that Justice

17    Kagan used is that she said that, quoting from *Fox*:  "When a

18    defendant would have incurred expense in any event, he has

19    suffered no incremental harm from the frivolous claim."  And

20    she went on to say:  "Substitute 'discovery abuse' for

21    'frivolous claim' in that sentence, and the same thing goes."

22        In other words, it doesn't matter if the statute is not

23    the specific civil rights statute or the inherent power.  It's

24    the idea of litigation misconduct where there is a fee-shifting

25    statute that is shifting fees due to that litigation

1    misconduct.  In that scenario, when you look at both *Fox* and

2    *Goodyear* in conjunction, the law is, in this case with the

3    Lanham Act, this fee-shifting provision, that the fees should

4    only be provided for, related to the spoliation in this case.

5        And bear in mind that Facebook spent most of its time not

6    on the spoliation, at least when 35.com was in the case.

7    Spoliation was something that had happened in the past.  There

8    is a great amount of legal work that happened, had nothing to

9    do with the spoliation, the prelitigation work, the drafting of

10    the complaint.  Then once 35 came into the case, there was

11    extensive briefing on the pleadings and discovery and summary

12    judgment motions.

13        So defendant 35 presents two Supreme Court cases.  In

14    response, the plaintiffs present one case, which is a Federal

15    Appendix case, which has no precedential value whatsoever.

16    It's called *San Diego Comic Convention versus Dan Farr Products*

17    (sic).  And this case is cited again, and again, and again in

18    both of their briefs.  It's -- unfortunately, there are not

19    many facts in this decision, but there was the totality of the

20    circumstances that were considered.  But it was pretty severe

21    litigation misconduct.  Failure to comply with court rules,

22    persistent relitigation of issues, advocacy that veered into

23    gamesmanship and unreasonable responses to the litigation.  The

24    Court also noted that at every stage of the litigation there

25    was misconduct.  So that -- so even under the *Goodyear* and *Fox*

1  case, it seems like that may be a case where full fees were

2  permitted.

3       And I should say that, going back to the *Goodyear* case,

4  Justice Kagan did note that there's an exception that if the

5  defendants' entire course of conduct is, quote, part of a

6  sordid scheme to defeat a valid claim, then maybe full fees are

7  appropriate.

8              **THE COURT:**  It's the sordid scheme test.

9              **MR. KRONENBERGER:**  Yes.

10       And there's no sordid scheme here, Your Honor.  It is --

11  it's a complex case involving unique issues.  And I'd note

12  Magistrate van Keulen specifically found that the business

13  model of OnLineNic did not per se qualify for willfulness.  So

14  there's not an issue with the business model.  The heart of the

15  business model, I should say.

16       Other factors that could play into the analysis, that

17  there are third parties that registered these domain names.  In

18  fact, the complaint even creates a definition for them.

19  They're called licensees.  And this is different from other

20  misconduct in trademark infringement, in many other cases where

21  there's direct infringement.  And of course we have the

22  vicarious liability arguments using the registrar accreditation

23  agreement.

24       So in summary, Magistrate van Keulen was correct.  Even

25  though she did not mention *Goodyear* and *Fox* by name, and even

1    though she did not use the words "but for," she's generally

2    correct, considering the fairly clear case law with the Supreme

3    Court.  So we urge the Court to adopt the but-for test of

4    *Goodyear* and *Fox* in analyzing fees in this case.

5        I believe that we will rely on our briefing regarding

6    other arguments.  However, if, at any point, you have a

7    question, we'd be happy to address it.

8            **THE COURT:**  Thank you.

9        Mr. Kroll?

10       You'll have to state your name and ...

11           **MR. NARANCIC:**  Yes, good morning again.  Perry

12   Narancic for the OnLineNic defendants.

13       I just wanted to note that the OnLineNic defendants don't

14   have any further submissions other than what's already in the

15   briefing, and they adopt the submissions of counsel.

16           **THE COURT:**  All right.  Thank you.

17           **MR. NARANCIC:**  Thank you.

18           **THE COURT:**  Now, Mr. Kroll.

19           **MR. KROLL:**  Howard Kroll.  Good morning, Your Honor.

20       This case is about a serial cybersquatter and its

21   alteregos, who are not deterred by the past $33 million

22   cybersquatting judgment against them.  They continue to

23   register domain names that were identical or confusingly

24   similar to famous marks with a bad-faith intent to profit, in

25   violation of the Anticybersquatting Consumer Protection Act.

1   They've used their position of trust as a registrar to hide the

2   names of their licensees despite receiving from plaintiffs

3   reasonable evidence of actionable harm, and they attempted to

4   hide their own liability by the wholesale destruction of

5   evidence and other discovery malfeasance, not only data

6   dumping, failure to appear at a court-ordered deposition.

7   There's other litigation misconduct, as well.

8        Mr. Kronenberger started his discussion by saying that

9   Judge van Keulen only found litigation misconduct, and that's

10  not true.  On~--- at -- in her report and recommendation, which

11  is ECF 225, at page 32, the Court stated not only that the

12  OnLineNic defendants engaged in significant litigation

13  misconduct, but number two, that defendants' cybersquatting was

14  egregious.

15       So we have a situation here where there is not just

16  litigation misconduct, but also the fact that the defendants

17  are liable under the ACPA for their egregious cybersquatting.

18           **THE COURT:**  So it's serial egregious cybersquatting.

19           **MR. KROLL:**  Well, they're serial cybersquatters, and

20  they are -- yes.  And as the Court has noted and as Judge van

21  Keulen has noted, several of the domain names that were

22  registered by the defendants involved fishing and other domain

23  name abuse.  There was a $33 million judgment.  There was

24  also -- in a prior case.  There was also a finding of contempt

25  for discovery violations against the defendants.  That hasn't

1    deterred them either.

2         Now, one of the litigation misconduct that we have noted

3    is that defendants had this tendency to relitigate issues that

4    have already been decided.  And, in fact, Mr. Kronenberger just

5    did it again in his oral argument when he said third parties

6    registered the domain names.  Third parties did not register

7    the domain names at issue in this case.  I.D. Shield registered

8    the domain names.  I.D. Shield is listed as the registrant in

9    the WhoIs data.

10        This was also alleged in our second amended complaint,

11   which the allegation is deemed to be true.  We have attached as

12   exhibit 7 to the second amended complaint the WhoIs data

13   showing that I.D. Shield registered all of these domain names.

14   The OnLineNic defendants admitted in their response -- in their

15   answer to the second amended complaint that I.D. Shield is

16   listed as the registrant in the WhoIs data, and we've provided

17   ICAN documentation showing that whoever is listed as the

18   registrant in the WhoIs data directory is the registrant for

19   purposes of the ACPA.

20        Other litigation misconduct that, again, we just heard is

21   misrepresentations about the discovery disputes that we've had.

22   So if the Court recalls, we filed our case in October 2019.

23   It's almost -- it's past four and a half years.  In March of

24   2020, the plaintiff sent discovery requests, and that started

25   this long line of discovery abuse of showing failure to produce

1    documents, failure to produce reasonable and responsive

2    documents, data dumping.  That is why a special master was

3    appointed.  The special master found not only that, but also

4    found spoliation that occurred before the complaint was filed,

5    after the complaint was filed, after the special master was

6    appointed; misrepresentations to the Court, Judge van Keulen

7    and to the special master.  Okay.  This was all pervasive

8    throughout the case.

9        And just recently in the opposition that 35CN filed with

10   the Court and the oral argument that Mr. Kronenberger just

11   stated, he indicated that 35CN won a number of discovery

12   disputes.

13       And let me just take an aside.  In order to determine

14   prevailing party, prevailing party is for the entire case;

15   we're not looking at piecemeal motions.  But even that, they

16   did not prevail.  Mr. Kronenberger stated that it's based on

17   Chinese law.  And we've submitted to the Court in our reply,

18   which is ECF 388, at pages 16 and 17, the fact that the 35 --

19   that 35CN informed Judge Tse that they had withdrawn all of

20   their claims of Chinese law prohibiting them from producing

21   documents.  So this has nothing to do with Chinese law at all.

22   35CN did not produce documents not based on Chinese law.

23       Now, we should go to *Goodyear*, Your Honor.  So *Goodyear*

24   involved the Court's inherent authority -- it did not involve a

25   statute -- as a way of sanctioning the party for litigation

misconduct.  And the *Goodyear* court cited to *Fox* and -- or I
think it was *Chambers*, actually, Your Honor.  It said:
"Everything they did was part of a sordid scheme" -- this is
the sordid scheme -- sordid scheme "to defeat a valid claim."
And that's what we have in this case, including the fact that
they hid -- "they" being the defendants -- hid the fact that
they were alteregos.

    We filed a motion for -- and it turned out to be a motion
for summary judgment on alterego, and the defendants were
unable to produce any fact to show that there was a question of
fact as to the fact that they are alteregos.  Again, this is
pervasive throughout the entire case.

    *Octane Fitness* focuses on the totality of circumstances,
focuses on compensation and deterrence, and *Octane Fitness* has
been applied to cases under the Lanham Act.

    *Goodyear* has not been applied to the Lanham Act.  We're
not aware of any case that has required that but-for analysis
in determining attorney's fees under the Lanham Act.

    Now, Mr. Kronenberger is correct, we did cite the *San
Diego Comic Convention* case.  And in that case, I actually
can't remember if the plaintiffs or the defendants in their
submission cited to *Goodyear* as a way of suggesting that the
Court should adopt the but-for test, and the *San Diego* court
said there is no authority to support the application of the
but-for test, the Lanham Act.

1          **THE COURT:**  What year was *Goodyear*?

2          **MR. KROLL:**  *Goodyear* was 2017, I think.  Yes, 2017.

3          **THE COURT:**  That's not long.

4          **MR. KROLL:**  That's true.

5      *Octane Fitness* rejected any precise rule or formula in

6  making a determination as to attorney's fees.

7          And in *Goodyear*, they were only focusing on litigation

8  misconduct, and we don't have that here.  What we have here is

9  litigation misconduct.  Don't get me wrong, there's severe

10  litigation misconduct that we characterize as a sordid scheme

11  to defeat a valid claim.  But in addition, they are serial

12  cybersquatters, repetitive recidivist cybersquatters.  And

13  because of those two things together, Your Honor, we believe

14  that attorney's fees should be awarded for the entire case and

15  not just limited to the but-for test.

16          **THE COURT:**  All right.  Thank you.

17          **MR. KROLL:**  Thank you.

18          **THE COURT:**  Anything else anybody wants to argue

19  today?

20          **MR. KROLL:**  No, Your Honor.  Thank you.

21          **MR. KRONENBERGER:**  Just a few quick items, Your

22  Honor.

23      I just did a word search on the *San Diego Comic Convention*

24  case.  I did not find the word *"Goodyear"* anywhere in that

25  case, unless I just missed it in my word search.  I do think --

1    **THE COURT:**  What year was the *Comic-Con* case?

2    **MR. KROLL:**  Your Honor, that was in 2020.

3    And we agree with Mr. Kronenberger.  The *San Diego* case

4    did not cite to *Goodyear*.  My comment was the fact that in the

5    briefing to the Court, the party seeking to apply *Goodyear*

6    cited to *Goodyear*, and yet the Court said there's no case that

7    says that but-for test should be applied under the Lanham Act.

8    **THE COURT:**  Okay.  Thank you.

9    **MR. KRONENBERGER:**  But Your Honor, the case doesn't

10    talk about but-for.  The case doesn't talk about *Goodyear*.

11    There is not much in that case.  I think --

12    **THE COURT:**  Don't you think I actually have quite a

13    lot of discretion here?

14    **MR. KRONENBERGER:**  You absolutely have discretion.

15    **THE COURT:**  That's what I thought.

16    You agree with that, Mr. Kroll?

17    **MR. KROLL:**  Yes, Your Honor.  Of course.

18    **THE COURT:**  Okay.  That was the bottom line of

19    everything you folks just said, I thought.

20    **MR. KRONENBERGER:**  My final comment.  This may seem

21    minor, but I do think it helps flesh out the landscape a lot.

22    It's not great what happened years ago with -- in the *Verizon*

23    case against OnLineNic.  35 can apologize for that, but it does

24    seem to be significantly different than the current case

25    against OnLineNic, because there are third parties who register

1    these domain names.  Now, maybe there's a dispute over who the

2    technical registrant is.  However, in the complaint itself, it

3    defines all these people that own these domain names.  It's

4    fundamentally different than what happened years ago, decades

5    ago.  Because back then, OnLineNic was registering domain names

6    directly.

7         I think litigants can learn things, especially when they

8    are hit with a 30-some-million-dollar verdict.  But this is an

9    important fact in this case, that it's a unique theory of

10   liability and recovery by Facebook, because there are third

11   parties out there that paid money, I would argue to register,

12   but they paid money to have -- to obtain domain names, and

13   there was a privacy service listed in the WhoIs database.  That

14   is an important fact, because it -- because then any criticism

15   of OnLineNic is really about its business model and not so much

16   the specific misconduct.

17             THE COURT:  Okay.  Thank you.

18             MR. KROLL:  Your Honor, I'm sorry.  Just a quick

19   question, actually not in response to what Mr. Kronenberger

20   just said, but if the Court were to grant attorney's fees,

21   there is that two-step process that courts contemplate on what

22   the next step is.

23             THE COURT:  Right.  And let me tell you my plan.

24             MR. KROLL:  Yes.

25             THE COURT:  My plan is to consider all the matters

1    you've brought to my attention today.  I plan to get you an

2    order on the motion, which will include working on the form of

3    the default judgment.  But I'll let you know what I, in my

4    discretion, view to be the appropriate metes and bounds of an

5    attorney fee award, and then you'll have to file and ask for

6    and show what you did.  So that's the two-step process I had in

7    mind.

8              **MR. KROLL:**  Thank you.

9              **THE COURT:**  So I'll try to get you a response to

10   today's argument very soon, and then that will give you the

11   opportunity to take the next steps.  Okay?

12             **MR. KROLL:**  Thank you, Your Honor.

13             **THE COURT:**  Okay.  All right.  Thank you all.  It was

14   actually very nice to see you in court.  It's a nice change of

15   pace, and thank you for coming.

16             (Proceedings concluded at 10:49 a.m.)

17                          ---o0o---

18                  **CERTIFICATE OF REPORTER**

19             I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21   DATE:  Saturday, July 6, 2024

22

23   _(signature)_

24   _____

25   Stephen W. Franklin, RMR, CRR, CPE