**Pages 1 - 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

```
FACEBOOK, INC. and INSTAGRAM,  )
LLC,                           )
                               )
         Plaintiffs,           )
                               )
   VS.                         )   NO. 3:19-CV-07071 SI
                               )
ONLINENIC INC.; DOMAIN ID      )
SHIELD SERVICE CO., LIMITED;   )
and XIAMEN 35.COM INTERNET     )
TECHNOLOGY CO., LTD.,          )
                               )
         Defendants.           )
_____)
```

San Francisco, California
Friday, December 20, 2024

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM**:

For Plaintiffs:
          TUCKER ELLIS LLP
          515 South Flower Street, 42nd Floor
          Los Angeles, California 90071-2223
     **BY: HOWARD A. KROLL, ATTORNEY AT LAW**
          **DAVID J. STEELE, ATTORNEY AT LAW**
          **HELENA M. GUYE, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED REMOTELY BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                      CSR No. 7445, Official U.S. Reporter

```
 1   APPEARANCES VIA ZOOM:   (CONTINUED)

 2   For Defendant Leascend Technology:
                             KRONENBERGER ROSENFELD LLP
 3                           150 Post Street, Suite 520
                             San Francisco, California 94108
 4                     BY:   KARL S. KRONENBERGER, ATTORNEY AT LAW
                             LIANA W. CHEN, ATTORNEY AT LAW
 5

 6

 7   For Defendant OnlineNIC:
                             LEXANALYTICA, PC
 8                           3000 El Camino Real
                             Building 4, Suite 200
 9                           Palo Alto, California 94303
                       BY:   PERRY J. NARANCIC, ATTORNEY AT LAW
10
```

|   |   |
|---|---|
| 1 | **Friday - December 20, 2024**                              **12:07 p.m.** |

                              P R O C E E D I N G S

                                    ---o0o---

**THE CLERK:** Now calling Civil Matter 19-CV-7071, Facebook Incorporated, et al. vs. OnlineNIC, et al.

Counsel, please state your appearances for the record, starting with plaintiff.

**MR. KROLL:** Good afternoon, Your Honor. Howard Kroll David Steele, and Helena Guye on behalf of the plaintiffs.

**THE COURT:** Good afternoon.

**MR. STEELE:** Good afternoon, Your Honor.

**MR. KRONENBERGER:** Good afternoon, Your Honor. Karl Kronenberger and Liana Chen on behalf of Leascend Technology, a defendant in the case.

**MR. NARANCIC:** Hello, Your Honor. Perry Narancic for defendant OnlineNIC.

**THE COURT:** Good afternoon.

So we have received Facebook's *ex parte* application, which is now party application. It's requesting that assets be frozen. I have a few questions for you.

First off, of course, it's December 20th, and this was an emergency motion because things are set to happen within days during the holidays. And I'm wondering what led up to this. Haven't you folks been talking about this right along?

**MR. KROLL:** Yes, Your Honor.

1          **THE COURT:** That's what the defendant says about the
2  plaintiff.
3          So plaintiff -- is that you, Mr. Kroll?
4          **MR. KROLL:** Yes.
5          **THE COURT:** What about that?
6          **MR. KROLL:** Thank you, Your Honor.
7      35.CN or Leascend -- we prefer calling them 35.CN because
8  that has been their name throughout this litigation. So 35.CN
9  and plaintiff have discussed settlement. There is no
10 settlement agreement that has been entered into. It's just
11 proposed settlement terms.
12     In the opposition, 35.CN claims that it was plaintiffs'
13 idea for the registrar of business to be sold; and, in fact,
14 that's just not true and contradicted by Mr. Kronenberger's --
15 not only in his opposition, but also in open court.
16     On May 3rd before Your Honor, he said that 35.CN is
17 "slowly exiting the business model regarding domain
18 registrations" and explained that's the reason why 35.CN
19 changed their name to Leascend, because they were getting out
20 of the business.
21     So in order to accommodate 35.CN's request to get out of
22 the business, it was contemplated that there would be a sale of
23 the registrar business. But there are certain exceptions to
24 that.
25     One is that that sale would occur after a settlement was

```
 1  signed and executed, and we have no settlement agreement
 2  signed.  We have provided 35.CN with what we thought was final
 3  terms of an agreement for two and a half weeks, and they
 4  haven't signed it.  And it's actually instructive why they
 5  haven't signed it, and I'll get to that in a second,
 6  Your Honor.
 7       And the second thing is, with respect to the sale of the
 8  registrar business, it was going to be subject to certain --
 9            THE COURT:  You froze, Mr. Kroll.
10            MR. KROLL:  I'm sorry?
11            THE COURT:  You're breaking up a little bit.
12            MR. KROLL:  Oh, I'm sorry.
13       With respect to the sale of the registrar business, it was
14  subject to certain specified terms.  Those terms are not in the
15  proposed sale that is going to be approved by the shareholders
16  on Monday in China or Sunday here in the United States.
17       The instructive thing about the proposed settlement
18  agreement is the reason we were told by Mr. Kronenberger why
19  35.CN has not signed that agreement.  And the reason is that
20  the proposed settlement agreement requires, within five days
21  after execution, that 35.CN would send -- we're loath to
22  discuss specific settlement terms but --
23            THE COURT:  But you have been right along here.
24            MR. KROLL:  Yes, because, unfortunately, in the
25  opposition, it was -- you know, opened the door.
```

1  So I'm not giving any specific terms.  But there was a
2  requirement for an installment payment that would be made five
3  days after execution of the settlement agreement.
4  Mr. Kronenberger has repeatedly told us that the reason
5  35.CN has not signed the settlement agreement is that they
6  don't have the cash to be able to make those payments, which
7  sort of belies the argument in the opposition that 35.CN is a
8  multimillion dollar company and there's no problem with
9  satisfying any judgment when they don't even have --
10  **THE COURT:**  Okay.  So let me interrupt you there,
11  because what I actually wanted to talk to all of you about, and
12  mainly to the defendant, is money.
13  The opposition says:  Well, I don't know why they're all
14  so upset because we have $118 million in equity and so it's
15  really not a problem.
16  That was the gist of it; right, Mr. Kronenberger?
17  **MR. KRONENBERGER:**  Yes, Your Honor.
18  **THE COURT:**  Okay.  So I looked at some of the
19  documents in English that were provided.  And I'm looking now
20  at page 7 of 55 on Docket Number 415-1, which is a balance
21  sheet attached to Mr. Kronenberger's declaration; and it says
22  that as of September 30th, there's cash and cash equivalents of
23  12 million 973-plus in the bank.
24  Is that right, Mr. Kronenberger?
25  **MR. KRONENBERGER:**  Yes, Your Honor, correct.

1        **THE COURT:** And that is accurate?

2        **MR. KRONENBERGER:** I -- as of the end of the quarter.
3   This is a Q3 report that had information for Quarters 1
4   through 3.

5        **THE COURT:** Okay. Well, because what I'm prepared to
6   do today, which would be the easiest thing, I think, is order
7   that -- and I don't know what I'm going to award in attorney's
8   fees, but the maximum that would be coming from me would be
9   5.5 million -- that $5.5 million be set aside either in an
10  escrow or some kind of a frozen account out of the assets that
11  you say you have, and then I wouldn't have to interfere with
12  the sale.

13       So can you do that, Mr. Kronenberger?

14       **MR. KRONENBERGER:** Perhaps. If I could provide a
15  little more color, though.

16       The company has cash. They also have, if you look at the
17  balance sheet, a significant amount of account payable --
18  accounts payable.

19       **THE COURT:** Yeah. Well, you've got a significant
20  amount of liability in this case as well.

21       **MR. KRONENBERGER:** Yeah, in this case -- in this case
22  as well.

23       So the client needs to engage in, let's call it, cash
24  management. And that's why we've worked out payment terms with
25  Meta because of these cash management issues, because there

1  are, I believe, secured creditors; and when that money comes in
2  from the sale, I do not know what is secured or tied up with
3  other obligations and what is not.
4      I can say, though, that the company intends to use part of
5  the proceeds to pay off Meta much quicker than we've even
6  negotiated.  There's a payment plan, essentially, we've
7  negotiated.  And we -- and, one, the sale's necessary for the
8  first part of the payment plan; and then -- and the sale also
9  will allow earlier payments on the payment plan.
10     So the question is:  Would locking up 5.5 million, would
11 that wreak havoc on their cash management?  Because they've got
12 employees and owing a lot of people and they're bringing money
13 in as well.  I don't know.
14     I -- frankly, your proposal, Your Honor, is much better
15 than the proposal we heard from Meta here.  So I would think,
16 just as counsel that is looking out for their best interests
17 but doesn't know all the details about their cash management
18 plans, it may seem reasonable, but I'm somewhat -- I'm somewhat
19 hesitant because I just don't know.
20     And this happened so quickly, we had very little time to
21 talk to the client's representative, which is an attorney who
22 speaks English who has been our main contact; and so I'm
23 fearful that I'm not being able to factor in enough information
24 about the position of the client to really give you a good
25 answer.

1          **THE COURT:** Which is problematic, given that all of
2  these deadlines are looming.
3          **MR. KRONENBERGER:** These deadlines as in payment
4  deadlines?  Or --
5          **THE COURT:** As in you want to sell off the main assets
6  of the company.
7          **MR. KRONENBERGER:** Well, I would -- I would disagree
8  that this is the main asset of the company.  I mean, the
9  company has moved forward into a different business.  They're
10 selling solar panels.  And for many months -- I mean, we've
11 told the Court; we've told -- we have the announcement about
12 how it's being put up for sale that was provided to Meta months
13 ago.
14     I do disagree with -- with Meta on sort of the timing
15 issues.  I think what Meta wants is to lock up any registrar it
16 could possibly lock up with agreements where it has access into
17 their databases to very quickly do lookups and see if there's
18 Facebook IP.
19     And I sort of get their interest, but the question is:
20 Can that -- and we provided this agreement to Meta, and they
21 took a long time to get back to us.  The buyer knows about this
22 agreement.  But they just got back to us recently.  And it's
23 unreasonable to go back to this buyer and say, "At the
24 last minute, after you've already provided documents, here's
25 another document to sign."

1        So that's the problem that we --

2            **THE COURT:** So what happens if the Court just orders:
3    "All right. Put it off for two weeks, put off the sale"?

4            **MR. KRONENBERGER:** Then we lose the sale. This is
5    important. It's a year-end thing, I believe.

6            **THE COURT:** Well, it's entirely unreasonable for these
7    issues to be discussed on December 20th if it's a year-end kind
8    of a thing, and I say that to both sides here.

9        We've gone long enough on this case that the Court has
10   found that Meta is entitled to somewhere south of $5.5 million,
11   and it's my plan to make it as possible for that to be realized
12   as I can.

13       And so I am inclined to disallow anything that's going to
14   make that impossible, which is what Meta says, but I am
15   disinclined to make your business model fail. And so that's
16   why I was suggesting the escrow notion because, if it's true
17   what you said, that there's all this cash money floating
18   around, why, just save some of it up and that would avoid the
19   problems you were just talking about with snooping into
20   people's records and whatnot.

21           **MR. KRONENBERGER:** Your Honor, if I could --

22           **THE COURT:** But I have to do something today because
23   it's entirely possible that we won't have a government
24   tomorrow. So I just need to make a decision on this.

25           **MR. KRONENBERGER:** If I could make a suggestion,

1   Your Honor.
2       **THE COURT:** Sure.
3       **MR. KRONENBERGER:** If -- if the Court would order
4   $3 million of the sale to be -- to be locked up, that would
5   give some comfort to Meta. And we disagree with it on this
6   Zoom today, but considering -- considering our -- our
7   settlement agreement, that may give them significant comfort,
8   and that would not interfere with the cash management problems
9   and any obligations that the client may have to third parties
10  regarding some of those proceeds.
11      **THE COURT:** Mr. Kroll?
12      **MR. KROLL:** Our concern is the -- and to be blunt, we
13  are not trusting of 35.CN. And the gamesmanship that they have
14  played, the Court is well aware of. I don't need to repeat.
15      The reason we were focusing on the registrar and the
16  dot-com domain names that are part of the registrar business is
17  those are U.S.-based assets. The registrar is regulated and
18  accredited by ICANN, located in California. The dot-com domain
19  names are regulated and monitored --
20      **THE COURT:** So is that -- is he correct, then, that
21  what you really want to do is be able to sniff out what they
22  have and get rid of the ones that you feel like are infringing?
23      **MR. KROLL:** No. What we're interested in is ensuring
24  that when the Court issues a final judgment, we'll be able to
25  execute on that and collect. And everything that 35.CN has

```
 1   done in this litigation and in the past reflects a dissipation
 2   of assets that we're concerned of.
 3           The idea of putting in escrow someplace in the
 4   United States the $5.5 million seems very fair and equitable to
 5   us, and that would allow 35.CN to go forward with the registrar
 6   of business if it wants.
 7           To order that sometime in the future this is going to
 8   happen gives me pause.
 9                   THE COURT:  Anything else, Mr. Kronenberger?
10                   MR. KRONENBERGER:  My -- my main comment, I think, is
11   that this is frustrating for me, as counsel, because I have
12   encouraged my client to sell this business as quickly as
13   possible because there's a January 1st, 2025, deadline, and it
14   is --
15                   THE COURT:  What deadline is that?
16                   MR. KRONENBERGER:  There's a settlement agreement, and
17   in that agreement -- and I've -- I've --
18                   THE COURT:  A settlement agreement between you and the
19   plaintiffs in this case?
20                   MR. KRONENBERGER:  A settlement between Meta and
21   Leascend.  There's a settlement -- unsigned settlement
22   agreement.  The first draft was provided on May 15th, shortly
23   after our hearing; and there were many versions, drafts of
24   that; and it's always stayed the same, that all the companies
25   had to get out of the domain name business by January 1st,
```

```
 1   2025.
 2        So I instructed my client, I said, "This isn't signed yet,
 3   but this is their big request.  This is more important than the
 4   money."
 5        The money was agreed almost immediately.
 6        And I told my client again and again, "You need to meet
 7   this deadline."
 8        So they have -- they put the assets into a subsidiary.
 9   They dealt with regulators on the potential sale.  We gave
10   copies of the public statement to Meta, and they knew the
11   entire time this thing was going to be sold, and now there's
12   some problem where they want an agreement with the subsidiary
13   so the new owner is bound.
14        And this is a last-minute thing, and I feel like I have
15   egg on my face because I -- I was so aggressive with
16   instructing my client that they need to get out of the
17   business.
18        This is -- I -- I copy and pasted the exact provision in
19   that May 15th provision.  Every single draft of the settlement
20   agreement, it's been in there.  It's been delivered orally that
21   these defendants need to get out of the business.  This is --
22   and luckily for Leascend, it wants to get out of the business.
23        But I told them, "This needs to be expedited.  You need to
24   be out."
25        And it just -- it's fundamentally unfair to punish
```

1  Leascend for doing exactly what Meta asked them to do or
2  demanded that they do.  And then Leascend relied upon these
3  statements, this statement that was repeated again and again
4  and again.
5       I -- just -- because I'm going to face blowback with the
6  client.  They're going to ask:  Why is this happening?  We were
7  told that this is part of the deal.
8       So I want the Court to know that I -- that there's --
9  there's some fundamental unfairness here.  And I know that
10 Mr. Kroll believes that there's this -- there's another
11 provision that this registrar needs to be locked up with an
12 agreement before it's sold.  I don't agree that that was --
13 that was a key part of the agreement.  The timing was not
14 discussed until just this month.
15      And it's -- so I need to convey that to the Court so when
16 the Court crafts some sort of remedy, that it takes this into
17 consideration.
18           **MR. KROLL:**  Your Honor, if I may.
19      The proposed terms of the settlement agreement are just
20 that, proposed terms.  We have asked 35.CN over and over and
21 over again, certainly in the last two and a half, three weeks,
22 to sign the settlement agreement.  If they had done that, there
23 would be certain terms and requirements that would have to be
24 done.  They have not done that.  We do not have --
25           **THE COURT:**  Okay.  Thank you.

1          **MR. KROLL:**  -- agreement --

2          **THE COURT:**  I'm so pleased that you are this close to
3  settling, but you haven't settled.  I can't make you settle.
4  And I'm not really -- I ought not be privy to who says what
5  about what the settlement terms are or are not.

6          I am very hopeful that you will go ahead and settle it.
7  It'll improve the lives of the lawyers, if not the clients,
8  immeasurably if the settlement goes through as planned.  That
9  probably will require that the sale go through as planned if
10 Mr. Kronenberger is to have a happy holiday.  So I'm loath to
11 interfere with that, except that I would like Facebook to be
12 paid a judgment that's owed to Facebook.

13         So what I'm going to order is this.  And I will ask --
14 well, I guess I'll ask counsel to send me something that will
15 do this, and you'd better do it today before -- I don't know
16 what -- midnight so that I can get it done.  But I'm going to
17 just order that $5 1/2 million U.S., in cash or liquid assets,
18 be escrowed in a U.S. account pending -- pending resolution of
19 this matter.

20         And then the sale can go forward, and you can -- so we
21 won't interfere with that, but the money will be in the bank in
22 the event that Facebook -- when we get the judgment entered.
23 So that'll be the order of the Court.

24         And, Mr. Kronenberger, I'm sorry that you don't know for
25 sure what the assets are, but I'm looking at the declaration

```
 1   with the balance sheet, and it ought not interfere in any way
 2   with your client, Leascend, as long as this is true.
 3       So that'll be the order of the Court.  And I would like
 4   you to get me a prepared order doing that today.  So it ought
 5   to be in just simple English.  I don't think we need a lot of
 6   really complex language.
 7           MR. KROLL:  Your Honor, I'm sorry.  I have an inquiry
 8   about that.  If the $5 1/2 million is not deposited in a U.S.
 9   account, then what?
10           THE COURT:  Well, then the defendants will be in
11   contempt of court.
12           MR. STEELE:  And, Your Honor, if I may, David Steele
13   for plaintiffs.
14       So should the order also prohibit the sale absent the
15   deposit of the 5.5 million, just to ensure that the money is
16   deposited as ordered?  Because, otherwise, the defendants
17   have -- if the order doesn't say that the sale should not go
18   through or the sale is prohibited to go through absent the
19   deposit of the funds, then the defendants, who are in China,
20   would have very little motivation or, more to the point,
21   the Court won't have any control over ensuring that the
22   defendants comply with the order.
23           THE COURT:  Well, I think --
24           MR. KRONENBERGER:  Your Honor --
25           THE COURT:  I think that's a good point.
```

1        **MR. KRONENBERGER:**  Your Honor, I don't think the
2   client can deposit funds into a U.S. account before the sale.
3   I just -- things are too complicated, and there's board
4   approval that's needed.
5        If it's -- if it's after the sale, the proceeds from the
6   sale, they can work that into the board meeting that they have
7   coming up on Sunday.  But if it's -- I just don't think they
8   have -- they can put money in before a sale.
9        **THE COURT:**  So do they have a board meeting at which
10  the sale would be approved?
11       **MR. KRONENBERGER:**  Yes.  It is -- it is Sunday.  It's
12  Monday their time, Sunday our time.
13       **THE COURT:**  Well, how about the order says that they
14  need to -- they need to approve the deposit of those funds in
15  the U.S. or else they can't approve the sale?
16       **MR. KRONENBERGER:**  What if they don't have the funds?
17  I'm worried they don't have the funds to deposit.
18       And I can tell you, it's also complicated because funds
19  were going to come through our firm for the settlement.  And
20  it's complicated.  It has to go from a Chinese bank to a
21  Hong Kong bank, and then -- and there are fees and there's
22  regulatory approvals if it's over a certain amount.  It's
23  complicated.
24       And frankly, I don't think they can -- they can make any
25  payment before the sale.  The proceeds of the sale was what the

1  company was going to use to make initial payments to Facebook
2  as part of the settlement.  So I just -- I can tell you now, I
3  don't think they would be able to make any deposits before a
4  sale and that, after a sale, they have the funds.
5          **THE COURT:**  But what if they didn't?
6          **MR. KRONENBERGER:**  What if they didn't --
7          **THE COURT:**  Didn't do it.
8          **MR. KRONENBERGER:**  Well, I guess they'd be in
9  contempt.  They'd be in contempt either way.
10         **MR. STEELE:**  Your Honor, I guess I just want to point
11 out the inconsistencies with Mr. Kronenberger's declaration,
12 because when arguing that no bond would be required, he
13 advocates that the company has substantial cash on hand that it
14 can pay any debts.
15      So I'm confused, on the one hand, how he can say and
16 represent to the Court that he's familiar enough to say that no
17 bond should be required because the company has tons of money
18 that it can spend at any time and yet, on the other hand, say
19 it can't come up with $5.5 million, which is an amount
20 significantly smaller than the financial reports he's put into
21 his declaration.  It's just internally inconsistent.
22         **MR. KRONENBERGER:**  The company has employees and
23 payroll is significant and it is tight right now, and they have
24 significant accounts payable.  And just in my discussions with
25 the client in the past month, I do not believe that they can

1    put $5.5 million into an escrow account right now.
2        **THE COURT:** Okay. Well, then what the order is going
3    to be is that if they do that, that they put the money in an
4    escrow account in the U.S.; and if they do not do that, then
5    the sale can't go through until they do.
6        **MR. KRONENBERGER:** I'm worried that we're setting them
7    up for failure.
8        **THE COURT:** Well, I'm sorry, but I don't know what
9    else to do.  This comes in at the last moment.  You folks have
10   been negotiating since May, and I don't want to undue any of
11   the things that you've done, but you haven't finished them, so
12   I am left between a rock and a hard place.
13       And counsel is correct that the whole argument against
14   doing this or a main part of it is:  We've got plenty of money
15   so not to worry.  And I'm looking at a balance sheet with
16   plenty of money so not to worry.
17       So I am taking it at face value and saying 5 1/2 million
18   in an escrow in the U.S. or else the sale doesn't go through.
19       And I apologize to you, Mr. Kronenberger, if that makes
20   your life difficult with your client, but I don't see an
21   alternative at this time.
22       So that'll be the order of the Court.  I'd like to enter
23   it today if I can.  I would like you folks to get me a draft by
24   close of business today.  All right?
25       **MR. STEELE:** Yes, Your Honor.

1    **MR. KROLL:** Yes, Your Honor.  Thank you.

2    **THE COURT:** Okay.  Thank you.  So that'll be the order

3 of the Court.

4    **THE CLERK:** That concludes our civil law and motion

5 calendar for today.

6            (Proceedings adjourned at 12:35 p.m.)

7                     ---o0o---

8

9            **CERTIFICATE OF REPORTER**

10       I certify that the foregoing is a correct transcript

11 from the record of proceedings in the above-entitled matter.

12

13 DATE:  Friday, December 27, 2024

14

15

16

17                   *[signature: Ana Dub]*

18    _____

19       Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

20       CSR No. 7445, Official United States Reporter