# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>ONLINENIC INC.; DOMAIN ID SHIELD SERVICE CO., LTD.; and XIAMEN 35.COM INTERNET TECHNOLOGY CO., LTD.,<br><br>　　　　　　Defendants. | Case No. 3:19-cv-07071-SI<br><br>**AMENDED [PROPOSED] DEFAULT JUDGMENT** |

On October 17, 2022, the Court adopted Judge van Keulen's report and recommendation (ECF No. 225) ("R&R"), with the exception that it deferred ruling on the question of whether to enter default judgment against Defendants OnlineNIC, Inc. ("OnlineNIC") and Domain ID Shield Service Co., Ltd. ("ID Shield") (together, the "OnlineNIC Defendants"). ECF No. 276. On December 16, 2022, the Court adopted the R&R with the exception of Section IV ("Relief"). ECF No. 291. The clerk entered default against the OnlineNIC Defendants on December 19, 2022. ECF No. 292.

On November 6, 2023, the Court granted Plaintiffs Meta Platforms, Inc. ("Meta") and Instagram, LLC's ("Instagram" and, collectively with Meta, "Plaintiffs") Motion For Summary Judgment finding that Defendant Leascend Technology Co., Ltd. f/k/a Xiamen 35.com Internet Technology Co., Ltd. ("35.CN") and the OnlineNIC Defendants were alter egos of each other. ECF No. 357. The clerk entered default against 35.CN on November 8, 2023. ECF No. 352.

Plaintiffs' Motion for Default Judgment against the OnlineNIC Defendants and 35.CN (collectively, "Defendants") is before the Court. Having considered the law, and finding that the requirements for a default judgment have all been met,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Default Judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that default judgment be entered against Defendants as set forth below.

I. **STATEMENT OF FACTS**

A. **Plaintiffs' Trademarks**

1. Meta, formerly known as Facebook, Inc., operates Facebook which offers a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.

2. Meta owns the exclusive rights to several trademarks and service marks to provide its online services, including the distinctive FACEBOOK word mark and stylized mark, and has used the marks in connection with its services since 2004.

3. In addition to its extensive common law rights, Meta owns numerous United States registrations for its FACEBOOK marks, including: U.S. Reg. Nos. 3,122,052 and 3,881,770. Meta's common law and registered trademarks are collectively referred to herein as the "Facebook Trademarks."

4. Meta's use of the Facebook Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Meta has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Facebook and the Facebook Trademarks. As a result of Meta's efforts and use, the Facebook Trademarks are famous (and have been famous since at least as early as 2011) as they are recognized within the United States and around the world as signifying high-quality, authentic services provided by Meta.

5. Instagram offers a photo and video sharing service, mobile application, and social network. Instagram users can choose to share their photos and videos with their followers online.

6. Instagram owns the exclusive rights to the distinctive INSTAGRAM word mark and stylized mark, having used the marks in connection with its goods and services as early as 2010.

7. In addition to its extensive common law rights, Instagram owns numerous United States registrations for the INSTAGRAM marks, including:

    a. U.S. Reg. No. 4,795,634;
    b. U.S. Reg. No. 4,146,057;
    c. U.S. Reg. No. 4,756,754;
    d. U.S. Reg. No. 5,566,030;
    e. U.S. Reg. No. 4,170,675;
    f. U.S. Reg. No. 4,856,047;
    g. U.S. Reg. No. 4,822,600;
    h. U.S. Reg. No. 4,827,509;
    i. U.S. Reg. No. 4,863,595; and
    j. U.S. Reg. No. 5,019,151.

Instagram's common law and registered trademarks are collectively referred to herein as the "Instagram Trademarks," and, collectively with the Facebook Trademarks, "Plaintiffs' Marks."

8. Instagram's use of the Instagram Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Instagram has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Instagram and the Instagram Trademarks. As a result of Instagram's efforts and use, the Instagram Trademarks are famous (and have been famous since

at least as early as 2014) as they are recognized within the United States and around the world as signifying high-quality, authentic services provided by Instagram.

B.   **Defendants Cybersquatting Activities**

9. OnlineNIC, a California corporation, and 35.CN, a Chinese corporation, are domain name registrars accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN") and subject to ICANN's Registrar Accreditation Agreement ("RAA").

10. ID Shield, a Hong Kong, China limited company, provides a proxy service for OnlineNIC's customers by registering domain names, as the registrant, and licensing these domain names to OnlineNIC's customers (the "Licensees") for their use.

11. Defendants registered, used, or trafficked in, at least the following 35 domain names that are identical or confusingly similar to Plaintiffs' Marks (the "Infringing Domain Names"):

1. buyinstagramfans.com
2. face2bouk.com
3. facebook-alkalmazasok.net
4. facebook-chat-emoticons.com
5. facebook-fans-buy.com
6. facebook-login-signup.com
7. facebook-mails.com
8. facebook-pass.com
9. facebookphysician.com
10. facebook-pw.com
11. facebookvideodownload.net
12. facebux2.com
13. facekhook.com
14. facessbook.com
15. faecb00k-page.com
16. faecbook-page.com
17. findfacebookid.com
18. hackfacebook-now.com
19. hackingfacebook.net
20. hacksomeonesfacebook.com
21. iiinstagram.com
22. instaface.org
23. instagram01.com
24. instakram.com
25. lamsocialfacebook.net
26. learntohackfacebook.com
27. login-lnstagram.com
28. m-facebook-login.com
29. ofacebooklogin.com
30. singin-lnstargram.com
31. trollfacebook.com
32. watch-facebook.com
33. www-facebook-login.com
34. www-facebook-pages.com

35. www-instagram.net

12. ID Shield is the registrant for each of the Infringing Domain Names and is listed as the registrant in the WHOIS directory.

13. ID Shield trafficked in the Infringing Domain Names by licensing these domain names to the Licensees for their use.

14. OnlineNIC has a history of cybersquatting on famous and distinctive trademarks.

15. Defendants profit from the sale of the ID Shield proxy service, including providing the service to the end users of the Infringing Domain Names and to OnlineNIC.

16. Defendants also profit from the sale of the ID Shield proxy service by collecting fees from the sale of that service.

17. The Licensees purchase and pay for the ID Shield services directly from their OnlineNIC user account.

18. The Licensees of the Infringing Domain Names intended to divert consumers to websites using domain names that were confusingly similar to Plaintiffs' Marks.

19. The Infringing Domain Names have been used for malicious activity, including hosting websites directing visitors to other commercial sites, phishing, and selling purported tools for hacking.

20. The Licensees also used some of the Infringing Domain Names in connection with email services, which is usually an indication that the domain name was used for phishing or other scams. Specifically, at least the following domain names had domain name servers configured to facilitate email: facebook-mails.com, facebook-pass.com, facebook-pw.com, facebookvideodownload.net, findfacebookid.com, hackingfacebook.net, hacksomeonesfacebook.com, login-lnstagram.com, m-facebook-login.com, and singin-lnstagram.com, trollfacebook.com.

21. Under § 3.7.7.3 of the RAA, which is incorporated into OnlineNIC's registration agreement with registrants, OnlineNIC agreed that ID Shield "shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing [ID Shield] reasonable evidence of actionable harm."

22. Plaintiffs' authorized representatives sent at least five notices to ID Shield with evidence

that the Infringing Domain Names caused Plaintiffs actionable harm and requesting that ID Shield disclose the identities of the registrant(s).

23. ID Shield failed to timely disclose the identity or contact information of any of the Licensees after Plaintiffs' authorized representatives presented ID Shield with reasonable evidence of actionable harm.

## II. CONCLUSIONS OF LAW

24. Upon default, the well-pled factual allegations of the Second Amended Complaint (ECF No. 109) will be taken as true. *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977).

25. The Court has federal question jurisdiction over the federal causes of action alleged in this complaint pursuant to 28 U.S.C. § 1331.

26. The Court has personal jurisdiction over Defendant OnlineNIC, and its alter egos ID Shield and 35.CN, because OnlineNIC maintains and operates its business in California. *Ranza v. Nike*, 793 F.3d 1059, 1073 (9th Cir. 2015) (explaining "the alter ego test may be used to extend personal jurisdiction to a foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate").

27. Pursuant to Rule 55(b)(2), the court, in its discretion, may enter a default judgment against a party against whom default has been entered. *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). In determining whether default judgment is appropriate, the court may consider the following factors[1]: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Id.* at 1471-72. Each of the *Eitel* factors support entering default judgment against the Defendants.

---

[1] Where default is imposed as a sanction, consideration of the *Eitel* factors may be "redundant or inconsistent." *Dreith v. Nu Image, Inc.*, No. CV 05–4146 SVW (MANx), 2007 WL 9658786, at *6 (C.D. Cal. Mar. 2, 2007) (declining to consider *Eitel* factors when entering default judgment as a sanction). "If the *Eitel* factors could somehow compel this Court to deny default judgment despite having already concluded that the entry of default was proper, the result would defy common sense. The Court's discovery sanction for willful and deliberate misconduct would amount to a nullity, and would only have had the effect of delaying the case's resolution on the merits." *Id*.

### A. Defendants are Liable for Cybersquatting on Plaintiffs' Marks Under 15 U.S.C. § 1125(d).

28. Plaintiffs' Marks were distinctive or famous and federally registered at the United States Patent and Trademark Office at the time Defendants and Licensees registered, trafficked in, or used the Infringing Domain Names.

29. The Infringing Domain Names are identical or confusingly similar to Plaintiffs' Marks.

30. The Infringing Domain Names are dilutive of Plaintiffs' Marks.

31. Defendants and Licensees registered, used, or trafficked in the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Marks.

32. Defendants and Licensees do not have any trademark or other intellectual property rights in the Infringing Domain Names.

33. The Infringing Domain Names do not consist of the legal name of any of the Defendants or Licensees, nor do they consist of a name that is otherwise commonly used to identify them.

34. Defendants and Licensees have not made any prior use of any of the Infringing Domain Names in connection with the *bona fide* offering of any goods or services.

35. Defendants and Licensees have not made any *bona fide* noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

36. With actual knowledge, Defendants and Licensees registered, used, and trafficked in the Infringing Domain Names to divert consumers from Plaintiffs' legitimate websites to a website accessible under the Infringing Domain Names for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of their websites.

37. With actual knowledge, Defendants and the Licensees registered multiple domain names which the Licensees knew were identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names.

38. Defendants and the Licensees have provided material and misleading false contact information for the Infringing Domain Names.

39. Defendants' and Licensees' registration, use, and/or trafficking in the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiffs to relief.

40. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices as required by ICANN prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' registration, use, and/or trafficking in the Infringing Domain Names in violation of the ACPA.

41. As the registrant of the Infringing Domain Names, ID Shield is liable under 15 U.S.C. § 1125(d)(1)(D).

42. 35.CN and OnlineNIC are also liable under the ACPA as a direct participant in the registration and trafficking by ID Shield in the Infringing Domain Names because (a) the operations of ID Shield and OnlineNIC, including all technical support and customer support, are carried out by employees of 35.CN (SAC ¶¶ 45, 46) and the operations of ID Shield are controlled by OnlineNIC. SAC ¶ 33.

**B. Defendants are Liable for their Licensees' Trademark and Service Mark Infringement of Plaintiffs' Marks Under 15 U.S.C. § 1114.**

43. ID Shield is a proxy service because it registers domain names, as the registrant, in its own name and not in the name of its Licensees. SAC ¶¶ 10, 27. ICANN defines a proxy service as "a service through which a Registered Name Holder *licenses use* of a Registered Name to the . . . Customer in order to provide the . . . Customer use of the domain name, *and the Registered Name Holder's contact information is displayed in the Registration Data Service (Whois) or equivalent services rather than the . . . Customer's contact information*." SAC Ex. 4 at 59 (RAA, "Specification On Privacy And Proxy Registrations" § 1.3) (emphasis added). *See also* ICANN, Information for Privacy and Proxy Service Providers, Customers and Third-Party Requesters, available at: https://www.icann.org/resources/pages/pp-services-2017-08-31-en (last accessed January 14, 2024) ("***The proxy service provider is the registrant of record (the registered domain name holder)*** and provides alternative, reliable contact information. . . . ***The proxy service provider licenses use of the domain name*** to the customer via its agreement with the customer.") (emphasis added).

44. OnlineNIC's Registration Agreement contains all the terms required by ICANN, including RAA § 3.7.7.3, which provides:

> A Registered Name Holder licensing use of a Registered Name according to this provision **shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee** and the identity of the licensee within seven (7) days to a party providing the Registered Name Holder reasonable evidence of actionable harm.

SAC Ex. 4 at 16–17 (RAA § 3.7.7.3) (emphasis added).

45. ICANN requires every registrant of a domain name to enter into a Registration Agreement with an ICANN-accredited domain name registrar. SAC ¶ 26 & Ex. 4. As the registrant of the Infringing Domain Names, ID Shield was thus required to enter into OnlineNIC's Registration Agreement and be bound by its terms.

46. Accordingly, ID Shield, as a proxy service provider, contractually agreed under the OnlineNIC Registration Agreement to accept liability if it failed to disclose Licensees' contact information within seven days of being provided reasonable evidence of trademark infringement.

47. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees as required by ICANN in response to Plaintiffs' Notices prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

48. The Licensees have used Plaintiffs' Marks in interstate commerce.

49. The Licensees' use of Plaintiffs' Marks is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval by Plaintiffs of the Licensees' websites.

50. The above-described acts of the Licensees constitute trademark and service mark infringement in violation of 15 U.S.C. § 1114(1) and entitle Plaintiffs to relief.

51. The Licensees have unfairly profited from the alleged trademark and service mark infringement.

52. By reason of the Licensees' acts of trademark and service mark infringement, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Marks.

53. Defendants repeatedly failed to take appropriate steps to investigate and respond appropriately to any reports of domain name abuse as required by the RAA and failed to provide abusive domain name registrants' names and contact information to victims of online domain name abuse as

required by ICANN.

### C. Defendants are Liable for their Licensees' False Designation of Origin Under 15 U.S.C. § 1125(a).

54. Plaintiffs' Marks are distinctive marks that are associated with Plaintiffs and exclusively identify their respective businesses and services.

55. The Licensees' use in commerce of Plaintiffs' Marks, and variations thereof, is likely to cause confusion, or to cause mistake, or to deceive the relevant public that the Licensees' goods and services are authorized, sponsored, or approved by, or are affiliated with, Plaintiffs.

56. The Licensees' acts constitute trademark and service mark infringement of Plaintiffs' Marks, as well as false designation of origin, in violation of 15 U.S.C. § 1125(a), entitling Plaintiffs to relief.

57. The Licensees have unfairly profited from their conduct.

58. By reason of the above-described acts of the Licensees, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Marks.

59. Plantiffs have a legitimate interest in investigating, enforcing, and protecting their customers and services from domain name abuse and fraud.

60. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices as required by ICANN prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

### D. Defendants are Liable for their Licensees' Dilution of Plaintiffs' Marks Under 15 U.S.C. § 1125(c).

61. Plaintiffs' Marks are famous, as that term is used in 15 U.S.C. § 1125(c), and they were famous before the Licensees' use of them and variations of the trademarks in commerce. This fame is based on, among other things, the inherent distinctiveness and federal registration of each of Plaintiffs' Marks as well as the extensive and exclusive worldwide use, advertising, promotion, and recognition of them.

62. The Licensees' use of Plaintiffs' Marks, and variations thereof, in commerce is likely to

cause dilution by blurring or dilution by tarnishment of these trademarks.

63. The Licensees' acts constitute dilution by blurring and dilution by tarnishment in violation of 15 U.S.C. § 1125(c), entitling Facebook and Instagram to relief.

64. The Licensees have unfairly profited from their conduct.

65. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices as required by ICANN prior to the filing of the original Complaint, Defendants are liable for the harm to Plaintiffs caused by those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

### III.  DAMAGES AND ATTORNEYS' FEES AND COSTS

#### A.  Statutory Damages of $3,135,000

66. Defendants' and Licensees' registration, use, and/or trafficking in the Infringing Domain Names willfully cybersquatted in violation of 15 U.S.C. § 1125(d).

67. The Court fully adopts the Report and Recommendation of Judge van Keulen relating to statutory damages and awards $3,135,000 in statutory damages in favor of Plaintiffs and against Defendants (ECF No. 225 at 26:22-28:23) as follows:

68. Plaintiffs are awarded, in accordance with the provisions of 15 U.S.C. § 1117(d), $80,000 in statutory damages per infringing domain name for each of the following 10 Infringing Domain Names involving typosquatting: face2bouk.com; facebux2.com; facekhook.com; facessbook.com; faecb00k-page.com; faecbook-page.com; instaface.org; instakram.com; login-1nstargram.com; and singin-1nstargram.com.

69. Plaintiffs are also awarded, in accordance with the provisions of 15 U.S.C. § 1117(d), $85,000 in statutory damages per infringing domain name for each of the following 4 Infringing Domain Names that incorporate identical spellings of Plaintiffs' Marks but do not include other commonly-spelled words: facebook-alkamazasok.net; iiinstagram.com; facebook-pw.com; and www-instagram.net.

70. Plaintiffs are also awarded, in accordance with the provisions of 15 U.S.C. § 1117(d), $95,000 in statutory damages per infringing domain name for each of the remaining 21 Infringing Domain Names that include correct spellings of Plaintiffs' Marks and correct spellings of other commonly-spelled words.

B.   **Attorneys' Fees and Costs**

71.   Defendants employed various means to conceal that they operated as a single enterprise. Defendants also concealed their own identity when cybersquatting and the identity of the Licensees.

72.   Defendants have shown a pattern and practice of unlawful cybersquatting against famous trademarks.

73.   By permanently deleting millions of records, including records that pertained to Defendants' trouble tickets related to complaints of domain name abuse, cybersquatting, and interactions with its customers, Defendants not only irreparably and intentionally harmed Plaintiffs' ability to prosecute this case, but interfered with countless other trademark holders and law enforcement agencies investigating crimes or protecting their trademarks under law.

74.   Defendants used their proxy services to conceal the identities of customers engaged in cybercrime and malicious use of domain names and obstructed Plaintiffs' legitimate investigations.

75.   As such, the Court adopts the finding in the Report and Recommendation of Judge van Keulen that this is an exceptional case entitling Plaintiffs to an award of attorneys' fees under 15 U.S.C. § 1117 in an amount to be determined. ECF No. 225 at 31:16-32:8.

76.   Plaintiffs are entitled to all of their attorneys' fees because Defendants have engaged in significant litigation misconduct by spoliating evidence "before the complaint was filed" and "continued deleting responsive records during the discovery process, and even after Special Master's appointment." ECF No. 115 at 39:26-28 (Special Master's Report). Defendants also withheld documents and data dumped over 27 million non-responsive records "to obscure 5,096 responsive records." *Id*. at 40:12-13. Defendants also violated this Court's orders and made material misrepresentations to the Court and to the Special Master. Defendants' behavior shows a lack of respect for the judicial system.

77.   Additionally, Plaintiffs are entitled to all of their attorneys' fees because Defendants are serial cybersquatters, their cybersquatting of Plaintiffs' trademarks was egregious, and Defendants must be deterred from future cybersquatting.

78.   Therefore, Plaintiffs are awarded their attorneys' fees of $2,185,869.14 pursuant to 15 U.S.C. § 1117 and any other applicable provision of law.

79.   Plaintiffs are also awarded their costs of suit incurred herein.

### C. Reimbursement of Payments to the Special Master

80. Defendants shall reimburse Plaintiffs $88,937 which represents Plaintiffs' payments to the Special Master.

## IV. TRANSFER OF DEFENDANTS' DOMAIN NAMES

81. Defendants will immediately transfer the Infringing Domain Names to Plaintiffs.

82. To facilitate the transfer:

    a. The registry operator of record for each of Infringing Domain Names shall change the registrar of record to a registrar selected by Facebook;

    b. The registrar of record selected by Plainiffs shall place the Infringing Domain Names into a user account controlled by Plaintiffs' counsel (or an agent designated by Plaintiffs);

    c. The registrar of record shall update the listed registrant to Plaintiffs' counsel (or an agent designated by Plaintiffs);

    d. Plaintiffs' counsel may serve a copy of this Default Judgment on the appropriate registry operators and registrars as necessary to facilitate the transfer of the Infringing Domain Names; and

    e. Defendants shall cooperate and assist as necessary to facilitate the transfer of the Infringing Domain Names.

## V. PERMANENT INJUNCTION

83. Defendants and Licensees have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiffs and their federally registered trademarks and service marks.

84. Defendants and Licensees, have irreparably harmed the general public, which has an interest in being free from confusion, mistake, and deception.

85. As a result of the unlawful actions of Defendants and the Licensees, Plaintiffs have suffered and continue to suffer irreparable harm to their reputation and goodwill.

86. Plaintiffs' remedy at law is not adequate to compensate it for the injuries Defendants and Licensees inflicted on Plaintiffs.

87. The balance of hardships favor the Plaintiffs.

88. The public interest would be properly served by an injunction.

89. Accordingly, Plaintiffs are entitled to permanent injunctive relief pursuant to 15 U.S.C. § 1116.

90. Therefore, Defendants and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, are permanently enjoined and restrained from:

    a. Registering, trafficking in, or using, in any manner, any Internet domain name that incorporates, in whole or in part, Plaintiffs' Marks, or any name, mark, or designation confusingly similar thereto;

    b. Using Plaintiffs' Marks, or any other name, mark, designation, or depiction in a manner that is likely to cause confusion regarding whether Defendants are affiliated or associated with or sponsored by Plaintiff;

    c. Engaging in any activity which lessens the distinctiveness or tarnishes the Facebook Trademarks or the Instagram Trademarks; and

    d. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of these activities.

91. Furthermore, Defendants and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, are Ordered to:

    a. Relinquish all rights, title, and interest, in all domain names under their control which are identical or confusingly similar to Plaintiffs' Marks, including the Infringing Domain Names, and to transfer those domain names to Plaintiffs within 10 days of notice from Plaintiffs;

    b. Provide accurate identifying information for each Licensee and beneficial user who has registered any of the Infringing Domain Names;

    c. Identify all additional domain names sponsored by Defendants that are identical or confusingly similar to any of Plaintiffs' Marks and all information related to them;

    d. To ensure compliance with this injunction, within 2 Chinese business days, but in no case later than 3 calendar days, of any notice sent by Plaintiffs for the purposes of Plaintiffs' investigating or enforcing against instances of infringement or illegal activity, Defendants shall disclose to Plaintiffs or their attorneys and agents, the complete and accurate beneficial user information of any

customer or licensee of any privacy or proxy service used or made available by Defendants, their affiliates, resellers, or agents who are in active concert or participation with any Defendant, with respect to any domain name that is identical or confusingly similar to Plaintiffs' Marks, as allowed by applicable privacy laws. If Plaintiffs' good faith notice indicates that a domain name is or has been used for phishing, malware, fraud or other similar type of domain name abuse involving or targeting Plaintiffs' trademarks, customers, or end-users, Defendants shall disclose the requested information within 24 hours of Plaintiffs' notice, as allowed by applicable privacy laws. Defendants shall provide Plaintiffs an email address for use in sending any such notices. Plaintiffs' notice shall detail the domain name(s) and type(s) of harm (e.g., infringement, cybersquatting, used for phishing) and certify that the notice is being sent in good faith;

   e. To ensure compliance with this injunction, within 2 Chinese business days, but in no case later than 3 calendar days, of any notice sent by Plaintiffs that any domain name registered or sponsored by or through Defendants, their affiliates, resellers, or agents who are in active concert or participation with any Defendant, is identical or confusingly similar to Plaintiffs' Marks, Defendants shall suspend the domain name(s), as well as all other domain names in the same customer's account that are identical or confusingly similar to Plaintiffs' Marks. If Plaintiffs' good faith notice indicates that a domain name registered or sponsored by or through Defendants, their affiliates, resellers, or agents who are in active concert or participation with any Defendant, is or has been used for phishing, malware, fraud or other similar types of domain name abuse, Defendants shall suspend the domain name(s) within 24 hours of Plaintiffs notice. Defendants shall provide Plaintiffs an email address for use in sending any such notices. Plaintiffs' notice shall detail the domain name(s) and type(s) of harm (e.g., infringement, cybersquatting, used for phishing) and certify that the notice is being sent in good faith; and

   f. To ensure compliance with this injunction, within 2 Chinese business days, but in no case later than 3 calendar days, of any notice sent by Plaintiffs for the purposes of Plaintiffs' investigating or enforcing against instances of infringement or illegal activities with respect to a domain name registered or sponsored by or through Defendants, their affiliates, resellers, or agents who are in active concert or participation with any Defendant, Defendants shall disclose to Plaintiffs or their attorneys and agents the complete and accurate contact information (including the non-public contact names and contact information of Defendants' customers) of the registrant (commonly referred to as WHOIS or

domain name registration data) and complete and accurate customer information, as allowed by applicable privacy laws. If Plaintiffs' notice indicates that a domain name registered or sponsored by or through Defendants, their affiliates, resellers, or agents who are in active concert or participation with any Defendant, is or has been used for phishing, malware, fraud or other similar type of domain name abuse involving or targeting Plaintiffs' trademarks, customers, or end-users, Defendants shall disclose the requested information within 24 hours of Plaintiffs' notice, as allowed by applicable privacy laws. Defendants shall provide Plaintiffs an email address for use in sending any such notices. Plaintiffs' notice shall detail the domain name(s) and type(s) of harm (e.g., infringement, cybersquatting, used for phishing) and certify that the notice is being sent in good faith. To ensure compliance with this injunction, Defendants, their affiliates, resellers, or agents who are in active concert or participation with any Defendant, shall provide unrestricted access to the data in the publicly available WHOIS or similar registration data service (containing publicly available contact names and contact information) to Plaintiffs or their attorneys and agents for the purposes of investigating or enforcing against instances of cybersquatting, illegal activity, or domain name abuse, as allowed by applicable privacy laws.

92. 35.CN shall immediately provide to the Court an accounting of all of its assets, including but not limited to (a) all of 35.CN's bank account numbers and those accounts' respective balances as of the date the order is entered; (b) 35.CN's ownership interest in any companies, including in its wholly-owned subsidiary Xiamen 35.com Information Co., Ltd. ("35.com Info"); and (c) any other tangible or intangible assets, including 35.CN's registrar business and accreditation (IANA 4163) currently held by 35.com Info, cash balances, accounts receivable, income, real estate, physical property, domain names, or intellectual property.

93. Until the judgment is satisfied, 35.CN, as well as its officers, agents, servants, employees, or attorneys, or any other person who is in active concert or participation with them, **shall not** transfer, sell, dissipate, abscond, hide, secret away, borrow against, or pledge any of their assets, including 35.CN's registrar business and accreditation (IANA 4163) currently held by 35.com Info.

94. Until the judgment is satisfied, and except to pay costs directly necessary to maintain and continue the day-to-day operations of 35.CN's business, 35.CN, as well as its officers, agents, servants, employees, or attorneys, or any other person who is in active concert or participation with them, **shall not**:

   a. Transfer, release, delete, or assign any tangible and intangible assets, including any domain names or intellectual property owned by 35.CN;

   b. Transfer or withdraw any funds from any bank account;

   c. Transfer or use any funds from PayPal accounts and any other third-party payment processor, except that those funds may be deposited into one of the bank accounts identified in response to Paragraph 92 above;

   d. Transfer or use any funds from Visa, MasterCard, American Express, or any other credit card company as well as any credit card processing company, except that those funds may be deposited into one of the bank accounts identified in response to Paragraph 92 above;

   e. Transfer or use any funds held in any attorney-client trust account;

   f. Sell, lease, loan, pledge, or otherwise encumber any physical assets or infrastructure, including any computer server or equipment of value;

   g. Assign any employee compensation or benefit plan or requesting any return of such funds from the plan coordinator;

   h. Sell, assign, or otherwise transfer any equity 35.CN owns in any other companies identified by 35.CN in response to Paragraph 92 above; and

   i. Assist, aid, or abet any other person or business entity in engaging in or performing any of these activities.

DATED: __February 14, 2025__

                    _____
                    Susan Illston
                    United States District Judge