TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:      213.430.3400
Facsimile:      213.430.3409

Attorneys for Plaintiffs,
META PLATFORMS, INC. (fka FACEBOOK, INC.)
and INSTAGRAM, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC. and INSTAGRAM, LLC,<br><br>        Plaintiffs,<br><br>        v.<br><br>ONLINENIC INC.; DOMAIN ID SHIELD SERVICE CO., LIMITED; and XIAMEN 35.COM INTERNET TECHNOLOGY CO., LTD.,<br><br>        Defendants. | Case No. 3:19-cv-07071-SI<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER HOLDING DEFENDANT LEASCEND TECHNOLOGY CO., LTD. F/K/A XIAMEN 35.COM INTERNET TECHNOLOGY CO., LTD. IN CIVIL CONTEMPT AND IMPOSING CONTEMPT SANCTIONS**<br><br>DATE:     March 14, 2025<br>TIME:     10:00 a.m.<br>CTRM:    1 – 17th Floor<br><br>Hon. Susan Illston |

**TABLE OF CONTENTS**

PAGE

I. INTRODUCTION ................................................................................................................ 1

II. 35.CN'S CLAIMED INABILITY TO COMPLY WITH THE ESCROW ORDER IS NOT SUPPORTED BY EITHER THE FACTS OR THE LAW. ......................... 2

    A. 35.CN is in contempt because it did not take all reasonable steps to transfer $5.5 million to the United States to comply with the Escrow Order. ...................................................................................................................... 2

        1. 35.CN's "evidence" does not show that 35.CN attempted to send the funds to the United States, let alone that the transfer was blocked. ................................................................................................................ 4

        2. 35.CN's efforts were unreasonable because it did not attempt to follow the procedure its counsel represented to the Court. ............................... 6

        3. 35.CN admittedly pursued no efforts to transfer the funds other than a single remittance request to its bank. ...................................................... 7

    B. The Escrow Order was not premised on a mistake of fact. ........................................ 8

        1. 35.CN's counsel previously confirmed as of December 20 that the registrar business had not been sold. ............................................................... 8

        2. 35.CN's own evidence also contradicts this purported "mistake of fact." ..................................................................................................................... 9

        3. 35.CN has failed to show that the purported "mistake of fact" impacts the validity of the Escrow Order or excuses compliance with that order. .................................................................................................. 11

    C. The Court has personal jurisdiction over 35.CN. ..................................................... 12

    D. The sanctions requested in Plaintiffs' motion are both warranted and practicable. ................................................................................................................. 13

III. CONCLUSION ................................................................................................................ 14

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Arabian Gas & Oil Dev. Co. v. Wisdom Marines Lines, S.A.*,
  No. 16-CV-03801-DMR, 2017 WL 4390184 (N.D. Cal. Oct. 3, 2017) ........................................... 2, 3

*Diaz v. Brewer*,
  656 F.3d 1008 (9th Cir. 2011) ................................................................................................ 14

*FTC v. Affordable Media*,
  179 F.3d 1228 (9th Cir. 1999) ......................................................................................... 2, 3, 5, 7

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ................................................................................................ 14

*Green v. City of Santa Monica*,
  No. CV 05-5252 DSF (FFM), 2009 WL 3713081 (C.D. Cal. Nov. 5, 2009) ......................................... 3

*In re Chase & Sanborn Corp.*,
  872 F.2d 397 (11th Cir. 1989) ................................................................................................. 3

*In re Crystal Palace Gambling Hall, Inc.*,
  817 F.2d 1361 (9th Cir. 1987) ......................................................................................... 3, 6, 11

*Perry v. O'Donnell*,
  759 F.2d 702 (9th Cir. 1985) ................................................................................................ 13

*Reebok Int'l Ltd. v. McLaughlin*,
  49 F.3d 1387 (9th Cir. 1995) ............................................................................................ 12, 13

*Shell Offshore Inc. v. Greenpeace, Inc.*,
  815 F.3d 623 (9th Cir. 2016) ................................................................................................. 7

*Shuffler v. Heritage Bank*,
  720 F.2d 1141 (9th Cir. 1983) ................................................................................................ 3

*Thomas, Head & Greisen Emps. Tr. v. Buster*,
  95 F.3d 1449 (9th Cir. 1996) ................................................................................................. 3

*United States v. Asay*,
   614 F.2d 655 (9th Cir. 1980) ......................................................................................... 3

*United States v. Bright*,
   596 F.3d 683 (9th Cir. 2010) ...................................................................................... 3, 5

*United States v. Rylander*,
   460 U.S. 752 (1983) .................................................................................................... 2, 7

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947) ....................................................................................................... 14

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) .......................................................................................... 4

**Rules**

Local Civil Rule 7-9(b)(1) ................................................................................................... 11

## I.   INTRODUCTION

There is no dispute that Defendant Leascend Technology Co., Ltd. fka Xiamen 35.Com Internet Technology Co., Ltd. ("35.CN") failed to deposit $5.5 million into a United States escrow account by January 31, 2025, in violation of the Court's order. ECF No. 420 ("Escrow Order") at 2 ¶ 1. 35.CN's opposition tries to excuse its non-compliance with the Escrow Order by claiming that (1) 35.CN's single attempt to transfer these funds directly from China to the United States on January 10, 2025, was rejected (ECF No. 432 ("Opp.") at 2:10-23), (2) 35.CN sold its registrar business before the December 20, 2025, hearing and entry of the Escrow Order (*id.* at 2:24-3:15), and (3) the Court has no personal jurisdiction over 35.CN (*id.* at 4:4-5:3). The Court should reject 35.CN's claims because they are not supported by the evidence or the law, and they also run counter to the Court's prior findings. Significantly, 35.CN's assertions also directly contradict both its counsel's representations to the Court and its own public representations.

For example, Karl Kronenberger, counsel for 35.CN, represented to the Court on December 20, 2024, that, due to the complicated nature of such a transfer, the funds had to go from a Chinese bank to a Hong Kong bank to Mr. Kronenberger's escrow account. ECF No. 423 ("Hr'g Tr.") at 17:18-23 (Supplemental Declaration of Howard A. Kroll ("Supp. Kroll Decl.") Ex. 1). However, 35.CN never attempted to transfer funds through Hong Kong. Nor did 35.CN make any attempts to transfer funds directly to the United States other than its purported[1] single attempt on January 10, 2025. 35.CN's solitary effort to comply with the Escrow Order was not reasonable and, as a matter of law, cannot support 35.CN's claim of impossibility.

Mr. Kronenberger also represented to the Court on December 20, 2024, that 35.CN's wholly owned subsidiary housing its registrar business ("35 Info") had not been sold. And 35.CN made a public statement on December 12 that its shareholders needed to approve the sale of the registrar business on December 23 "to authorize the company's management to handle all subsequent matters related to the transaction, including but not limited to signing the transaction agreement and handling the property rights

---

[1] 35.CN's "evidence" supporting this attempted transfer does not show its application to wire funds to the United States was actually submitted to its bank or that the bank rejected the request, as discussed below.

transfer procedures." ECF No. 408-2 at 18 § I(ii) (public announcement by 35.CN); ECF No. 408-6 (announcing shareholder meeting). 35.CN now represents in its Opposition that the registrar business had already been sold. In any event, the Escrow Order, which was jointly submitted by 35.CN and Plaintiffs, required 35.CN to deposit $5.5 million into the United States regardless of whether the registrar was sold. Escrow Order at 2 ¶ 1.[2]

Finally, 35.CN again claims that the Court does not have personal jurisdiction over it. Opp. at 4:4-5:3. Indeed, in its public statement after the judgment was entered, 35.CN announced that this Court has no authority over it. Supp. Kroll Decl. ¶ 3, Ex. 2 (public announcement concerning this Court's February 14, 2025, judgment). 35.CN's claims run counter to the Court's repeated findings that it does have jurisdiction over 35.CN (*see, e.g.*, Order Granting Pls.' Mot. Summ. J. ("SJ Order"), ECF No. 393, at 5:7-6:4 (citing ECF Nos. 357, 384)) and should be rejected by the Court.

35.CN's excuses for non-compliance are not supported by either the facts or the law. Accordingly, 35.CN has not carried its burden to show why imposing contempt sanctions would be inappropriate. Plaintiffs' motion for contempt should therefore be granted.

## II.     35.CN'S CLAIMED INABILITY TO COMPLY WITH THE ESCROW ORDER IS NOT SUPPORTED BY EITHER THE FACTS OR THE LAW.

### A.     35.CN is in contempt because it did not take all reasonable steps to transfer $5.5 million to the United States to comply with the Escrow Order.

35.CN claims that it was impossible to comply with the Escrow Order because its bank rejected 35.CN's single attempt to transfer the funds from China directly to the United States. Opp. at 5:4-24. Yet, 35.CN has failed to meet its burden to "show 'categorically and in detail' why [it] is unable to comply." *FTC v. Affordable Media*, 179 F.3d 1228, 1240–41 (9th Cir. 1999) (quoting *United States v. Rylander*, 460 U.S. 752, 757 (1983) ("It is settled, however, that in raising this defense, the defendant has a burden of production.")). This has been described as a "rigorous and demanding standard." *Arabian Gas & Oil*

---

[2] Plaintiffs did not originally move for contempt on the basis that 35.CN sold its registrar business before escrowing $5.5 million in violation of Paragraph 3 of the Escrow Order because, based on 35.CN's own public announcements as discussed in detail below, Plaintiffs had no way of knowing if all requirements for the sale have been completed and the transaction has closed. Of course, if the transaction has closed, then 35.CN would have violated the Escrow Order for this additional reason.

*Dev. Co. v. Wisdom Marines Lines, S.A.*, No. 16-CV-03801-DMR, 2017 WL 4390184, at *5 (N.D. Cal. Oct. 3, 2017). Further, "[a] person fails to act as ordered by the court when he fails to take 'all the reasonable steps within [his] power to insure compliance with the [court's] order[].'" *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir. 1983)). "Self-induced inability is not a defense to a contempt proceeding." *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980).

To meet its burden, 35.CN "must go beyond a mere assertion of inability." *Green v. City of Santa Monica*, No. CV 05-5252 DSF (FFM), 2009 WL 3713081, at *6 (C.D. Cal. Nov. 5, 2009) (quoting *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989)). The claimed inability to comply must be supported by admissible evidence. *See Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1457 (9th Cir. 1996) (affirming finding of contempt where contemnors' claimed inability to comply "was unsupported by any admissible evidence"). The evidence submitted by 35.CN must also be credible to meet its burden of production. *See United States v. Bright*, 596 F.3d 683, 695 (9th Cir. 2010) ("[Contemnor] failed to show that she could not produce offshore credit card documents. Nor was the district court required, in the absence of corroborating evidence, to credit [Contemnor's] declaration that other documents named in the summonses did not exist.").

35.CN failed to carry its burden to show it was impossible to transfer $5.5 million to the United States by January 31, 2025, as ordered, for three reasons. First, the scant evidence 35.CN submits in support of this claim is neither admissible nor credible and fails to support 35.CN's story. Second, 35.CN allegedly made only one attempt to transfer the funds directly from Mainland China to the United States despite being fully aware that a request to transfer through that channel would be rejected and was therefore not a reasonable effort. *See Affordable Media*, 179 F.3d at 1239 (noting in the asset protection trust context that "the burden on the party asserting an impossibility defense will be particularly high because of the likelihood that any attempted compliance with the court's orders will be merely a charade rather than a good faith effort to comply"). Finally, 35.CN's single attempt to transfer funds is insufficient to demonstrate 35.CN took "all reasonable steps" to comply with the Escrow Order because 35.CN undertook no further efforts to comply.

**1.  35.CN's "evidence" does not show that 35.CN attempted to send the funds to the United States, let alone that the transfer was blocked.**

On January 10, 2025, 35.CN purportedly made its one and only attempt to comply with the Escrow Order by submitting an application for remittance abroad requesting a transfer of $5.5 million. But 35.CN's scant admissible evidence—when taken together—is insufficient to demonstrate that 35.CN actually tried to comply with the Escrow Order. For instance, 35.CN cites to the Application for Outward Remittance to wire the funds to the United States attached as Exhibit A to the Declaration of Yanrong Li (ECF No. 432-1, "Li Decl.").[3] This exhibit appears, however, to contain only the application that 35.CN filled out. *Id.* Ex. A. at 5-8. There is no proof that the application form was actually submitted to the bank. The text containing the transaction details all appears to comprise fillable fields, complete with optional check boxes and radial buttons for the applicant to select. The form also contains a number of red asterisks, which typically indicate required fields for a yet-to-be submitted webform. In other words, 35.CN's evidence at best indicates that 35.CN filled out the application form for remittance and printed it to PDF.

In fact, 35.CN's application does not in itself indicate that the form was actually submitted, and 35.CN does not provide any additional admissible evidence to show that it was. 35.CN's declarant does not testify that he personally submitted the application, nor does he identify who allegedly did. Li Decl. ¶ 2. Moreover, 35.CN did not file with its opposing papers any kind of transaction receipt or other acknowledgment from its bank confirming the remittance application was actually submitted. It strains credulity that 35.CN's bank accepted a request to send a $5.5 million wire and provided no confirmation that the request was received or any kind of receipt with a reference or tracking number, the submission date and time, or the status for the transaction. Tellingly, 35.CN provides no explanation why such

---

[3] Mr. Li's declaration contains paragraphs that should be stricken because they are not based on personal knowledge or provide legal conclusions rather than facts. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (holding district court properly disregarded declaration that included facts beyond declarant's personal knowledge and where declarant did not indicate how she knew the facts to be true). For example, Mr. Li declares that 35.CN submitted an application for remittance to transfer $5.5 million to the United States and describes the bank's response. Li Decl. ¶¶ 2-4. There is no evidence showing that Mr. Li knows this information personally, that he was responsible for submitting the application, or that he discussed the remittance with the bank. Mr. Li's testimony in this regard is also hearsay with no applicable exception, and the testimony should be stricken for this reason as well.

evidence does not exist. As such, 35.CN has not shown "categorically and in detail" that sending the funds was impossible. *See Bright*, 596 F.3d at 695 (district court not required in contempt proceeding to credit declaration testimony with no corroborating evidence).

Equally troubling are the remaining pages of Exhibit A, which are unidentified by the declarant but appear to be a transaction report and a portal for uploading documents. Yi Decl. Ex. A at 9-10. 35.CN argues, and Mr. Li swears under penalty of perjury, that it submitted its application to send the wire on January 10, only to be informed by the audit department of its bank on January 13 that the transaction was rejected. Opp. at 2:10-23 (citing Li Decl. ¶¶ 2-4). Notably, these dates do not comport with the documents provided by 35.CN. The attached "transaction record" indicates that unspecified funds from an unknown transaction were returned to 35.CN by the bank on January 8, with the remitter requesting that payment be tried again on January 10 only for the transaction to be rejected again on that same day. *Id.* Ex. A at 9. Other than inadmissible declaration testimony, there is nothing in the record to show that 35.CN tried to send a wire, let alone that the attempt was actually rejected. And again, without a reference number, there is no way to determine if this attached "transaction record" is related to 35.CN's purported remittance application despite the inconsistent dates.

Similarly, the page of Exhibit A apparently comprising a portal for uploading documents shows nothing more than the fact that an individual dragged and dropped some files into the webpage's upload container and that the filenames correlate to documents filed in this action. Li Decl. Ex. A at 10. There is no proof concerning what these files actually contained, and no confirmation page showing the files were actually submitted, just as with the wire "application." Mr. Li does not even declare that any documents were submitted to the bank. *See* Yi Decl. ¶¶ 2-4.

35.CN's evidence is neither admissible nor credible and, indeed, contains internal (and unexplained) inconsistencies. With such scant evidence, 35.CN cannot be said to have shown "categorically and in detail" that it even attempted to send the $5.5 million to the United States. *Affordable Media*, 179 F.3d at 1241. Nor has 35.CN demonstrated that the Chinese government blocked the transaction with no recourse. 35.CN has not carried its burden to show impossibility, and 35.CN should thus be held in contempt of court.

**2.    35.CN's efforts were unreasonable because it did not attempt to follow the procedure its counsel represented to the Court.**

Even if the Court were to accept 35.CN's purported evidence regarding the January 10, 2025 application for remittance, that application requested only that 35.CN's **Mainland China bank** transfer $5.5 million *directly* to 35.CN's attorneys *in the United States*. Li Dec. Ex. A at 5 (indicating amount should be sent in USD), 6 (listing 35.CN's counsel as the beneficiary), 7 (designating Heritage Bank in California as the beneficiary bank). 35.CN's attempted transfer was not a reasonable attempt to comply with the Escrow Order because it conflicts with the method Mr. Kronenberger outlined to the Court during the hearing on December 20, 2024. Specifically, Mr. Kronenberger represented that any transfer of funds to the United States would be complicated precisely because 35.CN first needed to transfer the funds to Hong Kong before they could be transferred to 35.CN's United States counsel. Hr'g Tr. at 17:18-23 ("[I]t's also complicated because funds were going to come through our firm for the settlement. And it's complicated. It has to go from a Chinese bank to a Hong Kong bank.").

In China, the State Administration of Foreign Exchange ("SAFE") requires evidence that payments from Mainland China to the United States have a legitimate and reasonable purpose. Declaration of Mai Ming Hui ("Hui Decl.") ¶¶ 3-4. When a company wishes to send large sums abroad, it may be required to provide documentation, such as a contract and an invoice, to SAFE to confirm the legitimacy of the transaction. *Id.* ¶ 5. However, companies in Mainland China wishing to transfer large sums to the United States sometimes employ a procedure where the company transfers Chinese yuan (RMB) to a Hong Kong bank because Hong Kong banks are not subject to the same foreign exchange restrictions as banks in Mainland China. *Id.* ¶ 6. The company can then have the Hong Kong bank convert the yuan to United States Dollars and transfer the money to a bank in the United States. *Id.*

Mr. Kronenberger's representations to the Court confirm that 35.CN had anticipated following this practice to transfer money to the United States via Hong Kong. 35.CN, however, did not follow the very procedure they represented to the Court. As such, 35.CN has not carried its burden to show it made "all the reasonable steps within [its] power" to comply with the Escrow Order. *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d at 1365.

**3.     35.CN admittedly pursued no efforts to transfer the funds other than a single remittance request to its bank.**

35.CN claims that the bank's audit department on January 13 informed 35.CN that the application to transfer funds "was denied under China's foreign exchange control policies because the bank did not consider the [Escrow Order] to be legally sufficient grounds under Chinese law to authorize this transfer." Opp. at 3:10-17. Even if the Court were to accept 35.CN's factual assertions as true, 35.CN would have still failed to show "categorically and in detail" that it took all reasonable steps to comply with the Escrow Order because, per 35.CN's own recounting, 35.CN undertook no other efforts to transfer the funds. *Affordable Media*, 179 F.3d at 1241. Nor did 35.CN notify the Court or Plaintiffs of the problem it was having with the transfer of funds and seek additional time to comply.

When 35.CN's bank purportedly rejected the transfer on January 13, 35.CN did nothing more—despite that this outcome was "not a surprise" (Opp. at 3:17-18) and despite having eighteen more days to comply with the Escrow Order. 35.CN could have applied to SAFE through its bank for authorization to transfer the funds either immediately upon entry of the Escrow Order or once 35.CN's bank allegedly refused to perform the transfer. Hui Decl. ¶¶ 7-8. This approval process can take between one and thirty business days. *Id.* ¶ 7. 35.CN, however, did not seek approval from SAFE at any time despite SAFE being fully responsible for such decisions. *Id.* ¶ 3.

Significantly, 35.CN also makes clear in its Opposition that it can now apply to a Chinese court to allow it to transfer funds to satisfy the judgment the Court entered on February 14, 2025. Opp. at 2:19-23 (indicating that 35.CN "could apply to the competent Intermediate People's Court for recognition and enforcement of a final judgment"). However, at no point has 35.CN informed the Court that it has applied to a Chinese court so that it could transfer the funds.

The test for civil contempt is "whether contemnor has the *present* ability to comply, not whether it could have complied in the past." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629-30 (9th Cir. 2016) (citing *Rylander*, 460 U.S. at 757). Thus, a court "must look to the purpose of the contempt at the time it is *enforced*, rather than at the time it is *imposed*." *Id.* Accordingly, by not making any additional efforts to send the funds, including through Hong Kong as 35.CN originally represented, and by not taking the step of seeking to register this Court's judgment so that 35.CN could transfer the funds from Mainland

7

REPLY IN SUPPORT OF MOTION FOR CIVIL CONTEMPT
Case No. 3:19-cv-07071-SI

China, 35.CN has negated any purported showing that it took "all reasonable steps" to comply with the Court's Escrow Order. Because 35.CN has not shown a *present* inability to comply, it is appropriate for contempt sanctions to be imposed by the Court.

**B.     The Escrow Order was not premised on a mistake of fact.**

In its Opposition, and contrary to its prior representations to the Court and its own public statements, 35.CN now asserts for the first time that the sale of its registrar business occurred on December 5, 2024. Opp. at 2-3. 35.CN then asserts that "[t]his demonstrates that the Order, which was granted on shortened notice, was premised on a mistake of fact . . . ." Opp. at 3:12-13.[4] 35.CN's post hoc justification for failure to comply with the Escrow Order should be rejected. Even assuming it were true that the sale occurred on December 5—which all available evidence indicates it did not—35.CN offers no authority or explanation as to how this purported "mistake of fact" impacts the validity of the Escrow Order or how it would excuse compliance. Moreover, as discussed in more detail below, 35.CN's own evidence of record indicates that the sale did not occur prior to entry of the Escrow Order.

**1.     35.CN's counsel previously confirmed as of December 20 that the registrar business had not been sold.**

35.CN repeatedly and affirmatively represented that the sale of 35 Info, the wholly owned subsidiary housing its registrar business, had not yet been finalized. For example, in its opposition to Plaintiffs' asset freeze motion, 35.CN stated, "[I]f Plaintiffs obtain an asset freeze order *before the sale transaction closes*, it could potentially impact the transaction to Leascend's detriment." ECF No. 415 ("TRO Opp.") at 6:11-13 (citing ECF 415-1 ("Kronenberger Decl.") ¶ 7 & Ex. B) (emphasis added). In support of this representation, Mr. Kronenberger attached to his declaration 35.CN's public announcement dated December 5, 2024, regarding the "progress" of the sale in which 35.CN represented that it "*will* proceed with signing the transfer agreement and completing the asset handover." Kronenberger Decl. Ex. B (emphasis added). Moreover, at the hearing on December 20, in response to the Court's question,

---

[4] Surprisingly, Mr. Kronenberger does not disclose when and how he purportedly became aware of this "mistake," nor does he provide an explanation via a declaration or otherwise as to why he did not bring the alleged mistake to the Court's attention until filing 35.CN's opposition to the motion for contempt on February 21, 2025.

"So what happens if the Court just orders: 'All right. Put it off for two weeks, put off the sale'?", Mr. Kronenberger asserted, "Then we lose the sale. This is important. It's a year-end thing, I believe." Hr'g Tr. at 10:2-4.

In addition to its affirmative representations, 35.CN also continually implied the sale had not yet been finalized. For instance, 35.CN referred to the transaction as the "supposed" and "impending sale." TRO Opp. at 2:14, 5:13. 35.CN further stated that "revers[ing] movement towards the sale" would cause 35.CN to be in conflict with Chinese law and "would frustrate [35.CN's] duties to the buyer." *Id.* at 6:2-9. In fact, many of the arguments in 35.CN's TRO opposition were premised entirely on the fact that the sale had not yet occurred. For example, 35.CN indicated that it intended to use the proceeds from the sale to pay a potential settlement or judgment amount. *See, e.g.*, TRO Opp. at 5:14-16 ("[A] sale of unrelated domain names will only benefit Plaintiffs by providing Leascend with more funds to pay a potential judgment."). At the December 20 hearing, Mr. Kronenberger asserted that his client would not actually be able to escrow any funds "before the sale," but that doing so could be possible "after the sale." Hr'g Tr. at 17:1-8. Finally, in its TRO opposition, 35.CN requested the Court order Plaintiffs to pay an $8.5 million bond to "cover the value of the sale and any potential sale termination penalties and attorney's fees." TRO Opp. at 9:25-10:2. Each of these arguments presumed that the sale of 35 Info had not yet been finalized, and each comports with the sale not closing until after entry of the Escrow Order.

### 2. 35.CN's own evidence also contradicts this purported "mistake of fact."

35.CN's own evidence of record actually shows the sale—if it occurred—transpired after the December 20 entry of the Escrow Order. 35.CN asserts that the registrar "business was sold on December 5, 2024, through an auction process" and that, "[u]nder the applicable Xiamen Property Rights Exchange Network Auction Rules (the 'Rules') that governed the auction process, the sale was effective with a binding contract under Chinese law at the time the Xiamen Property Rights Exchange Center gave notice of the winning bidder in the auction." Opp. at 2:24-3:12 (citing Li Decl. ¶ 5, Ex. B). Assuming this auction transpired, it is not the entire story.

The Rules specifically reference 35.CN's "Asset Transfer Contract Template" that is attached to the "Rules as Attachment 1" and that becomes the binding agreement upon completion of the auction regardless of whether the parties sign that contract. Li Decl. Ex. B at §§ 5(b) (referencing "Asset Transfer

Contract Template as Attachment 1), 8 ("If the contract is not signed, the automatically formed contract shall be based on the transferee's transaction price and the terms of the contract in Attachment 1"), 15 (list of attachments). Tellingly, 35.CN has failed to attach a copy of this contract, leaving the Court without the ability to readily determine whether this particular contract—like many purchase agreements—includes conditions precedent to the sale, contingencies such as the opportunity for the buyer to perform due diligence or for Board or shareholder approval, and the timing and manner of the transfer of assets. Based on the evidence in the record concerning 35.CN's efforts to sell 35 Info, it is evident that the unattached contract contained at least some of these requirements, leaving it unclear when after the December 5 auction the sale and transfer of property occurred, if it has even occurred.

Indeed, on December 12, 2024, 35.CN issued a public announcement concerning the sale of its registrar business. *See* ECF No. 408-2 (Declaration of Helena Guye Ex. 1 ("Announcement")). In the Announcement, 35.CN confirmed that the auction center had issued a notice on December 5, 2024 that the company Chengdu Yuyuling Internet Technology Co., Ltd. ("Yuyuling") had made the winning bid for 35.CN's registrar business. Announcement at 10 § I(i)3. In a section titled "Approval procedures for this transaction," the Announcement further explains that, after receiving notification of the winning bid, 35.CN's Board of Directors met on **December 10** where it reviewed and approved the transaction. *Id.* at 11 § I(ii). The Announcement made clear that the "transaction still needs to be submitted to the Company's shareholders' meeting for consideration" where the shareholders would be requested to provide company management authorization for "***signing the transaction agreement*** and ***handling the property rights transfer procedures***." *Id.* (emphasis added). Apparently, once 35.CN and Yuyuling sign the contract, Yuyuling would have five business days to transfer the agreed-upon purchase price to 35.CN (minus the deposit paid to participate in the auction), and fifteen business days later, the parties would take steps to consummate the transfer, including signing any necessary intellectual property transfer agreements. *Id.* at 13 §§ IV(ii)3.2, IV(ii)4.1. On December 23, 2024, 35.CN issued an additional announcement that its shareholders had, on that same day, voted to approve the transaction. Supp. Kroll Decl. ¶ 4, Ex. 3.

In sum, the evidence of record does not show that 35.CN sold its registrar business on December 5 such that it was impossible for 35.CN to comply with the Escrow Order and transfer the $5.5 million into escrow prior to selling the business. To the contrary, the evidence at most indicates that on December 5,

10

REPLY IN SUPPORT OF MOTION FOR CIVIL CONTEMPT
Case No. 3:19-cv-07071-SI

Yuyuling was the highest bidder in an auction for the sale of 35.CN's registrar business, subject to a purchase agreement with unknown terms. Significantly, the agreement at the very least still required 35.CN's Board of Director and shareholder approval, the transfer of funds, and subsequent agreements to complete and close the deal.[5] At this juncture, it is unclear what additional conditions must still be met, if any, now that shareholder approval has occurred. It is equally unclear whether any of the property that comprised 35.CN's registrar business has been transferred.

### 3. 35.CN has failed to show that the purported "mistake of fact" impacts the validity of the Escrow Order or excuses compliance with that order.

35.CN cites no authority and puts forth no arguments concerning how a purported mistake of fact affects the validity of the Escrow Order. Similarly, 35.CN offers no binding or even persuasive authority discussing how courts examine an impossibility defense where a portion of the underlying order was premised on a mistake of fact. 35.CN also provides no explanation as to why it misrepresented to the Court both orally and in writing that the sale had not taken place as of December 20 only now to claim that those representations were false and that the sale had taken place fifteen days prior.[6] And 35.CN offers neither authority nor any justification as to how 35.CN's and Mr. Kronenberger's misrepresentations to the Court excuse compliance with its orders.

Regardless, this purported mistake of fact has no impact on 35.CN's failure to comply with the Escrow Order's first requirement—namely, that 35.CN deposit $5.5 million into a United States escrow account by January 31, 2025. Escrow Order at 2 ¶ 1. This requirement was unconnected to 35.CN's

---

[5] 35.CN's Announcement on December 12 also indicates that either party may terminate the purchase agreement with cause, thus further indicating that the sale was not complete on December 5. Announcement at 14 § IV(ii)6.1.

[6] Leaving aside 35.CN's counsel's duty of candor to this Court pursuant to California Rule of Professional Conduct 3.3 to "correct a false statement of material fact or law previously made to the tribunal," if 35.CN and its counsel truly believed there was a mistake of fact undermining the Escrow Order, then the appropriate course of action would have been to seek leave to file a motion for reconsideration or to appeal the order while requesting a stay. *See* Local Civil Rule 7-9(b)(1) (movant must show "a material difference in fact or law exists from that which was present to the Court before entry of the interlocutory order"); *see also In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d at 1365 ("If the appellants believed that the district court incorrectly issued an order, their remedy was to appeal and request a stay pending the appeal. Absent a stay, all orders and judgments of courts must be complied with promptly.") (citations and quotation marks omitted).

pending sale, a fact plain from the face of the order and from the Court's comments during the hearing resulting in the Escrow Order. The Court made clear that it ordered 35.CN to deposit the funds into escrow to avoid having to interfere with 35.CN's pending sale or otherwise freeze its assets. Hr'g Tr. 6:10-7:12, 15:13-16:6; *compare* Escrow Order at 2 ¶¶ 1, 2 with *id.* at 2 ¶ 3. In short, even accepting that 35.CN sold its registrar business on December 5 contrary to its prior representations to this Court, 35.CN would still be in violation of the Escrow Order with no justification for its non-compliance because it failed to deposit funds into escrow by January 31. A finding of contempt remains appropriate.

### C. The Court has personal jurisdiction over 35.CN.

Throughout this litigation, 35.CN continued to argue that the Court does not have personal jurisdiction over it even though the Court has repeatedly rejected those arguments. *See, e.g.*, SJ Order at 5:7-6:4 (citing ECF Nos. 357, 384). In its Opposition, 35.CN once again claims that this Court lacks personal jurisdiction over it. 35.CN argues that "[t]he Court lacks personal jurisdiction for the alleged contempt conduct" because "courts lack jurisdiction over a foreign national following the law of its own country when doing acts within that country . . . ." Opp. at 4:4-8. Asserting that such conduct in itself does not create a basis for personal jurisdiction, 35.CN argues that the Court has not made a finding of personal jurisdiction on any basis during the time when the contemptuous conduct occurred and that this Court accordingly lacks jurisdiction to hold 35.CN in contempt. Not only does 35.CN's argument distort the law, but it also ignores the Court's prior finding of personal jurisdiction over 35.CN. SJ Order at 5:7-6:4.

The facts and holding of the only case 35.CN cites in support of its arguments are inapposite to this action. In *Reebok*, the district court issued a contempt citation against a **non-party** bank in Luxembourg because that bank released funds to the defendant even after being served with an asset freeze order **entered against the defendant** prohibiting the release of such funds. *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1388-89 (9th Cir. 1995). For various reasons, the plaintiff's attempts to register the order with the Luxembourg courts had proven unsuccessful, meaning the order had no force or effect in Luxembourg per Luxembourg law. *Id.* at 1389, 1392. Because Luxembourg law requires banks to allow depositors to withdraw funds on demand and because the asset freeze order had no legal effect in that country, the bank in Luxembourg allowed the withdrawal by the defendant in Luxembourg in compliance with the only law by which the bank was bound—that of Luxembourg. *Id.* at 1392, 1394.

Notwithstanding these facts, the district court held the bank in contempt and assessed sanctions of over $2.6 million. *Id.* at 1388-89. In its contempt order, the district court asserted it had specific personal jurisdiction over the bank because its conduct in "assisting" the defendant in violating the asset freeze order gave rise to sufficient contacts with the forum. *Id.* at 1391. The bank petitioned the Ninth Circuit for relief, and the Ninth Circuit reversed the contempt order, holding that the district court did not have personal jurisdiction over a foreign non-party acting according to the laws of that entity's country in "violation" of a court order found to have no legal effect in that country. *Id.* at 1393-95 ("[W]e do not agree that when a national of a foreign country follows the law of that country in that country it can be dragged halfway around the world to answer contempt charges arising out of a foreign court's ineffective order.").

Here, Plaintiffs do not ask that the Court hold 35.CN's bank in China in contempt for non-compliance with the Escrow Order because the bank did not transfer funds to the United States in alleged contravention of Chinese law. Rather, Plaintiffs ask the Court to hold 35.CN—a party to this action over whom the Court has already determined it has personal jurisdiction—in contempt for its violations of the Court's Escrow Order. Nothing in *Reebok* prohibits such a contempt finding, and Plaintiffs' motion should be granted.

### D. The sanctions requested in Plaintiffs' motion are both warranted and practicable.

35.CN argues that "[c]ontempt sanctions are not warranted here to compel compliance where compliance is not possible and where Plaintiffs have not suffered any injuries." Opp. at 6:7-8. 35.CN is wrong. As discussed above, 35.CN failed to carry its burden to show that it was impossible to comply with the Escrow Order. Further, and apart from the harm caused by the fact that $5.5 million to satisfy this Court's judgment was never deposited into an escrow account as ordered, Plaintiffs have been harmed by having to expend attorneys' fees to bring 35.CN's contemptuous conduct to the Court's attention and then to rebut the numerous misstatements contained in 35.CN's opposition papers. These are quintessential contempt "injuries" warranting sanctions. *See Perry v. O'Donnell*, 759 F.2d 702, 705-06 (9th Cir. 1985) ("[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order.").

The Escrow Order prohibited 35.CN from dissipating the assets of its registrar business until 35.CN deposited $5.5 million into an escrow account. Escrow Order at 2 ¶ 3. Despite that Order, and the representations made by Mr. Kronenberger that the registrar business had not been sold, 35.CN now claims that Plaintiffs' request to seize the 35.com domain name pending compliance with the Escrow Order is moot because that domain name is no longer in the possession of 35.CN. Opp. at 6:20-7:6. 35.CN similarly argues that, because the Court has since entered a judgment that contains the asset freeze Plaintiffs had requested, that request for relief is moot as well, leaving none of Plaintiffs' requested sanctions on the table. Essentially, 35.CN argues that it is entitled to a "get out of jail free card" on the contempt issue because the relief Plaintiffs request is no longer available.[7]

Leaving aside the fact that 35.CN has not shown that the sale of 35 Info has actually closed and that the 35.com domain name—or any assets related to the registrar business—has been transferred to a new owner, the Court retains broad discretion in crafting a contempt citation and is well within its power to impose sanctions beyond those requested by Plaintiffs. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 304, 307 (1947) (district court exercises its discretion in crafting the remedy such that it "consider[s] the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired").

The simple fact remains that 35.CN still has not complied with this Court's Escrow Order. Nor has 35.CN made the requisite showing of impossibility. 35.CN cannot erase its clear violations of this Court's order simply by arguing that the purported changed circumstances nullify the Escrow Order. 35.CN should therefore be found in contempt of court.

### III. CONCLUSION

At best, 35.CN has failed to carry its burden to rebut Plaintiffs' showing that contempt sanctions are appropriate. At worst, 35.CN has misrepresented the facts and law to this Court. Either way, Plaintiffs

---

[7] 35.CN also argues that a corporate surety bond is usually required before an asset can be attached. Opp. at 6:26-7:2. It is, however, well settled in the Ninth Circuit that a district court retains broad discretion in requiring a nominal bond or even no bond at all when crafting an order for injunctive relief. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000) (refusing to increase nominal bond); *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (district court "properly invoked its discretion not to have plaintiffs post a bond in this matter. There was no error.").

have carried their burden of proving by clear and convincing evidence that 35.CN violated a specific and definite order without any legally sufficient justification. Accordingly, the motion should be granted and 35.CN should be found in contempt of court.

DATED: February 28, 2025

Tucker Ellis LLP

By: /s/David J. Steele
    David J. Steele
    Howard A. Kroll
    Steven E. Lauridsen

    Attorneys for Plaintiffs,
    META PLATFORMS, INC. (fka
    FACEBOOK, INC.)
    and INSTAGRAM, LLC