# Exhibit 1

# PROPERTY TRANSFER AGREEMENT

**Transferor: Leascend Technology Co., Ltd.** (hereinafter referred to as "Party A")

Unified Social Credit Code: 91350200751642792T
Registered Address: No. 66, Tongjia East Road, Nantong High-Tech Industrial Development Zone
Legal Representative: Huang Mingliang
Contact Information: +86 13860169608

**Transferee: Chengdu Yuyuling Internet Technology Co., Ltd.** (hereinafter referred to as "Party B")

Unified Social Credit Code: 91510106MAE4KL82X6
Registered Address: Unit 6, 24th Floor, Building 1, No. 99, Section 1, North First Ring Road, Jinniu District, Chengdu, Sichuan Province
Legal Representative: Han Baochuan
Contact Information: +86 18011531174

**Target Company: Xiamen 35 Internet Information Co., Ltd.** (hereinafter referred to as the "Target Company")

Unified Social Credit Code: 91350200MACKTQ1N08
Registered Address: Unit A01, Room 401, No. 8, Guanri Road, Software Park Phase II, Xiamen Torch High-Tech Zone
Legal Representative: Zhang Weiwei

WHEREAS:

1. Party A is a joint-stock company established in April 2004 under the laws of the People's Republic of China and is legally in existence. Party A holds 100% of the equity interest in the Target Company and owns certain trademarks related to the SaaS business of the Target Company.
2. The Target Company, Xiamen 35 Internet Information Co., Ltd., is a limited liability company established under the laws of China on June 1, 2023. It primarily engages in software and information technology services, with a registered capital of RMB 20 million, fully paid.
3. Party A intends to transfer to Party B its 100% equity interest in the Target Company (the "Target Equity") and certain trademarks (the "Target Assets"), which shall be determined based on an asset valuation report. The Target

Equity and Target Assets are collectively referred to as the "Target Property." Party B agrees to acquire the Target Property.

Pursuant to the Civil Code of the People's Republic of China and other relevant laws and regulations, and in adherence to the principles of voluntariness, fairness, and good faith, both parties have reached an agreement through friendly negotiation on the transfer of the Target Property. Accordingly, they hereby enter into this Property Transfer Agreement (the "Agreement") as follows:

## ARTICLE 1 - DEFINITIONS

1.1 Unless otherwise indicated in this Agreement, the following terms shall have the meanings set forth below:

- **Target Company:** Refers to **Xiamen 35 Internet Information Co., Ltd.**
- **Target Property:** Refers to the **100% equity interest in the Target Company and certain trademarks** that Party A intends to transfer to Party B.
- **Transaction:** Refers to the transfer of the Target Property from Party A to Party B under this Agreement.
- **Transfer Price:** Refers to the total consideration payable by Party B to Party A for the acquisition of the Target Property under this Agreement.
- **Effective Date:** Refers to the date on which this Agreement is signed by the legal representatives or authorized representatives of both parties and affixed with their official seals.
- **Closing Date:** Refers to the date on which the equity transfer registration with the administrative authority is completed.
- **Valuation Date:** Refers to **May 31, 2024**.
- **Business Day:** Refers to **any day on which banks in China are open for business**, excluding statutory holidays.

## ARTICLE 2 - TRANSFER OF PROPERTY

2.1 Party A agrees to transfer to Party B **100% of the equity interest in Xiamen 35 Internet Information Co., Ltd.**, corresponding to a **registered capital of RMB 20 million**, fully paid.

2.2 Party A further agrees to transfer to Party B **certain trademark ownership rights related to the SaaS business** of the Target Company.

2.3 Party A warrants that the **RMB 20 million capital contribution corresponding to the Target Equity has been fully paid**.

## ARTICLE 3 - ASSET VALUATION

3.1 According to the Asset Valuation Report issued by North Asia Assets Assessment Co., Ltd. (Report No.: North Asia Assessment No. (2024) 01-748), as of the Valuation Date (May 31, 2024), the appraised value of the Target Equity is RMB 40.81 million (in words: RMB Forty Million Eight Hundred Ten Thousand Only).

According to the Asset Valuation Report issued by North Asia Assets Assessment Co., Ltd. (Report No.: North Asia Assessment No. (2024) 01-747), as of the Valuation Date (May 31, 2024), the appraised value of certain trademarks is RMB 0.3031 million (in words: RMB Three Hundred Thousand Three Hundred Ten Only).

3.2 The specific assets to be transferred under this Agreement shall be as set forth in the Asset Valuation Report (Report No.: North Asia Assessment No. (2024) 01-747) issued by North Asia Assets Assessment Co., Ltd..

3.3 Party A warrants that there are no undisclosed or omitted material matters that may adversely affect the valuation results or significantly impact the value of the Target Equity as determined in the Asset Valuation Report.

3.4 The parties acknowledge and agree that the terms and conditions of this Agreement are based on the valuation results set forth in the Asset Valuation Report.

## ARTICLE 4 - CONDITIONS PRECEDENT TO PROPERTY TRANSFER

4.1 Party A has completed the public listing process at the Xiamen Property Rights Exchange Center in accordance with the relevant laws and regulations for the property transfer under this Agreement.

4.2 Party A has duly fulfilled its internal decision-making procedures for the transfer of the Target Property under this Agreement.

## ARTICLE 5 - METHOD OF PROPERTY TRANSFER

5.1 The property transfer under this Agreement has been publicly listed at the Xiamen Property Rights Exchange Center, and Party B lawfully acquires the Target Property through the listing process.

## ARTICLE 6 - TRANSFER PRICE AND PAYMENT

6.1 Transfer Price

Based on the Asset Valuation Reports issued by North Asia Assets Assessment Co., Ltd. (Report No.: North Asia Assessment No. (2024) 01-748 and North Asia Assessment No. (2024) 01-747) and the public listing results at the Xiamen Property Rights Exchange Center, the parties confirm that: The Target Equity shall be transferred from Party A to Party B for a total consideration of RMB 47,370,600 (in words: RMB Forty-Seven Million Three Hundred Seventy Thousand Six Hundred Only). The Target Trademarks shall be transferred from Party A to Party B for a total consideration of RMB 868,300 (in words: RMB Eight Hundred Sixty-Eight Thousand Three Hundred Only).

6.2 Payment Method

The deposit previously paid by Party B to the Xiamen Property Rights Exchange Center shall be applied toward the transfer price after deducting the transaction commission and certification fees payable to the Exchange Center.The remaining balance of the transfer price shall be paid by Party B to the Xiamen Property Rights Exchange Center within five (5) Business Days after the execution of this Agreement.The Xiamen Property Rights Exchange Center shall transfer the full amount of the transfer price to the bank account designated by Party A within five (5) Business Days after receiving the total transfer payment.

## ARTICLE 7 - APPROVAL AND CLOSING OF PROPERTY TRANSFER

7.1 Within fifteen (15) Business Days after obtaining the Property Transaction Certificate from the Xiamen Property Rights Exchange Center, the Target Company shall convene an internal meeting to adopt resolutions/decisions, amend its articles of association, and execute relevant agreements (including but not limited to intellectual property transfer agreements). The Target Company shall submit an application to the registration authority for the registration of the transfer of the Target Property, and both Party A and Party B shall provide necessary cooperation and assistance.

7.2 Given that the registration process for trademark transfer requires a certain period and is subject to the discretion of the relevant administrative authorities, and given that certain transferred trademarks may be subject to cancellation or invalidation, the parties shall not seek claims against each other if the transfer of certain trademarks cannot be completed due to such administrative decisions. Any trademarks that cannot be transferred shall be handled through separate negotiation between the parties. After this Agreement becomes effective but before the completion of the trademark transfer registration, Party A grants Party B or the Target Company a royalty-free license to

use the trademarks involved in this Agreement. The specific terms shall be governed by a separate Trademark License Agreement to be executed by the parties.

The parties agree that, after this Agreement takes effect but before the completion of the transfer registration, Party B shall have the right to initiate any legal actions regarding any infringement of the Target Assets, regardless of whether such infringement occurred before, at the time of, or after the Effective Date. Party B shall have the right to file lawsuits, initiate proceedings, raise objections, defend, appeal, claim damages, or take any other legal action and obtain any available remedies. However, Party A retains the right to reach settlements or mediations with relevant parties for its own interests and to ensure the continuous legal existence of the Target Assets. If Party A incurs any legal costs due to Party B or the Target Company's use of the Target Assets, Party B shall fully compensate Party A for such costs.

7.3 The Closing Date shall be the date on which the equity transfer registration is completed with the relevant administrative authority.

7.4 The period from the Valuation Date to the Closing Date shall be considered the Transition Period. During this period, neither party shall adjust the transaction conditions or transfer price based on the profits or losses of the Target Company.

## ARTICLE 8 - LIABILITIES, DEBTS, TAXES, AND FEES RELATED TO PROPERTY TRANSFER

8.1 The parties agree that all existing debts and claims of the Target Company shall remain with the Target Company after the Closing Date. With respect to the transferred trademarks, the parties confirm that there are no existing or outstanding financial obligations beyond the transfer price that Party A needs to pay to the Target Company due to past trademark usage or any other reasons.

8.2 The taxes related to the property transfer under this Agreement shall be borne by each party in accordance with applicable laws and regulations. The transaction handling fees, expenses incurred during the Transition Period, and other costs (including but not limited to registration fees for the transfer of the Target Property and service fees for third-party agents assisting in the transfer registration process) shall be borne by Party B.

8.3 Except as otherwise stipulated in this Agreement, each party shall bear its own expenses incurred during the property transfer process in accordance with applicable laws and regulations.

8.4 The transaction commission payable to the Xiamen Property Rights Exchange Center for this property transfer shall be borne by Party B. Additionally, the

transaction certification fees payable to the Xiamen Property Rights Exchange Center shall also be borne by Party B.

## ARTICLE 9 - REPRESENTATIONS AND WARRANTIES

9.1 Party A hereby makes the following representations and warranties to Party B:

9.1.1 Party A has the legal right to transfer the Target Equity to Party B, including having lawful and complete ownership of the Target Equity, which is free from any mortgages, guarantees, liens, security interests, or other encumbrances.

9.1.2 All documents and materials submitted by Party A to the Xiamen Property Rights Exchange Center for the purpose of executing this Agreement are true, accurate, and complete.

9.1.3 The execution of this Agreement and the performance of its obligations hereunder will not violate any applicable laws or regulations, nor will it conflict with or breach any provisions of agreements or contracts to which Party A is a party.

9.1.4 All necessary procedures required for signing this Agreement, including but not limited to authorizations, approvals, and internal corporate decisions, have been lawfully and effectively obtained, and the conditions precedent for the validity of this Agreement and the property transfer have been satisfied.

9.2 Party B hereby makes the following representations and warranties to Party A:

9.2.1 Party B is a legally established and validly existing entity or natural person, with the legal capacity to execute this Agreement and fulfill its obligations hereunder.

9.2.2 Party B's acquisition of the Target Property complies with all applicable laws and regulations.

9.2.3 All documents and materials submitted by Party B to Party A and the Xiamen Property Rights Exchange Center for the purpose of executing this Agreement are true, accurate, and complete.

9.2.4 The execution of this Agreement and the performance of its obligations hereunder will not violate any applicable laws or regulations, nor will it conflict with or breach any provisions of agreements or contracts to which Party B is a party.

9.2.5 All necessary procedures required for signing this Agreement, including but not limited to authorizations, approvals, and internal corporate decisions, have been lawfully and effectively obtained, and the conditions precedent for the validity of this Agreement and the property transfer have been satisfied.

9.2.6 The funds used by Party B to pay the property transfer price are from lawful sources, and Party B has not engaged in insider trading or any conduct that could render the property transfer transaction or this Agreement void or revocable.

## ARTICLE 10 - BREACH OF CONTRACT

10.1 After this Agreement becomes effective, if either party unilaterally terminates the Agreement without cause, such party shall pay the other party a penalty equivalent to 20% of the transfer price. If the termination causes further losses to the other party, the defaulting party shall also be liable for damages.

10.2 If Party B fails to pay the transfer price as agreed, Party B shall pay a late payment penalty to Party A, calculated at 0.05% of the overdue amount per day. If the delay exceeds 30 days, Party A shall have the right to terminate this Agreement, require Party B to pay 20% of the transfer price as a penalty, and demand compensation for any losses incurred by Party A and the Target Company as a result.

10.3 Unless otherwise stipulated in this Agreement, if either party (the defaulting party) fails to comply with or perform all or part of its obligations under this Agreement, or makes any false representation, warranty, or commitment, it shall be deemed in breach of contract and shall bear liability for breach, compensating the non-defaulting party for any economic losses incurred. If the non-performance or incomplete performance of this Agreement is caused by the fault of one party, the defaulting party shall bear liability for breach. If both parties are at fault, they shall each bear their respective liabilities accordingly.

## ARTICLE 11 - CONFIDENTIALITY

11.1 Both Party A and Party B shall maintain the confidentiality of the contents of this Agreement and any trade secrets of the other party that they become aware of. Neither party shall disclose such information to any unrelated third party without the prior written consent of the other party, except in the following cases: Disclosure to government authorities as required by applicable laws, regulations, or for approval, filing, or registration procedures; Disclosure required to fulfill disclosure obligations under the rules of the Shenzhen Stock Exchange or other similar institutions; Disclosure to professional advisors, lawyers, auditors, or other intermediaries engaged for this transaction, provided that such intermediaries agree to confidentiality obligations equivalent to those stipulated in this Agreement.

## ARTICLE 12 - FORCE MAJEURE

12.1 If either party is unable to perform or fully perform this Agreement due to force majeure, including natural disasters or adjustments in national policies that lead to the rejection of approval by relevant authorities, the affected party shall immediately notify the other party in writing and, within seven (7) business days from the occurrence of such event, provide detailed information and an explanation of the inability to perform, partial non-performance, or the necessity for delayed performance. The parties shall negotiate based on the impact of the event to decide whether to terminate the Agreement, partially exempt obligations, or delay performance.

12.2 If, after the signing of this Agreement, national policies, laws, regulations, or normative documents are adjusted in a manner that directly affects the performance of this Agreement or makes it impossible to perform as agreed, neither party shall be held liable for breach of contract. The parties shall negotiate based on the extent of the impact to decide whether to terminate or delay performance of the Agreement.

## ARTICLE 13 - AMENDMENT AND TERMINATION OF THE AGREEMENT

13.1 This Agreement may be amended or terminated by mutual agreement of the parties.

13.2 The non-defaulting party shall have the right to terminate this Agreement in the following circumstances:

1) The purpose of this Agreement becomes impossible to achieve due to force majeure or reasons not attributable to either party;
2) One party explicitly states, or its conduct clearly indicates, that it will not perform its primary obligations within the agreed timeframe;
3) One party delays performance of its primary obligations and fails to remedy such breach after receiving notice demanding performance;
4) One party delays performance or commits another breach, making it impossible to achieve the purpose of this Agreement.

13.3 Any amendment or termination of this Agreement must be made in writing.

## ARTICLE 14 - GOVERNING LAW AND DISPUTE RESOLUTION

14.1 The execution, validity, interpretation, and performance of this Agreement shall be governed by and construed in accordance with the laws of the People's Republic of China (for the purposes of this Agreement, excluding Hong Kong, Macau, and Taiwan).

14.2 Any dispute or controversy arising from or related to the execution or performance of this Agreement shall be first resolved through amicable negotiations. If negotiations fail, either party shall have the right to submit the dispute to the People's Court with jurisdiction in the location of the Target Company.

14.3 During the dispute resolution process, both parties shall continue performing their respective obligations under this Agreement, except for the obligations directly related to the disputed matters.

## ARTICLE 15 - EFFECTIVENESS AND MISCELLANEOUS

15.1 This Agreement shall become effective upon being signed and sealed by the legal representatives or authorized representatives of both parties.

15.2 The addresses listed by both parties in this Agreement shall serve as their designated addresses for service of documents throughout the signing, performance, and any legal proceedings related to this Agreement, including arbitration, first-instance trial, second-instance trial, enforcement, and retrial. If a party changes its designated address, it shall notify the other party in writing within two (2) business days from the date of such change. If a document cannot be delivered due to the recipient's refusal to sign or other reasons, it shall be deemed delivered upon dispatch by the sender.

15.3 This Agreement shall be executed in five (5) original copies, with each party holding one (1) copy, one (1) copy retained by the Xiamen Property Rights Exchange Center, and the remaining copies used for property transfer registration purposes. All copies shall have equal legal effect.

15.4 Failure or delay by either party in exercising any rights or powers under this Agreement shall not constitute a waiver of such rights or powers. Any single or partial exercise of such rights or powers shall not prevent further exercise in the future.

15.5 If any provision of this Agreement is found to be invalid, unlawful, or unenforceable under applicable laws or by a competent judicial authority, the validity, legality, and enforceability of the remaining provisions shall not be affected or impaired.

**(End of Text)**

**(This page is for signature purposes only and contains no substantive content.)**

IN WITNESS WHEREOF, the parties or their authorized representatives have signed this Agreement as of the date set forth below, as a commitment to its enforcement.

**Transferor:** (Seal)
**Legal Representative (or Authorized Representative):** (Signature & Seal)




**Transferee:** (Seal)
**Legal Representative (or Authorized Representative):** (Signature & Seal)

**Signing Location:** Siming District, Xiamen
**Signing Date:** December 23, 2024

24122301

# 产权交易合同

**转让方**：琏升科技股份有限公司 （以下简称"甲方"）
统一社会信用代码：91350200751642792T
住所：南通高新技术产业开发区通甲东路66号
法定代表人：黄明良
联系方式：13860169608

**受让方**：成都瑜与聆互联网科技有限公司 （以下简称"乙方"）
统一社会信用代码：91510106MAE4KL82X6
住所：四川省成都市金牛区一环路北一段99号1栋24层6号
法定代表人：韩保川
联系方式：18011531174



**标的公司**：厦门三五互联信息有限公司
统一社会信用代码：91350200MACKTQ1N08
住所：厦门火炬高新区软件园二期观日路8号401室A01单元
法定代表人：章威炜



**鉴于：**

1、甲方为2004年4月依照中华人民共和国法律设立并有效存续的股份有限公司，持有标的公司100%的股权和部分与标的公司SAAS业务相关的商标所有权；

2、厦门三五互联信息有限公司（以下简称"标的公司"）为2023年6月1日依照中国法律设立并有效存续的有限责任公司，主要从事软件和信息技术服务，认缴注册资本为人民币2000万元，实缴注册资本为人民币2000万元；

3、甲方拟向乙方转让其持有的标的公司的100%的股权（以下简称"标的股权"）和部分商标（以下简称"标的资产"，具体以资产评估报告为准，与"标的股权"合称"标的产权"），乙方为本次产权转让的受让方，其拟受让甲方持有的前述产

1

24122301

权。

根据《中华人民共和国民法典》及其它有关法律法规的规定，双方遵循自愿、公平、诚实信用的原则，经友好协商，就甲方向乙方转让标的产权相关事宜达成一致，签订本产权交易合同（以下简称"**本合同**"）如下：

### 第一条 定义

1.1 除非本合同中另有所指，本合同中的下列用语具有如下含义：

| 标的公司 | 指 | 厦门三五互联信息有限公司 |
|---|---|---|
| 标的产权 | 指 | 转让方拟转让给受让方的其持有的标的公司100%股权和部分商标。 |
| 本次交易 | 指 | 转让方将其持有的标的产权转让给受让方的行为。 |
| 产权转让价款 | 指 | 本合同项下受让方应向转让方支付的全部转让价款。 |
| 合同生效日 | 指 | 双方在本合同正本上由法定代表人或其授权代表签字并加盖公章之日。 |
| 交割日 | 指 | 标的股权的交割日为在行政管理部门完成股权转让变更登记手续之日。 |
| 评估基准日 | 指 | 2024年5月31日。 |
| 工作日 | 指 | 中国境内的银行开展对公业务的任何一日，但不包括法定的节假日。 |

### 第二条 产权转让标的

2.1 甲方将所持有的厦门三五互联信息有限公司100%的股权（对应认缴注册资本为人民币2000万元，实缴注册资本为人民币2000万元）

2.2 和SAAS业务相关的部分商标所有权

2.3 甲方就其持有的标的股权所认缴的出资2000万元人民币已经全额缴清。

### 第三条 资产评估

3.1 根据北方亚事资产评估有限责任公司出具的《资产评估报告书》（编号：北方亚事评报字（2024）第01-748号），截止评估基准日2024年5月31日，标的公司的股权评估价值为 4081 万元人民币（大写：人民币肆仟零捌拾壹万元

2

24122301

整）。根据北方亚事资产评估有限责任公司出具的《资产评估报告书》（编号：北方亚事评报字（2024）第 01-747 号），截止评估基准日 2024 年 5 月 31 日，部分商标的资产评估价值为人民币 30.31 万元人民币（大写：人民币叁拾万叁仟壹佰元整）。

3.2 本次转让的标的资产具体以北方亚事资产评估有限责任公司出具的《资产评估报告》（编号：北方亚事评报字（2024）第 01-747 号）载明的资产清单为准。

3.3 标的公司不存在上述《资产评估报告书》中未予披露或遗漏的、可能影响评估结果或对标的公司及其股权价值产生重大不利影响的事项。

3.4 双方在上述《资产评估报告书》评估结果的基础上达成本合同各项条款。

**第四条 产权转让的前提条件**

4.1 甲方依据有关法律、法规的规定，就本合同项下产权交易已在厦门产权交易中心完成公开挂牌程序。

4.2 甲方依据本合同转让所持有的标的产权事项，已适当履行了内部决策程序。

**第五条 产权转让方式**

5.1 本合同项下产权交易经厦门产权交易中心公开挂牌，由乙方依法受让标的产权。

**第六条 产权转让价款及支付**

6.1 转让价款

根据北方亚事资产评估有限责任公司出具的《资产评估报告书》（编号：北方亚事评报字（2024）第 01-748 号、北方亚事评报字（2024）第 01-747 号）的评估结果和厦门产权交易中心公开挂牌结果，各方确认，甲方将标的股权以人民币（大写） 肆仟柒佰叁拾柒万零陆佰 元整（小写：RMB 4737.06 万元）转让给乙方，甲方将部分商标以人民币（大写）捌拾陆万捌仟叁佰元整（小写：RMB 86.83 万元）转让给乙方。

6.2 转让价款支付方式

乙方原缴厦门产权交易中心的保证金在扣除乙方应缴交易佣金和交易鉴证费后余额作为部分转让价款，其余转让价款乙方须于本协议签订后五个工作日内支

3

付给厦门产权交易中心，厦门产权交易中心在收齐全部转让价款后【五】日内将该转让价款转至甲方指定账户。

**第七条 产权转让的审批及交割**

7.1 在本合同项下产权交易获得厦门产权交易中心出具的产权交易凭证后 15 个工作日内，标的公司应及时召开内部会议作出决议/决定、修改章程、签订相关协议（包括但不限于知识产权转让合同），向登记机关递交办理标的产权变更登记手续之申请，甲乙双方应给予必要的协助和配合。

7.2 由于转让的部分商标办理变更登记需要一定的周期、能否转让受限于行政主管部门判断且转让的部分商标可能存在被撤销、无效的情形，双方亦不因无法完成标的资产变更登记手续或行政主管部门拒绝办理转让向对方追索，无法办理变更手续的商标由各方另行协商处理。本协议生效后，商标办理完毕变更登记前，甲方授权乙方或标的公司无偿使用本协议所涉商标，具体以各方另行签署的许可协议内容为准。

双方同意，本合同生效后、标的资产办理完毕变更登记前，任一标的资产涉及的任何侵权，无论是发生在本合同生效日之前、之时或之后，有权起诉、实施任何程序、进行反对、辩护、上诉、索赔或采取任何行动和获得救济（和保留获得任何损害赔偿）的权利由乙方享有。但甲方有权为甲方自身利益及标的资产持续有效存续之目的，与相关方达成和解、调解。如甲方因乙方或标的公司使用标的资产而涉及任何司法程序、承担任何费用，均由乙方予以全额补偿。

7.3 双方同意，交割日为在行政管理部门完成股权变更登记手续之日（以下统称"**交割日**"）。

7.4 自评估基准日至交割日期间为过渡期，双方不以标的企业过渡期间损益为由对本协议中已达成的交易条件和交易价格进行调整。

**第八条 产权交易涉及的债权、债务及税收和费用**

8.1 双方同意，标的公司原有的债权、债务，在交割日后全部由标的公司享有、承担。对于转让的商标，各方确认不涉及既往商标字号使用等原因导致在转让价款之外仍需由甲方向标的公司支付费用或分配利益的任何情形。

8.2 本合同项下产权交易涉及的有关税收，按照有关法律、法规由双方各自承担缴纳。交割手续费、过渡期间产生的费用、其他的费用（包括但不限于标的产权办理转让登记费用、委托第三方服务机构办理标的产权转让的服务费）由乙

4

24122301

方承担。

8.3 除本合同另有约定外，本合同项下产权交易过程中所产生的费用，依照有关法律、法规由双方各自承担。

8.4 本次产权转让应缴厦门产权交易中心的产权交易佣金由受让方承担；本次产权转让应缴厦门产权交易中心的交易鉴证费由受让方承担。

### 第九条 声明与保证

9.1 甲方特此向乙方作出如下声明与保证：

9.1.1 甲方有权向乙方转让标的股权，包括对标的股权拥有合法、完整的所有权，且所出让的标的股权不附带任何抵押、担保、留置权、担保物权或其他权利负担。

9.1.2 为签订本合同之目的，甲方向厦门产权交易中心提交的各项证明文件及资料均为真实、准确、完整的；

9.1.3 签署本合同或履行其在本合同项下的义务将不会违反有关法律、法规，也不会违反其作为签约一方订立的任何协议的任何规定，或与该等文件或协议之规定相冲突；

9.1.4 签订本合同所需的包括但不限于授权、审批、公司内部决策等在内的一切手续均已合法有效取得，本合同成立和产权交易的前提条件均已满足；

9.2 乙方特此向甲方作出如下声明与保证：

9.2.1 乙方为合法有效设立且有效存续的主体或自然人，具有签署本合同并履行本合同项下责任和义务的合法主体资格；

9.2.2 乙方受让标的产权符合法律、法规的规定；

9.2.3 为签订本合同之目的，乙方向甲方及厦门产权交易中心提交的各项证明文件及资料均为真实、准确、完整的；

9.2.4 签署本合同或履行其在本合同项下的义务将不会违反有关法律、法规，也不会违反其作为签约一方订立的任何协议的任何规定，或与该等文件或协议之规定相冲突；

9.2.5 签订本合同所需的包括但不限于授权、审批、公司内部决策等在内的一切手续均已合法有效取得，本合同成立和产权交易的前提条件均已满足；

9.2.6 乙方用于支付产权转让价款的资金来源合法，参与受让标的产权过程中未从事内幕交易，不存在导致标的资产转让交易或本合同无效、可撤销的情形。

5

24122301

#### 第十条 违约责任

10.1 本合同生效后，任何一方无故提出终止合同，均应按照转让价款的 20%向另一方支付违约金。给另一方造成损失的，还应承担赔偿责任。

10.2 乙方未按本合同约定支付转让价款的，应向甲方支付逾期付款违约金。违约金按照延迟支付期间应付转让价款的每日万分之五计算。逾期付款超过 30 日，甲方有权解除本合同，要求乙方按照转让价款的 20%承担违约责任，并要求乙方赔偿甲方及标的公司因此遭受的损失。

10.3 除本合同另有约定外，本合同签署后，任何一方（违约方）未能按本合同的规定遵守或履行其在本合同项下的全部或部分义务，或做出任何虚假的声明、保证或承诺，则被视为违约，其应向守约方承担违约责任，负责赔偿守约方因此遭受的经济损失。由于一方的过错造成本合同不能履行或不能完全履行时，由有过错的一方承担违约责任。如属双方的过错，则双方承担各自相应的责任。

#### 第十一条 保密

11.1 甲乙双方对本合同的内容及所知悉的相对方的商业秘密均负有保密义务，未经其他方书面同意不得向任何无关第三方泄露。根据法律、法规应向政府主管部门办理有关批准、备案、登记手续或根据深圳证券交易所等机构的规定而履行披露义务、向双方为本次标的产权而聘请的专业顾问、律师、审计师等中介机构进行披露且中介机构承担本合同约定的同等保密义务的除外。

#### 第十二条 不可抗力

12.1 如因自然灾害或国家政策调整有权批准审核机关否决等不可抗拒的原因，致使任何一方不能履行或不能完全履行本合同时，该方应立即将该等情况以书面形式通知其他方，并在该等情况发生之日起7个工作日内提供详情及本合同不能履行或者部分不能履行，或者需要延期履行的理由的说明。按照事故对履行本合同的影响程度，由各方协商决定是否解除本合同，或者部分免除履行本合同的责任，或者延期履行本合同。

12.2 若因国家政策或法律、法规、规范性文件在本合同签订后发生调整而致使直接影响本合同的履行或者是不能按约履行时，合同双方均无过错的，不追究合同双方在此事件发生后未履行约定的违约责任，按其对履行合同影响的程度，由双方协商决定是否解除合同或者延期履行合同。

24122301

#### 第十三条　合同的变更和解除

13.1 双方协商一致时，可以变更或解除本合同。

13.2 发生下列情况之一时，无过错一方有权解除本合同：

（1）由于不可抗力或不可归责于双方的原因致使本合同的目的无法实现的；

（2）一方在本合同约定的期限内，当事人一方明确表示或者以自己的行为表明不履行主要债务；

（3）一方迟延履行主要义务，经催告后仍未履行的；

（4）一方迟延履行义务或有其他违约行为致使本合同的目的无法实现的；

13.3 变更或解除本合同均应采用书面形式。

#### 第十四条　管辖法律及争议解决

14.1 本合同签署、效力、解释和履行，均由中国（为本合同之目的，不包括香港、澳门、台湾地区）法律管辖并依其解释。

14.2 因订立、履行本协议而产生的任何争议或纠纷，均应首先通过友好协商解决；协商不成的，任何一方有权将此争议诉至标的公司所在地有管辖权的人民法院。

14.3 在争议解决期间，除争议事项外，本协议双方仍应继续履行本协议项下的其他条款及相应义务。

#### 第十五条　合同生效及其他

15.1 本合同在双方法定代表人或其授权代表签字并加盖公章后生效。

15.2 双方在本合同列明的地址均为各自的送达地址，适用于本合同签订、履行的全部过程及因本合同产生之争议的仲裁/一审、二审、执行、再审等全部法律程序；任何一方的送达地址发生变化的，均应当在送达地址发生变化之日起2个工作日内书面通知对方。双方在向对方列示的送达地址送达有关文书时，如果发生收件人拒绝签字或其他无法送达情形的，则从发件人寄出文书之日起视为已经送达对方。

15.3 本合同一式【伍】份，双方各执一份，厦门产权交易中心留存一份，其余用于办理本合同项下产权交易的登记使用。每一份合同均具有同等效力。

15.4 任何一方未能行使或延迟行使本合同项下的任何权利或权力不应视作放弃该权利或权力；任何单一或部分行使该权利或权力亦不应妨害其日后进一步行使该权利或权力。

7

24122301

15.5 若本合同内的任何一项或多项规定于任何方面根据所适用的法律而被视为，或被有管辖权的司法机构判定为无效、不合法或不能执行，本合同内的其余约定之有效性、合法性及可执行性将不受任何影响且其效力将不被削弱。

（以下无正文）

8

24122301

（本页为签署页，无正文）

**兹此**，双方或其授权代表已于本页载明的日期签署本协议，以昭信守。

转让方： （盖章）

法定代表人（或授权代表）（签字盖章）

受让方： （盖章）

法定代表人（或授权代表）（签字盖章） 何小汇

标的公司：厦门三五互联信息有限公司（盖章）
法定代表人或授权代表（签字）

签约地点：厦门市思明区
签约时间：2024 年 12 月 23 日

9