1

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
2
Jeffrey M. Rosenfeld (Bar No. 222187)
Liana W. Chen (Bar No. 296965)
3
Leah Rosa Vulić (Bar No. 343520)
548 Market Street, #85399
4
San Francisco, CA 94104
5
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
6
karl@kr.law
jeff@kr.law
7
liana@kr.law
8
leah@kr.law

9
Defendant Leascend Technology Co., Ltd.
f/k/a Xiamen 35.com Technology Co., Ltd.
10
(erroneously sued as Xiamen 35.com Internet Technology Co., Ltd.)

11

12

13

14
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
15
**SAN FRANCISCO DIVISION**

16
**FACEBOOK, INC.**, et al.,                      Case No. 3:19-cv-07071-SI
17
                    Plaintiffs,
18
         v.                                       **DEFENDANT LEASCEND**
                                                  **TECHNOLOGY CO., LTD.'S**
19
                                                  **OPPOSITION TO PLAINTIFFS'**
**ONLINENIC INC.**, et al.,                       **MOTION RE: CONTEMPT REMEDIES**
20
                    Defendants.
21                                                Date:      May 30, 2025
                                                  Time:      10:00 a.m.
22                                                Ctrm:      1 – 17th Floor
                                                  Before:    Hon. Susan Illston
23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2    INTRODUCTION.................................................................................................... 1

3    STATEMENT OF THE ISSUES ............................................................................ 3

4    BACKGROUND .................................................................................................... 3

5        A.    The Parties.................................................................................................. 3

6        B.    Public Sale of 35 Info Pursuant to Meta's Demands. ....................... 4

7        C.    The Asset Freeze Order and Attempts to Comply ............................... 7

8        D.    Summary of Mr. Kronenberger's Statements at Issue......................... 9

9        E.    The Final Judgement and Basis to Stay............................................. 11

10    ARGUMENT........................................................................................................ 12

11        A.    Contempt is not warranted because it is impossible to comply with the

12              Order................................................................................................... 12

13              1.    Contempt remedies are not warranted because compliance is

14                    impossible. ............................................................................... 12

15              2.    The Order is mooted by the final judgment and inability to comply. .......... 13

16        B.    Meta's requested sanctions are unworkable criminal sanctions in disguise.... 14

17              1.    Meta's requests are improper because Leascend cannot "purge"

18                    contempt................................................................................... 15

19              2.    The requested daily fines are punitive and not proportionate. ................... 16

20              3.    The requested deactivation of .com domain names, which were not related

21                    to the claimed misconduct, is not warranted and would be unduly

22                    punitive..................................................................................... 17

23        C.    Meta's request for fees, including against counsel, is unreasonable, especially

24              where there has been no bad faith or willfulness. ........................................... 19

25              1.    Meta's request for fees against Leascend is unwarranted........................ 19

26              2.    Meta's request for fees against counsel is unreasonable where there was

27                    no bad faith or reckless misconduct but transparent advocacy for a

28                    client. ........................................................................................ 20

1

D.   Meta's request to amend the judgment to add 35 Info as a default debtor is
unwarranted and beyond the Court's personal jurisdiction. ...........................22

1.  Meta's requests violate due process...........................................................23

2.  Meta's requests are not warranted considering the factors for successor
liability.......................................................................................................24

CONCLUSION ...........................................................................................................25

KRONENBERGER ROSENFELD

ii

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

<u>**Cases**</u>

4

*Blixeth v. Yellowstone Mountain Club, LLC,*

5

796 F.3d 1004 (9th Cir. 2015) ........................................................................... 22

6

*Caputo v. Tungsten Heavy Powder, Inc.,*

7

96 F.4th 1111 (9th Cir. 2024) ............................................................................ 22

8

*Cisco Sys., Inc. v. Wuhan Wolon Commc'n Tech. Co.,*

9

No. 5:21-CV-04272-EJD, 2021 WL 4962661 (N.D. Cal. July 23, 2021) ...................... 18

10

*Falstaff Brewing Corp. v. Miller Brewing Co.,*

11

702 F.2d 770 (9th Cir. 1983) ......................................................................... 12, 13

12

*Fink v. Gomez,*

13

239 F.3d 989 (9th Cir. 2001) ........................................................................... 20

14

*FTC v. Noland,*

15

No. CV-20-00047-PHX-DWL, 2020 WL 4530459 (D. Ariz. Aug. 6, 2020) .................. 18

16

*Hilao v. Est. of Marcos,*

17

95 F.3d 848 (9th Cir. 1996) ............................................................................. 13

18

*Hook v. Ariz. Dep't of Corr.,*

19

107 F.3d 1397 (9th Cir. 1997) ........................................................................... 17

20

*Hyde & Drath v. Baker,*

21

24 F.3d 1162 (9th Cir. 1994) ....................................................................... 20, 21

22

*In re Girardi,*

23

611 F.3d 1027 (9th Cir. 2010) ...................................................................... 20, 22

24

*In re Icenhower,*

25

755 F.3d 1130 (9th Cir. 2014) ...................................................................... 12, 15

26

*In re Search of Content Stored at Premises Controlled by Google Inc.,*

27

No. 16-mc-80263-RS, 2017 WL 4700056 (N.D. Cal. Oct. 19, 2017) .................... 16, 17

28

//

KRONENBERGER ROSENFELD

*Int'l Union, United Mine Workers of Am. v. Bagwell,*

    512 U.S. 821 (1994) ............................................................................. 15, 16

*j2 Cloud Servs., Inc. v. Fax87,*

    No. 13-05353 DDP (AJWX), 2017 WL 11682159 (C.D. Cal. Apr. 7, 2017) ................. 23

*Katzir's Floor & Home Design, Inc. v. M-MLS.com,*

    394 F.3d 1143 (9th Cir. 2004).................................................................. 23

*Kelly v. Wengler,*

    822 F.3d 1085 (9th Cir. 2016)................................................................. 15

*Off. Depot, Inc. v. Zuccarini,*

    621 F. Supp. 2d 773 (N.D. Cal. 2007) .......................................... 18, 19, 22

*Perry v. O'Donnell,*

    759 F.2d 702 (9th Cir. 1985) ................................................................. 19

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,*

    970 F.2d 552 (9th Cir. 1992) ................................................................. 18

*SEC v. Liu,*

    851 F. App'x 665 (9th Cir. 2021)............................................................. 13

*Shapiro v. Henson,*

    739 F.3d 1198 (9th Cir. 2014)................................................................. 12

*Shell Offshore Inc. v. Greenpeace, Inc.,*

    815 F.3d 623 (9th Cir. 2016) ...................................................... 14, 15, 16

*Shuffler v. Heritage Bank,*

    720 F.2d 1141 (9th Cir. 1983)............................................................ 14, 15

*Strojnik v. Vill. 1107 Coronado, Inc.,*

    No. 19-CV-02210-BAS-MSB, 2021 WL 6064198 (S.D. Cal. Dec. 21, 2021) .............. 13

*Toyo Tire & Rubber Co. v. Hong Kong Tri-Ace Tire Co.,*

    281 F. Supp. 3d 967 (C.D. Cal. 2017) ....................................................... 19

*United States v. Rylander,*

    460 U.S. 752 (1983) ............................................................................. 12

KRONENBERGER ROSENFELD

1  *Whittaker Corp. v. Execuair Corp.*,

2     953 F.2d 510 (9th Cir. 1992) ................................................................................. 13, 16

3  *Williams-Sonoma, Inc. v. Friendfinder, Inc.*,

4     No. C06-6572JSW (MEJ), 2007 WL 4973848 (N.D. Cal. Dec. 6, 2007) ...................... 17

5

6  **Statutes**

7  15 U.S.C. §1125(d) ...................................................................................................... 19

8  28 U.S.C. §1927........................................................................................................... 20

9  Cal. Civ. Code §3439.04 ....................................................................................... 23, 24, 25

10 Cal. Civ. Proc. Code §187 ..................................................................................... 22, 23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD

1   Defendant Leascend Technology Co., Ltd. f/k/a Xiamen 35.com Internet

2   Technology Co., Ltd. ("Defendant" or "Leascend") opposes the motion by Plaintiffs

3   Facebook, Inc. and Instagram, LLC (collectively "Plaintiffs" or "Meta") for contempt and

4   sanctions for claimed non-compliance with the December 20, 2024 Order (the "Order").

## INTRODUCTION

6   This Court should not acquiesce to Meta's gamesmanship in trying to bypass

7   judgment collection procedures and to stifle attorney advocacy. While Meta obtained an

8   asset freeze to facilitate payment of a potential judgment, the asset freeze is no longer

9   workable as it requires transfer of money by a date that has already past, and it is no longer

10  necessary as the final judgment was subsequently entered and is now on appeal. Meta

11  may want to punish Leascend for selling its domain name registration business (less than

12  2% of its total assets) without transferring money to the U.S., but there was no draining of

13  funds; and Meta failed to inform the Court that Meta previously demanded, as a term of

14  potential settlement, that Leascend sell that business by January 2025. Now, Meta is

15  improperly seeking punitive sanctions for Leascend doing exactly what Meta demanded.

16  Specifically, Meta seeks a daily fine and deactivation of domain names (that are

17  unrelated to the Complaint allegations), unless Leascend "purges" its purported contempt

18  of the Court's December 20th Order. However, it is presently impossible to "purge" and

19  comply with the Order, which requires depositing $5.5 million into a U.S. account "**on or**

20  **before January 31, 2025**"; moreover, the Order prohibited the sale of the registrar

21  business until that transfer of money into the escrow account (i.e., by January 31, 2025),

22  which is impossible as the sale had already occurred (although the parties dispute the

23  effective date of the sale). Meta also seeks deactivation of two domain names, but

24  Leascend did not own or use one of them. In sum, Meta is wrongfully seeking to punish

25  Leascend for past actions.

26  Meta also seeks compensation against Leascend and its undersigned counsel, Karl

27  Kronenberger, in the form of attorney's fees related to Meta's motion to freeze assets to

28  cover an eventual judgment. However, the final judgment has since been entered,

1  Leascend has appealed the judgment and the prior contempt orders, and Meta is moving

2  forward with a writ of execution. Therefore, Meta is unfairly attempting to use contempt

3  proceedings to duplicate its recovery of the judgment (including for attorney's fees that

4  were limited in scope in the judgment). Moreover, Meta targets Mr. Kronenberger for

5  certain statements made in connection with the December 20th hearing, for which Mr.

6  Kronenberger had less than 27 hours' notice. At the hearing, Mr. Kronenberger was

7  reasonably advocating for his client with scant information and little pre-hearing

8  communication with the client, following Meta filing an "emergency ex parte application"

9  seeking to freeze Leascend's assets. As Meta concedes, Mr. Kronenberger clarified the

10  hearing statements after having additional time to review documentation unknown to him

11  on December 20. Zealously defending a client on complex issues and appearing for an

12  emergency motion on shortened notice should not subject an attorney to sanctions.

13      Furthermore, Meta requests an order to show cause ("OSC") to amend the judgment

14  to add 35.Com Information Co., Ltd. ("35 Info") as a judgment debtor due to a purported

15  concealed transfer of the domain name business to purchaser Chengdu Yuyuling Internet

16  Technology Co., Ltd. ("Yuyuling") (Mtn at 22.) However, Meta does not argue that

17  Leascend lacks sufficient assets to pay the judgment after the sale, as Leascend actually

18  increased its assets with the sale, and 35 Info only accounted for 1.31% of Leascend's

19  total assets. In addition, Meta glaringly omits in its communications to the Court that it

20  demanded for months that Leascend sell and get out of the domain name registration

21  business (which was a small part of its business assets in China) **by January 1, 2025** (see

22  summary below). Meta cannot now feign surprise at the end of year sale.

23      Yet, Meta does so in an attempt to improperly get the Court to help collect on a debt

24  and recover fees. While the Court may question why Leascend has not paid the judgment,

25  Leascend has been following Chinese laws restricting international transfer of money

26  during the appellate proceedings. To clarify, a Chinese company's respect for competing

27  Chinese legal requirements does not equate to a disregard for U.S. Court authority. In fact,

28  contrary to Meta's assertion that Leascend views itself as beyond the power of this Court,

KRONENBERGER ROSENFELD

1  Leascend accepted service (despite its position that there is no personal jurisdiction in the

2  U.S.) and has actively participated in this litigation. Leascend understands that there was

3  claimed misconduct (including spoliation leading to discovery sanctions) that occurred prior

4  to its appearance in this case, but Leascend disputes alter ego control or involvement for

5  those actions (and is appealing the alter ego decision). Even if this Court disagrees with

6  Leascend's position, there is no bad faith or willfulness that supports the proposed

7  contempt sanctions. Factual disputes (between Meta's claims and public Chinese records,

8  or between the parties' respective arguments) do not equate with bad faith.

9      Meta's motion should be denied. Contempt is improper to punish Leascend in this

10  situation, and compliance would be impossible. Moreover, Meta's requested sanctions—a

11  $1,000 daily fine, domain name deactivation, joint liability for attorney's fees, and additional

12  briefing for an OSC—are unworkable and fail to account for good faith efforts by Leascend

13  and its counsel to comply with the Order and applicable laws in both China and the U.S.

14                    **STATEMENT OF THE ISSUES**

15      Whether the Court should enter sanctions of (a) a daily fine of $1,000, or (b) a

16  request to Verisign to deactivate two domain names—despite having no relationship to the

17  underlying causes of action and Leascend not owning one of them—until Leascend pays

18  the judgment by transferring funds to the U.S. by a past date of January 31, 2025, and to

19  pressure Leascend to pay the judgment, while collection efforts and appeals are pending.

20      Whether the Court should order Leascend and its attorney, Karl Kronenberger, to

21  pay Meta's attorney's fees and costs (and the applicable scope of fees), despite good faith

22  efforts to comply with the Order and counsel's reasonable advocacy based on issues

23  involving complex facts, Chinese laws, and reliance on Chinese counsel.

24      Whether the Court should issue an OSC as to why the Court should not amend the

25  judgment, which is being appealed, to add 35 Info as a judgment debtor.

26                         **BACKGROUND**

27  **A.    The Parties**

28      Facebook (now "Meta") filed this case back in 2019 and obtained an amended

1    default judgment (entered due to discovery sanctions, not any finding on the merits) in
2    February 2025. However, Meta is continuing to litigate these contempt proceedings to try
3    to get this Court to aid Meta in collecting on the judgment against companies in China.

4        For context, Meta is a *trillion-dollar* company with enough funds to sweep aside
5    record-breaking *billions of dollars* in fines and settlements, including those with
6    government agencies across the world.[1] Faced with public outcry over its questionable
7    practices harming consumers, Facebook (and Instagram) changed its name to "Meta."[2]
8    Meta now hypocritically targets Leascend's name change when Leascend (a respected
9    public company in China with various aspects of business) pivoted to solar energy.

10        Notably, Defendant's past domain name business dealt primarily with .cn domain
11    names and customers in China. (Declaration of Yanrong Li ("Li Decl.") ¶2.) While Meta
12    seeks deactivation of the domain name leascend.com, that domain name is not owned or
13    used by Leascend (and it publicly shows a third-party's logo). (Li Decl. ¶7; Meta's Mtn Ex.
14    4.)

15    **B.    Public Sale of 35 Info Pursuant to Meta's Demands**

16        1.    Meta's Demands That Leascend Sell and Exit the Domain Name Business (and
17            Issue a Public Announcement of the Sale) Before January 1, 2025

18        Meta's motion for contempt opens the door for disclosure of certain settlement
19    communications, as Leascend has been complying with Meta's specific demand to sell the
20    business, reiterated many times over months of prior negotiations. As detailed below,
21    Meta's counsel started insisting that Leascend "**exit the domain name registration**
22    **business by January 1, 2025**" back in May 2024; and Leascend's counsel confirmed at
23    the May 2024 hearing that Leascend was exiting the domain name business (and focusing
24    on solar energy). [D.E. 406 at 4:24-5:2.] The parties discussed the impending sale and an

---

[1] *See e.g.,* https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook; https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-14-billion-settlement-meta-over-its-unauthorized-capture; https://www.edpb.europa.eu/news/news/2023/12-billion-euro-fine-facebook-result-edpb-binding-decision_en.

[2] https://www.politico.com/news/2021/10/28/facebook-meta-whistleblower-517449. *C.f.*

**DEFENDANT'S OPP. TO PLAINTIFFS' MTN**
                                                                **RE. CONTEMPT REMEDIES**

1  announcement of the sale multiple times (see below), and Leascend relied on Meta's

2  statements in moving forward with the sale by January 1, 2025.

3          Specifically, on May 15, 2024, Meta's counsel conveyed a settlement offer to

4  counsel for Leascend and OnlineNIC, including the following terms[3] demanding that

5  Leascend "exit the domain name business" by January 1, 2025 (and using wording that

6  Leascend "independently decided" to exit the domain name business apparently due to

7  potential antitrust concerns that Meta is forcing other registrars out of business[4]):

8          d) All **Defendants shall issue a public statement that: (1) they are
           exiting the domain name business** . . .
9          e) The 35.CN Entities represent and warrant that **they have independently
           decided to exit the domain business and shall not own or operate or
10         establish any registrar**, registry, privacy or proxy service provider, or
           reseller ([ ] a "Domain Name Business") **on or after January 1, 2025**:
11                 (1) Failure to timely cease owning or operating all Domain Name
                   Businesses . . . will trigger the Liquidated Damages . . .
12
       (Kronenberger Decl. ¶2 & Ex. A (emphasis added).)
13
               On May 29, 2024, Meta's counsel (David Steele) emailed Leascend's counsel with
14
   updated settlement terms but confirming that Leascend must still get out of the business:
15
16         o   Onlin[e]NIC's statement and IDShield's statement shall further include
               the language regarding that they are voluntarily getting out of the
17             domain name business (as proposed in the Term Sheet);
           o   Leascend's statement need not include the language that it is getting
18             out of the business (note: **it must still get out of the business** . . .
               (Kronenberger Decl. ¶3 & Ex. B (emphasis added).)
19
               On July 25, 2024, Leascend's counsel provided Meta's counsel with updates on the
20
   process of selling the domain name business and reporting to regulatory authorities; after
21
   discussing terms for the sale notice (requested by Meta), Leascend's counsel provided the
22
   draft Sale Announcement on July 29, 2024. (Kronenberger Decl. ¶4 & Ex. C.)
23
               On August 6, 2024, Meta's counsel (David Steele) emailed counsel, stating: "I don't
24

25 _____
26 [3] Settlement emails (which copied other counsel) are redacted for the exhibits, aside from
   the issues responding to Meta's motion, but can be provided in full to the Court.
27 [4] *C.f.* https://domainnamewire.com/2021/11/08/facebook-registered-more-meta-domains-
   than-i-thought/; https://www.reuters.com/sustainability/boards-policy-regulation/facebook-
28 owner-meta-faces-existential-threat-trial-over-instagram-whatsapp-2025-04-14/.        [*See
   also* D.E. 238-1 (attaching evidence of AppDetex's vexatious reporting).]

**DEFENDANT'S OPP. TO PLAINTIFFS' MTN
RE. CONTEMPT REMEDIES**

believe there was confusion here. **The subsidiary is going to be sold**"; Meta's counsel also elaborated that the prior version of the terms was that the Leascend (fka 35.CN) entities "independently decided to exit the domain business and shall not own or operate or establish any registrar, registry, privacy or proxy service provider . . . **on or after January 1, 2025**." (Kronenberger Decl. ¶5 & Ex. C (emphasis added).)

On October 23, 2024, Leascend's counsel emailed Meta's counsel, attaching the announcement of the future sale of the subsidiary, and stating: "Currently, the subsidiary is 'for sale.'" Meta's counsel (Howard Kroll) responded stating: "Thanks Karl for your email. I am in the process of melding the suggested revisions to our term sheet with your latest revisions to the term sheet." (Kronenberger Decl. ¶6 & Ex. D.)

On December 4, 2024, Meta's counsel (Howard Kroll) emailed Leascend's counsel clean versions of the terms sheet "ready to be executed," which included terms that Leascend issue a public statement that "Leascend, **and its subsidiary after the sale**, will treat Meta as a Trusted Notifier . . ." (Kronenberger Decl. ¶7 & Ex. E.)

Despite these negotiations, and seeing an opportunity to bypass judgment collection procedures and to request recovery of additional fees, on December 18, 2024, Meta filed an ex parte application to try to halt the subsidiary sale until Leascend transferred money for the judgment. However, in reliance on Meta's demands for Leascend to exit the business, the sale was already in process (and, according to Chinese bidding rules [the Xiamen Property Rights Exchange Network Auction Rules] later obtained by counsel, the sale was already completed). (Li Decl. ¶4 & D.E. 432-1.)

2. <u>35 Info's Public Sale of the Domain Name Business in December 2024</u>

As outlined to Meta, the domain name business (which was held by the subsidiary 35 Info and which accounted for less than 2% of Leascend's assets) was sold to a third party, Yuyuling, on December 5, 2024. (Li Decl. ¶¶3, 4.) This was a lengthy process that was chronicled in Chinese public records. Meta does not dispute that there was a public sale but disagrees on the effective date. Further, Chinese laws and the bidding rules, as well as transferring money from China to satisfy a U.S. judgment on appeal, are complex

1  issues,[5] for which Leascend has separate Chinese counsel. (Li Decl. ¶5.)

2      As a preliminary matter, Meta implies that Leascend transferred its domain name

3  registration business to the subsidiary 35 Info in June 2024, one month after the Court

4  granted the motion for default judgment. (Mtn at 4:17-22.) However, Meta points to a public

5  announcement that described past actions; in actuality, the domain name registration

6  business, including certain domain-related staff, was transferred into a subsidiary 35 Info

7  back in 2023 (i.e., prior to the 2024 ruling and simply because the company adjusted its

8  business strategy to separate the domain name-related business and pivot towards solar

9  energy, and not due to any draining of Leascend's assets). (Li Decl. ¶3.)

10     Then, after months of open dialogue with Meta about the impending sale, the 35

11 Info domain name-related business was sold to a third party, Yuyuling, as of December 5,

12 2024. (Li Decl. ¶4 & D.E. 432-1.) Now, Meta relies on a "certificate"—which Meta

13 subpoenaed directly from ICANN[6] and only later provided to Leascend in April 2025—to

14 argue that the purchase was completed "as of" February 20, 2025; however, Meta's

15 assertion, and the translation, is misleading as the certificate only demonstrates that the

16 sale was completed as of (i.e., before) February 20 (not exactly on February 20). (*See*

17 Meta's Guye Decl. Ex. 1; Li Decl. ¶6.)[7] Further, contrary to Meta's assertions about

18 commonalities between the seller and purchaser, there is no "alter ego" relationship

19 (Leascend even certified the transaction was with a non-related party). (*See* Li Decl. ¶4.)

20 **C.    The Asset Freeze Order and Attempts to Comply**

21     On December 18, 2024 after 6:00 p.m. (i.e., on the eve of the holidays when

22 Leascend's counsel was traveling), Meta filed an "emergency" ex parte application for a

23 temporary restraining order to freeze Leascend's assets, desiring to freeze funds to satisfy

24 a judgment, and citing Rules 64 and 65. [D.E. 408.] The next day, December 19, 2024, the

---

[5]  *See e.g.,* https://www.dlapiper.com/en/insights/publications/2024/02/enforcing-us-monetary-judgments-in-china-rules-and-cases (noting that "the Chinese law only treat the non-appealable judgment as 'enforceable' under the [*Civil Procedure Law* in China].").
[6] This is the Internet Corporation for Assigned Names and Numbers ("ICANN").
[7] Even Meta's Exhibit 12 (p.5-6) lists the investor (shareholder) change date as in December 2024. (Li Decl. ¶6.)

clerk's notice set the deadline for Leascend's opposition brief for 6:00 p.m. that day (i.e., early morning in China, with counsel having to work on the opposition brief without having meaningful time to discuss with representatives in China) and set the hearing. [D.E. 411-412.] On the same day, Meta also lodged an Amended Proposed Default Judgment.[8]

At 12:00 p.m. the next day, the Court held the December 20, 2024 hearing on the motion (this was a hearing on shortened time, and <u>not</u> an evidentiary hearing with witness testimony). [*See* D.E. 412.] At the hearing, Leascend's counsel Karl Kronenberger explained that Leascend has cash and significant accounts payable as evidenced by its balance sheet, that there were multiple settlement agreement drafts for months that required Defendants to get out of the domain name business by January 1, 2025 (i.e., Meta was now complaining that Leascend was doing exactly what Meta had demanded that Leascend do), and that counsel had limited opportunity to discuss with the client representative in China, summarizing at the hearing:

> "**I'm somewhat hesitant because I just don't know**. **And this happened so quickly, we had very little time to talk to the client's representative**, which is an attorney who speaks English who has been our main contact; and so I'm fearful that **I'm not being able to factor in enough information** about the position of the client to really give you a good answer." [Dec. 20 Hr'g Tr. at 7:16-8:25; 12:20-14:14 (emphasis added).]

Later on December 20, 2024, the Court issued its Order (over Leascend's counsel's email confirming there were "serious concerns about the ability to comply"), stating:

1. **35.CN shall deposit, <u>on or before January 31, 2025</u>, $5.5 million** (USD) into an escrow account in the United States held by an escrow agent to be security to satisfy any judgment issued by the Court.
2. 35.CN shall provide Plaintiffs proof of the deposit into escrow . . .
3. **35.CN shall not sell or transfer the registrar business or accreditation** . . . **until 35.CN has deposited the $5.5 million into an escrow account pursuant to paragraph 1** . . . [D.E. 420 ¶¶1-3 (emphasis added).]

As previously outlined, Leascend attempted to comply with the Order. [*See* D.E. 432 & 432-1.] For example, on January 10, 2025, Leascend submitted an application for outward remittance to transfer $5.5 million overseas to a U.S. account, but the application

---

[8] In its amended default judgment, Meta "mistakenly" included relief provisions that were contrary to the law and this Court's prior ruling; perplexed, Leascend's counsel was forced to review those mistaken issues, with limited time, until Meta filed an errata.

**DEFENDANT'S OPP. TO PLAINTIFFS' MTN RE. CONTEMPT REMEDIES**

1  was denied under China's foreign exchange control policies. [*See* D.E. 432-1 Ex. A.]

2  After the 2024 holidays, it was determined that the sale was actually effective with

3  a binding contract under Chinese law at the time the Xiamen Property Rights Exchange

4  Center gave notice of the winning bidder in the auction, styled as the "Confirmation Notice

5  of Transaction" on December 5, 2024, i.e., prior to the Court's Order, although ministerial

6  acknowledgements had not taken place. [*See* D.E. 432-1 at ¶5 & Ex. B.]

7  On March 14, 2025, the Court held another hearing where Leascend's counsel Karl

8  Kronenberger explained how the attorney role was to provide Court Orders to his client as

9  quickly as possible and tell them to comply, not to get around it (but counsel cannot force

10  a client to take certain actions); Mr. Kronenberger also confirmed Leascend's attorneys

11  had limited time to prepare for the December 20th hearing and on that day did not know

12  about the terms of the auction (i.e., that the sale was effective December 5th, confirmed by

13  board resolution at a later date) until he returned from a Christmas trip after the hearing.

14  (*See* Kronenberger Decl. ¶14.) [*See also* Mar. 14 Hr'g Tr. at 4:15-6:25.]

15  On April 4, 2025, the Court held another hearing, and Mr. Kronenberger again

16  explained how the auction documents outlined how the business was sold on December

17  5th but that he did not have the auction documents before the December 20th hearing; he

18  also discussed how Leascend faced difficulty transferring money out of China as

19  international transfers are highly regulated for a public company (e.g., there are limits on

20  transferring the funds where the judgment is being appealed). [Apr. 4 Hr'g Tr. at 6:3-7:23.]

21  On April 17, 2025, Meta's counsel emailed counsel for ICANN, asking for ICANN's

22  prior response to Meta's subpoena to be forwarded to Leascend's counsel; Leascend's

23  counsel followed up the next day, and Meta's counsel ultimately emailed ICANN's

24  responses a few days later. (Kronenberger Decl. ¶21 & Ex. F.) Those responses included

25  the 35 Info "certificate" misleadingly used by Meta to argue the sale occurred in February

26  2025 (when the translation only confirms that the transaction was *before* that date).

27  **D.    Summary of Mr. Kronenberger's Statements at Issue**

28  Meta takes issue with various counsel statements, which are summarized below:

- <u>Statements in December 2024 Omitting Reference to the Auction Terms</u>: Mr. Kronenberger had only 24 hours to prepare an opposition on December 19; he was able to talk to Chinese outside counsel for Leascend on the evening on December 19, at which time he confirmed that Leascend's board of directors was meeting on December 23, 2024 to confirm the sale, but outside counsel did not yet inform Mr. Kronenberger that the terms of the auction state that the best offer to buy above the reserve price creates an enforceable contract. Thus, when Mr. Kronenberger addressed the Court on December 20, 2024, he reasonably assumed the transaction would be enforceable only after the meeting of the board of directors. Notably, in subsequent briefing and hearing statements before the Court, Mr. Kronenberger explained to the Court that he had the facts wrong on December 20.

- <u>Communicating with the Client in English</u>. Mr. Kronenberger commented about the client not speaking English. There have been language/translation and time-of-day barriers; and legal discussions have required separate outside counsel in China.

- <u>No U.S. Assets</u>. In Court, Mr. Kronenberger stated that Leascend has no U.S. assets, and he believed that to be true when he made the comment. While Meta makes the argument that a corporate domain name owned by Leascend is a U.S. asset, this argument is a questionable one, as the core of such an asset would be a Chinese trademark, and notably Leascend does not own or use the domain name leascend.com (but does rely on leasdgrp.com). Regardless of how the Court would rule on this issue, the statement should not be construed as a misrepresentation, and it is consistent with Leascend's arguments in its personal jurisdiction motion.

- <u>ICANN Certificate</u>. While Meta argues that Mr. Kronenberger made statements inconsistent with an ICANN certificate, he did not. Notably, this certificate was not created by Mr. Kronenberger or Leascend. Further, Meta has misinterpreted and/or mistranslated the certificate to argue that the sale was finalized on February 20, 2025 when the certificate merely states that the sales was finalized prior to February 20, 2025. Thus, statements to the Court were consistent with this certificate.

- <u>Funds Wired from Hong Kong</u>. Mr. Kronenberger tried to assist with a settlement where settlement funds would be wired from an account in Hong Kong owned by a financing partner of Leascend. Mr. Kronenberger informed Meta's counsel multiple times about this potential alternative to Leascend wiring funds directly from China. However, efforts to facilitate payments from Hong Kong failed. While Mr. Kronenberger did comment on the proposal for funds to be wired from Hong Kong to the Court, Leascend did not do so. These statements were not misstatements. (Kronenberger Decl. ¶¶20-22; Li Decl. ¶¶6, 8.)

**E.    The Final Judgment and Basis to Stay**

Meta has not proven liability on the merits. Instead, Meta obtained discovery sanctions against OnlineNIC and ID Shield (for claimed document spoliation prior to Leascend and its counsel entering this case), and then Meta claimed that Leascend was an alter ego subject to the terminating default sanctions against other Defendants.

On February 14, 2025, the Court entered the Amended Default Judgment. [D.E. 431.] In particular, the judgment contained provisions for providing an accounting of assets (which Leascend has done[9] [D.E. 436]), and a requirement that Leascend shall not sell any assets, including the registrar business "currently held by 35.com Info" until the judgment is satisfied. [D.E. 431 ¶¶92-94.] However, by the time of the judgment, Leascend and 35 Info did not own the registrar business, as outlined above. Leascend has filed an appeal of the final judgment and relevant contained orders. [*See* D.E. 439.] On May 2, 2025, Leascend appealed the April 4, 2025 post judgment contempt order. [*See* D.E. 468.]

As outlined below, Meta should not be allowed to collect on its judgment through contempt procedures, especially as the final judgment has now been entered (after the December 20th Order to freeze assets) and is being appealed. In lieu of continuing these post-judgment contempt proceedings, Leascend requests a stay of contempt proceedings pending the appeal, given Leascend will be irreparably injured absent a stay (i.e., if

---

[9] As Meta is aware, Leascend, as a public company in China, is required to make certain financial information public (but the original filings are in Chinese).

1  contempt sanctions are imposed, especially a daily fine), a stay will not substantially injure

2  the other parties (Meta will be in the same position), and Leascend has a strong showing.

3  **ARGUMENT**

4      Meta's motion should be denied because the requested sanctions are unworkable

5  criminal sanctions in disguise (given that it is impossible to purge contempt), there was no

6  recklessness or bad faith to support recovery of attorney's fees (defense counsel's

7  advocacy for a client on complex issues, based on known information, should not be

8  sanctioned), and there is no basis to amend the judgment (which is on appeal) to add a

9  judgment debtor (especially when Meta does not claim that Leascend has insufficient

10  assets to cover the judgment). Continuing these contempt proceedings, after the Court has

11  since issued the final judgment, is not efficient for the Court or the parties.

12      Therefore, Meta's motion for contempt sanctions should be denied in full.

13  **A.    Contempt is not warranted because it is impossible to comply with the Order.**

14      It is impossible to comply with the Order given that Leascend cannot transfer money

15  by the past date of January 31, 2025 or undo the sale. Further, contempt for a pre-judgment

16  asset freeze is not reasonable where the final judgment has now been entered.

17      1.  <u>Contempt remedies are not warranted because compliance is impossible.</u>

18      A party's inability to comply with a judicial order constitutes a defense to a charge

19  of civil contempt. *See United States v. Rylander,* 460 U.S. 752, 757 (1983); *see also*

20  *Shapiro v. Henson*, 739 F.3d 1198, 1202 (9th Cir. 2014) (noting a party cannot be held in

21  contempt for failing to do the impossible, such as turning over property it no longer

22  possesses). *C.f. In re Icenhower*, 755 F.3d 1130, 1140 (9th Cir. 2014) (finding party needed

23  to show that, despite all reasonable steps to comply, compliance was impossible).

24      For example, in *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 780–81

25  (9th Cir. 1983), the court found contempt improper where compliance (to find missing

26  documents) was "impossible" and "futile"; and the requested remedy could therefore not

27  possibly serve as an incentive to obey. *See id.* at 780-81 ("Conditioning an order of

28  contempt on the performance of an impossible act, for the purpose of punishing a

KRONENBERGER ROSENFELD

1  contemnor for its incapacity to perform the act, does not square with the Supreme Court's

2  admonishment . . . [and] The power to impose coercive sanctions to compel obedience to

3  an order in a civil contempt is limited by the individual's ability to comply with the court's

4  order."). Even "reprehensible" conduct does not support a contempt order that creates a

5  duty "impossible of performance, so that punishment can follow." *See id.* (citing cases).

6      Here, Leascend made reasonable and good-faith efforts to comply with the

7  December 20th Order—which required transferring $5.5 million to a U.S. escrow account

8  by January 31, 2025—including by submitting an application for outward remittance. [*See*

9  D.E. 432-1 at ¶¶2-3.] The inability to comply is not due to any fault of Leascend, which

10  maintains its bank account funds in China, i.e., the country where it is organized and

11  conducted business. Additionally, compliance is impossible because Leascend cannot

12  transfer money by the past date of January 31, 2025. Thus, contempt is not workable.

13      2.  The Order is mooted by the final judgment and inability to comply.

14      Courts may entertain asset freezes as a potential remedy *pending* final judgment.

15  *See SEC v. Liu* , 851 F. App'x 665, 669 (9th Cir. 2021). Recognizing this interim relief,

16  Meta's initial "emergency" motion to freeze Leascend's assets in December 2024 relied on

17  Rule 64, which governs seizing property to secure satisfaction of a *potential judgment* and

18  Rule 65, which covers preliminary injunctions i.e., prior to a final judgment. [D.E. 408.]

19  However, the Court issued a final judgment two months after the Order. [D.E. 431.]

20      "Contempt [ ] is not appropriate to collect on a money judgment." *Strojnik v. Vill.*

21  *1107 Coronado, Inc.*, No. 19-CV-02210-BAS-MSB, 2021 WL 6064198, at *6, *9 (S.D. Cal.

22  Dec. 21, 2021) ("In sum, it was plainly incorrect to use contempt to enforce the Fee Award

23  and Final Judgment."); *see also Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 516 (9th

24  Cir. 1992) (noting "money judgments may not be enforced by the imposition of contempt

25  sanctions"). *C.f. Hilao v. Est. of Marcos*, 95 F.3d 848, 854 (9th Cir. 1996) (finding federal

26  courts may not enforce a money judgment by contempt or methods other than a writ of

27  execution except in cases where established principles so warrant).

28      In particular, a coercive civil contempt order is mooted when the proceeding out of

1    which it arises terminate. *See Shell Offshore Inc. v. Greenpeace, Inc.,* 815 F.3d 623, 630-

2    31 (9th Cir. 2016); *Shuffler v. Heritage Bank,* 720 F.2d 1141, 1148 (9th Cir. 1983) ("When

3    the sole coercive purpose of the civil contempt order was satisfied . . . the necessity for

4    any coercive sanction ended, and the sanction should have terminated."). Thus, where a

5    pre-judgment injunction has expired, there is no longer anything left for the district court to

6    coerce; and a fee-schedule monetary sanction would only serve to punish a defendant for

7    past conduct. *See Shell Offshore Inc.,* 815 F.3d at 631 (vacating contempt proceedings).

8         Here, Meta's motion is attempting to bypass collection procedures to get a quicker

9    remedy and to get additional attorney's fees (after its initial request for full fees was

10   narrowed). Meta argues that Leascend should be found in contempt for failing to comply

11   with the December 20th Order to essentially pay Meta's judgment (in the form of transferring

12   funds for the judgment to a U.S. bank account). However, this argument is flawed. Now

13   that the Court entered the default judgement, Meta should not be allowed to also obtain

14   pre-judgement remedies to freeze or deposit money; there is no reason to force Leascend

15   to do so except to allow Meta to bypass judgment collection procedures. Contempt

16   sanctions at this point would be unnecessarily punitive and set dangerous precedent; if

17   Meta can obtain daily fines and deactivation of domain names until Leascend pays the

18   judgment, every plaintiff with a judgment would seek the same. Therefore, Meta should not

19   be able to obtain contempt remedies, which solely relate to paying the judgment.

20        In sum, no sanctions are warranted because the Order relates to payment of a

21   judgment, and Meta can now use its writ of execution to collect on the actual judgment;

22   Meta should not be able to use the Court's contempt power to bypass judgment collection.

23   While Meta may argue that the final judgment (which has been appealed) also contained

24   injunctive relief terms for an asset freeze, those terms were solely designed to facilitate

25   payment of the judgment, are impossible to follow (as the January payment deadline has

26   passed and the subsidiary was already sold), and should not support sanctions.

27   **B.    Meta's requested sanctions are unworkable criminal sanctions in disguise.**

28        While Meta requests "civil" sanctions with an opportunity to "purge" contempt, the

1  ability to "purge" is impossible, and the relief would be improper criminal sanctions. Further,

2  a daily fine and deactivation of Leascend's corporate .com domain names (leascend.com

3  and leasdgrp.com), 14 days after an order, would be unworkable and unduly punitive.

4  Thus, Meta's motion, including for "coercive" sanctions, should be denied.

5      1.  <u>Meta's requests are improper because Leascend cannot "purge" contempt.</u>

6      Sanctions for civil contempt can be imposed for one or both of two distinct purposes:

7  (1) to compel or coerce obedience to a court order; and (2) to compensate the contemnor's

8  adversary for injuries resulting from the contemnor's noncompliance. *Shuffler v. Heritage*

9  *Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983); *see also Shell Offshore Inc. v. Greenpeace,*

10 *Inc.,* 815 F.3d 623, 629 (9th Cir. 2016) (summarizing standard). Before compulsory

11 sanctions may be imposed, a contemnor must have an "opportunity to reduce or avoid the

12 fine through compliance." *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S.

13 821, 829 (1994); *see also In re Icenhower*, 755 F.3d at 1141 (outlining a contemnor must

14 be given notice that it will face compulsory sanctions if it fails to take a particular action).

15     A criminal sanction, by contrast, generally seeks to punish a completed act of

16 disobedience. *See Kelly v. Wengler,* 822 F.3d 1085, 1097 (9th Cir. 2016). Meta does not

17 request criminal sanctions; otherwise, additional due process and procedural safeguards

18 would be required. *See e.g., Int'l Union, United Mine Workers of Am.*, 512 U.S. at 833, 838

19 (noting criminal contempt sanctions are entitled to full criminal process; finding criminal jury

20 trial and disinterested factfinding and evenhanded adjudication were necessary where total

21 fines were serious); *see also Kelly*, 822 F.3d at 1097 (noting criminal contempt requires

22 procedural safeguards in criminal cases, including proof beyond a reasonable doubt); *Shell*

23 *Offshore Inc.*, 815 F.3d at 631 ("[C]riminal penalties may not be imposed on someone who

24 has not been afforded the protections that the Constitution requires of such criminal

25 proceedings . . . in cases where the underlying proceeding has been rendered moot, the

26 coercive contempt proceeding must be vacated in order to avoid a due-process violation.")

27     Meta asserts that it is seeking civil contempt sanctions with the ability for Leascend

28 to purge. (*See* Mtn at 1.) However, Leascend cannot simply "purge" contempt by complying

KRONENBERGER ROSENFELD

15

1  with the December 20th Order. [*See* D.E. 420.] The Order requires a deposit of $5.5 million

2  into a U.S. escrow account "on or before January 31, 2025" and prohibits a sale or transfer

3  of the registrar business "until [Leascend] has deposited the $5.5 million." [D.E. 420 ¶¶1,

4  3.] Leascend cannot transfer money by a past date. Moreover, although the parties dispute

5  the effective date of the sale of the domain name registration business, the parties agree

6  that there has been a sale (and Leascend asserts the sale was effective prior to the

7  December 20 Order, as determined under the auction rules). (*See* Mtn at 2.) Therefore,

8  Leascend cannot "not sell or transfer" the business as the sale has already been

9  completed. In other words, Meta's requests (for a daily fine and deactivation of domain

10  names) are actually requests for criminal penalties to punish alleged past misconduct,

11  which is improper (as there have been no criminal procedural safeguards, such as an

12  evidentiary hearing and due process). For these reasons, Meta's motion should be denied.

13       2.  <u>The requested daily fines are punitive and not proportionate.</u>

14      "[T]he Supreme Court has recognized that per diem fines like this one are generally

15  coercive," requiring the ability to purge the contempt. *Shell Offshore Inc.,* 815 F.3d at 630;

16  *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833 (1994)

17  (noting procedural protections are afforded for contempts occurring out of court).

18  Additionally, courts should consider "the character and magnitude of the harm threatened

19  by continued contumacy, and the probable effectiveness of any suggested sanction," as

20  well as resources and consequent seriousness of the burden imposed by the sanction.

21  *See In re Search of Content Stored at Premises Controlled by Google Inc.*, No. 16-mc-

22  80263-RS, 2017 WL 4700056, at *2 (N.D. Cal. Oct. 19, 2017). In fact, Meta's brief (Mtn at

23  11) concedes that: "Generally, the minimum sanction necessary to obtain compliance is to

24  be imposed." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992).

25      Meta seeks to cure deficiencies by requesting that daily fines be issued 14 days

26  after an order; however, Leascend cannot "comply" with the Order, for reasons including

27  the fact that the date for transferring the $5.5 million has passed. Furthermore, allowing 14

28  additional days does not remedy the complex issues of international money transfer and

KRONENBERGER ROSENFELD

1    Chinese regulations, where the total fines will be severe and excessive given that there is

2    no end date for the sanctions (as Leascend cannot unsell the subsidiary).

3    Meta's citations in support of daily fines are inapposite. First, Meta cites to *In re*

4    *Search of Content Stored at Premises Controlled by Google Inc.*, No. 16-mc-80263-RS,

5    2017 WL 4700056, at *3 (N.D. Cal. Oct. 19, 2017) for the proposition of ordering a $10,000

6    per day fine. However, in that case, Google requested the fine (which was minimal for

7    Google) against itself so that it could appeal an order relating to withholding stored content

8    that was requested by a subpoena. Further, Meta cites to *Hook v. Ariz. Dep't of Corr.*, 107

9    F.3d 1397, 1400, 1404 (9th Cir. 1997), but that case did not deal with any asset freeze or

10   transfer of money to pay the ultimate judgment, which is what Meta seeks to do here. There

11   is insufficient support for daily fines in this case, and the relief would be unduly punitive.

12   For these reasons, the request for daily contempt fines should be denied.

13   3.  <u>The requested deactivation of .com domain names, which were not related to</u>

14   <u>the claimed misconduct, is not warranted and would be unduly punitive.</u>

15   Meta asks the Court to order Verisign to deactivate U.S.-based domain names of

16   Leascend until Leascend complies with the Order, i.e., until it transfers money to the U.S.

17   to pay Meta's judgment. This is another misguided attempt to bypass judgment collection

18   procedures, especially where the domain names do not relate to the issues, and regarding

19   leascend.com, Leascend does not even own or use that domain name, the legal and

20   factual issues are complex, and Meta's authorities do not support its requested remedies.

21   For example, to argue that courts can prohibit the sale or transfer of a domain name

22   to ensure assets are available to satisfy a judgment, Meta cites to *Williams-Sonoma, Inc.*

23   *v. Friendfinder, Inc.*, No. C06-6572JSW (MEJ), 2007 WL 4973848, at *10 (N.D. Cal. Dec.

24   6, 2007), *report and recommendation adopted as modified sub nom. Williams-Sonoma,*

25   *Inc. v. Online Mktg. Servs., Ltd.*, No. C 06-06572 JSW, 2008 WL 596251 (N.D. Cal. Mar.

26   4, 2008). However, that case found that "courts may prohibit the transfer of a trademark

27   defendant's ***relevant*** assets, such as domain names" when considering that "***Defendants***

28   ***used the domain names to accomplish their infringement***." *Id.* (emphasis added). By

KRONENBERGER ROSENFELD

1    contrast, in this case, Leascend did not use any .com or U.S. domain names to accomplish

2    infringement; rather, the alleged infringing domain names were used by third-party

3    customers of OnlineNIC, who was in turn the alleged alter ego of Leascend. Also, the two

4    domain names identified by Meta have no relationship to the claims at issue. In other

5    words, Meta is not seeking transfer of an infringing domain name, which might be turned

6    over in a judgment, but rather to deactivate unrelated domain names, which is unworkable.

7         Meta also cites to *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th

8    Cir. 1992), which dealt with a prejudgment asset freeze and equitable power to issue

9    provisional remedies ancillary to authority to provide final equitable relief, in connection

10   with an accounting for recovering defendants' wrongful profits, which is an equitable

11   remedy that is not synonymous with an award of monetary damages. *See id.* at 559. Here,

12   the request to continue to freeze Leascend's assets is not ancillary relief to provide for final

13   equitable relief, but merely an attempt to collect on statutory damages.

14        Further, Meta's citation to *Cisco Sys., Inc. v. Wuhan Wolon Commc'n Tech. Co.*,

15   No. 5:21-CV-04272-EJD, 2021 WL 4962661, at *11 (N.D. Cal. July 23, 2021) is inapposite.

16   That case, and the collection of other orders, relates to infringing websites. Here,

17   Leascend's websites did not infringe on Meta's trademarks; rather, Meta alleged that

18   OnlineNIC's customers/licensees infringed on Meta's marks, with OnlineNIC as the

19   registrar. (SAC ¶¶28, 88.) This is a key difference that supports denying Meta's request.

20        This case is also distinguishable from asset freeze cases where the defendant does

21   not have sufficient funds to pay a judgment, but potentially has assets related to the

22   wrongdoing. *See e.g., FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 4530459, at

23   *2, 5 (D. Ariz. Aug. 6, 2020) (noting the party had less than $8,000 in its bank accounts,

24   potential assets of around $621,000, and faced equitable relief of around $8 million). Here,

25   there is no dispute that Leascend has liquid and non-liquid assets and that it is a functioning

26   public company in China with business unrelated to Meta's claims. [*See* D.E. 436.]

27        Finally, Meta cites to *Off. Depot, Inc. v. Zuccarini*, 621 F. Supp. 2d 773, 777 (N.D.

28   Cal. 2007), *aff'd*, 596 F.3d 696 (9th Cir. 2010), in its briefing, but that case involved generic

KRONENBERGER ROSENFELD

1    domain names subject to levy under a writ of execution, which were held by the defendant

2    due to his ability to monetize so-called "type-in" traffic (*see Off. Depot, Inc.*, 621 F. Supp.

3    2d 773 at fn. 7), in contrast to the corporate domain names identified by Meta that contain

4    a Chinese trademark, where one domain name (leascend.com) is not even owned or used

5    by Leascend. Presently, Meta has not sought to levy on these corporate domain names,

6    but if they would, the Court would need to analyze the unique issue of a plaintiff seizing a

7    trademark and goodwill as a way to satisfy a judgment. More importantly, the plaintiff in

8    the *Zuccarini* case was able to bring the case in this District because of the location of

9    Verisign's prior California office. *See e.g., id.* at 777; *see also* 15 U.S.C. §1125(d).

10    However, Verisign has since moved headquarters to Virginia.[10] As such, this Court in

11    California is not the proper forum for the relief involving Verisign in Virginia. *C.f., Zuccarini*,

12    621 F. Supp. 2d at 777. Although Meta may desire to punish Leascend for failing to deposit

13    money, Meta cannot shortcut its way to unworkable contempt sanctions.

14    **C.    Meta's request for fees, including against counsel, is unreasonable,**

15    **especially where there has been no bad faith or willfulness.**

16    1.  Meta's request for fees against Leascend is unwarranted.

17    While district courts have discretion to award attorney's fees and costs, the amounts

18    must be reasonable. *Toyo Tire & Rubber Co. v. Hong Kong Tri-Ace Tire Co.*, 281 F. Supp.

19    3d 967, 993 (C.D. Cal. 2017) (noting attorney's fees in a civil contempt proceeding are

20    limited to those reasonably and necessarily incurred in the attempt to enforce compliance).

21    Meta cites to *Perry v. O'Donnell*, 759 F.2d 702 (9th Cir. 1985) (Mtn at 16) for the

22    proposition that disobedience need not be "willful"; however, that case recognized that

23    even though there was not an express finding of willful contempt, there was sufficient

24    misconduct including non-compliance after a bench warrant for arrest. *See id.* at 706. This

25    case, by contrast, has involved key compliance efforts and complex international laws.

26    Here, Leascend's disputes that any award of fees or costs is warranted as its

27

28    [10] https://www.verisign.com/en_US/company-information/contact-us/index.xhtml; *see also* Meta's Mtn at n. 1, confirming Verisign is Virginia-based.

KRONENBERGER ROSENFELD

1   conduct arose from legitimate disputes over the Order and cross-border banking

2   complexities. Moreover, Meta requests an overbroad scope of fees and costs incurred by

3   the "harm" supposedly caused by "Leascend's contemptuous conduct," including costs for

4   bringing the temporary restraining order, motion for contempt, and motion for sanctions.

5   (Mtn at 16:11-13 & n. 14.) However, fees and costs for the initial application and motion

6   were not incurred in the attempt to enforce compliance, and they should not be

7   recoverable. Further, Meta's fees and costs (which would extend proceedings for a

8   subsequent motion) were not reasonable where they knew that compliance was not

9   possible. Thus, the request for fees should be denied, and especially for the full scope

10  requested (and including the request against Leascend's counsel, as outlined below).

11      2.   Meta's request for fees against counsel is unreasonable where there was no bad

12           faith or reckless misconduct but transparent advocacy for a client.

13      Meta seeks to extend a fees sanction (quote) "against Leascend's attorney, Mr.

14  Kronenberger, because he has recklessly misrepresented the facts and law to this Court

15  in furtherance of Leascend's contemptuous conduct in bad faith." (Meta's Mtn at 17:4-6.)

16  Meta cites authorities pointing to a (a) court's inherent power to impose sanctions for bad

17  faith, including willful improper conduct and recklessness coupled with an improper

18  purpose, and (b) 28 U.S.C. §1927 to sanction any attorney "who so multiplies the

19  proceedings in any case unreasonably and vexatiously." (Meta's Mtn at 17:6-26.)

20      Sanctions under the court's inherent power are consistently focused on bad faith.

21  *See Fink v. Gomez*, 239 F.3d 989, 992–93 (9th Cir. 2001) (noting cases where sanctions

22  were reversed e.g., where there was chronic tardiness, negligent failure to comply with

23  local court rules, and lack of acting in bad faith or intent to mislead the court). Further,

24  sanctions under §1927 require that counsel's conduct must multiply the proceedings in

25  both an unreasonable and vexatious manner; carelessly, negligently, or unreasonably

26  multiplying proceedings is not enough. See *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir.

27  2010). Meta cites to *Hyde & Drath v. Baker*, 24 F.3d 1162 (9th Cir. 1994) (Mtn at 16:15-

28  18) for the proposition that sanctions can be levied against a litigant and its counsel jointly

KRONENBERGER ROSENFELD

1    and severally, but that case dealt with Rule 37 discovery sanctions. *See id.* at 1170.

2        In this case, Mr. Kronenberger did not act with any bad faith; he has been defending

3    a client on complex issues, relying in part on Leascend's separate outside Chinese legal

4    counsel, and cautiously addressed issues at the "emergency" December 20th hearing and

5    then clarified statements at subsequent hearings. (Kronenberger Decl. ¶¶9-15.) Such a

6    response to an emergency application is not willful or reckless with an improper purpose,

7    nor did it multiply the proceedings unreasonably and vexatiously. Meta's arguments would

8    disproportionately extend sanctions for zealous legal defense and would deter attorneys

9    from correcting good faith mistaken statements (as Mr. Kronenberger did). Moreover,

10   taking inconsistent positions in litigation (as Meta has done[11]) is not equal to bad faith.

11       Importantly, Meta does not point to any attorney testimony under oath at an

12   evidentiary hearing or debtor's examination but rather nitpicks at statements in an

13   emergency opposition brief and hearing (statements Leascend's counsel made with limited

14   time to discuss issues with the client in China). Still, some clarifications may be helpful.

15   First, Meta argues there was an inaccurate statement about a client speaking English, but

16   the crux is there have been both language/translation and time-of-day barriers in

17   representing Leascend. (Kronenberger Decl. ¶16.) Furthermore, as previously conveyed,

18   legal discussions have required outside counsel for Leascend as he can effectively

19   translate nuances of *legal* jargon (which is distinct from translating ordinary business

20   matters) between English and Chinese. (Kronenberger Decl. ¶17; Li Decl. ¶8.)

21       Additionally, while Meta argues that Leascend has .com domain names

22   (leascend.com and leasdgrp.com) that are U.S.-based assets, one domain name

23   (leascend.com) is not owned or used by Leascend, and both domain names comprise

24   Chinese-based assets due to the domain names containing a Chinese trademark, in

25

26   _____

     [11] For instance, Meta has asserted that OnlineNIC's underlying customers infringed on
27   Meta's marks and that OnlineNIC, the registrar, was liable due to a contract that somehow
     must exist, despite being informed the contract did not exist; Meta also claimed it provided
28   requisite notice to the registrar when certain notices were found missing (and were not
     provided prior to the Complaint). [*See e.g.,* SAC ¶97; D.E. 238; D.E. 365.]

**DEFENDANT'S OPP. TO PLAINTIFFS' MTN
                                                          RE. CONTEMPT REMEDIES**

1    contrast to the domain names at issue in the *Zuccarini* case. Specifically, *Zuccarini,* 621 F.

2    Supp. 2d at 775 (cited by Meta) involved enforcement of a judgment against, namely,

3    generic domain names that did not contain trademarks. Here, the domain names contain

4    a Chinese trademark, and there is no connection between these domain names and the

5    infringement claims, i.e., Leascend did not use any .com domain name to cybersquat on

6    Meta's marks. Furthermore, counsel's statements were supported by the fact that

7    Leascend is a public company in China with primary assets in China. [*See e.g.,* D.E. 174-

8    1 ¶4 (prior declaration outlining lack of contacts in the U.S., including lack of assets,

9    accounts, offices, employees, owners, directors, agents, or business).]

10    Meta's case examples are distinguishable. For example, Meta cites to *In re Girardi*,

11    611 F.3d at 1061, which involved years of frivolous litigation based on known falsities

12    (whereas here Mr. Kronenberger's statements were required to defend a client on

13    shortened notice).[12] Meta also relies upon *Blixeth v. Yellowstone Mountain Club, LLC*, 796

14    F.3d 1004, 1008 (9th Cir. 2015), which dealt with "forged" evidence to accuse a bankruptcy

15    judge of misconduct and then *failure to retract* the statements. Further, Meta uses *Caputo*

16    *v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1155 (9th Cir. 2024), which involved

17    sanctions after a three-day evidentiary hearing, for frivolous reckless misconduct (in

18    misrepresenting that evidence was newly discovered) and subjective bad faith.

19    Here, Mr. Kronenberger has at all times respected this Court's authority, including

20    by clarifying statements made at a prior hearing; he has advocated for his client while

21    encouraging compliance with U.S. laws. (Kronenberger Decl. ¶14.) Mr. Kronenberger's

22    statements are summarized above and do not warrant sanctions. (Kronenberger Decl. ¶¶9-

23    23.) Thus, Meta's requests for sanctions against counsel should be denied in whole.

24    **D.    Meta's request to amend the judgment to add 35 Info as a default debtor is**

25    **unwarranted and beyond the Court's personal jurisdiction.**

26    Pursuant to California Code of Civil Procedure §187, used in federal court pursuant

27    _____

28    [12] *Compare* Meta's allegations in this case, which largely rely on the false premise that an underlying agreement with customers created secondary liability for Defendants, when Meta has been repeatedly informed that such an agreement does not exist.

**DEFENDANT'S OPP. TO PLAINTIFFS' MTN RE. CONTEMPT REMEDIES**

*(left margin: KRONENBERGER ROSENFELD)*

1   to Rule 69(a), courts have the authority to amend a judgment to add additional judgment

2   debtors if certain factors are met. *See Katzir's Floor & Home Design, Inc. v. M-MLS.com*,

3   394 F.3d 1143, 1148 (9th Cir. 2004). Specifically, Meta asserts that a court may amend a

4   judgment to add a successor corporation of the original judgment debtor where different

5   factors are satisfied and considering nonexclusive factors for "badges of fraud" if probative

6   of actual intent to hinder, delay, or defraud creditors. *See id.* at 1150; *see also* Cal. Civ.

7   Code §3439.04. However, the factors are not satisfied in this case.

8        1.  Meta's requests violate due process.

9        A §187 amendment requires (1) that the new party be the alter ego of the old party

10  *and* (2) that the new party had controlled the litigation, thereby having had the opportunity

11  to litigate, to satisfy due process concerns. *See Katzir's Floor & Home Design, Inc.*, 394

12  F.3d at 1148-49 (noting alter ego is a limited doctrine, invoked only where recognition of

13  the corporate form would work an *injustice* to a third person). These requirements stem

14  from due process rights as due process "guarantees that any person against whom a claim

15  is asserted . . . shall have the opportunity to be heard and to present his defenses." *Id.*

16       As an initial matter, there is no personal jurisdiction over 35 Info, a Chinese

17  company, or any valid evidence to support jurisdiction based on an alter ego analysis.

18  There has been no notice to 35 Info or consideration of international comity. Meta tries to

19  explain personal jurisdiction in a footnote, citing *j2 Cloud Servs., Inc. v. Fax87*, No. 13-

20  05353 DDP (AJWX), 2017 WL 11682159 (C.D. Cal. Apr. 7, 2017). (Mtn at 20 n. 15.)

21  However, that case recognized limits on personal jurisdiction, requiring (1) a court to make

22  a finding that one entity is actually an alter ego or successor of the entity that was served

23  with process, and (2) the alleged alter ego must have had actual notice of the action such

24  that it had the opportunity to intervene and contest the allegations of the complaint,

25  including any allegations about alleged alter ego or successor status. *See id.* at *5. Here,

26  Meta is attempting to bypass those safeguards by requesting that Leascend serve a copy

27  of an OSC and file a proof of service. (Mtn at 25:7-9.) That process is inadequate, and

28  Meta should not be allowed to bypass requirements for jurisdiction and due process.

KRONENBERGER ROSENFELD

2.   <u>Meta's requests are not warranted considering the factors for successor liability.</u>

Meta outlines four factors for assumption of successor liability and various other factors for consideration of "badges of fraud." Review of these items demonstrates that an OSC for amending the judgment (which is on appeal) is not necessary or practicable.

The initial four factors (*see* Mtn at 21:2-6) weigh in favor of Leascend. First, there is no indication that the successor agreed to assume the subject liabilities. Second, there is no indication of any merger or agreement to assume liabilities; by contrast, the companies had a valid business transfer that was documented in Chinese public records. (*See* Li Decl. ¶4.) Third, transfer of the assets was not for the fraudulent purpose of escaping liability for the predecessor's debts but for routine business purposes, with the transaction discussed with Meta over a period of many months. In fact, Meta demanded for months that Leascend get out of the domain name registration business (Kronenberger Decl. ¶5), which Leascend could only do by transferring the related domain name registration business and employees. Fourth, the transfer was not for the fraudulent purpose of escaping liability for debts, but rather, was indicative of compliance with Meta's demands (and routine business plans) to get out of the domain name registration business. Notably, Meta does not argue that Leascend lacks assets to pay the judgment (which is on appeal).

Furthermore, Meta's arguments relating to "badges of fraud" for successor liability are not convincing. First, contrary to Meta's argument that the transfer or obligation was concealed, the transaction was public (pursuant to Chinese regulatory requirements), and Meta accessed information about the sale itself from records on the internet. Second, while Meta attacks the timing of the sale, Meta was informed about the anticipated sale for months, and the sale was a crucial component to the parties' discussions. (*See* Kronenberger Decl. ¶¶2-7.) Third, Meta argues that Leascend transferred substantially all of its U.S.-based assets to 35 Info. This is misleading, as Leascend disputes having significant U.S. assets in the first instance, and its domain registration business was primarily for .CN Chinese domain names. (Li Decl. ¶3.) Moreover, this business was not substantially all of the debtor's assets under §3439.04, and in fact the domain name

1   business only accounted for approximately 1.31% of Leascend's total assets. (Li Decl. ¶3.)

2   Importantly, Leascend had, and still has, significant assets that do not include its prior

3   domain name registration business. [*See* D.E. 415-1; 436.] Finally, the assets were

4   transferred to 35 Info back in 2023 i.e., before a debt was incurred by the judgment in 2025.

5       Other §3439.04 factors are also not satisfied. For example, when Leascend sold its

6   subsidiary, 35 Info, Leascend received consideration that was reasonably equivalent to the

7   value of the asset transfer; thus, there is no dissipation of assets through the sale. (*See* Li

8   Decl. ¶5.) Leascend did not become insolvent due to the sale. (*See* Li Decl. ¶5.) Leascend

9   did not retain any portion of the subject domain name business or otherwise conceal any

10  assets in the process. (*See* Li Decl. ¶5.) Further, the buyer, Yuyuling (an independent third

11  party and not an "insider"), did not agree to assume 35 Info's liabilities relating to this

12  matter, and the sale was not a merger or agreement that Yuyuling or 35 Info would assume

13  these liabilities. (*See* Li Decl. ¶5.) There was no concealment of assets (to the contrary,

14  the sale was filed publicly in China). (*See* Li Decl. ¶4.) Unlike other successor liability

15  cases, here, the primary judgment debtor (Leascend) is still in a similar position with assets

16  to cover a judgment. [*See* D.E. 415-1; 436.] Even though Meta may complain that

17  Leascend's assets are primarily in China, Meta should not be allowed to obtain fees for

18  filing motions to assist it in collecting on an international judgment.

19      Therefore, Meta has not met its burden to show actual intent to hinder, delay, or

20  defraud creditors; and the Court should not issue an OSC for briefing the issue of amending

21  the judgment to add 35 Info as a judgment debtor. Nor should the Court require

22  undersigned counsel to immediately serve a copy of any order, as counsel does not

23  represent 35 Info, and Meta is merely trying to bypass service of process requirements on

24  another Chinese company. Finally, if the Court does issue a briefing schedule, Leascend

25  requests extending the dates (which were suggested by Meta to the Court without

26  consultation of counsel) by 21 days due to unavailability of counsel in weeks in July.

27                          **CONCLUSION**

28      Leascend requests that the Court deny the motion and stay contempt proceedings.

1    Respectfully Submitted,

2    Dated: May 9, 2025                  **KRONENBERGER ROSENFELD, LLP**

3                                        By:    s/ Karl S. Kronenberger
                                               Karl S. Kronenberger
4

5                                        Attorneys for Defendant Leascend Technology
                                        Co., Ltd. f/k/a Xiamen 35.com Technology Co.,
6                                        Ltd.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28